Nos. 23-1286, 23-1335

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

CHAYA WERFEL, et al.,
Plaintiffs/Appellants
v.
THE PALESTINE LIBERATION ORGANIZATION, et al.,
Defendants/Appellees
---------------------
UNITED STATES OF AMERICA,
Intervenor.

---

CHAYA WERFEL, et al.,
Plaintiffs,
v.
THE PALESTINE LIBERATION ORGANIZATION, et al.,
Defendants/Appellees
---------------------
UNITED STATES OF AMERICA,
Intervenor/Appellant.

---

On Appeal from the United States District Court
For the District of Colorado
The Honorable Gordon P. Gallagher
D.C No. 21-cv-03043-GPG-STV

---

**CONSOLIDATED JOINT APPENDIX**
**Volume I of IV**

---

Daniel K. Calisher
Michael A. Rollin
Chip G. Schoneberger
FOSTER GRAHAM MILSTEIN
& CALISHER LLP
360 S. Garfield Street, 6th Floor
Denver, CO 80209
Telephone: (303) 333-9810
Emails: calisher@fostergraham.com
mrollin@fostergraham.com
cschoneberger@fostergraham.com

Asher Perlin
4600 Sheridan Street, Suite 303
Hollywood, Florida 33021
Telephone: (786) 687-0404
Email: asher@asherperlin.com

# TABLE OF CONTENTS

## Volume I

| ECF No. | Document Title | Date Filed | Page No. |
|---|---|---|---|
| | Civil Docket for Case No. 1:21-cv-03043-GPG-STV | | 0001 |
| 50 | First Amended Complaint and Jury Demand | 5/17/22 | 0022 |
| 58 | Defendants' Motion to Dismiss First Amended Complaint Under Rule 12(b)(2) and Rule 12 (b)(6) | 6/27/22 | 0077 |
| 69 | Plaintiffs' Opposiiton to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12 (b)(6) | 9/19/22 | 0134 |
| 69-1 | Declaration of Asher Perlin in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12 (b)(6) | 9/19/22 | 0190 |
| 69-2 | Exhibit A to Declaration of Asher Perlin | 9/19/22 | 0193 |
| 69-3 | Exhibit B to Declaration of Asher Perlin | 9/19/22 | 0209 |

## Volume II

| ECF No. | Document Title | Date Filed | Page No. |
|---|---|---|---|
| 69-4 | Exhibit C to Declaration of Asher Perlin | 9/19/22 | 0277 |
| 69-5 | Exhibit D to Declaration of Asher Perlin | 9/19/22 | 0314 |
| 69-6 | Exhibit E to Declaration of Asher Perlin | 9/19/22 | 0373 |
| 69-7 | Exhibit F to Declaration of Asher Perlin | 9/19/22 | 0398 |
| 69-8 | Exhibit G to Declaration of Asher Perlin | 9/19/22 | 0401 |
| 69-9 | Exhibit H to Declaration of Asher Perlin | 9/19/22 | 0423 |
| 69-10 | Exhibit I to Declaration of Asher Perlin | 9/19/22 | 0467 |

**Volume III**

| ECF No. | Document Title | Date Filed | Page No. |
|---|---|---|---|
| 69-11 | Exhibit J to Declaration of Asher Perlin | 9/19/22 | 0554 |
| 69-12 | Exhibit K to Declaration of Asher Perlin | 9/19/22 | 0592 |

**Volume IV**

| ECF No. | Document Title | Date Filed | Page No. |
|---|---|---|---|
| 69-13 | Declaration of Dr. Boaz Shnoor | 9/19/22 | 0832 |
| 71 | Table of Authorities Supplement to Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12 (b)(6) | 9/20/22 | 0855 |
| 73 | Intervenor United States of America's Brief in Support of the Constitutionality of the Promoting Security and Justice for Victims of Terrorism Act of 2019 | 9/26/22 | 0868 |
| 76 | Defendants' Reply in Support of Their Motion to Dismiss Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12 (b)(6) | 11/14/22 | 0895 |
| 106 | Plaintiffs' Supplemental Briefing Concerning *Mallory v. Norfolk* | 7/24/23 | 0943 |
| 107 | Intervenor United States of America's Supplemental Brief | 7/24/23 | 0949 |
| 110 | Defendants' Supplemental Brief Concerning *Mallory* | 8/3/23 | 0955 |
| 111 | Order | 8/23/23 | 0964 |
| 112 | Final Judgment | 8/23/23 | 0980 |
| 113 | Notice of Appeal (Plaintiffs) | 9/13/23 | 0982 |
| 122 | Notice of Appeal (Intervenor United States of America) | 10/20/23 | 1003 |

Appellate Case: 23-1335    Document: 010110991828    Date Filed: 01/29/2024    Page: 4

ALLMTN,APPEAL,JD1,TERMED

## U.S. District Court - District of Colorado
## District of Colorado (Denver)
## CIVIL DOCKET FOR CASE #: 1:21-cv-03043-GPG-STV

Levine et al v. Palestine Liberation Organization, The, et al      Date Filed: 11/11/2021

Assigned to: District Judge Gordon P Gallagher             Date Terminated: 08/23/2023

Referred to: Magistrate Judge Scott T. Varholak             Jury Demand: Plaintiff

Case in other court: USCA, 23-01286                 Nature of Suit: 890 Other Statutory Actions

              USCA, 23-01335                   Jurisdiction: Federal Question

Cause: 18:2331 - Anti-Terrorism Act (Definitions)

| Date Filed | # | Docket Text |
|---|---|---|
| 11/11/2021 | 1 | COMPLAINT *AND JURY DEMAND* against All Defendants (Filing fee $ 402,Receipt Number ACODC-8172345)Attorney Daniel Kennedy Calisher added to party A.D.G.(pty:pla), Attorney Daniel Kennedy Calisher added to party A.T.(pty:pla), Attorney Daniel Kennedy Calisher added to party B.G.(pty:pla), Attorney Daniel Kennedy Calisher added to party B.Y.G.(pty:pla), Attorney Daniel Kennedy Calisher added to party C.T.(pty:pla), Attorney Daniel Kennedy Calisher added to party Nechama Charlap(pty:pla), Attorney Daniel Kennedy Calisher added to party E.C.(pty:pla), Attorney Daniel Kennedy Calisher added to party E.G.(pty:pla), Attorney Daniel Kennedy Calisher added to party E.T.(1)(pty:pla), Attorney Daniel Kennedy Calisher added to party E.T.(2)(pty:pla), Attorney Daniel Kennedy Calisher added to party E.Y.S.(pty:pla), Attorney Daniel Kennedy Calisher added to party Estate of Rabbi Abraham Samuel (Avraham) Goldberg(pty:pla), Attorney Daniel Kennedy Calisher added to party Estate of Rabbi Aryeh Kupinsky(pty:pla), Attorney Daniel Kennedy Calisher added to party Estate of Rabbi Kalman (Cary) Levine(pty:pla), Attorney Daniel Kennedy Calisher added to party Estate of Rabbi Moshe Twersky(pty:pla), Attorney Daniel Kennedy Calisher added to party Estate of Zidan Saif(pty:pla), Attorney Daniel Kennedy Calisher added to party Adrian Goldberg(pty:pla), Attorney Daniel Kennedy Calisher added to party Briana Hazel Goldberg(pty:pla), Attorney Daniel Kennedy Calisher added to party Elisheva Goldberg(pty:pla), Attorney Daniel Kennedy Calisher added to party Libby Goldberg(pty:pla), Attorney Daniel Kennedy Calisher added to party Malka Goldstein(pty:pla), Attorney Daniel Kennedy Calisher added to party Miriam Goldstein(pty:pla), Attorney Daniel Kennedy Calisher added to party Mordechai Goldstein(pty:pla), Attorney Daniel Kennedy Calisher added to party Moshe Gedaliah Goldstein(pty:pla), Attorney Daniel Kennedy Calisher added to party Sarah Rivka Goldstein(pty:pla), Attorney Daniel Kennedy Calisher added to party Saul Goldstein(pty:pla), Attorney Daniel Kennedy Calisher added to party H.Y.A.(pty:pla), Attorney Daniel Kennedy Calisher added to party Deborah (Goldberg) Hammond(pty:pla), Attorney Daniel Kennedy Calisher added to party Norman Heching(pty:pla), Attorney Daniel Kennedy Calisher added to party I.C.(pty:pla), Attorney Daniel Kennedy Calisher added to party I.T.(pty:pla), Attorney Daniel Kennedy Calisher added to party I.W.(pty:pla), Attorney Daniel Kennedy Calisher added to party Devorah Kupinsky(pty:pla), Attorney Daniel Kennedy Calisher added to party Eliyahu Kupinsky(pty:pla), Attorney Daniel Kennedy Calisher added to party Yakova Kupinsky(pty:pla), Attorney Daniel Kennedy Calisher added to party Yitzchak Kupinsky(pty:pla), Attorney Daniel Kennedy Calisher added to party L.S.(pty:pla), Attorney Daniel Kennedy Calisher added to party L.Y.P.(pty:pla), Attorney Daniel Kennedy Calisher added to party Aharon Levine(pty:pla), Attorney Daniel Kennedy Calisher added to party Avraham Levine(pty:pla), Attorney Daniel Kennedy Calisher added to party Chana Levine(pty:pla), Attorney Daniel Kennedy Calisher added to party Haya Levine(pty:pla), Attorney Daniel Kennedy Calisher added to party Michal Levine(pty:pla), Attorney Daniel Kennedy Calisher added to party Moshe Levine(pty:pla), Attorney Daniel Kennedy Calisher added to party Shelley Levine(pty:pla), Attorney Daniel Kennedy Calisher added to party Stefanie Levine(pty:pla), Attorney Daniel Kennedy Calisher |

added to party Yerachmiel Levine(pty:pla), Attorney Daniel Kennedy Calisher added to party Yitzchok Meir Levine(pty:pla), Attorney Daniel Kennedy Calisher added to party M.K.(pty:pla), Attorney Daniel Kennedy Calisher added to party M.T.(pty:pla), Attorney Daniel Kennedy Calisher added to party N.B.P.(pty:pla), Attorney Daniel Kennedy Calisher added to party N.G. (pty:pla), Attorney Daniel Kennedy Calisher added to party Avraham Nefoussi(pty:pla), Attorney Daniel Kennedy Calisher added to party Bassheva Miriam Pelcovics(pty:pla), Attorney Daniel Kennedy Calisher added to party Akiva Pollack(pty:pla), Attorney Daniel Kennedy Calisher added to party R.T.(1)(pty:pla), Attorney Daniel Kennedy Calisher added to party R.T.(2) (pty:pla), Attorney Daniel Kennedy Calisher added to party S.T.(pty:pla), Attorney Daniel Kennedy Calisher added to party Julia Saif(pty:pla), Attorney Daniel Kennedy Calisher added to party Nuhad Saif(pty:pla), Attorney Daniel Kennedy Calisher added to party Rinal Saif(pty:pla), Attorney Daniel Kennedy Calisher added to party Dana-Lee Salis(pty:pla), Attorney Daniel Kennedy Calisher added to party David Samuel Salis(pty:pla), Attorney Daniel Kennedy Calisher added to party Rivka (Goldberg) Sireling(pty:pla), Attorney Daniel Kennedy Calisher added to party Hadassa (Goldberg) Treuhaft(pty:pla), Attorney Daniel Kennedy Calisher added to party Avraham Twersky(pty:pla), Attorney Daniel Kennedy Calisher added to party Bashy Miriam Twersky(pty:pla), Attorney Daniel Kennedy Calisher added to party Meshulem Twersky(pty:pla), Attorney Daniel Kennedy Calisher added to party Refael Twersky(pty:pla), Attorney Daniel Kennedy Calisher added to party Rivka Walder(pty:pla), Attorney Daniel Kennedy Calisher added to party Joseph Werfel(pty:pla), Attorney Daniel Kennedy Calisher added to party Y.A.W.(pty:pla), Attorney Daniel Kennedy Calisher added to party Y.C.P.(pty:pla), Attorney Daniel Kennedy Calisher added to party Y.K.(pty:pla), Attorney Daniel Kennedy Calisher added to party Y.M.P.(pty:pla), Attorney Daniel Kennedy Calisher added to party Y.T. (pty:pla), Attorney Daniel Kennedy Calisher added to party Y.W.(pty:pla), Attorney Daniel Kennedy Calisher added to party Y.Y.L(pty:pla), filed by N.G., A.D.G., Avraham Nefoussi, I.C., Briana Hazel Goldberg, Y.Y.L, Saul Goldstein, Avraham Levine, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Yerachmiel Levine, Bashy Miriam Twersky, A.T., Miriam Goldstein, Libby Goldberg, R.T.(2), Y.W., Joseph Werfel, Bassheva Miriam Pelcovics, E.G., Malka Goldstein, L.Y.P., Elisheva Goldberg, E.T.(1), Adrian Goldberg, Avraham Twersky, Mordechai Goldstein, M.T., Yitzchak Kupinsky, E.C., Y.M.P., Rivka Walder, M.K., Yitzchok Meir Levine, S.T., I.W., I.T., Meshulem Twersky, Rinal Saif, Deborah (Goldberg) Hammond, Hadassa (Goldberg) Treuhaft, Norman Heching, Nechama Charlap, Refael Twersky, Estate of Zidan Saif, Julia Saif, L.S., Moshe Levine, Stefanie Levine, Shelley Levine, B.Y.G., Akiva Pollack, Sarah Rivka Goldstein, Devorah Kupinsky, Rivka (Goldberg) Sireling, Y.C.P., Y.A.W., Nuhad Saif, Y.T., E.Y.S., Estate of Rabbi Moshe Twersky, Y.K., David Samuel Salis, R.T.(1), N.B.P., Dana-Lee Salis, Chana Levine, Moshe Gedaliah Goldstein, Haya Levine, H.Y.A., E.T.(2), C.T., Estate of Rabbi Aryeh Kupinsky, Michal Levine, Estate of Rabbi Kalman (Cary) Levine, B.G., Yakova Kupinsky, Eliyahu Kupinsky, Aharon Levine. (Attachments: # 1 Civil Cover Sheet) (Calisher, Daniel) (Entered: 11/11/2021)

| 11/11/2021 | 2 | SUMMONS REQUEST as to The Palestine Liberation Organization by Plaintiffs A.D.G., A.T., B.G., B.Y.G., C.T., Nechama Charlap, E.C., E.G., E.T.(1), E.T.(2), E.Y.S., Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, H.Y.A., Deborah (Goldberg) Hammond, Norman Heching, I.C., I.T., I.W., Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, L.S., L.Y.P., Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, M.K., M.T., N.B.P., N.G., Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, R.T.(1), R.T.(2), S.T., Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Joseph Werfel, Y.A.W., Y.C.P., Y.K., Y.M.P., Y.T., Y.W., Y.Y.L. (Calisher, Daniel) (Entered: 11/11/2021) |
| 11/11/2021 | 3 | SUMMONS REQUEST as to The Palestinian Authority by Plaintiffs A.D.G., A.T., B.G., B.Y.G., C.T., Nechama Charlap, E.C., E.G., E.T.(1), E.T.(2), E.Y.S., Estate of Rabbi Abraham Samuel |

(Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, H.Y.A., Deborah (Goldberg) Hammond, Norman Heching, I.C., I.T., I.W., Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, L.S., L.Y.P., Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, M.K., M.T., N.B.P., N.G., Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, R.T.(1), R.T.(2), S.T., Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Joseph Werfel, Y.A.W., Y.C.P., Y.K., Y.M.P., Y.T., Y.W., Y.Y.L. (Calisher, Daniel) (Entered: 11/11/2021)

| 11/11/2021 | 6 | Case assigned to Judge Raymond P. Moore and drawn to Magistrate Judge Scott T. Varholak. Text Only Entry (norlin, ) (Entered: 11/12/2021) |
| 11/11/2021 | 7 | Magistrate Judge consent form issued pursuant to 28 U.S.C. 636(c). Summons submitted has incomplete caption and not issued. Please file completed summons for issuance using the event Summons Request. (norlin, ) (Entered: 11/12/2021) |
| 11/12/2021 | 4 | NOTICE of Entry of Appearance by Asher Perlin on behalf of All Plaintiffs Attorney Asher Perlin added to party A.D.G.(pty:pla), Attorney Asher Perlin added to party A.T.(pty:pla), Attorney Asher Perlin added to party B.G.(pty:pla), Attorney Asher Perlin added to party B.Y.G. (pty:pla), Attorney Asher Perlin added to party C.T.(pty:pla), Attorney Asher Perlin added to party Nechama Charlap(pty:pla), Attorney Asher Perlin added to party E.C.(pty:pla), Attorney Asher Perlin added to party E.G.(pty:pla), Attorney Asher Perlin added to party E.T.(1)(pty:pla), Attorney Asher Perlin added to party E.T.(2)(pty:pla), Attorney Asher Perlin added to party E.Y.S.(pty:pla), Attorney Asher Perlin added to party Estate of Rabbi Abraham Samuel (Avraham) Goldberg(pty:pla), Attorney Asher Perlin added to party Estate of Rabbi Aryeh Kupinsky(pty:pla), Attorney Asher Perlin added to party Estate of Rabbi Kalman (Cary) Levine(pty:pla), Attorney Asher Perlin added to party Estate of Rabbi Moshe Twersky(pty:pla), Attorney Asher Perlin added to party Estate of Zidan Saif(pty:pla), Attorney Asher Perlin added to party Adrian Goldberg(pty:pla), Attorney Asher Perlin added to party Briana Hazel Goldberg(pty:pla), Attorney Asher Perlin added to party Elisheva Goldberg(pty:pla), Attorney Asher Perlin added to party Libby Goldberg(pty:pla), Attorney Asher Perlin added to party Malka Goldstein(pty:pla), Attorney Asher Perlin added to party Miriam Goldstein(pty:pla), Attorney Asher Perlin added to party Mordechai Goldstein(pty:pla), Attorney Asher Perlin added to party Moshe Gedaliah Goldstein(pty:pla), Attorney Asher Perlin added to party Sarah Rivka Goldstein(pty:pla), Attorney Asher Perlin added to party Saul Goldstein(pty:pla), Attorney Asher Perlin added to party H.Y.A.(pty:pla), Attorney Asher Perlin added to party Deborah (Goldberg) Hammond(pty:pla), Attorney Asher Perlin added to party Norman Heching(pty:pla), Attorney Asher Perlin added to party I.C.(pty:pla), Attorney Asher Perlin added to party I.T.(pty:pla), Attorney Asher Perlin added to party I.W.(pty:pla), Attorney Asher Perlin added to party Devorah Kupinsky(pty:pla), Attorney Asher Perlin added to party Eliyahu Kupinsky(pty:pla), Attorney Asher Perlin added to party Yakova Kupinsky(pty:pla), Attorney Asher Perlin added to party Yitzchak Kupinsky(pty:pla), Attorney Asher Perlin added to party L.S.(pty:pla), Attorney Asher Perlin added to party L.Y.P.(pty:pla), Attorney Asher Perlin added to party Aharon Levine(pty:pla), Attorney Asher Perlin added to party Avraham Levine(pty:pla), Attorney Asher Perlin added to party Chana Levine(pty:pla), Attorney Asher Perlin added to party Haya Levine(pty:pla), Attorney Asher Perlin added to party Michal Levine(pty:pla), Attorney Asher Perlin added to party Moshe Levine(pty:pla), Attorney Asher Perlin added to party Shelley Levine(pty:pla), Attorney Asher Perlin added to party Stefanie Levine(pty:pla), Attorney Asher Perlin added to party Yerachmiel Levine(pty:pla), Attorney Asher Perlin added to party Yitzchok Meir Levine(pty:pla), Attorney Asher Perlin added to party M.K.(pty:pla), Attorney Asher Perlin added to party M.T.(pty:pla), Attorney Asher Perlin added to party N.B.P.(pty:pla), Attorney Asher Perlin added to party N.G.(pty:pla), Attorney Asher Perlin added to party Avraham Nefoussi(pty:pla), Attorney Asher Perlin added to party Bassheva Miriam Pelcovics(pty:pla), Attorney Asher Perlin added to party Akiva Pollack(pty:pla), Attorney Asher Perlin added to |

party R.T.(1)(pty:pla), Attorney Asher Perlin added to party R.T.(2)(pty:pla), Attorney Asher Perlin added to party S.T.(pty:pla), Attorney Asher Perlin added to party Julia Saif(pty:pla), Attorney Asher Perlin added to party Nuhad Saif(pty:pla), Attorney Asher Perlin added to party Rinal Saif(pty:pla), Attorney Asher Perlin added to party Dana-Lee Salis(pty:pla), Attorney Asher Perlin added to party David Samuel Salis(pty:pla), Attorney Asher Perlin added to party Rivka (Goldberg) Sireling(pty:pla), Attorney Asher Perlin added to party Hadassa (Goldberg) Treuhaft(pty:pla), Attorney Asher Perlin added to party Avraham Twersky(pty:pla), Attorney Asher Perlin added to party Bashy Miriam Twersky(pty:pla), Attorney Asher Perlin added to party Meshulem Twersky(pty:pla), Attorney Asher Perlin added to party Refael Twersky(pty:pla), Attorney Asher Perlin added to party Rivka Walder(pty:pla), Attorney Asher Perlin added to party Joseph Werfel(pty:pla), Attorney Asher Perlin added to party Y.A.W.(pty:pla), Attorney Asher Perlin added to party Y.C.P.(pty:pla), Attorney Asher Perlin added to party Y.K.(pty:pla), Attorney Asher Perlin added to party Y.M.P.(pty:pla), Attorney Asher Perlin added to party Y.T. (pty:pla), Attorney Asher Perlin added to party Y.W.(pty:pla), Attorney Asher Perlin added to party Y.Y.L(pty:pla) (Perlin, Asher) (Entered: 11/12/2021)

| 11/12/2021 | 5 | NOTICE of Entry of Appearance by Jordan D. Factor on behalf of All Plaintiffs Attorney Jordan D. Factor added to party Nechama Charlap(pty:pla), Attorney Jordan D. Factor added to party Estate of Rabbi Abraham Samuel (Avraham) Goldberg(pty:pla), Attorney Jordan D. Factor added to party Estate of Rabbi Aryeh Kupinsky(pty:pla), Attorney Jordan D. Factor added to party Estate of Rabbi Kalman (Cary) Levine(pty:pla), Attorney Jordan D. Factor added to party Estate of Rabbi Moshe Twersky(pty:pla), Attorney Jordan D. Factor added to party Estate of Zidan Saif(pty:pla), Attorney Jordan D. Factor added to party Adrian Goldberg(pty:pla), Attorney Jordan D. Factor added to party Briana Hazel Goldberg(pty:pla), Attorney Jordan D. Factor added to party Elisheva Goldberg(pty:pla), Attorney Jordan D. Factor added to party Libby Goldberg(pty:pla), Attorney Jordan D. Factor added to party Malka Goldstein(pty:pla), Attorney Jordan D. Factor added to party Miriam Goldstein(pty:pla), Attorney Jordan D. Factor added to party Mordechai Goldstein(pty:pla), Attorney Jordan D. Factor added to party Moshe Gedaliah Goldstein(pty:pla), Attorney Jordan D. Factor added to party Sarah Rivka Goldstein(pty:pla), Attorney Jordan D. Factor added to party Saul Goldstein(pty:pla), Attorney Jordan D. Factor added to party Deborah (Goldberg) Hammond(pty:pla), Attorney Jordan D. Factor added to party Norman Heching(pty:pla), Attorney Jordan D. Factor added to party Devorah Kupinsky(pty:pla), Attorney Jordan D. Factor added to party Eliyahu Kupinsky(pty:pla), Attorney Jordan D. Factor added to party Yakova Kupinsky(pty:pla), Attorney Jordan D. Factor added to party Yitzchak Kupinsky(pty:pla), Attorney Jordan D. Factor added to party Aharon Levine(pty:pla), Attorney Jordan D. Factor added to party Avraham Levine(pty:pla), Attorney Jordan D. Factor added to party Chana Levine(pty:pla), Attorney Jordan D. Factor added to party Haya Levine(pty:pla), Attorney Jordan D. Factor added to party Michal Levine(pty:pla), Attorney Jordan D. Factor added to party Moshe Levine(pty:pla), Attorney Jordan D. Factor added to party Shelley Levine(pty:pla), Attorney Jordan D. Factor added to party Stefanie Levine(pty:pla), Attorney Jordan D. Factor added to party Yerachmiel Levine(pty:pla), Attorney Jordan D. Factor added to party Yitzchok Meir Levine(pty:pla), Attorney Jordan D. Factor added to party Avraham Nefoussi(pty:pla), Attorney Jordan D. Factor added to party Bassheva Miriam Pelcovics(pty:pla), Attorney Jordan D. Factor added to party Akiva Pollack(pty:pla), Attorney Jordan D. Factor added to party Julia Saif(pty:pla), Attorney Jordan D. Factor added to party Nuhad Saif(pty:pla), Attorney Jordan D. Factor added to party Rinal Saif(pty:pla), Attorney Jordan D. Factor added to party Dana-Lee Salis(pty:pla), Attorney Jordan D. Factor added to party David Samuel Salis(pty:pla), Attorney Jordan D. Factor added to party Rivka (Goldberg) Sireling(pty:pla), Attorney Jordan D. Factor added to party Hadassa (Goldberg) Treuhaft(pty:pla), Attorney Jordan D. Factor added to party Avraham Twersky(pty:pla), Attorney Jordan D. Factor added to party Bashy Miriam Twersky(pty:pla), Attorney Jordan D. Factor added to party Meshulem Twersky(pty:pla), Attorney Jordan D. Factor added to party Refael Twersky(pty:pla), Attorney Jordan D. Factor added to party Rivka Walder(pty:pla), Attorney Jordan D. Factor added to party Joseph Werfel(pty:pla) (Factor, Jordan) (Entered: 11/12/2021) |
| 11/12/2021 | 8 | ORDER REFERRING CASE to Magistrate Judge Scott T. Varholak. Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Fed. R. Civ. P. 72(a) and (b), this case is referred to the assigned United States Magistrate Judge to (1) convene a scheduling conference under Fed. R. Civ. P. |

| | | |
|---|---|---|
| | | To(b) and enter a scheduling order meeting the requirements of D.C.COLO.LCivR 16.2, (2) conduct such status conferences and issue such orders necessary for compliance with the scheduling order, including amendments or modifications of the scheduling order upon a showing of good cause, (3) hear and determine pretrial matters, including discovery and other non-dispositive motions, (4) conduct a pretrial conference and enter a pretrial order, and (5) conduct hearings, including evidentiary hearings, and submit proposed findings of fact and recommendations for rulings on dispositive motions. Court sponsored alternative dispute resolution is governed by D.C.COLO.LCivR 16.6. On the recommendation or informal request of the magistrate judge or on the request of the parties by motion, this court may direct the parties to engage in an early neutral evaluation, a settlement conference, or another alternative dispute resolution proceeding. By Judge Raymond P. Moore on 11/12/2021. (Text Only Entry) (rmsec ) (Entered: 11/12/2021) |
| 11/12/2021 | 9 | MINUTE ORDER: With the assignment of this matter, the parties are advised that throughout this case they are expected to be familiar and comply with not only the Local Rules of this District, but also Judge Raymond P. Moore's Civil Practice Standards, which may be found at: http://www.cod.uscourts.gov/JudicialOfficers/ActiveArticleIIIJudges/HonRaymondPMoore.aspx. SO ORDERED by Judge Raymond P. Moore on 11/12/2021. (Text Only Entry) (rmsec ) (Entered: 11/12/2021) |
| 11/15/2021 | 10 | ORDER SETTING SCHEDULING CONFERENCE by Magistrate Judge Scott T. Varholak on 15 November 2021. Proposed Scheduling Order due 1/12/2022. Scheduling Conference set for 1/19/2022 11:30 AM in Courtroom A 402 before Magistrate Judge Scott T. Varholak. (cmadr, ) (Entered: 11/15/2021) |
| 11/16/2021 | 11 | SUMMONS REQUEST as to The Palestine Liberation Organization by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Joseph Werfel. (Calisher, Daniel) (Entered: 11/16/2021) |
| 11/16/2021 | 12 | SUMMONS REQUEST as to The Palestinian Authority by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Joseph Werfel. (Calisher, Daniel) (Entered: 11/16/2021) |
| 11/18/2021 | 13 | AFFIDAVIT re 1 Complaint,,,,,,,,,,,,,,,,,,,,,,,,,,,, *Requesting Foreign Mailing of Complaint and Summonses* by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, |

| | | |
|---|---|---|
| | | Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Joseph Werfel. (Perlin, Asher) (Entered: 11/18/2021) |
| 11/18/2021 | 14 | SUMMONS issued by Clerk. (Attachments: # 1 Summons, # 2 Magistrate Judge Consent Form) (agarc, ) (Entered: 11/18/2021) |
| 11/22/2021 | 15 | WAIVER OF SERVICE Returned Executed by Estate of Zidan Saif, Avraham Nefoussi, Julia Saif, Briana Hazel Goldberg, Saul Goldstein, Stefanie Levine, Moshe Levine, Shelley Levine, Avraham Levine, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Yerachmiel Levine, Bashy Miriam Twersky, Akiva Pollack, Libby Goldberg, Miriam Goldstein, Sarah Rivka Goldstein, Rivka (Goldberg) Sireling, Devorah Kupinsky, Joseph Werfel, Nuhad Saif, Bassheva Miriam Pelcovics, Malka Goldstein, Estate of Rabbi Moshe Twersky, Elisheva Goldberg, David Samuel Salis, Adrian Goldberg, Dana-Lee Salis, Avraham Twersky, Mordechai Goldstein, Chana Levine, Yitzchak Kupinsky, Moshe Gedaliah Goldstein, Haya Levine, Rivka Walder, Yitzchok Meir Levine, Estate of Rabbi Aryeh Kupinsky, Michal Levine, Estate of Rabbi Kalman (Cary) Levine, Meshulem Twersky, Rinal Saif, Deborah (Goldberg) Hammond, Yakova Kupinsky, Hadassa (Goldberg) Treuhaft, Norman Heching, Eliyahu Kupinsky, Nechama Charlap, Refael Twersky, Aharon Levine. All Defendants. (Perlin, Asher) (Entered: 11/22/2021) |
| 11/30/2021 | 16 | NOTICE of Entry of Appearance by Gassan A. Baloul on behalf of The Palestine Liberation Organization, The Palestinian AuthorityAttorney Gassan A. Baloul added to party The Palestine Liberation Organization(pty:dft), Attorney Gassan A. Baloul added to party The Palestinian Authority(pty:dft) (Baloul, Gassan) (Entered: 11/30/2021) |
| 11/30/2021 | 17 | NOTICE of Entry of Appearance by Mitchell R. Berger on behalf of The Palestine Liberation Organization, The Palestinian AuthorityAttorney Mitchell R. Berger added to party The Palestine Liberation Organization(pty:dft), Attorney Mitchell R. Berger added to party The Palestinian Authority(pty:dft) (Berger, Mitchell) (Entered: 11/30/2021) |
| 11/30/2021 | 18 | NOTICE of Entry of Appearance by Joseph S. Alonzo on behalf of The Palestine Liberation Organization, The Palestinian AuthorityAttorney Joseph S. Alonzo added to party The Palestine Liberation Organization(pty:dft), Attorney Joseph S. Alonzo added to party The Palestinian Authority(pty:dft) (Alonzo, Joseph) (Entered: 11/30/2021) |
| 11/30/2021 | 19 | NOTICE of Entry of Appearance by Brent Rollow Owen on behalf of The Palestine Liberation Organization, The Palestinian AuthorityAttorney Brent Rollow Owen added to party The Palestine Liberation Organization(pty:dft), Attorney Brent Rollow Owen added to party The Palestinian Authority(pty:dft) (Owen, Brent) (Entered: 11/30/2021) |
| 11/30/2021 | 20 | NOTICE of Entry of Appearance by David J. Lizmi on behalf of The Palestine Liberation Organization, The Palestinian AuthorityAttorney David J. Lizmi added to party The Palestine Liberation Organization(pty:dft), Attorney David J. Lizmi added to party The Palestinian Authority(pty:dft) (Lizmi, David) (Entered: 11/30/2021) |
| 12/30/2021 | 21 | Joint MOTION to Continue *Scheduling Conference* by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, |

Appellate Case: 23-1335     Document: 010110991838     Date Filed: 01/29/2024     Page: 10

| | | |
|---|---|---|
| | | Meshulem Twersky, Refael Twersky, Rivka Walder, Joseph Werfel. (Calisher, Daniel) (Entered: 12/30/2021) |
| 12/30/2021 | 22 | MEMORANDUM regarding 21 Joint MOTION to Continue *Scheduling Conference* filed by Bashy Miriam Twersky, Haya Levine, Avraham Twersky, Avraham Nefoussi, Rivka Walder, Moshe Levine, Estate of Zidan Saif, Adrian Goldberg, David Samuel Salis, Yakova Kupinsky, Elisheva Goldberg, Avraham Levine, Estate of Rabbi Moshe Twersky, Hadassa (Goldberg) Treuhaft, Yitzchok Meir Levine, Rivka (Goldberg) Sireling, Aharon Levine, Estate of Rabbi Kalman (Cary) Levine, Julia Saif, Bassheva Miriam Pelcovics, Yerachmiel Levine, Libby Goldberg, Miriam Goldstein, Yitzchak Kupinsky, Nuhad Saif, Mordechai Goldstein, Deborah (Goldberg) Hammond, Dana-Lee Salis, Chana Levine, Sarah Rivka Goldstein, Norman Heching, Briana Hazel Goldberg, Refael Twersky, Stefanie Levine, Shelley Levine, Meshulem Twersky, Moshe Gedaliah Goldstein, Estate of Rabbi Aryeh Kupinsky, Rinal Saif, Malka Goldstein, Akiva Pollack, Eliyahu Kupinsky, Nechama Charlap, Joseph Werfel, Saul Goldstein, Devorah Kupinsky, Michal Levine, Estate of Rabbi Abraham Samuel (Avraham) Goldberg. Motion referred to Magistrate Judge Scott T. Varholak. Entered by Judge Raymond P. Moore on 12/30/2021. Text Only Entry (cpear) (Entered: 12/30/2021) |
| 01/03/2022 | 23 | Joint MOTION for Protective Order by Defendants Palestine Liberation Organization, The, Palestinian Authority, The. (Attachments: # 1 Proposed Order (PDF Only) Stipulated Protective Order)(Baloul, Gassan) (Entered: 01/03/2022) |
| 01/03/2022 | 24 | MEMORANDUM regarding 23 Joint MOTION for Protective Order filed by Palestine Liberation Organization, The, Palestinian Authority, The. Motion referred to Magistrate Judge Scott T. Varholak. By Judge Raymond P. Moore on 1/3/2022. (Text Only Entry) (rmsec ) (Entered: 01/03/2022) |
| 01/03/2022 | 25 | ORDER granting 21 Motion to Continue. The Scheduling Conference set for 1/19/2022 is VACATED and RESET for 3/29/2022 09:30 AM in Courtroom A 402 before Magistrate Judge Scott T. Varholak. Joint Proposed Scheduling Order due 3/22/2022. SO ORDERED, by Magistrate Judge Scott T. Varholak on 1/3/2022. Text Only Entry(stvlc2, ) (Entered: 01/03/2022) |
| 01/03/2022 | 26 | ORDER granting 23 Motion for Protective Order. The Court will enter the protective order proposed by the parties. SO ORDERED, by Magistrate Judge Scott T. Varholak on 1/3/2022. Text Only Entry(stvlc2, ) (Entered: 01/03/2022) |
| 01/03/2022 | 27 | STIPULATED PROTECTIVE ORDER by Magistrate Judge Scott T. Varholak on 3 January 2022. (cmadr, ) (Entered: 01/03/2022) |
| 02/14/2022 | 28 | Unopposed MOTION for Leave to File Excess Pages *(ENLARGE PAGE LIMITS FOR DEFENDANTS MOTION TO DISMISS)* by Defendants Palestine Liberation Organization, The, Palestinian Authority, The. (Attachments: # 1 Proposed Order (PDF Only))(Baloul, Gassan) (Entered: 02/14/2022) |
| 02/14/2022 | 29 | ORDER: After reviewing the unopposed motion 28 , and applicable parts of the court record, and being otherwise fully advised, the Court finds no response is required before ruling. *See* D.C.COLO.LCivR 7.1(d). And, upon such review, the Court also finds sufficient grounds for granting Defendants leave to submit a motion to dismiss that is no longer than thirty-five (35) pages. Accordingly, the motion 28 is GRANTED. SO ORDERED by Judge Raymond P. Moore on 2/14/2022. (Text Only Entry)(rmsec ) (Entered: 02/14/2022) |
| 02/21/2022 | 30 | MOTION to Dismiss *Plaintiffs' Complaint* by Defendants Palestine Liberation Organization, The, Palestinian Authority, The. (Baloul, Gassan) (Entered: 02/21/2022) |
| 02/28/2022 | 31 | NOTICE *of constitutional challenge to the Promoting Security and Justice for Victims of Terrorism Act of 2019 (PSJVTA)* by Defendants Palestine Liberation Organization, The, Palestinian Authority, The (Baloul, Gassan) (Entered: 02/28/2022) |
| 02/28/2022 | 32 | ORDER CERTIFYING MATTER TO THE UNITED STATES ATTORNEY GENERAL. It is: ORDERED that Defendants' challenge to the constitutionality of the Promoting Security and Justice for Victims of Terrorism Act is certified to the United States Attorney General; and it is |

| | | |
|---|---|---|
| | | FURTHER ORDERED that the Clerk of this Court shall forward a copy of this Order, the Complaint (ECF No. 1 ), and the Motion to Dismiss (ECF No. 30 ), both certified under seal, to the United States Attorney General. By Judge Raymond P. Moore on 02/28/2022. (sdunb, ) (Entered: 02/28/2022) |
| 02/28/2022 | 33 | CERTIFICATE re 31 Notice of constitutional challenge to the Promoting Security and Justice for Victims of Terrorism Act of 2019 (PSJVTA). (sdunb, ) (Entered: 02/28/2022) |
| 03/07/2022 | 34 | MOTION for Extension of Time to File Response/Reply as to 30 MOTION to Dismiss *Plaintiffs' Complaint and Joint Motion to Adjourn Scheduling Conference* by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Joseph Werfel. (Attachments: # 1 Proposed Order (PDF Only))(Factor, Jordan) (Entered: 03/07/2022) |
| 03/07/2022 | 37 | Certified Mail Receipt for Service upon United States Attorney on 03/4/2022 re 33 Certificate of Service. (sdunb, ) (Entered: 03/10/2022) |
| 03/08/2022 | 35 | MEMORANDUM regarding 34 MOTION for Extension of Time to File Response/Reply as to 30 MOTION to Dismiss *Plaintiffs' Complaint and Joint Motion to Adjourn Scheduling Conference* filed by Bashy Miriam Twersky, Haya Levine, Avraham Twersky, Avraham Nefoussi, Rivka Walder, Moshe Levine, Estate of Zidan Saif, Adrian Goldberg, David Samuel Salis, Yakova Kupinsky, Elisheva Goldberg, Avraham Levine, Estate of Rabbi Moshe Twersky, Hadassa (Goldberg) Treuhaft, Yitzchok Meir Levine, Rivka (Goldberg) Sireling, Aharon Levine, Estate of Rabbi Kalman (Cary) Levine, Julia Saif, Bassheva Miriam Pelcovics, Yerachmiel Levine, Libby Goldberg, Miriam Goldstein, Yitzchak Kupinsky, Nuhad Saif, Mordechai Goldstein, Deborah (Goldberg) Hammond, Dana-Lee Salis, Chana Levine, Sarah Rivka Goldstein, Norman Heching, Briana Hazel Goldberg, Refael Twersky, Stefanie Levine, Shelley Levine, Meshulem Twersky, Moshe Gedaliah Goldstein, Estate of Rabbi Aryeh Kupinsky, Rinal Saif, Malka Goldstein, Akiva Pollack, Eliyahu Kupinsky, Nechama Charlap, Saul Goldstein, Devorah Kupinsky, Michal Levine, Estate of Rabbi Abraham Samuel (Avraham) Goldberg. Motion referred to Magistrate Judge Scott T. Varholak. By Judge Raymond P. Moore on 3/8/2022. (Text Only Entry) (rmsec ) (Entered: 03/08/2022) |
| 03/08/2022 | 36 | ORDER granting 34 Motion for Extension of Time. Plaintiff shall respond to Defendants' Motion to Dismiss on or before 5/13/2022. The Scheduling Conference set for 3/29/2022 is VACATED. The parties shall file a status report regarding resetting the scheduling conference on or before 5/11/2022. SO ORDERED, by Magistrate Judge Scott T. Varholak on 3/8/2022. Text Only Entry(stvlc2, ) (Entered: 03/08/2022) |
| 03/10/2022 | 39 | Certified Mail Receipt for Service upon United States Attorney General on 03/7/2022 re 33 Certificate of Service.(sdunb, ) (Entered: 03/11/2022) |
| 03/11/2022 | 38 | NOTICE of Supplemental Authorities by Defendants Palestine Liberation Organization, The, Palestinian Authority, The (Attachments: # 1 Mar. 10, 2022 Sokolow Decision)(Baloul, Gassan) (Entered: 03/11/2022) |
| 04/07/2022 | 40 | CONSENT to Jurisdiction of Magistrate Judge by Defendants Palestine Liberation Organization, The, Palestinian Authority, The All parties do not consent.. (Baloul, Gassan) (Entered: 04/07/2022) |

Appellate Case: 23-1335     Document: 010110991828     Date Filed: 01/29/2024     Page: 12

| | | |
|---|---|---|
| 04/27/2022 | 41 | Unopposed MOTION for Extension of Time to *Decide Whether to Intervene* by Intervenor United States of America. (Avallone, Zach) (Entered: 04/27/2022) |
| 04/27/2022 | 42 | ORDER: This matter is before the Court on the Motion of the United States of America for an Extension of Time to Decide Whether to Intervene 41 . The Motion is unopposed by the Parties. Being fully advised, the Motion is GRANTED. The United States of America shall have until May 20, 2022 in which to decide whether to intervene in this matter pursuant to Fed. R. Civ. P. 5.1. SO ORDERED by Judge Raymond P. Moore on 4/27/2022. (Text Only Entry)(rmsec ) (Entered: 04/27/2022) |
| 05/02/2022 | 43 | NOTICE of Change of Address/Contact Information *Squire Patton Boggs (US) LLP* by Brent Rollow Owen (Owen, Brent) (Entered: 05/02/2022) |
| 05/03/2022 | 44 | ADVISORY NOTICE OF NONCOMPLIANCE WITH COURT RULES/PROCEDURES: re 43 Notice of Change of Address/Contact Information filed by attorney Brent R. Owen. **DO NOT REFILE THE DOCUMENT. Action to take -** counsel must submit a change of contact request through the Manage my Account tab at the PACER website at https://www.pacer.gov/, pursuant to D.C.COLO.LAttyR 5(c) and 3.5 of the Electronic Case Filing Procedures (Civil cases).(Text Only Entry) (sdunb, ) (Entered: 05/03/2022) |
| 05/06/2022 | 45 | NOTICE of Entry of Appearance by Amy Brown Doolittle on behalf of Palestine Liberation Organization, The, Palestinian Authority, TheAttorney Amy Brown Doolittle added to party Palestine Liberation Organization, The(pty:dft), Attorney Amy Brown Doolittle added to party Palestinian Authority, The(pty:dft) (Doolittle, Amy) (Entered: 05/06/2022) |
| 05/09/2022 | 46 | Joint MOTION to Continue *and Status Report* by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Joseph Werfel. (Attachments: # 1 Proposed Order (PDF Only))(Calisher, Daniel) (Entered: 05/09/2022) |
| 05/09/2022 | 47 | MEMORANDUM regarding 46 Joint MOTION to Continue *and Status Report* filed by Bashy Miriam Twersky, Haya Levine, Avraham Twersky, Avraham Nefoussi, Rivka Walder, Moshe Levine, Estate of Zidan Saif, Adrian Goldberg, David Samuel Salis, Yakova Kupinsky, Elisheva Goldberg, Avraham Levine, Estate of Rabbi Moshe Twersky, Hadassa (Goldberg) Treuhaft, Yitzchok Meir Levine, Rivka (Goldberg) Sireling, Aharon Levine, Estate of Rabbi Kalman (Cary) Levine, Julia Saif, Bassheva Miriam Pelcovics, Yerachmiel Levine, Libby Goldberg, Miriam Goldstein, Yitzchok Kupinsky, Nuhad Saif, Mordechai Goldstein, Deborah (Goldberg) Hammond, Dana-Lee Salis, Chana Levine, Sarah Rivka Goldstein, Norman Heching, Briana Hazel Goldberg, Refael Twersky, Stefanie Levine, Shelley Levine, Meshulem Twersky, Moshe Gedaliah Goldstein, Estate of Rabbi Aryeh Kupinsky, Rinal Saif, Malka Goldstein, Akiva Pollack, Eliyahu Kupinsky, Nechama Charlap, Joseph Werfel, Saul Goldstein, Devorah Kupinsky, Michal Levine, Estate of Rabbi Abraham Samuel (Avraham) Goldberg. Motion referred to Magistrate Judge Scott T. Varholak. By Judge Raymond P. Moore on 5/9/2022. (Text Only Entry) (rmsec ) (Entered: 05/09/2022) |
| 05/09/2022 | 48 | ORDER granting 46 Motion to Continue. Plaintiffs shall file their Amended Complaint on or before 5/13/2022. Defendants shall respond to the Amended Complaint on or before 6/27/2022. Within seven (7) days after the completion of briefing on Defendants' motion to dismiss, the parties shall file a status report advising the Court of their positions as to the timing of a |

Appellate Case: 23-1335     Document: 010110991828     Date Filed: 01/29/2024     Page: 13

| | | |
|---|---|---|
| | | scheduling conference. SO ORDERED, by Magistrate Judge Scott T. Varholak on 5/9/2022. Text Only Entry(stvlc2, ) (Entered: 05/09/2022) |
| 05/13/2022 | 49 | RESTRICTED DOCUMENT - Level 1: First Amended Complaint and Jury Demand by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Joseph Werfel.. (Factor, Jordan) Modified on 5/16/2022 to add title (sdunb, ). (Entered: 05/13/2022) |
| 05/17/2022 | 50 | AMENDED COMPLAINT *Unredacted* against Palestine Liberation Organization, The, Palestinian Authority, The, Riyad Mansour Attorney Jordan D. Factor added to party Chaya Werfel(pty:pla), Attorney Jordan D. Factor added to party Basya Yehudis Goldstein(pty:pla), filed by Estate of Zidan Saif, Avraham Nefoussi, Julia Saif, Briana Hazel Goldberg, Saul Goldstein, Stefanie Levine, Moshe Levine, Shelley Levine, Avraham Levine, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Yerachmiel Levine, Bashy Miriam Twersky, Akiva Pollack, Libby Goldberg, Miriam Goldstein, Sarah Rivka Goldstein, Rivka (Goldberg) Sireling, Devorah Kupinsky, Joseph Werfel, Nuhad Saif, Bassheva Miriam Pelcovics, Malka Goldstein, Estate of Rabbi Moshe Twersky, Elisheva Goldberg, David Samuel Salis, Adrian Goldberg, Dana-Lee Salis, Avraham Twersky, Mordechai Goldstein, Chana Levine, Yitzchak Kupinsky, Moshe Gedaliah Goldstein, Haya Levine, Rivka Walder, Yitzchok Meir Levine, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Meshulem Twersky, Rinal Saif, Deborah (Goldberg) Hammond, Yakova Kupinsky, Hadassa (Goldberg) Treuhaft, Norman Heching, Eliyahu Kupinsky, Nechama Charlap, Refael Twersky, Aharon Levine, Chaya Werfel, Basya Yehudis Goldstein.(Factor, Jordan) (Entered: 05/17/2022) |
| 05/19/2022 | 51 | NOTICE re 42 Order on Motion for Extension of Time to File, 41 Unopposed MOTION for Extension of Time to *Decide Whether to Intervene*, 32 Order,, by Intervenor United States of America (Avallone, Zach) (Entered: 05/19/2022) |
| 05/25/2022 | 52 | SUMMONS REQUEST as to RIYAD MANSOUR by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Basya Yehudis Goldstein, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Chaya Werfel, Joseph Werfel, Intervenor United States of America. (Calisher, Daniel) (Entered: 05/25/2022) |
| 05/26/2022 | 53 | SUMMONS issued by Clerk. (sdunb, ) (Entered: 05/26/2022) |
| 06/01/2022 | 54 | STIPULATION for Extension of Time to Answer or Respond to the Complaint by Defendant Riyad Mansour. Riyad Mansour answer due 6/27/2022. (Baloul, Gassan) (Entered: 06/01/2022) |
| 06/01/2022 | 55 | SUMMONS Returned Executed by All Plaintiffs. Riyad Mansour served on 5/26/2022, answer due 6/27/2022. (Perlin, Asher) (Entered: 06/01/2022) |

| | | |
|---|---|---|
| 06/13/2022 | 56 | Unopposed MOTION for Leave to File Excess Pages *for Defendants' Motion to Dismiss the First Amended Complaint* by Defendants Palestine Liberation Organization, The, Palestinian Authority, The. (Attachments: # 1 Proposed Order (PDF Only))(Baloul, Gassan) (Entered: 06/13/2022) |
| 06/14/2022 | 57 | ORDER: After reviewing the unopposed motion 56 , and applicable parts of the court record, and being otherwise fully advised, the Court finds no response is required before ruling. See D.C.COLO.LCivR 7.1(d). And, upon such review, the Court also finds sufficient grounds for granting Defendants leave to submit a motion to dismiss that is no longer than forty-five (45) pages. Accordingly, the motion 56 is GRANTED. SO ORDERED by Judge Raymond P. Moore on 6/14/2022. (Text Only Entry)(rmsec ) (Entered: 06/14/2022) |
| 06/27/2022 | 58 | MOTION to Dismiss *Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12(b)(6)* by Defendants Palestine Liberation Organization, The, Palestinian Authority, The. (Baloul, Gassan) (Entered: 06/27/2022) |
| 07/05/2022 | 59 | NOTICE *OF CONSTITUTIONAL CHALLENGE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 5.1 TO 18 U.S.C. § 2334(e)* by Defendants Palestine Liberation Organization, The, Palestinian Authority, The (Baloul, Gassan) (Entered: 07/05/2022) |
| 07/06/2022 | 60 | Unopposed MOTION for Extension of Time to File Response/Reply as to 58 MOTION to Dismiss *Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12(b)(6)* by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Basya Yehudis Goldstein, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Chaya Werfel, Joseph Werfel. (Attachments: # 1 Proposed Order (PDF Only))(Calisher, Daniel) (Entered: 07/06/2022) |
| 07/06/2022 | 61 | ORDER: This matter is before the Court on Plaintiffs' Unopposed Motion for Extension of Time to Respond to the Motion to Dismiss the First Amended Complaint 60 . Being fully advised, the Motion is GRANTED. Plaintiffs shall have until September 6, 2022 in which to respond to the Motion to Dismiss. SO ORDERED by Judge Raymond P. Moore on 7/6/2022. (Text Only Entry) (rmsec) (Entered: 07/06/2022) |
| 07/06/2022 | 62 | ORDER CERTIFYING MATTER TO THE UNITED STATES ATTORNEY GENERAL. It is ORDERED that Defendants' challenge to the constitutionality of the Promoting Security and Justice for Victims of Terrorism Act is certified to the United States Attorney General; and it is FURTHER ORDERED that the Clerk of this Court shall forward a copy of this Order, the 49 Amended Complaint, and the 58 Motion to Dismiss, both certified under seal, to the United States Attorney General. By Judge Raymond P. Moore on 7/6/2022. (sdunb, ) (Entered: 07/06/2022) |
| 07/07/2022 | 63 | Certified Mail by Clerk of Court re 62 Order, 58 MOTION to Dismiss *Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12(b)(6)*, 49 Restricted Document - Level 1, to United States Attorney General. (sdunb, ) (Entered: 07/07/2022) |
| 07/21/2022 | 64 | RETURN Certified Mail Receipt of Service upon the United States Attorney General on 7/18/2022, re: 62 Order. (sdunb, ) (Entered: 07/21/2022) |
| 08/24/2022 | 65 | Unopposed MOTION for Extension of Time to File Response/Reply as to 58 MOTION to Dismiss *Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12(b)(6) and to Enlarge the Page Limit* by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel |

| | | |
|---|---|---|
| | | (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Basya Yehudis Goldstein, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchak Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Chaya Werfel, Joseph Werfel. (Attachments: # 1 Proposed Order (PDF Only))(Calisher, Daniel) (Entered: 08/24/2022) |
| 08/24/2022 | 66 | ORDER: This matter is before the Court on Plaintiffs' Unopposed Motion to Enlarge the Page Limit and for Extension of Time to Respond to Motion to Dismiss First Amended Complaint 65 . Being fully advised and finding good cause, the Motion is GRANTED. Plaintiffs shall have until September 19, 2022 in which to file their Response in Opposition to Defendants' Motion to Dismiss. Plaintiffs shall have leave to file a Response that is no longer than fifty-five (55) pages. SO ORDERED by Judge Raymond P. Moore on 8/24/2022. (Text Only Entry)(rmsec ) (Entered: 08/24/2022) |
| 09/06/2022 | 67 | Notice of Intervention by Intervenor United States of America. (Avallone, Zach) Modified on 9/9/2022 to correct docket title (sapod, ). (Entered: 09/06/2022) |
| 09/09/2022 | 68 | ORDER: In light of the Amended filings 50 and 58 , Defendants' Motion to Dismiss 30 is DENIED as moot. SO ORDERED by Judge Raymond P. Moore on 9/9/2022. (Text Only Entry) (rmsec ) (Entered: 09/09/2022) |
| 09/19/2022 | 69 | RESPONSE to 58 MOTION to Dismiss *Plaintiffs' First Amended Complaint Under Rule 12(b) (2) and Rule 12(b)(6)* filed by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Basya Yehudis Goldstein, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchak Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Chaya Werfel, Joseph Werfel. (Attachments: # 1 Declaration of Asher Perlin, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Declaration of Dr. Boaz Shnoor)(Calisher, Daniel) (Entered: 09/19/2022) |
| 09/20/2022 | 70 | MOTION for Extension of Time to File Response/Reply as to 58 MOTION to Dismiss *Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12(b)(6)* by Defendants Palestine Liberation Organization, The, Palestinian Authority, The. (Attachments: # 1 Proposed Order (PDF Only) [Proposed] Order Granting Defendants' Unopposed Motion for Extension of Time to File Reply in Support of Motion to Dismiss)(Baloul, Gassan) (Entered: 09/20/2022) |
| 09/20/2022 | 71 | SUPPLEMENT/AMENDMENT to 69 Response to Motion,,,,, *Table of Authorities* by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Basya Yehudis Goldstein, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley |

| | | |
|---|---|---|
| | | Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Chaya Werfel, Joseph Werfel. (Calisher, Daniel) (Entered: 09/20/2022) |
| 09/20/2022 | 72 | ORDER: This matter is before the Court on Defendants' Unopposed Motion for Extension of Time to File Reply Brief in support of Motion to Dismiss 70 . Being fully advised and finding good cause, the Motion is GRANTED. Defendants shall have through November 14, 2022 in which to file their Reply. SO ORDERED by Judge Raymond P. Moore on 9/20/2022. (Text Only Entry)(rmsec ) (Entered: 09/20/2022) |
| 09/26/2022 | 73 | RESPONSE to 58 MOTION to Dismiss *Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12(b)(6) Intervenor United States of America's Brief in support of the Constitutionality of the PSJVTA* filed by Intervenor United States of America. (Avallone, Zach) (Entered: 09/26/2022) |
| 10/27/2022 | 74 | Unopposed MOTION for Leave to File Excess Pages *FILE OVERSIZE REPLY BRIEF* by Defendants Riyad Mansour, Palestine Liberation Organization, The, Palestinian Authority, The. (Attachments: # 1 Proposed Order (PDF Only))(Baloul, Gassan) (Entered: 10/27/2022) |
| 10/27/2022 | 75 | ORDER: After reviewing the unopposed Motion 74 , and applicable parts of the court record, and being otherwise fully advised, the Court finds no response is required before ruling. See D.C.COLO.LCivR 7.1(d). And, upon such review, the Court also finds sufficient grounds for granting Defendants leave to submit a Reply in support of their Motion to Dismiss that is no longer than thirty-eight (38) pages. Accordingly, the motion 74 is GRANTED. SO ORDERED by Judge Raymond P. Moore on 10/27/2022. (Text Only Entry)(rmsec) (Entered: 10/27/2022) |
| 11/14/2022 | 76 | REPLY to Response to 58 MOTION to Dismiss *Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12(b)(6)* filed by Defendants Palestine Liberation Organization, The, Palestinian Authority, The. (Baloul, Gassan) (Entered: 11/14/2022) |
| 11/25/2022 | 77 | Joint MOTION for Extension of Time to *File Status Report Nunc Pro Tunc* by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Basya Yehudis Goldstein, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Chaya Werfel, Joseph Werfel. (Attachments: # 1 Proposed Order (PDF Only))(Calisher, Daniel) (Entered: 11/25/2022) |
| 11/28/2022 | 78 | MEMORANDUM regarding 77 Joint MOTION for Extension of Time to *File Status Report Nunc Pro Tunc* filed by Bashy Miriam Twersky, Haya Levine, Avraham Twersky, Avraham Nefoussi, Rivka Walder, Moshe Levine, Basya Yehudis Goldstein, Estate of Zidan Saif, Adrian Goldberg, David Samuel Salis, Yakova Kupinsky, Elisheva Goldberg, Avraham Levine, Estate of Rabbi Moshe Twersky, Hadassa (Goldberg) Treuhaft, Yitzchok Meir Levine, Rivka (Goldberg) Sireling, Aharon Levine, Estate of Rabbi Kalman (Cary) Levine, Julia Saif, Bassheva Miriam Pelcovics, Yerachmiel Levine, Libby Goldberg, Miriam Goldstein, Yitzchak Kupinsky, Nuhad Saif, Mordechai Goldstein, Deborah (Goldberg) Hammond, Dana-Lee Salis, Chaya Werfel, Chana Levine, Sarah Rivka Goldstein, Norman Heching, Briana Hazel Goldberg, Refael Twersky, Stefanie Levine, Shelley Levine, Meshulem Twersky, Moshe Gedaliah Goldstein, Estate of Rabbi Aryeh Kupinsky, Rinal Saif, Malka Goldstein, Akiva Pollack, Eliyahu Kupinsky, Nechama Charlap, Joseph Werfel, Saul Goldstein, Devorah Kupinsky, Michal Levine, Estate of Rabbi Abraham Samuel (Avraham) Goldberg. Motion referred to Magistrate Judge Scott T. |

| | | Varholak. By Judge Raymond P. Moore on 11/28/2022. (Text Only Entry) (rmsec) (Entered: 11/28/2022) |
|---|---|---|
| 11/28/2022 | 79 | ORDER granting 77 Motion for Extension of Time to File Status Report. The parties shall file a status report regarding the setting of the scheduling conference on or before 12/7/2022. SO ORDERED, by Magistrate Judge Scott T. Varholak on 11/28/2022. Text Only Entry(stvlc4, ) (Entered: 11/28/2022) |
| 11/28/2022 | | ***Set Deadlines per ECF 79 : Status Report due by 12/7/2022. (cmadr, ) (Entered: 11/29/2022) |
| 12/07/2022 | 80 | Joint STATUS REPORT by Defendants Palestine Liberation Organization, The, Palestinian Authority, The. (Baloul, Gassan) (Entered: 12/07/2022) |
| 12/07/2022 | 81 | MINUTE ORDER This Matter is before the Court on 80 Joint Status Report regarding the timing of a scheduling conference. The parties dispute whether a scheduling conference should be set in this matter before Defendants' pending Motion to Dismiss is ruled on. The Court determines that the proper avenue to take up this dispute is through a Motion to Stay followed by briefing and a hearing, if necessary. Accordingly, the Court declines to set a Scheduling Conference in this matter at this time. The Court will set this matter for a Scheduling Conference should a Motion to Stay be denied, or should no Motion to Stay be filed on or before 12/16/2022. SO ORDERED, by Magistrate Judge Scott T. Varholak on 12/7/2022. Text Only Entry (stvlc4, ) (Entered: 12/07/2022) |
| 12/14/2022 | 82 | MOTION to Stay re 81 Minute Order,,, *Defendants' Motion to Stay Discovery and Related Proceedings Pending Resolution of Defendants' Motion to Dismiss* by Defendants Palestine Liberation Organization, The, Palestinian Authority, The. (Baloul, Gassan) (Entered: 12/14/2022) |
| 12/14/2022 | 83 | MEMORANDUM regarding 82 MOTION to Stay re 81 Minute Order,,, *Defendants' Motion to Stay Discovery and Related Proceedings Pending Resolution of Defendants' Motion to Dismiss* filed by Palestine Liberation Organization, The, Palestinian Authority, The. Motion referred to Magistrate Judge Scott T. Varholak. SO ORDERED by Judge Raymond P. Moore on 12/14/2022. (Text Only Entry) (rmsec) (Entered: 12/14/2022) |
| 12/14/2022 | 84 | MINUTE ORDER This Matter is before the Court on 82 Motion to Stay. The Court sets the following expedited briefing schedule: Plaintiffs shall file a response on or before 12/28/2022. Defendants may then file a reply on or before 1/4/2023. A Motion Hearing is set for 1/10/2023 11:15 AM in Courtroom A 402 before Magistrate Judge Scott T. Varholak. SO ORDERED, by Magistrate Judge Scott T. Varholak on 12/14/2022. Text Only Entry (stvlc4, ) (Entered: 12/14/2022) |
| 12/28/2022 | 85 | RESPONSE to 82 MOTION to Stay re 81 Minute Order,,, *Defendants' Motion to Stay Discovery and Related Proceedings Pending Resolution of Defendants' Motion to Dismiss* filed by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Basya Yehudis Goldstein, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Chaya Werfel, Joseph Werfel. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Declaration of Dr. Ronni Shaked, # 10 Declaration of Yaniv Berman)(Calisher, Daniel) (Entered: 12/28/2022) |
| 12/29/2022 | 86 | NOTICE re 85 Response to Motion,,,,, *Notice of Amended Exhibits C, D and E* by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of |

Appellate Case: 23-1335     Document: 010110991828     Date Filed: 01/29/2024     Page: 18

Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Basya Yehudis Goldstein, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Chaya Werfel, Joseph Werfel (Attachments: # 1 Exhibit C, # 2 Exhibit D, # 3 Exhibit E)(Calisher, Daniel) (Entered: 12/29/2022)

| 01/01/2023 | 87 | MOTION for Order to *Permit Expert Witness to Appear by Video* by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Basya Yehudis Goldstein, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Chaya Werfel, Joseph Werfel. (Perlin, Asher) (Entered: 01/01/2023) |
| 01/02/2023 | 88 | MEMORANDUM regarding 87 MOTION for Order to *Permit Expert Witness to Appear by Video* filed by Bashy Miriam Twersky, Haya Levine, Avraham Twersky, Avraham Nefoussi, Rivka Walder, Moshe Levine, Basya Yehudis Goldstein, Estate of Zidan Saif, Adrian Goldberg, David Samuel Salis, Yakova Kupinsky, Elisheva Goldberg, Avraham Levine, Estate of Rabbi Moshe Twersky, Hadassa (Goldberg) Treuhaft, Yitzchok Meir Levine, Rivka (Goldberg) Sireling, Aharon Levine, Estate of Rabbi Kalman (Cary) Levine, Julia Saif, Bassheva Miriam Pelcovics, Yerachmiel Levine, Libby Goldberg, Miriam Goldstein, Yitzchak Kupinsky, Nuhad Saif, Mordechai Goldstein, Deborah (Goldberg) Hammond, Dana-Lee Salis, Chaya Werfel, Chana Levine, Sarah Rivka Goldstein, Norman Heching, Briana Hazel Goldberg, Refael Twersky, Stefanie Levine, Shelley Levine, Meshulem Twersky, Moshe Gedaliah Goldstein, Estate of Rabbi Aryeh Kupinsky, Rinal Saif, Malka Goldstein, Akiva Pollack, Eliyahu Kupinsky, Nechama Charlap, Joseph Werfel, Saul Goldstein, Devorah Kupinsky, Michal Levine, Estate of Rabbi Abraham Samuel (Avraham) Goldberg. Motion referred to Magistrate Judge Scott T. Varholak. By Judge Raymond P. Moore on 1/2/2023. (Text Only Entry) (rmsec) (Entered: 01/02/2023) |
| 01/03/2023 | 89 | ORDER This matter is before the Court on 87 Motion to Permit Expert Witness to Appear by Video. Plaintiffs' declarant Dr. Shaked shall be permitted to appear by video conference for any examination by Defendants at the 1/10 Motion Hearing. Any declarants on behalf of Defendants shall also be permitted to appear by video conference for any examination by Plaintiffs at the hearing. The parties shall confer before the Hearing to determine whether any such examination of declarants is anticipated, and jointly contact Magistrate Judge Varholak's Chambers via email on or before 1/6/2023 to receive the video appearance information if necessary. SO ORDERED, by Magistrate Judge Scott T. Varholak on 1/3/2023. Text Only Entry(stvlc4, ) (Entered: 01/03/2023) |
| 01/04/2023 | 90 | REPLY to 82 MOTION to Stay re 81 Minute Order,,, *Defendants' Motion to Stay Discovery and Related Proceedings Pending Resolution of Defendants' Motion to Dismiss* by Defendants Palestine Liberation Organization, The, Palestinian Authority, The. (Attachments: # 1 Exhibit A) (Baloul, Gassan) (Entered: 01/04/2023) |
| 01/10/2023 | 91 | MINUTE ENTRY for Motion Hearing held before Magistrate Judge Scott T. Varholak on 1/10/2023. ORDERED: Defendants' Motion to Stay Discovery and Related Proceedings Pending Resolution of Defendants' Motion to Dismiss 82 is GRANTED with the limited exception of the |

Appellate Case: 23-1335     Document: 010110991828     Date Filed: 01/29/2024     Page: 19

| | | three Requests for Production, three Requests for Admission and three Interrogatories, limited to the preservation of evidence with respect to Mr. Khoury and Mr. Al-Einein. FTR: A402. (morti) (Entered: 01/10/2023) |
|---|---|---|
| 01/19/2023 | [92](#) | NOTICE of Supplemental Authorities re: [76](#) Reply to Response to Motion by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Basya Yehudis Goldstein, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Chaya Werfel, Joseph Werfel (Calisher, Daniel) (Entered: 01/19/2023) |
| 01/23/2023 | [93](#) | RESPONSE to [92](#) Notice of Supplemental Authorities,,,, by Defendants Palestine Liberation Organization, The, Palestinian Authority, The. (Baloul, Gassan) (Entered: 01/23/2023) |
| 01/27/2023 | [94](#) | TRANSCRIPT of Motion Hearing held on January 10, 2023 before Magistrate Judge Varholak. Pages: 1-28. **NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov.** Transcript may only be viewed at the court public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (Patterson Transcription Company, ) (Entered: 01/27/2023) |
| 02/20/2023 | 95 | ADVISORY NOTICE TO ATTORNEY AND COURT: Amy Brown Doolittle failed to pay the 2022 Biennial Fee. Under D.C.COLO.LAttyR 3(a) and District Court General Order 2022-7, counsel was administratively removed from the court's attorney roll. Counsel must submit another bar application though PACER, pay the application fee, and, upon reinstatement, file a Notice of Appearance to continue as counsel of record in this case. Please visit and fully review the 2022 Biennial Renewal Fee page before contacting the court for assistance: Biennial / Renewal Fee Information | US District Court of Colorado (uscourts.gov). (Text Only Entry) (mfred) (Entered: 02/20/2023) |
| 02/23/2023 | [96](#) | NOTICE of Entry of Appearance by Amy Brown Doolittle on behalf of Palestine Liberation Organization, The, Palestinian Authority, The (Doolittle, Amy) (Entered: 02/23/2023) |
| 03/04/2023 | 97 | ADVISORY NOTICE TO ATTORNEY AND COURT: David J. Lizmi failed to pay the 2022 Biennial Fee. Under D.C.COLO.LAttyR 3(a) and District Court General Order 2022-7, counsel was administratively removed from the court's attorney roll. Counsel must submit another bar application though PACER, pay the application fee, and, upon reinstatement, file a Notice of Entry of Appearance to continue as counsel of record in this case. Please visit and fully review the 2022 Biennial Renewal Fee page before contacting the court for assistance: Biennial / Renewal Fee Information | US District Court of Colorado (uscourts.gov). (Text Only Entry) (mfred) (Entered: 03/04/2023) |
| 03/06/2023 | [98](#) | MOTION to Withdraw as Attorney *re David J. Lizmi* by Defendants Palestine Liberation Organization, The, Palestinian Authority, The. (Baloul, Gassan) (Entered: 03/06/2023) |
| 03/07/2023 | 99 | ORDER granting [98](#) Motion to Withdraw as Attorney. Attorney David J. Lizmi terminated. SO ORDERED by Judge Raymond P. Moore on 3/7/2023. (Text Only Entry)(rmsec) (Entered: 03/07/2023) |

Appellate Case: 23-1335    Document: 010110991828    Date Filed: 01/29/2024    Page: 20

| 04/05/2023 | 100 | REASSIGNMENT OF JUDGE. This action is reassigned to Judge Gordon P. Gallagher upon his appointment as United States District Judge. Unless otherwise ordered, the dates and times for all previously scheduled matters will be maintained. Judge Gallagher is located in Courtroom 323 in the Wayne Aspinall Courthouse. His telephone number is (970) 241-8932. All future pleadings should be designated as 21-cv-03043-GPG. (Text only entry) (msmot) (Entered: 04/05/2023) |
|---|---|---|
| 05/22/2023 | 101 | NOTICE of Supplemental Authorities re: 58 MOTION to Dismiss *Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12(b)(6)* by Defendants Palestine Liberation Organization, The, Palestinian Authority, The (Attachments: # 1 Exhibit A)(Baloul, Gassan) (Entered: 05/22/2023) |
| 07/07/2023 | 102 | MINUTE ORDER: Per the request of the parties, this matter is set for a Discovery Hearing on 8/22/2023 at 2:30 PM in Courtroom A 402 before Magistrate Judge Scott T. Varholak. On or before 8/17/2023, the parties shall submit via email to Varholak_Chambers@cod.uscourts.gov a brief joint statement setting forth the issues in dispute. SO ORDERED, by Magistrate Judge Scott T. Varholak on 7/7/23. Text Only Entry (stvlc3, Andrew) (Entered: 07/07/2023) |
| 07/12/2023 | 103 | NOTICE of Supplemental Authorities re: 58 MOTION to Dismiss *Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12(b)(6)* by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Basya Yehudis Goldstein, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Chaya Werfel, Joseph Werfel (Attachments: # 1 Exhibit)(Perlin, Asher) (Entered: 07/12/2023) |
| 07/13/2023 | 104 | RESPONSE to 103 Notice of Supplemental Authorities,,,, by Defendants Palestine Liberation Organization, The, Palestinian Authority, The. (Baloul, Gassan) (Entered: 07/13/2023) |
| 07/13/2023 | 105 | ORDER. The Court has determined that supplemental briefing concerning *Mallory v. Norfolk Southern Ry.*, No. 21-1168, 2023 WL 4187749 (U.S. June 27, 2023) is necessary and would be helpful to resolve outstanding issues in this action. It is therefore ORDERED that the individual Plaintiffs (collectively) and the Government SHALL file briefs of no more than three (3) pages per brief (exclusive of signature and title pages) **within 10 days** of this ORDER and that Defendants SHALL file a single responsive brief of no more than six (6) pages (exclusive of signature and title pages), **within 10 days** after Plaintiffs' and the Government's briefs are filed. By District Judge Gordon P Gallagher on 7/13/2023. Text Only Entry (sdunb, ) (Entered: 07/13/2023) |
| 07/24/2023 | 106 | SUPPLEMENT/AMENDMENT to 103 Notice of Supplemental Authorities,,,, by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Basya Yehudis Goldstein, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Chaya Werfel, Joseph Werfel. (Calisher, Daniel) (Entered: 07/24/2023) |

Appellate Case: 23-1335    Document: 010110991828    Date Filed: 01/29/2024    Page: 21

| | | |
|---|---|---|
| 07/24/2023 | 107 | BRIEF in Opposition to 58 MOTION to Dismiss *Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12(b)(6) Supplemental Brief re Mallory v. Norfolk Southern Railway Company, 143 S. Ct. 2028 (2023),* filed by Intervenor United States of America. (Avallone, Zach) (Entered: 07/24/2023) |
| 08/01/2023 | 108 | MINUTE ORDER Pursuant to conversation between Chambers and the parties, the Discovery Hearing set for 8/22/2023 is VACATED and RESET for 9/13/2023 10:45 AM in Courtroom A 402 before Magistrate Judge Scott T. Varholak. On or before 9/8/2023, the parties shall submit via email to Varholak_Chambers@cod.uscourts.gov a brief joint statement setting forth the issues in dispute. SO ORDERED, by Magistrate Judge Scott T. Varholak on 8/1/2023. Text Only Entry (stvlc4, ) (Entered: 08/01/2023) |
| 08/02/2023 | 109 | NOTICE of Entry of Appearance by Michael Andrew Rollin on behalf of All Plaintiffs Attorney Michael Andrew Rollin added to party Nechama Charlap(pty:pla), Attorney Michael Andrew Rollin added to party Estate of Rabbi Abraham Samuel (Avraham) Goldberg(pty:pla), Attorney Michael Andrew Rollin added to party Estate of Rabbi Aryeh Kupinsky(pty:pla), Attorney Michael Andrew Rollin added to party Estate of Rabbi Kalman (Cary) Levine(pty:pla), Attorney Michael Andrew Rollin added to party Estate of Rabbi Moshe Twersky(pty:pla), Attorney Michael Andrew Rollin added to party Estate of Zidan Saif(pty:pla), Attorney Michael Andrew Rollin added to party Adrian Goldberg(pty:pla), Attorney Michael Andrew Rollin added to party Briana Hazel Goldberg(pty:pla), Attorney Michael Andrew Rollin added to party Elisheva Goldberg(pty:pla), Attorney Michael Andrew Rollin added to party Libby Goldberg(pty:pla), Attorney Michael Andrew Rollin added to party Basya Yehudis Goldstein(pty:pla), Attorney Michael Andrew Rollin added to party Malka Goldstein(pty:pla), Attorney Michael Andrew Rollin added to party Miriam Goldstein(pty:pla), Attorney Michael Andrew Rollin added to party Mordechai Goldstein(pty:pla), Attorney Michael Andrew Rollin added to party Moshe Gedaliah Goldstein(pty:pla), Attorney Michael Andrew Rollin added to party Sarah Rivka Goldstein(pty:pla), Attorney Michael Andrew Rollin added to party Saul Goldstein(pty:pla), Attorney Michael Andrew Rollin added to party Deborah (Goldberg) Hammond(pty:pla), Attorney Michael Andrew Rollin added to party Norman Heching(pty:pla), Attorney Michael Andrew Rollin added to party Devorah Kupinsky(pty:pla), Attorney Michael Andrew Rollin added to party Eliyahu Kupinsky(pty:pla), Attorney Michael Andrew Rollin added to party Yakova Kupinsky(pty:pla), Attorney Michael Andrew Rollin added to party Yitzchak Kupinsky(pty:pla), Attorney Michael Andrew Rollin added to party Aharon Levine(pty:pla), Attorney Michael Andrew Rollin added to party Avraham Levine(pty:pla), Attorney Michael Andrew Rollin added to party Chana Levine(pty:pla), Attorney Michael Andrew Rollin added to party Haya Levine(pty:pla), Attorney Michael Andrew Rollin added to party Michal Levine(pty:pla), Attorney Michael Andrew Rollin added to party Moshe Levine(pty:pla), Attorney Michael Andrew Rollin added to party Shelley Levine(pty:pla), Attorney Michael Andrew Rollin added to party Stefanie Levine(pty:pla), Attorney Michael Andrew Rollin added to party Yerachmiel Levine(pty:pla), Attorney Michael Andrew Rollin added to party Yitzchok Meir Levine(pty:pla), Attorney Michael Andrew Rollin added to party Avraham Nefoussi(pty:pla), Attorney Michael Andrew Rollin added to party Bassheva Miriam Pelcovics(pty:pla), Attorney Michael Andrew Rollin added to party Akiva Pollack(pty:pla), Attorney Michael Andrew Rollin added to party Julia Saif(pty:pla), Attorney Michael Andrew Rollin added to party Nuhad Saif(pty:pla), Attorney Michael Andrew Rollin added to party Rinal Saif(pty:pla), Attorney Michael Andrew Rollin added to party Dana-Lee Salis(pty:pla), Attorney Michael Andrew Rollin added to party David Samuel Salis(pty:pla), Attorney Michael Andrew Rollin added to party Rivka (Goldberg) Sireling(pty:pla), Attorney Michael Andrew Rollin added to party Hadassa (Goldberg) Treuhaft(pty:pla), Attorney Michael Andrew Rollin added to party Avraham Twersky(pty:pla), Attorney Michael Andrew Rollin added to party Bashy Miriam Twersky(pty:pla), Attorney Michael Andrew Rollin added to party Meshulem Twersky(pty:pla), Attorney Michael Andrew Rollin added to party Refael Twersky(pty:pla), Attorney Michael Andrew Rollin added to party Rivka Walder(pty:pla), Attorney Michael Andrew Rollin added to party Chaya Werfel(pty:pla), Attorney Michael Andrew Rollin added to party Joseph Werfel(pty:pla) (Rollin, Michael) (Entered: 08/02/2023) |

| 08/03/2023 | 110 | BRIEF re 105 Order,,, *Supplemental Brief Concerning Mallory* by Defendants Palestine Liberation Organization, The, Palestinian Authority, The. (Baloul, Gassan) (Entered: 08/03/2023) |
|---|---|---|
| 08/23/2023 | 111 | ORDER granting 58 Motion to Dismiss and dismissing the remaining claims without prejudice. by District Judge Gordon P Gallagher on 08/23/2023.(dclem) (Entered: 08/23/2023) |
| 08/23/2023 | 112 | FINAL JUDGMENT in favor of The Palestine Liberation Organization, The Palestinian Authority, and Riyad Mansour against the Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, United States of America, Adrian Goldberg, Aharon Levine, Akiva Pollack, Avraham Levine, Avraham Nefoussi, Avraham Twersky, Bashy Miriam Twersky, Bassheva Miriam Pelcovics, Basya Yehudis Goldstein, Briana Hazel Goldberg, Chana Levine, Chaya Werfel, Dana-Lee Salis, David Samuel Salis, Deborah (Goldberg) Hammond, Devorah Kupinsky, Elisheva Goldberg, Eliyahu Kupinsky, Hadassa (Goldberg) Treuhaft, Haya Levine, Joseph Werfel, Julia Saif, Libby Goldberg, Malka Goldstein, Meshulem Twersky, Michal Levine, Miriam Goldstein, Mordechai Goldstein, Moshe Levine, Moshe Gedaliah Goldstein, Nechama Charlap, Norman Heching, Nuhad Saif, Refael Twersky, Rinal Saif, Rivka Walder, Rivka (Goldberg) Sireling, Sarah Rivka Goldstein, Saul Goldstein, Shelley Levine, Stefanie Levine, Yakova Kupinsky, Yerachmiel Levine, Yitzchak Kupinsky, and Yitzchok Meir Levine. Court grants Defendants Motion to Dismiss [D. 58], dismisses the remaining claims without prejudice, and case is closed. Entered by the Clerk on 08/23/2023. (dclem) (Entered: 08/23/2023) |
| 09/13/2023 | 113 | NOTICE OF APPEAL as to 111 Order on Motion to Dismiss, 112 Judgment,,,,, by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel Goldberg, Elisheva Goldberg, Libby Goldberg, Basya Yehudis Goldstein, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Chaya Werfel, Joseph Werfel (Filing fee $ 505, Receipt Number ACODC-9292218) (Attachments: # 1 Order, # 2 Final Judgment)(Perlin, Asher) (Entered: 09/13/2023) |
| 09/14/2023 | 114 | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the 113 Notice of Appeal, filed by All Plaintiffs to the U.S. Court of Appeals for the Tenth Circuit. (Retained Counsel, Fee paid) (Attachments: # 1 Docket Sheet, # 2 Preliminary Record)(trvo, ) (Entered: 09/14/2023) |
| 09/14/2023 | 115 | USCA Case Number 23-1286 for 113 Notice of Appeal, filed by Bashy Miriam Twersky, Haya Levine, Avraham Twersky, Avraham Nefoussi, Rivka Walder, Moshe Levine, Basya Yehudis Goldstein, Estate of Zidan Saif, Adrian Goldberg, David Samuel Salis, Yakova Kupinsky, Elisheva Goldberg, Avraham Levine, Estate of Rabbi Moshe Twersky, Hadassa (Goldberg) Treuhaft, Yitzchok Meir Levine, Rivka (Goldberg) Sireling, Aharon Levine, Estate of Rabbi Kalman (Cary) Levine, Julia Saif, Bassheva Miriam Pelcovics, Yerachmiel Levine, Libby Goldberg, Miriam Goldstein, Yitzchak Kupinsky, Nuhad Saif, Mordechai Goldstein, Deborah (Goldberg) Hammond, Dana-Lee Salis, Chaya Werfel, Chana Levine, Sarah Rivka Goldstein, Norman Heching, Briana Hazel Goldberg, Refael Twersky, Stefanie Levine, Shelley Levine, Meshulem Twersky, Moshe Gedaliah Goldstein, Estate of Rabbi Aryeh Kupinsky, Rinal Saif, Malka Goldstein, Akiva Pollack, Eliyahu Kupinsky, Nechama Charlap, Joseph Werfel, Saul Goldstein, Devorah Kupinsky, Michal Levine, Estate of Rabbi Abraham Samuel (Avraham) Goldberg. (schap, ) (Entered: 09/15/2023) |
| 09/28/2023 | 116 | TRANSCRIPT ORDER FORM by Plaintiffs Nechama Charlap, Estate of Rabbi Abraham Samuel (Avraham) Goldberg, Estate of Rabbi Aryeh Kupinsky, Estate of Rabbi Kalman (Cary) Levine, Estate of Rabbi Moshe Twersky, Estate of Zidan Saif, Adrian Goldberg, Briana Hazel |

| | | |
|---|---|---|
| | | Goldberg, Elisheva Goldberg, Libby Goldberg, Basya Yehudis Goldstein, Malka Goldstein, Miriam Goldstein, Mordechai Goldstein, Moshe Gedaliah Goldstein, Sarah Rivka Goldstein, Saul Goldstein, Deborah (Goldberg) Hammond, Norman Heching, Devorah Kupinsky, Eliyahu Kupinsky, Yakova Kupinsky, Yitzchak Kupinsky, Aharon Levine, Avraham Levine, Chana Levine, Haya Levine, Michal Levine, Moshe Levine, Shelley Levine, Stefanie Levine, Yerachmiel Levine, Yitzchok Meir Levine, Avraham Nefoussi, Bassheva Miriam Pelcovics, Akiva Pollack, Julia Saif, Nuhad Saif, Rinal Saif, Dana-Lee Salis, David Samuel Salis, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Avraham Twersky, Bashy Miriam Twersky, Meshulem Twersky, Refael Twersky, Rivka Walder, Chaya Werfel, Joseph Werfel. Transcript is not necessary re <u>113</u> Notice of Appeal. (schap, ) (Entered: 09/29/2023) |
| 09/29/2023 | 117 | LETTER TO USCA and all counsel certifying the record is complete as to <u>113</u> Notice of Appeal, filed by Bashy Miriam Twersky, Haya Levine, Avraham Twersky, Avraham Nefoussi, Rivka Walder, Moshe Levine, Basya Yehudis Goldstein, Estate of Zidan Saif, Adrian Goldberg, David Samuel Salis, Yakova Kupinsky, Elisheva Goldberg, Avraham Levine, Estate of Rabbi Moshe Twersky, Hadassa (Goldberg) Treuhaft, Yitzchok Meir Levine, Rivka (Goldberg) Sireling, Aharon Levine, Estate of Rabbi Kalman (Cary) Levine, Julia Saif, Bassheva Miriam Pelcovics, Yerachmiel Levine, Libby Goldberg, Miriam Goldstein, Yitzchak Kupinsky, Nuhad Saif, Mordechai Goldstein, Deborah (Goldberg) Hammond, Dana-Lee Salis, Chaya Werfel, Chana Levine, Sarah Rivka Goldstein, Norman Heching, Briana Hazel Goldberg, Refael Twersky, Stefanie Levine, Shelley Levine, Meshulem Twersky, Moshe Gedaliah Goldstein, Estate of Rabbi Aryeh Kupinsky, Rinal Saif, Malka Goldstein, Akiva Pollack, Eliyahu Kupinsky, Nechama Charlap, Joseph Werfel, Saul Goldstein, Devorah Kupinsky, Michal Levine, Estate of Rabbi Abraham Samuel (Avraham) Goldberg. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 23-01286) Text Only Entry (schap, ) (Entered: 09/29/2023) |
| 10/18/2023 | <u>118</u> | NOTICE of Entry of Appearance by Alexander N. Ely on behalf of United States of AmericaAttorney Alexander N. Ely added to party United States of America(pty:intv) (Ely, Alexander) (Entered: 10/18/2023) |
| 10/19/2023 | <u>119</u> | Unopposed MOTION to Withdraw as Attorney by Intervenor United States of America. (Avallone, Zach) (Entered: 10/19/2023) |
| 10/19/2023 | 120 | MEMORANDUM regarding <u>119</u> Unopposed MOTION to Withdraw as Attorney filed by United States of America. Motion referred to Magistrate Judge Scott T. Varholak, by District Judge Gordon P Gallagher on 10/19/2023. Text Only Entry (schap, ) (Entered: 10/19/2023) |
| 10/19/2023 | 121 | ORDER granting <u>119</u> Motion to Withdraw as Attorney. Attorney Zachary A. Avallone is relieved of any further representation of Intervenor United States. The Clerk of Court is instructed to terminate Attorney Avallone as counsel of record, and to remove his name from the electronic certificate of mailing. Intervenor United States shall continue to be represented by Attorney Alexander Ely of the Department of Justice. SO ORDERED, by Magistrate Judge Scott T. Varholak on 10/19/2023. Text Only Entry(stvlc4, ) (Entered: 10/19/2023) |
| 10/20/2023 | <u>122</u> | NOTICE OF APPEAL as to <u>111</u> Order on Motion to Dismiss, <u>112</u> Judgment,,,,, by Intervenor United States of America (Ely, Alexander) (Entered: 10/20/2023) |
| 10/23/2023 | <u>123</u> | LETTER Transmitting Notice of Appeal to all counsel advising of the transmittal of the <u>122</u> Notice of Appeal filed by United States of America to the U.S. Court of Appeals. (USA) (Attachments: # <u>1</u> Docket Sheet, # <u>2</u> Preliminary Record)(schap, ) (Entered: 10/23/2023) |
| 10/24/2023 | <u>124</u> | USCA Case Number 23-1335 for <u>122</u> Notice of Appeal filed by United States of America. (schap, ) (Entered: 10/24/2023) |
| 11/07/2023 | <u>127</u> | TRANSCRIPT ORDER FORM by Intervenor United States of America. Transcript is not necessary re <u>122</u> Notice of Appeal. (schap, ) (Entered: 11/08/2023) |
| 11/08/2023 | <u>125</u> | MOTION to Withdraw as Attorney *Brent R. Owen* by Defendants Palestine Liberation Organization, The, Palestinian Authority, The. (Attachments: # <u>1</u> Proposed Order (PDF Only)) (Owen, Brent) (Entered: 11/08/2023) |

Appellate Case: 23-1335    Document: 010110991828    Date Filed: 01/29/2024    Page: 24

| 11/08/2023 | 126 | MEMORANDUM regarding 125 MOTION to Withdraw as Attorney *Brent R. Owen* filed by Palestine Liberation Organization, The, Palestinian Authority, The. Motion referred to Magistrate Judge Scott T. Varholak, by District Judge Gordon P Gallagher on 11/8/2023. Text Only Entry (schap, ) (Entered: 11/08/2023) |
|---|---|---|
| 11/08/2023 | 128 | LETTER TO USCA and all counsel certifying the record is complete as to 122 Notice of Appeal filed by United States of America. A transcript order form was filed stating that a transcript is not necessary. ( Appeal No. 23-1335) Text Only Entry (schap, ) (Entered: 11/08/2023) |
| 11/08/2023 | 129 | ORDER granting 125 Motion to Withdraw as Attorney. Attorney Brent Rollow Owen is relieved of any further representation of Defendants. The Clerk of Court is instructed to terminate Attorney Owen as counsel of record, and to remove his name from the electronic certificate of mailing. Defendants shall continue to be represented by Attorneys Baloul, Berger, Alonzo, and Doolittle. SO ORDERED, by Magistrate Judge Scott T. Varholak on 11/8/2023. Text Only Entry(stvlc4, ) (Entered: 11/08/2023) |

<table>
<tr><td colspan="4" align="center"><strong>PACER Service Center</strong></td></tr>
<tr><td colspan="4" align="center"><strong>Transaction Receipt</strong></td></tr>
<tr><td colspan="4" align="center">01/08/2024 15:59:51</td></tr>
<tr><td><strong>PACER Login:</strong></td><td>commil9857</td><td><strong>Client Code:</strong></td><td>25991.0001</td></tr>
<tr><td><strong>Description:</strong></td><td>Docket Report</td><td><strong>Search Criteria:</strong></td><td>1:21-cv-03043-GPG-STV</td></tr>
<tr><td><strong>Billable Pages:</strong></td><td>23</td><td><strong>Cost:</strong></td><td>2.30</td></tr>
</table>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-03043-RM-STV

**SHELLEY LEVINE**;
**STEFANIE LEVINE**;
**HAYA LEVINE**, individually and as
personal representative of the Estate of Rabbi Kalman (Cary) Levine;
**ESTATE OF RABBI KALMAN (CARY) LEVINE**, by its personal representative, Haya
Levine;
**AHARON LEVINE**;
**CHANA LEVINE**;
**YEHUDA YISROEL LEVINE**;
**MICHAL LEVINE**, individually and as parent and natural guardian of minor H.Y.A.
**H.Y.A.**, minor, by her parent and natural guardian Michal Levine;
**BASSHEVA MIRIAM PELCOVICS**, individually and as parent and natural guardian of
minors L.Y.P., Y.M.P., N.B.P., and Y.C.P.;
**L.Y.P.**, minor, by her parent and natural guardian Bassheva Miriam Pelcovics;
**Y.M.P.**, minor, by his parent and natural guardian Bassheva Miriam Pelcovics;
**N.B.P.**, minor, by his parent and natural guardian Bassheva Miriam Pelcovics;
**Y.C.P.**, minor, by his parent and natural guardian Bassheva Miriam Pelcovics;
**YITZCHOK MEIR LEVINE**;
**YERACHMIEL LEVINE**;
**MOSHE LEVINE**;
**AVRAHAM LEVINE**;
**DR. NORMAN HECHING**;
**CHAYA WERFEL**, as personal representative of the Estate of Joseph Werfel;
**THE ESTATE OF JOSEPH WERFEL**, by its personal representative, Chaya Werfel;
**AVRAHAM NEFOUSSI**;
**DAVID SAMUEL SALIS**, individually and as parent and natural guardian of minor E.Y.S.;
**DANA-LEE SALIS**, individually and as parent and natural guardian of minor E.Y.S.;
**E.Y.S.**, minor, by his parents and natural guardians David Samuel Salis and Dana-Lee Salis;
**AKIVA POLLACK**;
**RABBI SAUL GOLDSTEIN**, individually and as parent and natural guardian of minors E.G.,
A.D.G., N.G. and B.G.;
**MIRIAM GOLDSTEIN**, individually and as parent and natural guardian of minors E.G.,
A.D.G., N.G. and B.G.;
**SARAH RIVKA GOLDSTEIN**;
**MORDECHAI GOLDSTEIN**;
**BASYA YEHUDIS GOLDSTEIN**;
**E.G.** minor, by his parents and natural guardians Rabbi Saul Goldstein and Miriam Goldstein;
**A.D.G.**, minor, by his parents and natural guardians Rabbi Saul Goldstein and Miriam

**0022**

Goldstein;

**N.G.**, minor, by her parents and natural guardians Rabbi Saul Goldstein and Miriam Goldstein;

**B.G.**, minor, by her parents and natural guardians Rabbi Saul Goldstein and Miriam Goldstein;

**MALKA GOLDSTEIN**;

**MOSHE GEDALIAH GOLDSTEIN**;

**YAKOVA KUPINSKY**, individually, as parent and natural guardian of minors M.K., and Y.K., and as personal representative of the estate of Rabbi Aryeh Kupinsky;

**ESTATE OF RABBI ARYEH KUPINSKY**, by its personal representative, Yakova Kupinsky;

**YITZCHAK KUPINSKY**;

**DEVORAH KUPINSKY**;

**M.K.**, minor, by her parent and natural guardian Yakova Kupinsky;

**Y.K.**, minor, by his parent and natural guardian Yakova Kupinsky;

**ELIYAHU KUPINSKY**;

**BASHY MIRIAM TWERSKY**, individually and as personal representative of the Estate of Rabbi Moshe Twersky;

**MESHULEM TWERSKY**, individually, as parent and natural guardian of minors R.T.(1), C.T., E.T.(1), Y.T., M.T., E.T.(2), and S.T., and as personal representative of the Estate of Rabbi Moshe Twersky;

**R.T.(1)**, minor, by her parent and natural guardian Meshulem Twersky;

**C.T.**, minor, by her parent and natural guardian Meshulem Twersky;

**E.T.(1)**, minor, by her parent and natural guardian Meshulem Twersky;

**Y.T.**, minor, by his parent and natural guardian Meshulem Twersky;

**M.T.**, minor, by his parent and natural guardian Meshulem Twersky;

**E.T.(2)**, minor, by her parent and natural guardian Meshulem Twersky;

**S.T.**, minor, by her parent and natural guardian Meshulem Twersky;

**ESTATE OF RABBI MOSHE TWERSKY**, by its personal representatives Bashy Miriam Twersky and Meshulem Twersky;

**REFAEL TWERSKY**, individually and as parent and natural guardian of minors A.T., I.T., and R.T.(2);

**A.T.**, minor, by his parent and natural guardian Refael Twersky;

**I.T.**, minor, by her parent and natural guardian Refael Twersky;

**R.T.(2)**, minor, by her parent and natural guardian Refael Twersky;

**RIVKA WALDER**, individually and as parent and natural guardian of minors Y.A.W., I.W. and Y.W.;

**Y.A.W.**, minor, by his parent and natural guardian Rivka Walder;

**I.W.**, minor, by her parent and natural guardian Rivka Walder;

**Y.W.**, minor, by his parent and natural guardian Rivka Walder;

**NECHAMA CHARLAP**, individually and as parent and natural guardian of minors I.C. and E.C.;

**I.C.**, minor, by her parent and natural guardian Nechama Charlap;

**E.C.**, minor, by his parent and natural guardian Nechama Charlap;

**AVRAHAM TWERSKY**;

**RINAL SAIF**, individually, as parent and natural guardian of minor, L.S., and as personal representative of the Estate of Zidan Saif;

**0023**

**ESTATE OF ZIDAN SAIF**, by its personal representative, Rinal Saif;
**L.S.**, minor, by her parent and natural guardian, Rinal Saif;
**NUHAD SAIF**;
**JULIA SAIF**;
**BRIANA HAZEL GOLDBERG**, individually and as personal representative of the Estate of
Rabbi Abraham Samuel (Avraham) Goldberg;
**ESTATE OF RABBI ABRAHAM SAMUEL (AVRAHAM) GOLDBERG**, by its personal
representative, Briana Hazel Goldberg;
**DEBORAH (GOLDBERG) HAMMOND**;
**LIBBY GOLDBERG**;
**RIVKA (GOLDBERG) SIRELING**;
**HADASSA (GOLDBERG) TREUHAFT**;
**ADRIAN GOLDBERG**; and
**ELISHEVA GOLDBERG**

      Plaintiffs,

v.

**THE PALESTINE LIBERATION ORGANIZATION**;
**THE PALESTINIAN AUTHORITY** (a/k/a "The Palestinian Interim Self-Government
Authority" and/or "The Palestinian National Authority"); and
**RIYAD MANSOUR**, as the representative of The Palestine Liberation Organization
and The Palestinian Authority,

      Defendants.

---

## FIRST AMENDED COMPLAINT AND JURY DEMAND

---

      Plaintiffs, by counsel, bring this action against Defendants, and allege as follows:

### INTRODUCTION

      1.     This is a civil action under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2331 *et*

*seq.*, and supplemental causes of action, seeking damages for international terrorism, wrongful

death, personal injury, and related harms, resulting from a terrorist shooting and stabbing attack

carried out on November 18, 2014, in a synagogue in Jerusalem, Israel (the "Terrorist Attack").

**0024**

2.      This action is brought by the personal representatives of the estates of U.S. citizens Rabbi Kalman (Cary) Levine, Rabbi Aryeh Kupinsky and Rabbi Moshe Twersky, and of non-U.S. citizens Zidan Saif and Rabbi Abraham Goldberg, all of whom were murdered in the Terrorist Attack; by U.S. citizens Rabbi Saul Goldstein, Mordechai Goldstein, Dr. Norman Heching, the late Joseph Werfel (by the personal representative of his estate), Avraham Nefoussi and David Samuel Salis, all of whom were present at the scene of the Terrorist Attack and suffered serious physical, emotional, and/or other injuries therein or as a result thereof; and by the family members of the aforementioned decedents and plaintiffs, each of whom has suffered serious emotional or other injuries as a result of the Terrorist Attack.

3.      The Terrorist Attack was executed by a constituent faction of defendant The Palestine Liberation Organization ("PLO") known as the Popular Front for the Liberation of Palestine ("PFLP"). Defendant PLO and defendant Palestinian Authority ("PA") (collectively: "defendants"[1]) aided and abetted and conspired with the PFLP to carry out the Terrorist Attack, and took other actions that facilitated, enabled, and caused the Terrorist Attack.

## **SUBJECT MATTER JURISDICTION**

4.      This Court has original subject matter over plaintiffs' ATA claims pursuant to 18 U.S.C. §§ 2331, 2333, 2334, and 2338, and 28 U.S.C. § 1331.

---

[1] For the sake of simplicity the term "defendants" used in this First Amended Complaint refers *only* to defendants PLO and PA. By contrast, Riyad Mansour, who is named in this action as a representative member of the PLO and PA, is referred to herein by his full name or by "Mansour."

**0025**

5.      This Court has supplemental subject matter jurisdiction over plaintiffs' non-federal claims pursuant to 28 U.S.C. § 1367, because the non-federal claims and the ATA claims derive from a common nucleus of operative fact.

## VENUE

6.      Venue is proper in this Court pursuant to 18 U.S.C. § 2334(a) because plaintiff Shelley Levine is domiciled and resides in Boulder, Colorado.

## PERSONAL JURISDICTION

7.      This Court has acquired personal jurisdiction over defendants PLO and PA pursuant to Rule 4(k)(1)(C) of the Federal Rules of Civil Procedure because the PLO and PA have waived service of process in this action (DE 15) and 18 U.S.C. § 2334(a) is a federal statute that authorizes nationwide service of process in actions under the ATA.

8.      Additionally or alternatively, this Court has acquired personal jurisdiction over defendants PLO and PA pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure, because the PLO and PA have waived service of process in this action (DE 15), they are not subject to jurisdiction in any individual state's courts of general jurisdiction, and exercising personal jurisdiction over the PLO and PA is consistent with the United States Constitution and laws.

9.      The PLO and PA cannot assert a Due Process challenge to the exercise of personal jurisdiction over them in this action because the PLO and the PA have no Due Process rights.

10.     As its name indicates ("Palestine Liberation Organization") the PLO is a foreign political entity. The Executive Branch has correctly stated that: "Foreign entities such as the PLO obviously do not have due process rights since they are not part of our constitutional scheme."

**0026**

*Palestine Info. Office v. Schultz*, No. 87-5396 (D.C. Cir. Jan. 1988), Brief for the U.S., at 44. Similarly, the Executive Branch has accurately stated that "[a]s a foreign political entity, the PLO does not itself enjoy constitutional protection … It is clear, for example, that the PLO would not be recognized by American courts as a juridical entity capable of bringing a constitutional claim. Neither will the argument that the PLO is not a sovereign nation bring it within the constitutional fold." *Constitutionality of Closing the Palestine Information Office, an Affiliate of the Palestine Liberation Organization*, 11 Op. O.L.C. 104 (1987) at 120 (citation omitted).

11.     Defendant PA is a foreign government. As such, it is not a "person" within the meaning of the Due Process Clause. The Judicial Branch has properly determined that the Due Process Clause protects only *people*, never governments.[2] The Executive Branch, too, has correctly taken the position that a government entity, including a non-sovereign government (such as defendant PA), is not a "person" under the Due Process Clause.[3]

12.     Alternatively, if the Court finds that the PLO and/or the PA are entitled to the protections of the Due Process Clause, it can and should exercise personal jurisdiction over them in this action on the bases set forth below.

---

[2] *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966) (U.S. States); *U.S. v. Cardinal Mine Supply, Inc.*, 916 F.2d 1087, 1089-90 (6th Cir. 1990) (federal government); *Appling Cty. v. Mun. Elec. Auth.*, 621 F.2d 1301, 1308 (5th Cir. 1980) (county); *City of E. St. Louis v. Cir. Ct. for the Twentieth Jud. Cir., St. Clair Cnty., Ill.*, 986 F.2d 1142, 1144 (7th Cir. 1993) (municipalities); *Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*, 59 F. Supp. 2d 310, 325 (D.P.R. 1999) (Puerto Rico); *Virgin Islands v. Miller*, 2010 WL 1790213, at *5 (V.I. Super. May 4, 2010) (Virgin Islands); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002) (foreign states).

[3] *Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*, No. 96-1304 (D.P.R. 1996), United States' Motion for Partial Dismissal, at 24-25.

**0027**

A.      **Specific Jurisdiction**

13.     As set forth in detail below : (i) the Terrorist Attack was carried out pursuant to the defendants' long-standing policy and practice of using terrorism, and the threat of further terrorism, to obtain concessions from Israel; (ii) the defendants recognize that they cannot obtain concessions from Israel unless the United States and the American public use their influence and leverage with Israel to convince it to make concessions; and (iii) in order to cause the United States and the American public to exercise their influence over Israel to make such concessions, the defendants utilized a "double-pronged strategy": (a) the defendants employed terrorist violence to provoke the interest and concern of the United States and the American public about Middle East peace and security and (b) in parallel, defendants argued and advocated to the United States and the American public that in order to end the terrorist violence, the United States and the American public must persuade Israel to make the concessions sought by the defendants.

14.     Between 1994 and the date of the Terrorist Attack, the PLO and PA maintained and operated a joint office in Washington, D.C., staffed by senior officials and numerous employees of the PLO and PA. The activities of that office, and the fact that the office and its personnel were maintained by and operated on behalf of both the PLO and the PA, have been the subject of many federal court decisions, and the defendants are precluded from contesting those factual holdings.

15.     The primary activity of defendants' D.C. office and staff was to carry out advocacy, public relations and propaganda on behalf of defendants PLO and PA in the United States. During the years prior and leading up to the Terrorist Attack, defendants' D.C.-based officers and staff conducted and participated in thousands of media interviews, public lectures, conferences, symposia, academic events, meetings, and other events across the United States. They issued numerous

**0028**

press releases and statements, and published materials on defendants' U.S.-based, English-language website. A central message and theme that defendants' D.C. office and staff communicated to the American public generally, to American opinion makers, and to American policy-makers, politicians and officials, in the course of these wide-ranging advocacy activities, was that the terrorist violence in Israel, the West Bank, and Gaza, would end only after Israel made the concessions that the defendants sought, and that the United States and the American public should use their leverage and influence with Israel to cause it to make those concessions.

16.     The Fifth Amendment's Due Process Clause permits the exercise of jurisdiction over a defendant for claims which "relate to" the defendant's contacts with the United States. Defendants' extensive advocacy activities in the United States in the years prior to the Terrorist Attack sufficiently "relate to" plaintiffs' claims, because those activities were an integral part of the defendants' "double-pronged strategy" (described above) of using terrorism to achieve their goals.

**B.     Consent Jurisdiction**

17.     Additionally or alternatively, this Court has personal jurisdiction over the PLO and PA in this action pursuant to the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, div. J, tit. IX, § 903, 133 Stat. 3082 (codified at 18 U.S.C. § 2334(e)). Defendants PLO and PA have consented to personal jurisdiction in ATA actions such as this, pursuant to the provisions of the PSJVTA, because the PLO and PA have elected to engage in the activities described in 18 U.S.C. § 2334(e)(1) after the trigger dates specified in the PSJVTA.

18.     For decades, defendants PLO and PA have maintained a practice and program (known as "Pay-for-Slay") of paying benefits to the family members of suicide bombers and other terrorists killed while carrying out deadly terrorist attacks against Jewish and Israeli targets, and

**0029**

to the family members of terrorists who were imprisoned after pleading guilty to or being tried and convicted of executing such attacks. Scores of U.S. citizens were murdered or injured in the terrorist attacks for which defendants make these Pay-for-Slay payments.[4] Defendants' Pay-for-Slay payments thus meet all the elements of the payments described in 18 U.S.C. § 2334(e)(1)(A).

19.    Congress has determined that "[t]he Palestinian Authority's practice of paying salaries to terrorists serving in Israeli prisons, as well as to the families of deceased terrorists, is an incentive to commit acts of terror." Taylor Force Act, Pub. L. No. 115-141, § 1002(1) (Findings) (22 U.S.C. § 2378c-1 note) (Mar. 23, 2018). Congress has also called on "the Palestinian Authority, the Palestine Liberation Organization, and any successor or affiliated organizations to stop payments for acts of terrorism by individuals who are imprisoned after being fairly tried and convicted for acts of terrorism and by individuals who died committing acts of terrorism" and has conditioned aid to the defendants on the termination of these payments. *Id*. at § 1003(1), § 1004.

20.    But defendants PLO and PA have defied the United States, and have publicly stated that they continued to make these Pay-for-Slay payments after the trigger date provided in the PSJVTA (120 days after the enactment of the PSJVTA, *i.e.*, April 18, 2020), and will continue to do so forever. For example, on June 8, 2020, PA Prime Minister Mohammad Shtayyeh stated in a television interview that: "[W]e continued to pay the prisoners and the *shahids* [martyrs] in full …

---

[4] The identities of the many Americans killed and injured in terrorist attacks in Israel, the West Bank and Gaza, for which defendants make their Pay-for-Slay payments, the circumstances of those attacks and the identities of many of the terrorists involved are generally available on the dockets of federal courts that have heard civil actions under the ATA and the Foreign Sovereign Immunities Act arising from those attacks. *See e.g. Linde v. Arab Bank*, Civ. Nos. 04-2799, 04-5449, 05-365 (E.D.N.Y.); *Campuzano v. Islamic Republic of Iran*, Civ. Nos. 00-2328, 01-1655 (D.D.C.); *Sokolow v. PLO*, Civ. No. 04-397 (S.D.N.Y); *Henkin v. Islamic Republic of Iran*, Civ. Nos. 18-1273, 19-1184 (D.D.C.).

We will remain committed to this until Judgment Day, until we are victorious, until the bloodbath stops, and until the prisons are closed. This is one issue to which we remain committed."[5]

21.     Defendants PLO and PA have thus admitted that they made payments constituting consent to jurisdiction under 18 U.S.C. § 2334(e)(1)(A). Defendants have explicitly conceded this fact on the record in this action. *See* DE 30 at 7, n.5.

22.     Moreover, documents produced to the plaintiffs by defendants show that subsequent to April 18, 2020, defendants made over one thousand Pay-for-Slay payments, totaling millions of dollars, to over 100 terrorists involved (or to the family members of terrorists who were killed) in some 50 terrorist attacks in which American citizens were killed or injured.

23.     Furthermore, documents produced to the plaintiffs by defendants show that in the years since the Terrorist Attack from which this action arises, both prior and subsequent to April 18, 2020, defendants made monthly Pay-for-Slay payments to the families of the terrorist murderers who carried out the Terrorist Attack, Uday Abu Jamal and Ghassan Abu Jamal.

24.     Defendants PLO and PA have also consented to personal jurisdiction under 18 U.S.C. § 2334(e)(1)(B)(i), because after the trigger date provided in the PSJVTA (15 days after the enactment of the PSJVTA, *i.e.*, January 4, 2020), the PLO and PA continued to maintain offices, headquarters, premises and other facilities in the United States, at a building owned by them at 115 East 65th Street in New York. Deposition transcripts and documents produced to the

---

[5] Palestinian Prime Minister Mohammad Shtayyeh: We Are Reconsidering Our 1993 Recognition of Israel; We Will Continue to Pay Salaries to Families of Prisoners and "Martyrs," https://www.memri.org/reports/palestinian-prime-minister-mohammad-shtayyeh-we-are-reconsidering-our-1993-recognition.

**0031**

plaintiffs by defendants PLO and PA, and/or that are publicly available, show that that building is used, among other things, as a personal residence, and to conduct propaganda, social media, and other public relations activities that are unrelated to the official business of the United Nations.

25.     Deposition transcripts and documents produced to the plaintiffs by defendants PLO and PA, and/or that are publicly available, show that defendants PLO and PA have also consented to personal jurisdiction under 18 U.S.C. § 2334(e)(1)(B)(iii), because after January 4, 2020, defendants and their employees and agents conducted activities on defendants' behalf while physically present in the United States, including extensive propaganda, public relations, lobbying, and social media activities that are unrelated to the official business of the United Nations.

26.     Defendant PA was created in 1994 pursuant to agreements between the PLO and the State of Israel known as the Oslo Accords. Pursuant to the Oslo Accords, which govern the PA's capacity and authority, the PA lacks legal capacity to conduct foreign relations. *Gilmore v. Palestinian Authority*, 422 F. Supp. 2d 96, 101 (D.D.C. 2006) (The Oslo Accords "clearly indicate that the PA lacks the capacity to conduct foreign relations."). The PA is not an invitee of the UN, is not an observer at the UN, and has no status whatsoever at the UN. Therefore, as a threshold matter of law and fact, the PA's conduct and activities in the United States after January 4, 2020, and the conduct and activities of the PA's employees and agents in the United States after that date, are not and cannot be related to the official business of the United Nations.

**C.     Jurisdiction Pursuant to Rule 23.2 of the Federal Rules of Civil Procedure**

27.     Additionally or alternatively, this Court has personal jurisdiction over the PLO and PA pursuant to Rule 23.2 of the Federal Rules of Civil Procedure.

28.     The PLO and PA are both unincorporated associations. *Waldman v. PLO*, 835 F.3d

317, 332 (2d Cir. 2016) ("the PA is a non-sovereign government and the PLO is a foreign agent,

and both are unincorporated associations.").

29.     The PLO and PA are judicially estopped from disputing that they are unincorpo-

rated associations, because they have successfully obtained dismissal of claims against them on

the basis of the fact that they are unincorporated associations. *Shatsky v. PLO*, 2017 WL 2666111,

at *10 (D.D.C. June 20, 2017) (agreeing that "the PLO and the PA are unincorporated associations"

and granting motion by PLO and PA to dismiss non-federal claims against them for lack of capac-

ity); *Sokolow v. PLO*, 60 F. Supp. 3d 509, 524 (S.D.N.Y. 2014) (same); *Parsons v. Palestinian

Authority*, No. 07-cv-1847, DE 14 at 13-14 (D.D.C. Sept. 30, 2008) (same).

30.     Pursuant to Rule 23.2 of the Federal Rules of Civil Procedure, the PLO and the PA,

as unincorporated associations, are each subject to suit "by naming certain members as representa-

tive parties." Fed. R. Civ. P. 23.2.

31.     Plaintiffs have named defendant Riyad Mansour ("Mansour") as a representative

member of both the PLO and the PA. Riyad Mansour is a resident, domiciliary and citizen of the

United States. He has resided and been domiciled in the United States for over 50 years, and has

been a United States citizen for many decades. His home address is in Orlando, Florida (where he

owns a private residence), but he often resides in defendants' building at 115 East 65th Street in

New York. As a domiciliary of the United States, Mansour is subject to the general personal juris-

diction of this Court, pursuant to 18 U.S.C. § 2334(a).

**0033**

32. Pursuant to Rule 23.2, because this Court has jurisdiction over the representative member of the PLO and PA named in this action, Riyad Mansour, this Court also has personal jurisdiction over the PLO and PA.[6]

33. Riyad Mansour is a senior member and officer of the PLO and PA, and he will fairly and adequately protect the interests of the PLO and PA and their members in this action.

34. Mansour joined the PLO in 1983, and at that time began serving in a senior position ("Deputy Permanent Observer") at the PLO's UN Observer Mission. Mansour remained in that post until 1994. Since 2005 and until the present day, Riyad Mansour has served the PLO in the top position ("Permanent Observer") at the PLO's UN Mission.

35. On September 5, 2005, defendant PA appointed Riyad Mansour to a very senior position (with the civil service rank of "ambassador") within the PA's Ministry of Foreign Affairs. Mansour holds and serves in that official rank and position in the PA until today.

36. All of the elements of Rule 23.2 are therefore satisfied, and this Court has personal jurisdiction over defendants PLO and PA.

37. Because defendants are subject to personal jurisdiction on plaintiffs' ATA claims, because the ATA authorizes nationwide personal jurisdiction and service of process, and because plaintiffs' ATA claims and non-federal claims derive from the same common nucleus of operative fact, this Court has pendent personal jurisdiction over defendants for plaintiffs' non-federal claims.

---

[6] "[A] a court has jurisdiction over an unincorporated association pursuant to Rule 23.2 Fed.R.Civ.P. on the basis of personal jurisdiction over the named class representatives." *Battle Fowler v. Brignoli*, 765 F. Supp. 1202, 1204 (S.D.N.Y.), *aff'd*, 952 F.2d 393 (2d Cir. 1991). *Cf.* 7C C. Wright, A. Miller, M. Kane, *Federal Practice and Procedure*: Civil 3d § 1861 (2021) (same).

**0034**

## THE PARTIES

38.     Plaintiff Shelley Levine is and at all times was an American citizen, and the sister of American citizen Rabbi Kalman (Cary) Levine, who was murdered in the Terrorist Attack. Plaintiff Shelley Levine is domiciled and resides in Boulder, Colorado.

39.     Plaintiff Stefanie Levine is and at all times was an American citizen, and the sister of Rabbi Kalman (Cary) Levine.

40.     Plaintiff Haya Levine is and at all relevant times was an American citizen. She is the widow and personal representative of the estate of Rabbi Kalman (Cary) Levine. Haya Levine brings this action individually and on behalf of the Estate of Rabbi Kalman (Cary) Levine.

41.     Plaintiff the Estate of Rabbi Kalman (Cary) Levine brings this action through its personal representative, plaintiff Haya Levine.

42.     Plaintiff Aharon Levine is and at all times was an American citizen and the son of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine.

43.     Plaintiff Chana Levine is and at all times was an American citizen and the daughter of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine.

44.     Plaintiff Yehuda Yisroel Levine is and at all times was an American citizen and the son of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine.

45.     Plaintiff Michal Levine is and at all times was an American citizen, and the daughter of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine. Michal Levine brings this action individually and as parent and natural guardian of her minor daughter plaintiff H.Y.A.

46.     Plaintiff H.Y.A., minor, is and at all times was an American citizen, and the granddaughter of Rabbi Kalman (Cary) Levine.

**0035**

47.     Plaintiff Bassheva Miriam Pelcovics is and at all times was an American citizen, and the daughter of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine. Bassheva Miriam Pelcovics brings this action individually and as parent and natural guardian of her minor children, plaintiffs L.Y.P., Y.M.P., N.B.P., and Y.C.P.

48.     Plaintiffs L.Y.P., Y.M.P., N.B.P., and Y.C.P. are and at all times were American citizens, and the grandchildren of Rabbi Kalman (Cary) Levine.

49.     Plaintiff Yitzchok Meir Levine is and at all times was an American citizen, and the son of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine.

50.     Plaintiff Yerachmiel Levine is and at all times was an American citizen, and the son of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine.

51.     Plaintiff Moshe Levine is and at all times was an American citizen, and the son of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine.

52.     Plaintiff Avraham Levine is and at all times was an American citizen, and the son of Rabbi Kalman (Cary) Levine and plaintiff Haya Levine.

53.     Plaintiff Dr. Norman Heching was stabbed during the Terrorist Attack and is and at all times was an American citizen. Plaintiff the Estate of Joseph Wefel brings this action through its personal representative, plaintiff Chaya Werfel.

54.     Plaintiff Chaya Werfel is and at all relevant times was an American citizen. She brings this action as the widow, sole heir, and personal representative of the estate of decedent Joseph Werfel. Joseph Werfel was present at the scene of the Terrorist Attack and was at all times an American citizen.

**0036**

55.     Plaintiff the Estate of Joseph Werfel brings this action through its personal representative, plaintiff Chaya Werfel.

56.     Plaintiff Avraham Nefoussi was present at the scene of the Terrorist Attack and is and at all times was an American citizen.

57.     Plaintiff David Samuel Salis was present at the scene of the Terrorist Attack and is and at all times was an American citizen. David Samuel Salis brings this action individually and as parent and natural guardian of his son, minor plaintiff E.Y.S.

58.     Plaintiff Dana-Lee Salis is and at all relevant times was the spouse of plaintiff David Samuel Salis. Dana-Lee Salis brings this action individually and as parent and natural guardian of her son, minor plaintiff E.Y.S.

59.     Plaintiff E.Y.S., minor, is and at all times was an American citizen, and the son of plaintiffs David Samuel Salis and Dana-Lee Salis.

60.     Plaintiff Akiva Pollack was present at the scene of the Terrorist Attack and is and at all times was an American citizen.

61.     Plaintiff Rabbi Saul Goldstein was stabbed during the Terrorist Attack and is and at all times was an American citizen. Rabbi Saul Goldstein brings this action individually and as parent and natural guardian of his minor children, plaintiffs E.G., A.D.G., N.G., and B.G.

62.     Plaintiff Miriam Goldstein is and at all relevant times was an American citizen, and the spouse of plaintiff Rabbi Saul Goldstein. Miriam Goldstein brings this action individually and as parent and natural guardian of her minor children, plaintiffs E.G., A.D.G., N.G., and B.G.

**0037**

63.     Plaintiff Sarah Rivkah Goldstein is and at all times was an American citizen, the daughter of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the sister of plaintiff Mordechai Goldstein.

64.     Plaintiff Mordechai Goldstein is and at all times was an American citizen, and the son of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein. Plaintiff Mordechai Goldstein was also present at the scene of the Terrorist Attack.

65.     Plaintiff Basya Yehudis Goldstein is and at all times was an American citizen, the daughter of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the sister of plaintiff Mordechai Goldstein.

66.     Plaintiff E.G., minor, is and at all times was an American citizen, the son of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the brother of plaintiff Mordechai Goldstein.

67.     Plaintiff A.D.G., minor, is and at all times was an American citizen, the son of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the brother of plaintiff Mordechai Goldstein.

68.     Plaintiff N.G., minor, is and at all times was an American citizen, the daughter of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the sister of plaintiff Mordechai Goldstein.

69.     Plaintiff B.G., minor, is and at all times was an American citizen, the daughter of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the sister of plaintiff Mordechai Goldstein.

0038

70.     Plaintiff Malka Goldstein is and at all times was an American citizen, the daughter of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the sister of plaintiff Mordechai Goldstein.

71.     Plaintiff Moshe Gedaliah Goldstein is and at all times was an American citizen, the son of plaintiffs Rabbi Saul Goldstein and Miriam Goldstein, and the brother of plaintiff Mordechai Goldstein.

72.     Plaintiff Yakova Kupinsky is and at all relevant times was an American citizen. She is the widow and personal representative of the estate of American citizen, Rabbi Aryeh Kupinsky, who was murdered in the Terrorist Attack, and the mother of minor plaintiffs M.K., and Y.K. Yakova Kupinsky brings this action individually, on behalf of the Estate of Rabbi Aryeh Kupinsky, and as parent and natural guardian of her minor children, M.K., and Y.K.

73.     Plaintiff the Estate of Rabbi Aryeh Kupinsky brings this action through its personal representative, plaintiff Yakova Kupinsky.

74.     Plaintiff Yitzchak Kupinsky is and at all times was an American citizen and the son of Rabbi Aryeh Kupinsky and plaintiff Yakova Kupinsky.

75.     Plaintiff Devorah Kupinsky is and at all times was an American citizen and the daughter of Rabbi Aryeh Kupinsky and plaintiff Yakova Kupinsky.

76.     Plaintiff M.K., minor, is and at all times was an American citizen and the daughter of Rabbi Aryeh Kupinsky and plaintiff Yakova Kupinsky.

77.     Plaintiff Y.K., minor, is and at all times was an American citizen and the son of Rabbi Aryeh Kupinsky and plaintiff Yakova Kupinsky.

78.   Plaintiff Eliyahu Kupinsky, is and at all times was an American citizen and the son of Rabbi Aryeh Kupinsky and plaintiff Yakova Kupinsky.

79.   Plaintiff Bashy Miriam Twersky is and at all relevant times was an American citizen. She is the widow and personal representative of the estate of American citizen, Rabbi Moshe Twersky, who was murdered in the Terrorist Attack. Bashy Miriam Twersky brings this action individually and on behalf of the Estate of Rabbi Moshe Twersky.

80.   Plaintiff Meshulem Twersky is and at all relevant times was an American citizen, and the son of Rabbi Moshe Twersky and plaintiff Bashy Miriam Twersky. Together with his mother, plaintiff Bashy Miriam Twersky, he is personal representative of the Estate of Rabbi Moshe Twersky. Meshulem Twersky brings this action individually, on behalf of the Estate of Rabbi Moshe Twersky, and as parent and natural guardian of his minor children plaintiffs R.T.(1), C.T., E.T.(1), Y.T., M.T., E.T.(2), and S.T.

81.   Plaintiffs R.T.(1), C.T., E.T.(1), Y.T., M.T., E.T.(2), and S.T., minors, are and at all times were American citizens, and the grandchildren of Rabbi Moshe Twersky.

82.   Plaintiff the Estate of Rabbi Moshe Twersky brings this action through its personal representatives, plaintiffs Bashy Miriam Twersky and Meshulem Twersky.

83.   Plaintiff Refael Twersky is and at all times was an American citizen, and the son of Rabbi Moshe Twersky and plaintiff Bashy Miriam Twersky. Rafael Twersky brings this action individually and as parent and natural guardian of his minor children plaintiffs A.T., I.T., and R.T.(2).

84.   Plaintiffs A.T., I.T., and R.T.(2), minors, are and at all times were American citizens, and the grandchildren of Rabbi Moshe Twersky.

0040

85.     Plaintiff Rivka Walder is and at all times was an American citizen, and the daughter of Rabbi Moshe Twersky and plaintiff Bashy Miriam Twersky. Rivka Walder brings this action individually and as parent and natural guardian of her minor children plaintiffs Y.A.W., I.W., and Y.W.

86.     Plaintiffs Y.A.W., I.W., and Y.W., minors, are and at all times were American citizens, and the grandchildren of Rabbi Moshe Twersky.

87.     Plaintiff Nechama Charlap is and at all times was an American citizen, and the daughter of Rabbi Moshe Twersky and plaintiff Bashy Miriam Twersky. Nechama Charlap brings this action individually and as the parent and natural guardian of her minor children plaintiffs I.C. and E.C.

88.     Plaintiffs I.C. and E.C., minors, are and at all times were American citizens, and the grandchildren of Rabbi Moshe Twersky.

89.     Plaintiff Avraham Twersky is and at all times was an American citizen, and the son of Rabbi Moshe Twersky and plaintiff Bashy Miriam Twersky.

90.     Plaintiff Rinal Saif, is the widow and personal representative of the estate of Zidan Saif, a policeman who was among the first to respond to emergency calls regarding the Terrorist Attack. Zidan Saif was mortally wounded and later died of his wounds. Rinal Saif is also the mother of minor plaintiff, L.S. Rinal Sarif brings this action individually and on behalf of the Estate of Zidan Saif, and as the parent and natural guardian of her minor child, L.S.

91.     Plaintiff the Estate of Zidan Saif brings this action through its personal representative, plaintiff, Rinal Saif.

92.     Plaintiff L.S. is the minor daughter of Zidan Saif.

0041

93.     Plaintiff Nuhad Saif is the father of Zidan Saif.

94.     Plaintiff Julia Saif is the mother of Zidan Saif.

95.     Plaintiff Briana Hazel Goldberg is the widow and personal representative of the estate of Rabbi Avraham Shmuel (Abraham) Goldberg, who was murdered in the Terrorist Attack. Briana Goldberg brings this action individually and on behalf of the Estate of Rabbi Avraham Shmuel (Abraham) Goldberg.

96.     Plaintiff Estate of Rabbi Abraham Samuel (Avraham) Goldberg brings this action through its personal representative, plaintiff Briana Hazel Goldberg.

97.     Plaintiff Deborah (Goldberg) Hammond is the daughter of Rabbi Avraham Shmuel (Abraham) Goldberg.

98.     Plaintiff Libby Goldberg is the daughter of Rabbi Avraham Shmuel (Abraham) Goldberg.

99.     Plaintiff Rivka (Goldberg) Sireling is the daughter of Rabbi Avraham Shmuel (Abraham) Goldberg.

100.     Plaintiff Hadassa (Goldberg) Treuhaft is the daughter of Rabbi Avraham Shmuel (Abraham) Goldberg.

101.     Plaintiff Adrian Goldberg is the son of Rabbi Avraham Shmuel (Abraham) Goldberg.

102.     Plaintiff Elisheva Goldberg is the daughter of Rabbi Avraham Shmuel (Abraham) Goldberg.

103.     Defendant PLO is a person as defined in 18 U.S.C. § 2331. Defendant PLO aided and abetted, conspired to carry out, caused, and executed the Terrorist Attack.

104.     Defendant PA is a person as defined in 18 U.S.C. § 2331. Defendant PA aided and abetted, conspired to carry out, caused, and executed the Terrorist Attack.

105.     Defendant Riyad Mansour, a citizen and domiciliary of the United States, is a senior official and member of the PLO and the PA, and is named in this action as the representative member of the PLO and PA pursuant to Fed. R. Civ. P. 23.2.

## STATEMENT OF FACTS

### A.     Historical and Geographical Context

106.     The establishment of the State of Israel was proclaimed on May 14, 1948, and President Harry S. Truman recognized the new nation just eleven minutes after its independence was declared. Hours later, the regular armies of Egypt, Jordan, Syria, Lebanon, and Iraq invaded the nascent country, in an effort to destroy Israel in its infancy. The invading armies were joined in this effort by thousands of local armed irregulars and guerillas. This fighting, known as Israel's War of Independence, lasted into 1949, when Israel and most of the invading countries signed armistice agreements. The conclusion of the War of Independence left the West Bank (including East Jerusalem) under Jordanian rule, and the Gaza Strip under Egyptian rule.

107.     Eighteen years later, in June 1967, full-scale armed conflict again erupted between Israel, Egypt, Jordan and Syria. During this conflict, generally known as the Six-Day War, Israel captured the West Bank (including East Jerusalem) from Jordan, and the Gaza Strip from Egypt.[7]

---

[7] During the Six-Day War Israel also captured the Sinai Peninsula from Egypt, and the Golan Heights from Syria. Sinai was returned to Egypt as part of the 1979 Camp David peace agreement between Israel and Egypt. Israel effectively annexed the Golan Heights in 1981.

### B.   The PLO and the PFLP

108.    Defendant Palestine Liberation Organization ("PLO") was founded in 1964 (*i.e.*, long prior to Israel's capture of the West Bank and Gaza Strip). The structure and internal operations of the PLO are governed by the PLO's Basic Law. The two most important governing bodies in the PLO are the Palestine National Council ("PNC"), and the Executive Committee. The PNC has several hundred members, convenes in full infrequently, and is the highest decision-making body in the PLO. The PLO Executive Committee has fewer than 20 members, meets frequently, and controls the day-to-day operations of the PLO.

109.    The leader of the PLO is the Chairman of the PLO Executive Committee (also known as "Chairman of PLO"). Between 1969 and 2004 the Chairman of the PLO was the late Yasser Arafat. Since Arafat's death in 2004 the Chairman of the PLO has been Mahmoud Abbas.

110.    Since the late 1960's the PLO has been an "umbrella" organization composed of several constituent factions. Each of these factions has representatives in the PNC and on the PLO Executive Committee. The largest faction in the PLO has always been the "Fatah" faction, headed first by Yasser Arafat and then by Mahmoud Abbas. The Popular Front for the Liberation of Palestine ("PFLP") has always been the second largest faction in the PLO. The third-largest faction in the PLO is the Democratic Front for the Liberation of Palestine ("DFLP").

111.    The PLO's factions, including the PFLP, are not separately incorporated and do not have legal personalities separate from the PLO. The factions, including the PFLP, are merely subdivisions or departments of the PLO, and the members of the various factions are ipso facto members of the PLO. Thus, all members of the PFLP are members of the PLO.

**0044**

112.    Under the PLO's rules of internal organizational governance, including the PLO's

Basic Law, the internal by-laws of the PLC, and the PLO's Revolutionary Penal Code, the PLO

has the right, the authority and the ability to control, to discipline, and to expel from the PLO, any

of its factions and any members of its factions, including the PFLP and the members of the PFLP.

113.    The PLO's control over its factions is especially pronounced in respect to smaller

factions such as the PFLP. That is because the largest faction, Fatah, has since the late 1960s been

far larger and controlled far more seats in the PNC and in the PLO Executive Committee than all

the other factions combined. Additionally, the head of Fatah (first Yasser Arafat and then

Mahmoud Abbas), has since the late 1960s served as the Chairman of the PLO. Thus, for over 50

years, the Fatah-dominated PLO has had a broad array of overwhelming levers of control over its

minority PFLP faction—among its other powers, the PLO had the ability to deprive the PFLP of

organizational roles, positions, privileges, and benefits; the PLO had the ability to cut its financial

and other material support (discussed below) to the PFLP; and the PLO had the ability to expel the

PFLP, and/or its leaders and members, from the PLO.

114.    Since its founding in 1964, the supreme goal of the PLO (including its constituent

factions) has been to end Israeli control over, and the presence of Jews in, territories which com-

prise the State of Israel, the West Bank (including Jerusalem) and the Gaza Strip. Since its found-

ing, the PLO (including its constituent factions) has sought to achieve this goal by using and facil-

itating terrorist violence in an attempt to force and intimidate the government and citizens of Israel

to cede physical and political control over areas held by Israel. The PLO (including its constituent

factions) has at all times believed that by using and facilitating terrorism, it will weaken, undermine

and demoralize Israel's government, population, institutions, and economy, and thereby coerce

**0045**

Israel into capitulating to the PLO's territorial demands and achieve its goal of ending the Israeli and Jewish presence in areas governed by Israel.

115.    Thus, since its founding, in an effort to achieve its supreme goal of ending Israeli control over, and the presence of Jews in, these areas, the PLO has facilitated and carried out tens of thousands of terrorist attacks against Jewish and Israeli targets, resulting in the deaths of thousands of innocent civilians and the wounding of many thousands more. Hundreds of United States nationals have been killed or injured by terrorist attacks facilitated and carried out by the PLO and its constituent factions. In a determination made in 1987 that remains in force today, Congress found that "the PLO and its constituent groups have taken credit for, and been implicated in, the murders of dozens of American citizens abroad" and that "the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and to international law." 22 U.S.C. § 5201. As the PLO's second-largest faction, the PFLP is one of the PLO's "constituent groups" referenced by Congress in § 5201. The PFLP has been continuously designated by the United States government as a Specially Designated Terrorist ("SDT") since 1995, as a Foreign Terrorist Organization ("FTO") since 1997, and as a Specially Designated Global Terrorist ("SDGT") since 2001.

116.    Since the 1980s, however, the PLO has recognized that terrorism and the threat of terrorism cannot, standing alone, force Israel to capitulate to the PLO's demands. For example, a top U.S.-based representative of the PLO (and the PA), Maen Areikat, stated in an interview with Tablet magazine in 2010 that, "**Israel is the stronger party in the equation. Palestinians have no way of forcing Israel to accept anything. … Do you think we would be able to force Israel to do things that they don't want to do?**" Since the 1980s the PLO has also recognized that the

United States, and the American public, have enormous influence and leverage with Israel, and have the ability to cause Israel to make the concessions and take the actions that the PLO seeks.

117.    Accordingly, the PLO (including its constituent factions) has for many decades used and facilitated terrorist violence to create an atmosphere of crisis and instability in the Middle East, in order to draw the United States and the American public into the Israeli-Palestinian conflict. The PLO has done so because it believes that the United States and the American public are interested in achieving calm and stability in the Middle East, and will therefore use their influence and leverage with Israel to convince Israel to make territorial concessions to the PLO, in order to end the terrorist violence generated by the PLO.

## C.    The Palestinian Authority

118.    Defendant Palestinian Authority ("PA") was established in 1994 pursuant to agreements between the PLO and the State of Israel known as the Oslo Accords.

119.    Pursuant to the Oslo Accords, the PA is a non-sovereign governmental entity, with a range of authority and powers over the territories and residents of the Palestinian cities and villages in the West Bank and the Gaza Strip. In 2007, the Hamas terrorist organization seized the Gaza Strip.

120.    Since its establishment, the PA has been both legally and practically subordinate to and controlled by the PLO. The President of the PA has always been the Chairman of the PLO; thus, between 1994 and 2004 the President of the PA was PLO Chairman Yasser Arafat, and since Arafat's death in 2004 the President of the PA has been PLO Chairman Mahmoud Abbas. Additionally, since its establishment, the PA's various governmental departments and agencies have been headed, staffed and controlled almost exclusively by PLO officials and operatives. Since the

26

**0047**

PA was established, the PA and PLO have acted in complete unison and concert, and pursuant to shared policies and goals.

121.    Since its establishment, the PA's supreme goal (like the PLO) has been to end Israeli control over, and the presence of Jews in, territories in the State of Israel, the West Bank (including Jerusalem) and the Gaza Strip. Since its establishment the PA has worked hand-in-glove with the PLO (including its constituent factions) to achieve this goal by using and facilitating terrorist violence in an attempt to force and intimidate the government and citizens of Israel to cede physical and political control over areas held by Israel. The PA has at all times believed that by using and facilitating terrorism, it will weaken, undermine and demoralize Israel's government, population, institutions, and economy, and thereby coerce Israel into capitulating to the territorial demands of the PA and PLO, and thus achieve defendants' shared goal of ending the Israeli and Jewish presence in areas governed by Israel.

122.    Thus, since its establishment, in an effort to achieve defendants' shared goal of ending the Israeli and Jewish presence in areas governed by Israel, the PA has facilitated and carried out thousands of terrorist attacks against Jewish and Israeli targets, resulting in the deaths of thousands of innocent civilians and the wounding of many thousands more. Dozens of Americans have been killed or injured by terrorist attacks facilitated and carried out by the PA.

123.    Since its creation, however, the PA (like the PLO) has recognized that terrorism and the threat of terrorism cannot, standing alone, force Israel to capitulate to the demands of the PA and PLO. For example, a top U.S.-based representative of the PA (and the PLO), Maen Areikat, stated in an interview with Tablet magazine in 2010 that, "**Israel is the stronger party in the equation. Palestinians have no way of forcing Israel to accept anything. … Do you think we**

**would be able to force Israel to do things that they don't want to do?**" Since its creation, the PA has also recognized that the United States, and the American public, have enormous influence and leverage with Israel, and have the ability to cause Israel to make the concessions and take the actions that the PA and PLO seek.

124.    Accordingly, the PA (like the PLO) has since its creation used and facilitated terrorist violence to create an atmosphere of crisis and instability in the Middle East, in order to draw the United States and the American public into the Israeli-Palestinian conflict. The PA has done so because it also believes that the United States and the American public are interested in achieving calm and stability in the Middle East, and will therefore use their influence and leverage with Israel to convince Israel to make territorial concessions to the PA and PLO, in order to end the terrorist violence generated by the PA and PLO.

125.    Since its establishment the PA, too, has had the right, the authority and the ability to control the conduct of the PFLP. The PA was and is empowered under local law to take legal and regulatory measures, and/or to deploy its security and police forces, to limit or entirely prevent the existence and activities of organizations such as the PFLP within the territories it governs. Thus, since 1994, the PA had the authority and ability to ban the PFLP, to close its offices, and/or to otherwise limit its activities, in PA territory. Additionally, the PA has always had the ability to cut off the financial and other material support (discussed below) that it provides to the PFLP.

**D.    The Defendants' Provision of Material Support and Resources to the PFLP**

126.    As the second-largest faction in the PLO for over 50 years, the PFLP fully shares and supports the supreme goal of defendants PLO and PA to end Israeli control over, and the presence of Jews in, territories which comprise the State of Israel, the West Bank (including

**0049**

Jerusalem) and the Gaza Strip, as well as the policy and practice of the PLO and the PA of using terrorist violence to achieve this goal by coercing Israel, directly and/or through American involvement, to cede territory.

127.   Accordingly, during the 15 years prior to the Terrorist Attack, defendants PLO and PA provided the PFLP faction of the PLO with vital material support and resources (detailed below), for the specific purpose of enabling and assisting the PFLP to carry out terrorist attacks in furtherance of their shared supreme goal of eliminating Israeli control over, and the presence of Jews in, territories comprising the State of Israel, the West Bank (including Jerusalem) and Gaza.

128.   **Cash Support**: Between 1999 and the date of the Terrorist Attack, the defendants provided the PFLP with direct monetary allocations totaling (at least) several million dollars every year. While the PFLP is the second-largest faction in the PLO, it is a relatively small group in the Palestinian arena (a fraction of the size, for example, of the PLO's Fatah faction, or of the Hamas organization), and the funding provided by the defendants in the amount of a few million dollars annually constituted an enormous sum for a faction of the PFLP's size.

129.   Thus, during the 15 years prior to the Terrorist Attack, the defendants provided the PFLP with cash funding totaling in the tens of millions of dollars. These funds enabled the PFLP to build, maintain and expand its organizational scope and operational strength and capabilities.

130.   **Geographic Base of Operations**: During the period between 2000 and the date of the Terrorist Attack, the PA exercised governmental powers pursuant to the Oslo Accords, including security and police powers, in all the Palestinian cities and nearly all of the Palestinian villages in the West Bank, which together cover about 39% of the West Bank territory and contained over 95% of the Palestinian population.

0050

131.     During this period, the defendants permitted the PFLP to freely conduct activities and maintain offices and other facilities in the areas of the West Bank under PA control, and thereby provided the PFLP and its operatives a physical, geographic base of operations in which to organize, recruit, train and operate. This physical base of operations was absolutely vital to the PFLP, because the PFLP is strictly banned in Israel and in the areas of the West Bank governed by Israel. The only other areas in the region in which the PFLP is permitted to operate freely and aboveground are Syria, Lebanon and the Gaza Strip, but it is impossible for PFLP operatives in those areas to enter Israel to execute attacks against Jewish and Israeli targets.

132.     By providing the PFLP with this crucial physical base of operations in the West Bank during the 15 year period leading up to the Terrorist Attack, defendants enabled the PFLP to vastly expand its size, strength and operational capabilities, including its ability to plan and carry out deadly terrorist attacks in Israel, such as the Terrorist Attack.

133.     **Personnel**: During the 15 years preceding the Terrorist Attack, the defendants used the threat of violence to obtain the release of numerous PFLP operatives incarcerated in Israel for terrorist activities. Furthermore, during this period, as part of their "Pay-for-Slay" program the defendants paid "salaries" to hundreds of PFLP operatives in the West Bank and Gaza who had been incarcerated in the past by Israel for terrorist activities (including those terrorists whose release was arranged by the defendants and others). These payments were made solely due to the fact that the recipients had been incarcerated for terrorist crimes. The defendants' provision of unconditional financial support for these freed PFLP convicts (who were not required to perform any work in return), relieved these terrorists from the need to earn a living, and thereby enabled

and encouraged them to continue their PFLP activities as their full-time occupation. By making these payments the defendants provided the PFLP with a large number of leaders and operatives.

134.    Through these actions, the defendants provided the PFLP with a large pool of experienced and hardened terrorist leaders and operatives.

135.    **Communications and Broadcast Facilities**: Terrorist groups such as the PFLP require means of mass communication for many purposes, including: to recruit, indoctrinate and mobilize new and existing terrorist operatives, members and supporters; to spread their ideology and build public support for their activities and goals; and to raise funds and obtain other types of material support and resources.

136.    The defendants provided the PFLP with at least two crucial and highly effective means of mass communication during the years prior to the Terrorist Attack.

137.    PFLP Radio – Under the Oslo Accords, the defendants were given permission to control, govern and manage the use of various radio frequencies in the West Bank and Gaza Strip. The defendants abused and exploited their control over these radio frequencies to aid and assist the PFLP. Since 2006, the defendants have allowed the PFLP to operate and broadcast its own radio station, named "Voice of the People," on one of the frequencies under their control.

138.    The PFLP's radio station transmits and is received in the West Bank and Gaza Strip. Between 2006 and the date of the Terrorist Attack, the PFLP used its radio station, transmitting with the permission of the defendants on a frequency governed by the defendants, to broadcast programming which was intended to and did in fact build, expand and strengthen the PFLP's pool of human and material resources by recruiting new operatives, members, supporters and sympathizers for the PFLP, and thereby enhanced the PFLP's ability to carry out terrorist attacks.

0052

139.   <u>PFLP Websites</u> – In 2000, in its capacity as the local government in the West Bank and Gaza Strip, defendant PA sought and obtained from the body that governs the internet, the Internet Corporation for Assigned Names and Number, (ICANN) its own "top-level domain" on the internet, which is designated as the **___.ps** domain.

140.   As the holders of the **___.ps** top-level domain, the defendants are empowered to permit and control the registration of all websites with an address within the **___.ps** domain.

141.   In 2005, defendants allowed the PFLP to register its official website, [www.pflp.ps](www.pflp.ps), within the **___.ps** top-level domain controlled by them, and defendants have allowed the PFLP to maintain and operate the [www.pflp.ps](www.pflp.ps) website continuously until today.

142.   Additionally, in 2010, defendants allowed the PFLP to register a second official website, [www.abuali.ps](www.abuali.ps), within the **___.ps** top-level domain controlled by them, and defendants have allowed the PFLP to maintain and operate the [www.abuali.ps](www.abuali.ps) site continuously until today.

143.   The [www.pflp.ps](www.pflp.ps) site is the PFLP's general website, while [www.abuali.ps](www.abuali.ps) is dedicated specifically to promoting the PFLP's violent terrorist activities.

144.   The acute danger of allowing foreign terrorists groups like the PFLP access to internet domains, as the defendants have done, is reflected in the fact that the United States Government has a policy and practice of regularly shutting down and seizing internet domains that belong to terrorist groups. After one such seizure last year, the Department of Justice explained that: "Seizures like these are critical to preventing designated entities and terrorist organizations from using

U.S. websites to recruit new members and promote their twisted world views … We will continue to fight terror groups and their propaganda no matter the domain."[8]

145.    Thus, while the United States is vigorously engaged in *seizing* terrorist internet domains within U.S. jurisdiction, because shutting down such domains is "critical" to preventing terrorist groups from using their sites "to recruit new members" and proselytize for terrorism, the defendants have done exactly the opposite: they have *granted* the PFLP its own internet domains.

146.    Since their creation and through the date of the Terrorist Attack, the PFLP domains provided by defendants, www.pflp.ps and www.abuali.ps, contained a vast range of sophisticated, well-written, graphically-esthetic content in multiple languages (Arabic, English, French, and Italian). The PFLP used these sites to recruit, indoctrinate and mobilize new and existing terrorist operatives, members and supporters; to spread its ideology and build public support for its activities and goals; and to raise funds and obtain other types of material support and resources.

E.    **The Defendants' Conspiracy with the PFLP**

147.    For decades, the PLO has been involved in the international political sphere, lobbying and interacting with national governments, international organizations and NGOs, the news

---

[8] "United States Seizes More Domain Names Used by Foreign Terrorist Organization," Oct. 21, 2020, www.justice.gov/opa/pr/united-states-seizes-more-domain-names-used-foreign-terrorist-organization (viewed Nov. 11, 2021). *See also* "United States Seizes Domain Names Used by Foreign Terrorist Organization," Sept. 2, 2020, https://www.justice.gov/opa/pr/united-states-seizes-domain-names-used-foreign-terrorist-organization (viewed Nov. 11, 2021) ("Once again we see designated foreign terrorist organizations turning to the internet to push their message and recruit followers for their violent causes .. .We will continue to fight terror recruitment and propaganda efforts in the digital world, as we do elsewhere.")

0054

media, and the general public. In order to maintain its ability to conduct such interactions without the taint of terrorists attacks executed under the name "PLO"—a taint that would make contacts with the PLO politically difficult, unpalatable, or impossible for many of the PLO's interlocutors—the PLO does not carry out its terrorist attacks under the name "PLO." Instead, the PLO's terrorist attacks were at all times executed by the PLO's constituent factions under the name of the respective PLO faction involved (*e.g.*, Fatah, PFLP, DFLP, etc.).

148.    Thus, notwithstanding the fact that the PLO's factions are integral parts of the PLO itself without separate legal identities, the fact that the leaders and terrorist operatives of the PLO's factions are all members of the PLO, and the fact that the PLO at all times approved of the attacks executed by its factions, by having its factions carry out attacks in their factional names and not in the name "PLO," the PLO was able to falsely seek to distance itself in the public eye from its own terrorism. This cynical "name game" has enabled the PLO to participate far more extensively in international politics than it otherwise could.

149.    Because the PLO and the PA have overlapping leaderships, the PA would be negatively impacted if the PLO carried out terrorist attacks under its own name. Thus, the fictitious "division of roles" between the PLO and its factions—pursuant to which the PLO's factions carry out terrorism under their factional names and the PLO participates in the international arena without the PLO name being directly linked to terrorism—has also benefited the PA since its creation.

150.    Since the early 1990s, this ersatz and purely nominal division of roles has allowed the defendants and the PFLP to advance their shared goal of eliminating the Israeli and Jewish presence in areas held by Israel using what is in essence a classic protection racket. Defendants have presented themselves to the world as seeking to achieve their territorial goals through

peaceful discussions, but at the same time they repeatedly warned Israel, and especially the United States and the American public, that unless Israel gives in to defendants' demands, the supposed "radicals"—*i.e.*, the PFLP and other PLO factions—will carry out further terrorist attacks.

151.    Thus, for example, in a 2010 interview with a U.S.-based English-language media outlet, the deputy head of the defendants' Washington, D.C. office, Amal Jadou, said that what she "**wants Americans to understand about Palestinians**" is that "**Palestinians are not looking to incite anything … but people need to understand that incitement and violence are a consequence of occupation. Once the occupation ends, so will all the negative behavior**." Defendants republished this statement about what they "want[] Americans to understand" on the U.S.-based, English-language website operated by their D.C. office. Defendants' U.S.-based office, officers and employees consistently reiterated this same message to the American public—*i.e.*, that defendants do not seek violence but the violence will end only when Israel gives the defendants what they want—throughout the decades prior to the Terrorist Attack, in the news media, in public lectures and meetings, in conferences, on their website, and in many other fora.

152.    In fact, of course, as in every protection scheme, the defendants and the PFLP work hand-in-glove, each playing their accepted roles. The PFLP is a full, willing participant in this conspiracy, executing terrorist attacks against Israeli and Jewish targets—using the material support and resources provided by the defendants for that purpose—and leaving to defendants the task of leveraging those attacks into political achievements.

153.    Each of the disparate roles of the participants in this terrorist conspiracy is critical to advancing the shared goal of ending Israeli rule and the Jewish presence in areas part of or governed by Israel. The role of the PFLP is critical because without the fact and the threat of

terrorist violence, the ability of defendants PLO and PA to achieve their territorial demands in the political arena and through public advocacy would be far weaker; yet if defendants carried out the violence under their own names they would be unable to operate effectively in the political arena or sway American public opinion. The role of the defendants is critical both: (i) because without accompanying political and public advocacy activities—especially those carried out in the United States and directed to the American public—terrorism alone would not result in Israeli concessions; and (ii) because the funding, physical base of operations, personnel, and communications and broadcast facilities provided by defendants to the PFLP enabled it to carry out terrorist attacks against Jewish targets in Israel and the West Bank.

## F.   PFLP Terror Activities Between 1999 and November 2014

154.   The financial support, geographical base of operations adjacent to Israel, personnel, and communications and broadcast facilities provided by the defendants to the PFLP between 1999 and the date of the Terrorist Attack enormously enhanced the PFLP's organizational and operational capabilities. This material support enabled the PFLP to recruit, build, maintain and deploy the human, material, and operational resources and infrastructure in the West Bank and Gaza that were needed and used by the PFLP to plan, organize and execute acts of terrorism against Jewish and Israeli targets in Israel, the West Bank and Gaza, including the Terrorist Attack.

155.   As a result and by means of the material support and assistance provided to the PFLP by defendants during this period, in fulfillment of the defendants' intent in providing that support and assistance to the PFLP, and further to the conspiracy between defendants and the PFLP described above, between 1999 and the date of the Terrorist Attack the PFLP carried out hundreds of terrorist attacks against Jewish and Israeli targets in Israel and the West Bank, in which scores

0057

of Israeli and U.S. citizens were murdered and hundreds more wounded. The PFLP carried out these attacks pursuant to the policy and practice of defendants PLO and PA of using terrorist violence to end the Israeli and Jewish presence in territories that are part of or governed by Israel.

156.    During the 15 years of deadly PFLP terrorism preceding the Terrorist Attack, the defendants did not take any of the numerous measures available to them to prevent the PFLP from continuing to engage in terrorism; they did not terminate their provision of material support and resources to the PFLP, and they did not expel the PFLP from the PLO or otherwise sever their relationship with the PFLP. To the contrary, during this period the defendants continued to fund the PFLP, to grant it a physical base of operations contiguous to Israel, and to provide the other material support detailed above. Defendants allowed the PFLP to remain a respected faction within the PLO, and maintained their close relationship with the PFLP.

157.    The reason that defendants acted as described in the preceding paragraph is simple: defendants fully supported and approved of the PFLP's terrorist activities which, as discussed above, served the defendants' goals and purposes.

158.    Defendants' policy of approval and support for the PFLP's terrorist activities in the years leading up to the Terrorist Attack is exemplified in their response to an especially horrific attack executed by the PFLP in 2011. On March 11, 2011, PFLP terrorists entered the home of the Fogel family in the town of Itamar and murdered five family members in their beds. The victims were the parents, children aged 11 and 4, and a three-month-old infant. The infant was decapitated.

159.    On April 17, 2011, *i.e.*, less than 6 weeks after the massacre of the Fogel family, the Director-General of the PA's Ministry of Detainees (which administered defendants' Pay-for-Slay program), called for the release of the PFLP terrorists who murdered the Fogel family and

**0058**

decapitated their baby, on the grounds that all Palestinians "**have the right to resist the occupation, and they have a duty to resist the occupation**."

160.    Moreover, in an affidavit executed by the defendants on April 13, 2021, in a suit brought by the Fogel family in an Israeli court, the defendants admitted that since 2011, they have been making monthly Pay-for-Slay payments to the families of each of the seven members of the PFLP cell convicted and imprisoned for their roles in the terrorist murders of the Fogels.

### G.    The Terrorist Attack

161.    The Jerusalem neighborhood of Har Nof is located on the southwestern edge of the city in an area that has been part of the modern State of Israel since Israel's independence in 1948.

162.    Har Nof's population of about 20,000 mostly Orthodox Jews is unique in that a very large percentage of the residents are American citizens.

163.    Har Nof is home to dozens of synagogues. The Congregation Bnei Torah synagogue (the "Synagogue") is one of the largest in the neighborhood.

164.    At an unknown time prior to November 18, 2014, the PFLP decided to carry out a terrorist attack at the Synagogue.

165.    On November 18, 2014, at approximately 6:55 am, two operatives of the PFLP, Uday Abu Jamal and Ghassan Abu Jamal, burst into the Synagogue wielding a pistol, meat cleavers, and an axe, and began shooting and slashing their way through the sanctuary, which was packed with worshipers in the midst of their morning prayers.

166.    Rabbi Kalman (Cary) Levine had attended an earlier prayer service. He came to the Synagogue to discuss a point of Jewish law with the congregation's rabbi. While standing in the

hall outside of the prayer sanctuary, Rabbi Levine was brutally murdered by the PFLP terrorists as they entered the Synagogue.

168.    Rabbis Aryeh Kupinsky, Moshe Twersky, and Abraham Goldberg were among those praying in the Synagogue that morning, and were brutally murdered by the PFLP terrorists inside the prayer sanctuary.

168.    Police Sergeant Zidan Saif, a member of Israel's Druze religious community, was among the first security personnel to arrive at the scene of the massacre. Israel's Chief of Police stated that Sgt. Saif "ran into the heart of the murderous inferno, without fear, without concern" for his own well being. The police chief credited Sgt. Saif with stopping the rampage and saving the lives of others. Tragically, Zidan Saif was shot by one of the terrorists and mortally wounded. He was rushed to the hospital and died of his wounds during the night following the attack.

169.    Plaintiffs Dr. Norman Heching and Rabbi Saul Goldstein, who were also praying in the Synagogue that morning, were stabbed and seriously injured by the PFLP terrorists. Rabbi Goldstein's young son, plaintiff Mordechai Goldstein, was at morning prayers alongside his father, and witnessed the attack on his father and the other victims.

170.    The late Joseph Werfel and plaintiff David Samuel Salis were present in the Synagogue during the attack, and plaintiffs Avraham Nefoussi and Akiva Pollack, both emergency medical responders, voluntarily arrived at and entered the Synagogue to treat the victims, while the attack was still in progress.

171.    Police arrived at the scene a few minutes after 7 am, and shot and killed both terrorists as they exited the Synagogue and charged at police with their weapons.

0060

172.     Immediately after the Terrorist Attack, Rabah Muhanna, a senior PFLP leader in Gaza and member of the PFLP's Political Bureau, and Marwan Abd al-Al, the head of the PFLP in Lebanon, both publicly confirmed that Uday and Ghassan Abu Jamal were PFLP operatives.

173.     The PFLP carried out the Terrorist Attack pursuant to and as implementation of the longstanding policy and practice of the defendants, detailed above, of using terrorism in an effort to achieve the supreme goal—shared by the defendants and the PFLP—of eliminating the Israeli and Jewish presence in areas that are part of or governed by Israel. Thus, in a November 19, 2014, interview with Palestine Today television, Kayed al-Ghoul, a Gaza-based senior PFLP leader and PFLP Political Bureau member, confirmed that the PFLP had executed the Terrorist Attack, and explained that the PFLP had done so to prove that the Palestinians "will defend their city with all they have, until Jerusalem will become Arab, until it will become Palestinian." Al-Ghoul added that, "the two martyrs' blood that was shed yesterday has reinforced Jerusalem's Arab identity, and has thwarted the attempts to Judaize [sic] Jerusalem." Similarly, in an interview with Al Jazeera television on November 20, 2014, Hani Thawabta, a member of the PFLP Central Committee and a top PFLP leader in Gaza, explained that the Terrorist Attack "prove[s] that … we will continue to chase this enemy wherever it is until he leaves our land."

174.     The PFLP was enabled to and did in fact recruit, build, indoctrinate, maintain and deploy the human, material, and operational infrastructure needed and used to plan, organize and execute the Terrorist Attack, as the result of and utilizing the material support and resources provided to the PFLP by defendants for the purpose of carrying out such attacks, detailed above.

175.     The Terrorist Attack constituted another in the long series of terrorist attacks carried out by the defendants and the PFLP, acting in concert and in pursuant of a common goal and plan,

since the 1990s. The PFLP thus carried out the Terrorist Attack as a co-conspirator and as an agent of the defendants.

176.    The defendants endorsed and ratified the PFLP's execution of the Terrorist Attack. For example, after the attack, the defendants publicly praised the PFLP operatives who carried it out, Uday and Ghassan Abu Jamal, as "martyrs" and termed the Terrorist Attack "heroic."

177.    Defendants further endorsed and ratified the Terrorist Attack by officially designating Uday and Ghassan Abu Jamal as "Martyrs" under defendants' Pay-for-Slay program, less than two months after the Terrorist Attack. Since that time, defendants have been making monthly Pay-for-Slay payments to the families of Uday and Ghassan Abu Jamal.

178.    Additionally, following the Terrorist Attack, the defendants continued to provide the PFLP with funding and the other material support detailed above, and allowed the PFLP to remain within the PLO. Indeed, defendants continued to treat the PFLP as a highly respected faction of the PLO. On December 6, 2014, less than three weeks after the Terrorist Attack, the PFLP marked the 47th anniversary of its founding with celebrations in different locales, with the enthusiastic participation of defendants. Participants in the main celebration in Ramallah included representatives of the PLO Executive Committee and the PA's security forces. Senior PLO official Mahmoud Al-Aloul fully endorsed the PFLP, proclaiming at the celebration that: "**The Popular Front for the Liberation of Palestine is a faction we take pride in, and is one of the pillars of the Palestinian political system. It has significantly and actively taken part in the national struggle, and has made immense efforts and enormous sacrifices – martyrs, prisoners, casualties and exiled people … The PFLP is a politically unique group. It has worked and made tireless efforts, doing all it could for the people and for the homeland.**"

**FIRST CAUSE OF ACTION**
**AGAINST DEFENDANTS PLO AND PA BY THE AMERICAN PLAINTIFFS**[*]
<u>**ACTION FOR INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a)**</u>
**(Direct Liability)**

179.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

180.    The actions of the defendants described herein constituted "acts of international terrorism" as defined in 18 U.S.C. § 2331.

181.    As required by § 2331, the actions of the defendants described herein constituted a violation of numerous criminal laws of the United States and of the several States (or, if carried out in the United States, would constitute such violations), including without limitation the provisions of 18 U.S.C. §§ 2339A, 2339B and 2339C, which criminalize the provision of material support or resources to terrorist organizations and/or for terrorist activities. The PFLP has been continuously designated by the United States government as a Specially Designated Terrorist ("SDT") since 1995, as a Foreign Terrorist Organization ("FTO") since 1997, and as a Specially Designated Global Terrorist ("SDGT") since 2001, and the provision of funding, or other material support or resources, to an SDT, an FTO, or an SDGT, such as the PFLP, is a crime under numerous provisions of United States law, including the provisions of Chapter 113B of Title 18 of the United States Code.

---

[*] The "American Plaintiffs" include all the plaintiffs herein, except for the family members and the personal representatives of the estates of Zidan Saif and Rabbi Abraham Goldberg.

42

**0063**

182.    As required by § 2331, the actions of the defendants were dangerous to human life by their nature and as evidenced by their consequences. The PFLP faction of the PLO is a deadly, notoriously dangerous group, which has carried out hundreds of murderous terrorist attacks.

183.    As required by § 2331(1)(B) the actions of the defendants appeared to be, and were in fact, "intended ... to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion," in that the defendants provided the PFLP with extensive material support and resources with the purpose of facilitating, enabling and causing the PFLP to carry out acts of terrorism against Jewish and Israeli targets in order to intimidate, influence and coerce the Israeli government and public, and to influence the United States government and the American public.

184.    As required by § 2331, the actions of the defendants transcended national boundaries in terms of the means by which they were accomplished and the persons they appeared intended to intimidate or coerce.

185.    The actions of defendants described herein therefore constitute "acts of international terrorism" as defined in 18 U.S.C. §§ 2331 and 2333(a).

186.    The Terrorist Attack was carried out by reason and as a direct and proximate result of the defendants' acts of international terrorism.

187.    Decedent Rabbi Kalman (Cary) Levine was murdered in the Terrorist Attack. The murder of Rabbi Kalman (Cary) Levine caused decedent, his estate, and plaintiffs Shelley Levine, Stefanie Levine, Haya Levine, Aharon Levine, Chana Levine, Yehuda Yisroel Levine, Michal Levine, H.Y.A., Bassheva Miriam Pelcovics, L.Y.P., Y.M.P., N.B.P., Y.C.P., Yitzchok Meir Levine, Yerachmiel Levine, Moshe Levine and Avraham Levine, severe injury, including: pain and

0064

suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

188.    Decedent Rabbi Aryeh Kupinsky was murdered in the Terrorist Attack. The murder of Rabbi Aryeh Kupinsky caused decedent, his estate, and plaintiffs Yakova Kupinsky, Yitzchak Kupinsky, Devorah Kupinsky, M.K.,Y.K. and Eliyahu Kupinsky, severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium. The injuries to Rabbi Aryeh Kupinsky's wife and children were severely compounded by their own close proximity to the Terrorist Attack, hearing the shooting and police and ambulance sirens, and witnessing the police, military, and emergency medical response in the immediate aftermath of the Terrorist Attack, all while knowing that Rabbi Kupinsky was in the Synagogue.

189.    Decedent Rabbi Moshe Twersky was murdered in the Terrorist Attack. The murder of Rabbi Moshe Twersky caused decedent, his estate, and plaintiffs Bashy Miriam Twersky, Meshulem Twersky, R.T.(1), C.T., E.T.(1), Y.T., M.T., E.T.(2), S.T., Refael Twersky, A.T., I.T., R.T.(2), Rivka Walder, Y.A.W., I.W., Y.W., Nechama Charlap, I.C., E.C., and Avraham Twersky, severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

190.    Plaintiff Rabbi Saul Goldstein was present in the Synagogue and was stabbed repeatedly during the Terrorist Attack, was placed in extreme fear of immediate death or serious physical injury (for both himself and his young son, plaintiff Mordechai Goldstein, who was also present), witnessed the terrorists murder and maim the other victims, among many other horrifying

sights, and suffered severe physical and other injuries as a result, including: stab wounds, disfig-

urement, loss of physical and mental functions, and multiple surgeries; extreme pain and suffering;

severe emotional distress and mental anguish; loss of guidance, companionship and society; loss

of consortium; loss of solatium; and pecuniary loss and loss of income.

191.   Plaintiff Mordechai Goldstein was present in the Synagogue during the Terrorist

Attack, was placed in extreme fear of immediate death or serious physical injury (for both himself

and his father), and witnessed a terrorist repeatedly stab his father, plaintiff Rabbi Saul Goldstein,

and murder and maim the other victims, among many other horrifying sights. Plaintiff Mordechai

Goldstein suffered severe harm as a result of the Terrorist Attack, including: severe emotional

distress and mental anguish; loss of guidance, companionship and society; loss of consortium; and

loss of solatium.

192.   The injuries suffered by plaintiffs Rabbi Saul Goldstein and Mordechai Goldstein

in the Terrorist Attack caused plaintiffs Miriam Goldstein, Sarah Rivkah Goldstein, Basya Yehudis

Goldstein, E.G., A.D.G., N.G., B.G., Malka Goldstein, and Moshe Gedaliah Goldstein, severe

harm, including: severe emotional distress and mental anguish; loss of guidance, companionship

and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

193.   Plaintiff Dr. Norman Heching was present in the Synagogue and was stabbed dur-

ing the Terrorist Attack, was placed in extreme fear of immediate death or serious physical injury,

witnessed the terrorists murder and maim the other victims, among many other horrifying sights,

and suffered severe physical and other injuries as a result, including: stab wounds, disfigurement,

sutures, and loss of physical functions; extreme pain and suffering; severe emotional distress and

mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

194.    The late Joseph Werfel was present in the Synagogue during the Terrorist Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed the terrorists murder and maim the other victims, among many other horrifying sights, and suffered severe harm as a result, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

195.    Plaintiff Avraham Nefoussi was present in front of and in the Synagogue during the Terrorist Attack, was placed in extreme fear of immediate death or serious physical injury. He witnessed the terrorists murder and maim the other victims, among many other horrifying sights, and suffered severe harm as a result, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

196.    Plaintiff David Samuel Salis was present in the Synagogue during the Terrorist Attack, was placed in extreme fear of immediate death or serious physical injury, witnessed many horrifying sights, and suffered severe harm as a result, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

197.    Plaintiff David Samuel Salis' presence in the Synagogue during the Terrorist Attack, and the harm suffered by him as a result thereof, caused plaintiffs Dana-Lee Salis and E.Y.S. severe harm, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; and loss of solatium. Plaintiffs Dana-Lee Salis and

E.Y.S.'s emotional injuries were severely compounded by their own close proximity to the Terrorist Attack, hearing the shooting and police and ambulance sirens, and witnessing the police, military, and emergency medical response in the immediate aftermath of the Terrorist Attack, all while knowing that their husband and father was in the Synagogue.

198.    Plaintiff Akiva Pollack was present in front of and in the Synagogue during the Terrorist Attack, was placed in extreme fear of immediate death or serious physical injury. He witnessed the terrorists murder and maim the other victims, among many other horrifying sights, and suffered severe harm as a result, including: severe emotional distress and mental anguish; loss of guidance, companionship and society; loss of consortium; loss of solatium; and pecuniary loss and loss of income.

199.    Defendants are therefore liable for the full amount of the American Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333.

### SECOND CAUSE OF ACTION
### AGAINST DEFENDANTS PLO AND PA BY THE AMERICAN PLAINTIFFS
### ACTION FOR INTERNATIONAL TERRORISM PURSUANT TO 18 U.S.C. § 2333(a)
#### (Respondeat Superior Liability)

200.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

201.    The Terrorist Attack constituted a violation of the criminal laws of the United States, and was dangerous to human life. The Terrorist Attack appeared to be, and was in fact, "intended ... to intimidate or coerce a civilian population [or] to influence the policy of a government by intimidation or coercion," in that the PFLP carried out the Terrorist Attack in order to intimidate, influence and coerce the Israeli government and public, and to influence the United

**0068**

States government and the American public. The Terrorist Attack transcended national boundaries in terms of the means by which it was accomplished and the persons it appeared intended to intimidate or coerce. Therefore, the Terrorist Attack constituted an "act[] of international terrorism" as defined in 18 U.S.C. § 2331.

202.   The PFLP carried out the Terrorist Attack as the agent of the defendants, pursuant to the official, long-established policy and practice of the defendants of using terrorism to achieve the supreme goal shared by the defendants and the PFLP, namely: to end the Israeli and Jewish presence in territories governed by Israel. The PFLP served as the defendants' agent for that purpose for many years prior to the Terrorist Attack, carrying out many such attacks on the defendants' behalf, and the Terrorist Attack was carried out further to that agency relationship.

203.   Therefore, in addition to their direct liability under § 2333(a), the defendants are also liable for the Terrorist Attack under § 2333(a) pursuant to principles of respondeat superior, because the Terrorist Attack was carried out by the PFLP as defendants' agent.

204.   Defendants are therefore liable for the full amount of the American Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333.

## THIRD CAUSE OF ACTION
## AGAINST DEFENDANTS PLO AND PA BY THE AMERICAN PLAINTIFFS
## AIDING AND ABETTING PURSUANT TO 18 U.S.C. § 2333(d)

205.   The preceding paragraphs are incorporated by reference as though fully set forth herein.

206.   The Terrorist Attack constituted an "act[] of international terrorism" as defined in 18 U.S.C. § 2331.

207.   The PFLP faction of the PLO planned and committed the Terrorist Attack.

**0069**

208.     The PFLP was designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which it planned and committed the Terrorist Attack.

209.     The PFLP is a "person" within the meaning of 18 U.S.C. § 2333(d)(1).

210.     The defendants knowingly aided and abetted the PFLP to commit the Terrorist Attack, by providing substantial assistance to the PFLP. Specifically, the defendants provided the PFLP with the extensive material support and resources discussed above, for at least 15 years prior to the Terrorist Attack, which they knew and intended would enable, facilitate, support and assist the PFLP to carry out acts of terrorism such as the Terrorist Attack.

211.     Defendants are therefore liable under 18 U.S.C. § 2333(d), as aiders and abettors, for the full amount of the American Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333.

## FOURTH CAUSE OF ACTION
## AGAINST DEFENDANTS PLO AND PA BY THE AMERICAN PLAINTIFFS
## <u>CONSPIRACY PURSUANT TO 18 U.S.C. § 2333(d)</u>

212.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

213.     The Terrorist Attack constituted an "act[] of international terrorism" as defined in 18 U.S.C. § 2331.

214.     The PFLP faction of the PLO planned and committed the Terrorist Attack.

215.     The PFLP was designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which it planned and committed the Terrorist Attack.

0070

216.    The PFLP is a "person" within the meaning of 18 U.S.C. § 2333(d)(1).

217.    The defendants engaged in a long-term common scheme and conspiracy with the PFLP, and with each other, which lasted from the 1990s until the Terrorist Attack, the goal of which was using terrorist violence and the threat of terrorist violence to cause Israel to cede territories governed by it, and remove the Jewish residents therefrom. Pursuant to that common scheme and conspiracy, defendants provided the PFLP with extensive material support and resources in order to enable and support the PFLP's terrorist activities, and in tandem the defendants conducted political and public advocacy activities to achieve their territorial demands while warning their interlocutors that a failure to grant their demands would result in terrorist attacks by the PFLP. As part of that conspiracy, the defendants and the PFLP adopted a fictitious division of roles, in order to enable the defendants to falsely disassociate themselves in the public arena from terrorism that they themselves facilitated, encouraged and desired. The PFLP carried out the Terrorist Attack pursuant to and in furtherance of that common plan and conspiracy with the defendants.

218.    Defendants are therefore liable under 18 U.S.C. § 2333(d), as co-conspirators, for the full amount of the American Plaintiffs' damages in such sums as may hereinafter be determined, to be trebled pursuant to 18 U.S.C. § 2333.

### FIFTH CAUSE OF ACTION
### AGAINST DEFENDANTS PLO AND PA BY ALL PLAINTIFFS
### NEGLIGENCE
### (Under Israeli Law)

219.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

**0071**

220.    Causes of action in tort in Israeli law are codified in the Civil Wrongs Ordinance (New Version) - 1968, (hereinafter "CWO"). The CWO provides that any person injured or harmed by the torts listed in the CWO is entitled to relief from the person liable or responsible for the tort.

221.    Section 35 of the Israeli CWO creates a tort of Negligence. CWO § 35 provides that a person is liable for the tort of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby causes damage to another person toward whom, under those circumstances he is obligated not to act as he did.

222.    CWO § 36 provides that the obligation stated in CWO § 35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

223.    Under binding precedent of the Israeli Supreme Court, the tort of Negligence also includes intentional and/or reckless conduct.

224.    Defendants committed acts which a reasonable and prudent person would not have committed under the same circumstances, and refrained from committing acts which a reasonable and prudent person would have committed under the same circumstances, within the meaning of the CWO.

225.    Defendants acted negligently in connection with the plaintiffs and their decedents, toward whom, in the circumstances described herein, the defendants had an obligation not to act

0072

as they did. Defendants were obligated not to act as they did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, the plaintiffs' and the decedents were likely to be injured by the defendants' acts and omissions described herein.

226.    Defendants' behavior therefore constitutes Negligence under the CWO, and as a result of the defendants' negligent behavior decedents Rabbi Kalman (Cary) Levine, Rabbi Aryeh Kupinsky and Rabbi Moshe Twersky were murdered in the Terrorist Attack and the American Plaintiffs suffered the damages described above.

227.    Additionally, as a result of the defendants' negligent behavior decedents Zidan Saif and Rabbi Abraham Goldberg were murdered in the Terrorist Attack.

228.    At the time of his death, decedent Zidan Saif was 30 years of age, enjoying good health, was industrious and in possession of all his faculties. The murder of Zidan Saif caused him, his estate, and plaintiffs Rinal Saif, Nuhad Saif, Julia Saif, and L.S., severe injury, including: pain and suffering; pecuniary loss and loss of income; loss of guidance, companionship and society; loss of consortium; severe emotional distress and mental anguish; and loss of solatium.

229.    At the time of his death, decedent Rabbi Abraham Goldberg was 68 years of age, enjoying good health, was industrious and in possession of all his faculties. The murder of Rabbi Abraham Goldberg caused him, his estate, and plaintiffs Briana Hazel Goldberg, Deborah (Goldberg) Hammond, Libby Goldberg, Rivka (Goldberg) Sireling, Hadassa (Goldberg) Treuhaft, Adrian Goldberg, and Elisheva Goldberg, severe injury, including pain and suffering, pecuniary loss and loss of income. From the beginning of the Terrorist Attack until his death, decedent Rabbi Avraham Goldberg suffered great conscious pain, shock, and physical and mental anguish.

230.    Defendants are therefore liable for the full amount of the plaintiffs' damages in such sums as may hereinafter be determined.

231.    Defendants' conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**AGAINST DEFENDANTS PLO AND PA BY ALL PLAINTIFFS**
**VICARIOUS LIABILITY**
**(Under Israeli Law)**

232.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

233.    Aiding and abetting principles are recognized in Israeli law in § 12 of the CWO, which provides that a person who participates in, assists, advises or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

234.    Defendants knowingly and willingly provided the PFLP with material support and resources and other substantial aid and assistance, in order to aid, abet, facilitate and cause the commission of acts of terrorism, including the Terrorist Attack.

235.    As a result of the Terrorist Attack caused, resulting from, and facilitated by the defendants' provision of material support and resources to, and other acts of aiding and abetting, the PFLP, the decedents and the plaintiffs suffered the damages enumerated herein.

236.    Defendants are also liable to the plaintiffs under CWO § 12 because their Pay-for-Slay Payments to the families of Uday and Ghassan Abu Jamal, the PFLP terrorists who executed the Terrorist Attack, constitute ratification of the Terrorist Attack.

237.    Respondeat superior principles are recognized in Israeli law in § 14 of the CWO, which provides that a person who engages an agent who is not his employee, to perform an act or a category of acts, is liable for anything the agent does in carrying out that act or category of acts, and for the manner in which he carries them out.

238.    Defendants engaged the PFLP as their agent to carry out terrorist attacks in order to achieve the supreme goal shared by the defendants and the PFLP of ending the Israeli and Jewish presence in areas that are part of, or governed by, the State of Israel. The Terrorist Attack was carried out by the PFLP in fulfillment, and within the scope, of that agency relationship.

239.    Defendants are therefore liable for the full amount of the plaintiffs' damages in such sums as may hereinafter be determined.

240.    Defendants' conduct was criminal, outrageous, extreme, willful, malicious, and a threat to the public, warranting an award of punitive damages.

**WHEREFORE**, the plaintiffs respectfully request judgment be entered in their favor, against defendants PLO and PA, jointly and severally, as to each of the causes of action enumerated above, as follows:

a.    For all compensatory damages in an amount to be determined at trial;

b.    For all awards, sums, and other relief available pursuant to 18 U.S.C. § 2333, or other applicable law, including but not limited to treble damages, costs, expenses, and attorneys' fees;

c.    For all recoverable pre-judgment and post-judgment interest;

d.    For punitive and/or exemplary damages; and

e.    Such further relief as the Court finds just and equitable.

**0075**

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.


DATED this 13th day of May, 2022


                                   *s/ Daniel K. Calisher*
                                   Daniel K. Calisher
                                   Foster Graham Milstein & Calisher, LLP
   360 South Garfield Street, 6th Floor
   Denver, Colorado 80209
   Telephone: 303-333-9810
   Email: calisher@fostergraham.com
   *Attorneys for Plaintiffs*


                                     *s/ Jordan Factor*
   Jordan Factor
   Allen Vellon Wolf Helfrich & Factor, P.C.
   1600 Stout Street, Suite 1900
   Denver, Colorado 80202
   Telephone: 303-534-4499
   Email: jfactor@allen-vellone.com
   *Attorneys for Plaintiffs*


                                     *s/ Asher Perlin*
   Asher Perlin
   Law Office of Asher Perlin
   4600 Sheridan Street, Suite 303
   Hollywood, Florida 33021
   Telephone: 786-233-7164
   Email: asher@asherperlin.com
   *Attorneys for Plaintiffs*

**0076**

UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
----------------------------------------------------------------x

SHELLEY LEVINE, et al.,                          Case No. 21-cv-03043

                           Plaintiffs,

              v.

THE PALESTINE LIBERATION
ORGANIZATION and
THE PALESTINIAN AUTHORITY,

                           Defendants.
----------------------------------------------------------------x


### DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT UNDER RULE 12(b)(2) AND RULE 12(b)(6)


**SQUIRE PATTON BOGGS (US) LLP**

Gassan A. Baloul
gassan.baloul@squirepb.com
Mitchell R. Berger
mitchell.berger@squirepb.com

2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

717 17th Street
Suite 1825
Denver, CO 80202
Telephone: (303) 830-1776
Facsimile: (303) 894-9239

*Attorneys for Defendants*

**0077**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iv

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF CONFERRAL ........................................................................... 4

ARGUMENT ......................................................................................................... 4

I.    EXERCISING PERSONAL JURISDICTION OVER DEFENDANTS WOULD
VIOLATE DUE PROCESS .......................................................................... 4

    A.    The PSJVTA Does Not Establish Valid "Consent" to Personal Jurisdiction
under the Due Process Clause. .............................................................. 5

        1.    "Deemed" Consent Under the PSJVTA Violates Due Process. ............... 6

        2.    Other Implied Consent Cases Focus on the Defendant's Conduct
Rather than the Forum's Intent to Exercise Personal Jurisdiction. .......... 10

        3.    Allowing Congress to Dictate "Deemed" Consent to Personal
Jurisdiction Would Violate Separation of Powers. ................................. 14

    B.    Defendants Lack Sufficient Contacts with the United States to Support the
Exercise of Specific Jurisdiction. ......................................................... 15

    C.    The Addition of Ambassador Mansour as a Rule 23.2 "Representative"
Does Not Create Jurisdiction Over The PA and PLO. ............................. 19

        1.    Rule 23.2 Does Not Allow this Court to Ignore the Due Process
Limits On Personal Jurisdiction. ......................................................... 20

        2.    Rule 23.2 Does Not Apply in this Case Because Plaintiffs Have
Sued the PA and PLO Directly as Entities. ........................................... 21

        3.    The FAC Fails To Allege A Defendant Class Under Rule 23.2. ............... 24

II.    THE AMERICAN PLAINTIFFS FAIL TO STATE A DIRECT-LIABILITY OR
RESPONDEAT SUPERIOR CLAIM UNDER THE ATA ............................. 27

    A.    The American Plaintiffs Fail to State a Claim for Direct Liability for an
Act of International Terrorism Pursuant to 18 U.S.C. § 2333(a) ............... 30

        1.    The FAC Fails To Plausibly Allege Proximate Cause ............................. 30

        2.    The American Plaintiffs Do Not Plausibly Allege that Defendants
Committed an "Act of International Terrorism." ..................................... 34

        3.    The American Plaintiffs Do Not Plausibly Allege Defendants
Provided Material Support to an FTO, or Knew or Intended that
Such Support Would Be Used for a Terrorist Act. ................................. 36

    B.    The American Plaintiffs Fail to Establish Essential Elements of
Respondeat Superior Liability. ............................................................. 37

III.  PLAINTIFFS' FAIL TO STATE A CLAIM FOR CONSPIRACY LIABILITY UNDER 18 U.S.C. 2333(D). ............................................................................. 38

IV.  THE AMERICAN PLAINTIFFS FAILED TO PLAUSIBLY ALLEGE A CLAIM FOR AIDING AND ABETTING LIABILITY UNDER 18 U.S.C. § 2333(D). ................................................................................................................. 40

    A.  The American Plaintiffs Have Not Alleged, and Could Not Plausibly Allege, that Defendants Knowingly and Substantially Assisted the Attack. ........ 40

    B.  The American Plaintiffs Have Not Alleged, and Could Not Plausibly Allege, that Defendants were Generally "Aware" they were Assuming a Role in Violent Terrorist Activity. ....................................................................... 42

V.  PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED BUT-FOR CAUSATION AS REQUIRED FOR A NEGLIGENCE CLAIM UNDER ISRAELI LAW. ................ 43

VI.  PLAINTIFFS FAIL TO STATE A CLAIM FOR VICARIOUS LIABILITY UNDER ISRAELI LAW. ................................................................................................. 44

CONCLUSION ......................................................................................................................... 45

CERTIFICATE OF SERVICE

## <u>TABLE OF AUTHORITIES</u>

*Alfaro-Huitron v. Cervantes Agribusiness,*
    982 F.3d 1242 (10th Cir. 2020) ...............................................................39

*Am. Select Ins. v. Johnson,*
    2018 U.S. Dist. LEXIS 101446 (D. Colo. June 18, 2018) .....................38

*Anapoell v. Am. Express Bus. Fin. Corp.,*
    2009 U.S. App. LEXIS 6315 (10th Cir. Mar. 24, 2009).........................28

*Archangel Diamond Liquidating Trust v. OAO Lukoil,*
    75 F. Supp. 3d 1343 (D. Colo. 2014).................................................15, 16

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..........................................................................27, 28

*Ayda Husam Ahmad v. Christian Friends of Israeli Cmtys.,*
    2014 U.S. Dist. LEXIS 62053 (S.D.N.Y. May 5, 2014) ...................30, 36

*Bank Markazi v. Peterson,*
    578 U.S. 212 (2016)................................................................................14

*Behagen v. Amateur Basketball Ass'n,*
    744 F.2d 731 (10th Cir. 1984) ..................................................................4

*Benn v. Seventh-Day Adventist Church,*
    304 F. Supp. 2d 716 (D. Md. 2004).........................................................22

*Biodiversity Assocs. v. Cables,*
    357 F.3d 1152 (10th Cir. 2004) ..............................................................14

*Boim v. Am. Muslims for Palestine,*
    9 F.4th 545 (7th Cir. 2021) ....................................................................38

*Estate of Botvin v. Islamic Rep. of Iran,*
    772 F. Supp. 2d 218 (D.D.C. 2011).........................................................44

*Brewer v. Williams,*
    430 U.S. 387 (1977)................................................................................15

*Brzak v. UN,*
    597 F.3d 107 (2d Cir. 2010)....................................................................27

*Burger King v. Rudzewicz,*
    471 U.S. 462 (1985)................................................................................15

*CGC Holding Co. v. Hutchens,*
    974 F.3d 1201 (10th Cir. 2020) ..............................................................21

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) .......................................................................................................14

*College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
  527 U.S. 666 (1999) .............................................................................................7, 9, 10

*Coniglio v. Highwood Servs., Inc.*,
  60 F.R.D. 359 (W.D.N.Y. 1972) ..................................................................................23

*Daimler AG v Bauman*,
  571 US 117 ( 2014) .......................................................................................................13

*Doe v. Douglas Cty. Sch. Dist.*,
  775 F. Supp. 1414 (D. Colo. 1991) ..............................................................................26

*EEOC v. Arabian Am. Oil Co.*,
  499 U.S. 244 (1991) .....................................................................................................37

*Frutos v. Am. Modern Prop. & Cas. Ins.*,
  No. 19-334, 2020 U.S. Dist. LEXIS 169276 (D. Colo. Mar. 20, 2020) ......................38

*Fuld v. PLO*,
  No. 20-3374, 2022 U.S. Dist. LEXIS 3102 (S.D.N.Y. Jan. 6, 2022) ............................ *passim*

*Gay Lib v. Univ. of Missouri*.,
  416 F. Supp. 1350 (W.D. Mo. 1976), *rev'd on other grounds*, 558 F.2d 848
  (8th Cir. 1977) ..............................................................................................................23

*GCIU-Emplr. Ret. Fund v. Coleridge Fine Arts*,
  700 F. App'x 865 (10th Cir. 2017) ........................................................................18, 19

*Gill v. Arab Bank, PLC*,
  893 F. Supp. 2d 542 (E.D.N.Y. 2012) ..........................................................................34

*Gilson v. Republic of Ir.*,
  682 F.2d 1022 (D.C. Cir. 1982) ...................................................................................14

*Goldberg v. UBS AG*,
  660 F. Supp. 2d 410 (E.D.N.Y. 2009) ....................................................................37, 41

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011) .....................................................................................................13

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) .....................................................................................41

*Hamm v. United States*,
  483 F.3d 135 (2d Cir. 2007) .........................................................................................29

**0081**

*Heching v. Islamic Rep. of Iran*,
    No. 17-01659 (D.D.C.) ...............................................................................32, 33

*Heching v. Syrian Arab Rep.*,
    No. 17-01192 (D.D.C.) ..................................................................... *passim*

*Hess v. Pawloski*,
    274 U.S. 352 (1927)...............................................................................7, 10

*Honickman v. Blom Bank Sal*,
    6 F.4th 487 (2d Cir. 2021) ..............................................................42, 43

*Hooper v. Wyant*,
    502 F. App'x 790 (10th Cir. 2012) ...............................................................7

*Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982)...............................................................................6, 7

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021)..................................................... *passim*

*Kemper v. Deutsche Bank AG*,
    911 F.3d 383 (7th Cir. 2018) ..................................................... *passim*

*Klieman v. Palestinian Auth.*,
    923 F.3d 1115 (D.C. Cir. 2019)................................................... *passim*

*Klinghoffer v. S.N.C. Achille Lauro*,
    937 F.2d 44 (2d Cir. 1991)...............................................................6, 12

*Lang v. Windsor Mount Joy Mut. Ins. Co.*,
    493 F. Supp. 97 (E.D. Pa. 1980) ................................................................22

*Leonard v. USA Petroleum Corp.*,
    829 F. Supp. 882 (S.D. Tex. 1993) ............................................................11

*Licerio v. Lamb*,
    No. 20-681-WJM, 2021 U.S. Dist. LEXIS 175346 (D. Colo. July 15, 2021) ........................28

*Linde v. Arab Bank PLC*,
    882 F.3d 314 (2d Cir. 2018)...............................................34, 35, 36, 41

*Livnat v. Palestinian Auth.*,
    851 F.3d 45 (D.C. Cir. 2017) ..................................................... *passim*

*Low v. Chu*,
    2009 U.S. Dist. LEXIS 111623 (N.D. Okla.. Dec. 1, 2009)...................................26

*Lumbermen's Underwriting Alliance v. Mobil Oil*,
  612 F. Supp. 1166 (D. Idaho 1985) ...................................................24

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803)..........................................................15

*Mendelsohn v. Meese*,
  695 F. Supp. 1474 (S.D.N.Y. 1988)...................................................12

*In re Mid-Atl. Toyota Antitrust Litig.*,
  525 F. Supp. 1265 (D. Md. 1981).......................................................11

*Mohammad v. Palestinian Auth.*,
  566 U.S. 449 (2012).......................................................................38

*Monarch Asphalt Sales v. Wilshire Oil*,
  511 F.2d 1073 (10th Cir. 1975) .......................................................27

*Nasious v. Two Unknown B.I.C.E. Agents*,
  492 F.3d 1158 (10th Cir. 2007) ....................................................3, 22

*Nat'l Bank of Wash. v. Mallery*,
  669 F. Supp. 22 (D.C. Cir. 1987)......................................................22

*Noble Sec, Inc.. v. MIZ Eng, Ltd.*,
  611 F. Supp. 2d 513 (E.D. Va. 2009) ................................................19

*Northbrook Excess & Surplus Ins. v. Med. Malpractice Joint Underwriting Assn.*,
  900 F.2d 476 (1st Cir. 1990).............................................................21

*Nouinou v. Smith*,
  No. 20-8682, 2021 U.S. Dist. LEXIS 182293 (S.D.N.Y. Sep. 22, 2021)................................27

*O'Sullivan v. Deutsche Bank AG*,
  No. 17-8709, 2019 U.S. Dist. LEXIS 53134 (S.D.N.Y. Mar. 28, 2019) ...................39, 40, 42

*Owens v. BNP Paribas, S.A.*,
  897 F.3d 266 (D.C. Cir. 2018)...........................................29, 30, 31, 35

*Estate of Parsons v. Palestinian Auth.*,
  715 F. Supp. 2d 27 (D.D.C. 2010), *aff'd in part, rev'd in part,* 651 F.3d 118
  (D.C. Cir. 2011) ............................................................................38

*Estate of Parsons*,
  651 F.3d at 134 (J. Tatel, concurring)................................................39

*Patrician Towers Owners, Inc. v. Fairchild*,
  513 F.2d 216 (4th Cir. 1975) .......................................................22, 23

*Peay v. BellSouth Med. Assistance Plan*,
    205 F.3d 1206 (10th Cir. 2000) ...................................................................16

*PostNet Int'l Franchise Corp. v. Wu*,
    521 F. Supp. 3d 1087 (D. Colo. 2021) ...........................................................7

*Price v. Socialist People's Libyan Arab Jamahiriya*,
    294 F.3d 82 (D.C. Cir. 2002) ...............................................................14, 20

*Quill Corp. v. North Dakota*,
    504 U.S. 298 (1992)...................................................................................20

*Railway. Labor Executives' Ass'n v. Ass'n of Am. R.R.*,
    No. 87-2145, 1988 U.S. Dist. LEXIS 18600 (D.D.C. July 14, 1988) ...............20, 21

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)................................................................... *passim*

*Ruggieri v. General Well Serv.*,
    535 F. Supp. 525 ........................................................................................7

*Shatsky v. PLO*,
    955 F.3d 1016 (D.C. Cir. 2020) ...............................................................6, 16

*Shatsky v. PLO*,
    No. 02-2280 (RJL), 2017 U.S. Dist. LEXIS 94946 (D.D.C. June 20, 2017)
    *vac'd and rem'd for dismissal on other gnds*, 955 F.3d 1016 (D.C. Cir. 2020)............... *passim*

*Shatsky v. PLO*,
    No. 18-12355, 2022 U.S. Dist. LEXIS 48721 (S.D.N.Y. Mar. 18, 2022)...................... *passim*

*Siegel v. HSBC N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019)...........................................................4, 42, 43

*Siemer v. Learjet Acquisition Corp.*,
    966 F.2d 179 (5th Cir. 1992) .......................................................................13

*Sokolow v. PLO*,
    138 S. Ct. 1438 (2018)...............................................................................18

*Sokolow v. PLO*, 2022 U.S. Dist. LEXIS 107122, at *3 (June 15, 2022)............................1, 8, 10

*Sokolow v. PLO*,
    2022 U.S. Dist. LEXIS 43096 (S.D.N.Y. Mar. 10, 2022) ........................1, 8, 10, 35

*Sokolow v. PLO*,
    60 F. Supp. 3d 509 (S.D.N.Y. 2014)...............................................35, 40, 42, 44

*Souders v. Brill*,
No. 09-00778, 2009 U.S. Dist. LEXIS 50407 (D. Colo. Apr. 29, 2009) ............................... 25

*Taylor v. Bywater*,
1994 U.S. Dist. LEXIS 4176 (D. Kan. Mar. 29, 1994) ..................................................... 24, 25

*Tyson Foods v. Bouaphakeo*,
136 S. Ct. 1036 (2016) ........................................................................................................ 20

*United States v. Fischman*,
645 F.3d 1175 (10th Cir. 2011) ........................................................................................... 39

*United States v. Ghayth*,
709 F. App'x 718 (2d Cir. 2017) .......................................................................................... 36

*United States v. Hamilton*,
334 F.3d 170 (2d Cir. 2003) ................................................................................................ 42

*United States v. PLO*,
695 F. Supp. 1456 (S.D.N.Y. 1988) .................................................................................... 12

*United Water & Sanitation Dist. v. Geo-Con, Inc.*,
488 F. Supp. 3d 1052 (D. Colo. 2020) ................................................................................ 28

*van Aggelen v. UN*,
311 F. App'x 407 (2d Cir. 2009) .......................................................................................... 27

*Walden v. Fiore*,
571 U.S. 277 (2014) ............................................................................................................ 16

*Waldman v. PLO*,
835 F.3d 317 (2d Cir. 2016) ........................................................................................ *passim*

*Warnick v. Dish Network*,
301 F.R.D. 551 (D. Colo. 2014) .......................................................................................... 25

*Weiss v. Nat'l Westminster Bank PLC*,
768 F.3d 202 (2d Cir. 2014) ................................................................................................ 34

*Wellness Int'l Network, Ltd. v. Sharif*,
575 U.S. 665 (2015) .............................................................................................................. 7

*Wenz v. Memery Crystal*,
55 F.3d 1503 (10th Cir. 1995) .............................................................................................. 4

*Wilkinson v. FBI*,
99 F.R.D. 148 (C.D. Cal. 1983) .......................................................................................... 23

*WorldCare Ltd. Cor. v. World Ins. Co*,
    767 F. Supp. 2d 341 (D. Conn. 2011) ...................................................................14

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) .........................................................................43

*Wynadotte Nation v. City of Kan. City*,
    214 F.R.D. 656 (D. Kan. 2003) .............................................................................26

**Statutes**

28 U.S.C. § 1605A ............................................................................................... 37

18 U.S.C. § 2331 .................................................................................................. 34

18 U.S.C. § 2333 ........................................................................................... *passim*

18 U.S.C. § 2334 ........................................................................................ 1, 3, 5,14

18 U.S.C. § 2339A ................................................................................................ 36

18 U.S.C. § 2339B ................................................................................................ 37

18 U.S.C. § 2339C ................................................................................................ 36

22 U.S.C. § 5201 .................................................................................................. 12

22 U.S.C. § 5202 .................................................................................................. 12

28 U.S.C. § 1605A ............................................................................................... 37

Colo. Rev. Stat. §7-30-106(3) ...........................................................................24, 25

Colo. Rev. Stat. §7-30-107(1) ..............................................................................22

**Rules**

Fed. R. Civ. P 4 ................................................................................................... 19

Fed. R. Civ. P. 12 ................................................................................................ 27

Fed. R. Civ. P. 17 ................................................................................................ 22

Fed. R. Civ. P.  23.2 ........................................................................................19-27

0086

**Other Authorities**

CA 148/80 *Vaknin v. Beit Shemesh Local Council*
37(1) PD 113 [1982] (Isr.) ............................................................................................ 43

Israel Gilead, *Tort Law*, in The Law of Israel: General Surveys 275, 437 (Itzhak Zamir &
Sylviane Clombo eds., 1995) ...................................................................................... 44

Israeli Civil Wrongs Ordinance (New Version), 5728-1968, 2 LSI 5, § 14 (1972) (Isr.) ............ 44

Middle East Monitor, "PFLP reaffirms boycott of Palestinian National Council meetings,"
https://www.middleeastmonitor.com/20220131-pflp-reaffirms-boycott-of-palestinian-national-
council-meetings/ (Jan. 31, 2022) ............................................................................. 28

Programme of Work for 2020, CEIRPP,
UN Doc. A/AC.183/2020/1 (Feb. 7, 2020) ................................................................. 12

Report, CEIRPP, UN Doc. A/75/35 (Oct. 10,C 2020) ................................................. 11

Restatement (Second) of Agency § 82 (1958) .............................................................. 29

## PRELIMINARY STATEMENT

Despite a host of tactical amendments aimed at avoiding dismissal, the First Amended Complaint ("FAC") substantively suffers from the same jurisdictional and legal-sufficiency defects as its predecessor. Accordingly, the Court should dismiss the FAC for lack of personal jurisdiction. Plaintiffs primarily rely on the Promoting Security and Justice for Victims of Terrorism Act ("PSJVTA"), 18 U.S.C. § 2334(e) (*see* FAC ¶¶ 17-26), which three federal courts recently held to violate the Due Process Clause of the Fifth Amendment. *Fuld v. PLO*, No. 20-3374, 2022 U.S. Dist. LEXIS 3102, at *38-39 (S.D.N.Y. Jan. 6, 2022) (holding PSJVTA to be unconstitutional); *Sokolow v. PLO*, No. 04-397, 2022 U.S. Dist. LEXIS 43096, at *15 (S.D.N.Y. Mar. 10, 2022) (same); *id*, 2022 U.S. Dist. LEXIS 107122, at *3 (June 15, 2022) (same); *Shatsky v. PLO*, No. 18-12355, 2022 U.S. Dist. LEXIS 48721, at *13-16 (S.D.N.Y. Mar. 18, 2022) (same).

The PSJVTA is simply the latest unsuccessful legislative effort to undo an unbroken line of judicial decisions holding that the same type of allegations Plaintiffs level here cannot support jurisdiction over these Defendants consistent with Due Process.[1] Time and again, courts hold that the same type of activity by Defendants that Plaintiffs allege here lacks a sufficient jurisdictional connection with the United States. Because jurisdictional due process protections are rooted in the Constitution, they cannot be undone by mere legislation.

In holding the PSJVTA unconstitutional, the *Fuld* court held that legislatively-imposed "deemed" "consent" to jurisdiction on which the PSJVTA pivots (*see supra* n.1) cannot be squared with the Due Process Clause. "Congress cannot, consistent with the Constitution, simply decree

---

[1] Invoking the PSJVTA, Plaintiffs allege Defendants are "deemed" to have "consented" to jurisdiction because they (1) made certain payments to those responsible for terrorist attacks (or their families) that injured or killed a U.S. national; (2) maintained a non-exempt office in the U.S.; or (3) conducted non-exempt activities while physically present in the U.S. (FAC ¶¶ 18-23).

that any conduct, without regard for its connections to the United States generally or to litigation in the United States specifically, signals a party's intent to submit to" jurisdiction. *Fuld*, 2022 U.S. Dist. LEXIS 3102, at *3. The PSJVTA violates this basic principle because the conduct at issue—payments made in Palestine, maintenance of Palestine's UN Mission, and limited UN-related activities—"does not remotely signal[] approval or acceptance of the Court's jurisdiction." *Id.* at *19. "To hold otherwise would effectively mean that there are no constitutional limitations on the exercise of personal jurisdiction...." *Id.* at *3. Because the PSJVTA is unconstitutional, it cannot provide a basis for personal jurisdiction in this case.

Without the PSJVTA as a constitutionally-sufficient basis for personal jurisdiction, the FAC must be dismissed because the new jurisdictional theories added by amendment likewise fail. First, federal courts have repeatedly held that the Due Process Clause prohibits specific jurisdiction over the PA and PLO in suits like this one over attacks in Israel or Palestine. That is because in those cases, as here, Plaintiffs' claims did not arise from Defendants' alleged conduct in the United States, and Defendants' alleged conduct in Palestine was not aimed at the United States.

Second, Plaintiffs assert jurisdiction under Federal Rules of Civil Procedure 4(k) and 23.2, but federal courts have unanimously held that those procedural rules do not create jurisdiction where prohibited by the Due Process Clause. Further, Rule 23.2 does not apply by its terms, because Plaintiffs do not allege that the "representative" defendant (Palestine's UN Ambassador Riyad Mansour) took any action that harmed Plaintiffs—nor do they assert claims against him.

Independent of the lack of jurisdiction, Plaintiffs' six causes of action should be dismissed under Rule 12(b)(6). Plaintiffs' direct-liability claim under the Anti-Terrorism Act ("ATA") (Count 1) for an "act of international terrorism" fails because Plaintiffs make only conclusory assertions, devoid of plausible supporting facts, in an unavailing attempt to connect Defendants to

- 2 -

**0089**

the Nov. 18, 2014 attack in Har Nof, Israel (the "Attack"). Plaintiffs also fail to make plausible factual allegations about three essential elements, *i.e.*, that Defendants: (1) proximately caused Plaintiffs' injuries; (2) *themselves* committed an "act of international terrorism"; or (3) provided material support to a Foreign Terrorist Organization ("FTO"), or any support with knowledge or intent that such support would be used to prepare for, or to carry out, a criminal act of terrorism.

Plaintiffs' claim for ATA respondeat superior liability (Count 2) likewise fails because Congress has not authorized such a cause of action. Nor have Plaintiffs plausibly pled an employment relationship between Defendants and Uday Abu Jamal and Ghassan Abu Jamal (the "Attackers"), which is an essential element of any respondeat superior claim.

Similarly, Plaintiffs' JASTA[2] secondary-liability claim for conspiracy (Count 4) fails because Plaintiffs do not plausibly plead that Defendants had an agreement with the Attackers to carry out the Attack or any other act of international terrorism. That type of agreement is the *sine qua non* of a JASTA conspiracy claim. *Kaplan v. Lebanese Canadian Bank, SAL,* 999 F.3d 842, 855 (2d Cir. 2021) (JASTA conspiracy claim requires that defendant "conspire[d] with" the principal actor that committed the attack) (alteration in original). It is not satisfied by allegations that Defendants provided limited and generalized support for the Popular Front for the Liberation of Palestine ("PFLP") as a political faction, or by *post*-Attack praise or stipends.

Plaintiffs' secondary-liability claim for aiding and abetting the Attack (Count 3) fails because Plaintiffs do not plausibly allege Defendants knowingly and substantially assisted the Attack, or were "generally aware" they were playing a "role" in others' violent or life-threatening acts. Failing to plead either of these elements requires dismissal of Plaintiffs' aiding-and-abetting

---

[2] The relevant portions of the Justice Against Sponsors of Terrorism Act ("JASTA") are codified at 18 U.S.C. § 2334(d).

**0090**

claim. *See Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 223 (2d Cir. 2019) (JASTA aiding and abetting requires that the defendant "knowingly and substantially assist[ed] the principal violation," i.e., the "act of international terrorism").

Finally, Plaintiffs' non-federal claims (Counts 5 and 6) fail to plausibly establish elements required under Israeli law, which those claims invoke. Specifically, as to their negligence claim, Plaintiffs do not plausibly allege that Defendants' conduct was the *but-for cause* of Plaintiffs' injuries, as Israeli law requires. Because Plaintiffs do not allege facts to support Defendants' prior awareness of the Attack, they do not plausibly plead that the Attackers were acting as agents of, or were otherwise affiliated with, Defendants as Israeli law requires to establish vicarious liability.

## STATEMENT OF CONFERRAL

Pursuant to Local Rule 7.1(a), counsel for Defendants conferred in good faith via email with Plaintiffs' counsel regarding the specific bases for this Motion. Plaintiffs oppose this Motion.

## ARGUMENT

## I.   EXERCISING PERSONAL JURISDICTION OVER DEFENDANTS WOULD VIOLATE DUE PROCESS.

On a motion to dismiss for lack of personal jurisdiction, "[t]he plaintiff bears the burden of establishing personal jurisdiction over the defendant." *Behagen v. Amateur Basketball Ass'n*, 744 F.2d 731, 733 (10th Cir. 1984). Courts accept as true "the well pled facts of plaintiff's complaint," but do not credit "mere conclusory allegations." *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995). Once a defendant challenges the exercise of personal jurisdiction, "[t]he plaintiff has the duty to support jurisdictional allegations in a complaint by competent proof of the supporting facts." *Id.* at 1508.

Plaintiffs cannot satisfy their burden because: (1) the "deemed consent" provisions of the PSJVTA (*see* FAC ¶ 17-26) violate the Fifth Amendment's Due Process Clause because they

"push the concept of consent well beyond its breaking point," *Fuld*, 2022 U.S. Dist. LEXIS 3102, at \*38-39; (2) federal courts have already held the facts alleged here do not create specific jurisdiction over the PA and PLO, and have unanimously held that the PA and PLO are "persons" entitled to due process; (3) by their terms, Rule 4(k) and Rule 23.2 do not provide an alternative jurisdictional basis, and even if they did, those rules cannot supplant the supervening demands of jurisdictional due process.

### A. The PSJVTA Does Not Establish Valid "Consent" to Personal Jurisdiction under the Due Process Clause.

The PSJVTA states that the PA and PLO "shall be deemed to have consented to personal jurisdiction" in ATA cases if they: (1) made certain payments after April 18, 2020, to persons who were "fairly tried" or pled guilty and were imprisoned for terrorism that harmed a U.S. national (or made payments to the families of the attackers); (2) maintained "any office … in the United States" after January 4, 2020, except for one used for official UN business; or (3) engaged in "any activity while physically present in the United States" after January 4, 2020, not exempted by the PSJVTA.[3] 18 U.S.C. § 2334(e). In turn, Plaintiffs allege Defendants "consented" to personal jurisdiction in this case by making certain payments to those who carried out "attacks against Jewish and Israeli targets" that injured U.S. citizens; by maintaining an office for Palestine's UN Mission; and by conducting "propaganda, public relations, lobbying, and social media activities" while physically present in the U.S. FAC ¶¶ 24-25.[4]

---

[3] Section 2334(e)(3) expressly provides that, in determining whether Defendants engaged in "any activity while physically present in the United States," "no court may consider," *inter alia*, activities undertaken "exclusively for the purpose of conducting" official UN business, activities and meetings with U.S. or foreign government officials, and "any personal or official activities conducted ancillary to" such activities.

[4] Defendants strongly disagree with Plaintiffs' characterization of the payment programs, which even-handedly provide for families burdened by the loss of breadwinners due to the Israeli-

Notably, courts have consistently held that the *same activities* relied upon by Plaintiffs to establish purported "consent" to jurisdiction are *insufficient* to satisfy the Due Process Clause. *See Shatsky v. PLO*, 955 F.3d 1016, 1022-23, 1037 (D.C. Cir. 2020) (allegations Defendants provided "martyr payments" and conducted "public relations campaign designed to influence" U.S. foreign policy insufficient for personal jurisdiction); *Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1123-26 (D.C. Cir. 2019) (rejecting "plaintiff's theory of specific jurisdiction" that hinged on allegations of a "campaign" to "influence or affect [U.S.] foreign policy"); *Waldman v. PLO*, 835 F.3d 317, 335-44 (2d Cir. 2016) ("*Waldman I*") ("lobbying activities" in U.S. insufficient to support specific jurisdiction); *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 51 (2d Cir. 1991) (operation of Palestine's UN Mission cannot "properly be considered as a basis of jurisdiction").

The question before this Court is therefore whether Plaintiffs can evade the requirements of the Due Process Clause by relying upon these same constitutionally inadequate activities to establish "deemed consent" jurisdiction over Defendants under the PSJVTA. As explained below, permitting this sort of jurisdictional "sleight of hand" would violate due process.

### 1.   "Deemed" Consent Under the PSJVTA Violates Due Process.

To establish constitutionally valid "consent" to personal jurisdiction, a plaintiff bears the burden of demonstrating some "actions of the defendant" that "amount to a legal submission to the jurisdiction of the court." *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee* ("*Bauxites*"), 456 U.S. 694, 704-05 (1982). A party may expressly consent to jurisdiction via a forum-selection clause, for example, or impliedly consent through conduct in the litigation itself

---

Palestinian conflict. However, for purposes of this Motion, Defendants do not contest they have made at least one such payment after the PSJVTA's effective date. Accordingly, this Court may assume that predicate for "deemed-consent" jurisdiction under the PSJVTA is satisfied, and move directly to the constitutional issues.

(e.g., by appearing in the forum without objection). *Id.* at 703-05 (describing the "variety of legal arrangements" that "have been taken to represent express or implied consent" to personal jurisdiction); *Hooper v. Wyant*, 502 F. App'x 790, 792 (10th Cir. 2012) (litigation conduct); *PostNet Int'l Franchise Corp. v. Wu*, 521 F. Supp. 3d 1087, 1098 (D. Colo. 2021) (forum-selection clause). A party may also impliedly consent to jurisdiction by accepting some government benefit or privilege conditioned upon consent to personal jurisdiction in the forum. *See Hess v. Pawloski*, 274 U.S. 352, 354-57 (1927) (defendant's "acceptance" of the "rights and privileges" of driving on public roads constituted "signification of his agreement" to consent to jurisdiction in state court); *Ruggieri v. General Well Serv.*, 535 F. Supp. 525, 529 (D. Colo. 1982) ("Implied consent may also arise from a defendant's pre-litigation conduct," such as "use of a state's roads.").

Regardless of the specific type of consent at issue (whether express or implied), however, the Supreme Court has "emphasiz[ed]" that consent to jurisdiction must be "*knowing and voluntary.*" *Wellness Int'l Network v. Sharif*, 575 U.S. 665, 685 (2015) (emphasis added). Because "constructive consent is not a doctrine commonly associated with the surrender of constitutional rights," federal courts "indulge every reasonable presumption against waiver of fundamental constitutional rights." *College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 681-82 (1999) (internal quotations omitted). Accordingly, for implied consent, the nature of the defendant's activity must evince the defendant's agreement to the forum's exercise of jurisdiction. *Bauxites*, 456 U.S. at 705-09 (holding that "due process is violated ... if the behavior of the defendant will not support" legal presumption of personal jurisdiction).

As the *Fuld* court recently concluded, the PSJVTA fails this test, because "neither form of conduct" specified by the Act—making social welfare payments in Palestine or maintaining a UN office and conducting related activities in the U.S.—"remotely signals approval or acceptance of

- 7 -

**0094**

the Court's jurisdiction." *Fuld*, 2022 U.S. Dist. LEXIS 3102, at *19. "[F]or conduct to imply consent, the conduct must be 'of such nature as to justify the fiction' that the party actually consented to submit itself to the jurisdiction of the court. Put simply, for waiver of personal jurisdiction through consent to satisfy the requirements of due process, it 'must be willful, thoughtful, and fair. "Extorted actual consent" and "equally unwilling implied consent" are not the stuff of due process.'" *Id.* at *18 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945) and *Leonard v. USA Petroleum Corp.*, 829 F. Supp. 882, 889 (S.D. Tex. 1993)).

"Measured against these standards," the *Fuld* court correctly held that "the PSJVTA does not constitutionally provide for personal jurisdiction over Defendants," because "Congress simply took conduct in which the PLO and PA had previously engaged—conduct that the Second and D.C. Circuits had held was insufficient to support personal jurisdiction in *Waldman*, *Livnat*, *Shatsky*, and *Klieman*—and declared that such conduct 'shall be deemed' to be consent." *Id.* The specified payments "have no direct connection to the United States, let alone to litigation in a United States court." *Id.* at *19. Inferring consent to personal jurisdiction on that basis would therefore "strain the idea of consent beyond its breaking point." *Id.* And while the U.S. offices and activities prongs at least "relate to conduct in the United States," the courts have uniformly held that such conduct is "too thin" a reed to support the exercise of personal jurisdiction under the Due Process Clause. *Id.* "To pass muster," the *Fuld* court explained, "the predicate conduct would have to be a much closer proxy for actual consent than the predicate conduct at issue is here. To be blunt: The PSJVTA is too cute by half to satisfy the requirements of due process." *Id.* at *20; *Sokolow*, 2022 U.S. Dist. LEXIS 107122, at *6 (the activities anticipated by the PSJVTA "do not infer any intention on the part of Defendants to legally submit to suit in the United States").

*Fuld*'s conclusion draws "strong support," (*Fuld*, 2022 U.S. Dist. LEXIS 3102, at *20-23) from the Supreme Court's decision in *College Savings Bank*, which similarly rejected a Congressional attempt to exact "constructive" or implied waivers of jurisdictional defenses. *See College Savings Bank*, 527 U.S. at 676-87. In that case, plaintiffs argued that a state agency impliedly consented to jurisdiction in federal court by knowingly and voluntarily engaging in interstate marketing, after a federal statute made clear that such activity would subject it to suit. *Id.* at 671-72, 679. The Supreme Court emphatically rejected this "constructive-waiver" theory, holding:

> There is a fundamental difference between a State's expressing unequivocally that it waives its immunity, and Congress's expressing unequivocally its intention that if the State takes certain action it shall be deemed to have waived that immunity. In the latter situation, the most that can be said with certainty is that the State has been put on notice that Congress intends to subject it to suits brought by individuals. That is very far from concluding that *the State* made an "altogether voluntary" decision to waive its immunity.

*Id.* at 680-81 (emphasis in original).[5] The constitutional requirement of knowing and voluntary consent means nothing if Congress can simply "exact constructive waivers" of jurisdictional defenses "through the exercise of Article I powers." *Id.* at 683. The same is true in this case: "Congress cannot, consistent with the Constitution, simply decree that any conduct, without regard for its connections to the United States … signals a party's intent to submit to the jurisdiction of a United States court." *Fuld*, 2022 U.S. Dist. LEXIS 3102, at *3.

---

[5] Although *College Savings Bank* addressed waivers of state sovereign immunity rather than consent to personal jurisdiction, the Supreme Court made clear that its decision hinged on broader constitutional principles. *See* 527 U.S. at 681-82 (relying on the "classic description of an effective waiver of a constitutional right," and noting implied waivers "are simply unheard of in the context of *other* constitutionally protected privileges.") (emphasis in original); *see also Fuld*, 2022 U.S. Dist. LEXIS 3102, at *21-22 ("[T]he principles underlying *College Savings Bank* are not specific to the Eleventh Amendment, but rather apply to constitutional rights broadly.").

**0096**

The other courts to address the PSJVTA universally agree. For example, *Shatsky*, 2022 U.S. Dist. LEXIS 48721, at *15, agreed with *Fuld* that "it is not reasonable to infer an intention to consent to suit in U.S. courts from the factual predicates in the PSJVTA" because the specified conduct does not reflect any "knowing and voluntary" agreement to "submit" to jurisdiction. Similarly, Judge Daniels explained that "finding that Defendants have impliedly consented to personal jurisdiction based solely on their conduct in violation of the PSJVTA would violate the due process clause of the constitution" because the conduct does not support the "presumption" that Defendants intended to submit to jurisdiction. *Sokolow*, 2022 U.S. Dist. LEXIS 43096, at *17-20; *id.*, 2022 U.S. Dist. LEXIS 107122, at *6 (the "types of conduct" alleged by plaintiffs "do not infer any intention on the part of Defendants to legally submit to suit in the United States").

**2.   Other Implied Consent Cases Focus on the Defendant's Conduct Rather than the Forum's Intent to Exercise Personal Jurisdiction.**

The unanimous holdings in *Fuld, Shatsky,* and *Sokolow* draw further support from other "implied consent" cases, which similarly focus on the nature of the defendant's conduct rather than the forum's intent to subject the defendant to suit. Beginning with the Supreme Court's decision in *Hess*, courts confronting claims of implied consent have examined whether a defendant's decision to engage in the specified activity actually reflects its implicit agreement to submit to jurisdiction. When the defendant chooses to take advantage of a forum's offerings (e.g., driving on public roadways, doing business in the state), courts properly assume the defendant freely and voluntarily accepts the conditions the forum places on such activities—including consent to specific personal jurisdiction in the forum.[6] By accepting the benefit of engaging in the regulated

---

[6] *See, e.g.*, *Hess*, 274 U.S. at 354-57 (holding acceptance of the "privilege" of driving on public roads evinced defendant's implicit agreement to jurisdiction); *College Savings Bank*, 527 U.S. at 686-87 (holding Congress may condition grant of federal funds or "gratuit[ies]" on State's waiver

activity, the defendant "enters into a 'bargain' with the state" whereby it consents to jurisdiction in exchange for permission to engage in conduct which the state otherwise could prohibit. *Leonard*, 829 F. Supp. at 889; *see also In re Mid-Atl. Toyota*, 525 F. Supp. at 1278 (describing this "bargain"). Conversely, Defendants are not aware of a single case upholding an implied consent statute in the *absence* of reciprocity—i.e., absent some benefit conferred upon the defendant in exchange for its consent.

Judged against this standard, the PSJVTA again falls on the wrong side of the line. Unlike constitutionally permissible implied-consent statutes, the PSJVTA does not confer any "benefit" or "privilege" for Defendants to "accept" in exchange for their purported "consent" to jurisdiction. The payments at issue occur entirely outside the United States (in Palestine), and do not require authorization from the U.S. government or the involvement of any U.S. entity. Any decision to continue making such payments thus reflects Defendants' own domestic policy choice, rather than any intent to freely and voluntarily consent to jurisdiction in the United States.

Similarly, Defendants' choice to maintain Palestine's UN Mission in New York, and to conduct activities in furtherance of the Mission's work, does not reflect any intent to freely and voluntary consent to jurisdiction in the United States.[7] Under longstanding judicial interpretation

---

of sovereign immunity because "acceptance of the funds entails an agreement" to the condition); *In re Mid-Atl. Toyota Antitrust Litig.*, 525 F. Supp. 1265, 1278 (D. Md. 1981) (explaining state business registration statutes condition privilege of doing business in the state on defendant's consent to jurisdiction).

[7] Although, for purposes of this Motion, Defendants do not contest that the PSJVTA's "payments" prong is satisfied, they do contest Plaintiffs' conclusory allegations regarding their "U.S. activities." As noted above (*supra* n. 4), the PSJVTA provides "no court may consider" Defendants' UN activities, meetings with government officials, and *any activities "ancillary to" such activities*. As part of its UN activities, the Palestinian Mission is expected to "participate[] in the work of" the UN Committee on the Exercise of the Inalienable Rights of the Palestinian People ("CEIRPP"). *See* Report, CEIRPP, UN Doc. A/75/35 (Oct. 10, 2020). The CEIRPP's express purpose is to "mobilize the international community" to provide "the broadest possible

of the UN Headquarters Agreement ("UNHQA"), the U.S. government is "obligat[ed] ... to refrain from impairing the function of the PLO Observer Mission," which falls outside U.S. "jurisdiction." *United States v. PLO*, 695 F. Supp. 1456, 1465-68, 1471 (S.D.N.Y. 1988); *see also Klinghoffer*, 937 F.2d at 51. Aside from UN-related activities, the Anti-Terrorism Act of 1987—which Plaintiffs affirmatively allege "remains in force today" (FAC ¶ 115)—broadly prohibits Defendants from operating in the United States. *See* 22 U.S.C. §§ 5201, 5202; *see also PLO*, 695 F. Supp. at 1471; *Mendelsohn v. Meese*, 695 F. Supp. 1474, 1484 (S.D.N.Y. 1988) (explaining 1987 Act was enacted for express purpose of "deny[ing] the PLO the benefits of operating in the United States"). The PSJVTA does not remove any of the prohibitions on Defendants' U.S. activities under the 1987 Act, nor does it alter the scope of permissible UN-related activities under the UNHQA. The PSJVTA thus fails to offer any benefit for Defendants to "accept," and thereby signal their implied agreement to consent to jurisdiction.

Rather than conferring any government "benefit" or "privilege" conditioned upon consent to jurisdiction, the PSJVTA simply decrees that certain conduct in which Defendants previously engaged shall be "deemed consent" to personal jurisdiction—regardless of whether that conduct is meaningful under the Due Process Clause. As *Fuld* recognized, allowing Congress to transform constitutionally inadequate contacts with a forum into grounds for "deemed consent" to personal jurisdiction based on nothing more than legislative say-so would swallow the minimum contacts

---

international support" for the Palestinian people by "end[ing] ... the Israeli occupation," supporting the "two-State solution," "highlighting the illegality of Israeli settlement activities in the West Bank," and "rais[ing] international awareness of the political, human rights and humanitarian developments on the ground." Programme of Work for 2020, CEIRPP, UN Doc. A/AC.183/2020/1 (Feb. 7, 2020). The "propaganda," "social media," "public relations," and "lobbying" activities alleged in the FAC (*see* ¶¶ 12-13) are all plainly either official UN business (including within the mandate of the CEIRPP) or "ancillary to" such UN activities, or other exempt meetings.

test, leaving no limit—other than "legislative imagination"—to the types of activities that could subject a defendant to personal jurisdiction. *Fuld,* 2022 U.S. Dist. LEXIS 3102, at *28.

In *Daimler*, for example, the Supreme Court held that the Due Process Clause prohibited a California court from exercising general jurisdiction over a car manufacturer and its U.S. subsidiary, which distributed vehicles to California dealerships but were incorporated and maintained their principal places of business elsewhere. 571 U.S. at 139. Despite achieving "sizable" sales in the state, the Court held defendants' activities were insufficient to confer personal jurisdiction because they were not "essentially at home" in California. *Id.* But if "deemed consent" were a valid means of imposing "consent" to jurisdiction, the California legislature could circumvent *Daimler* simply by enacting a statute declaring that any foreign corporation that distributed vehicles to California dealerships "shall be deemed to have consented to personal jurisdiction" in the state. The same would be true of virtually any decision holding that a defendant's forum-related activities were insufficient to confer jurisdiction. If constitutionally inadequate activities in a forum could serve as a valid basis for implied consent to jurisdiction merely because the legislature incanted the magic words "deemed consent," there would be no end to the types of activities that could serve as the basis for implied "consent" to jurisdiction.

For that reason, courts have long rejected legislative attempts to create personal jurisdiction where the Constitution forbids it. Rather, the Due Process Clause "sets the outer boundaries of [a court's] authority to proceed against a defendant," *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011), and a court may only exercise jurisdiction where "constitutionally permissible." *Siemer v. Learjet Acquisition Corp.*, 966 F.2d 179, 183-84 (5th Cir. 1992); *see also Livnat v. Palestinian Auth.*, 851 F.3d 45, 53 (D.C. Cir. 2017) (courts must apply "due-process protections to limit personal jurisdiction in [ATA] cases" even when it might "thwart

Congress's intent to provide redress," because "Congress cannot wish away a constitutional provision"); *Gilson v. Republic of Ir.*, 682 F.2d 1022, 1028 (D.C. Cir. 1982) ("[A] statute cannot grant personal jurisdiction where the Constitution forbids it ...."); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95 (D.C. Cir. 2002) (same). "Expansive, non-explicit consent to being haled into court on any claim whatsoever in a [forum] in which one lacks minimum contacts goes against the longstanding notion that personal jurisdiction is primarily concerned with fairness." *WorldCare Ltd. v. World Ins.*, 767 F. Supp. 2d 341, 355 (D. Conn. 2011). The result in this case should be no different.

> ### 3.   Allowing Congress to Dictate "Deemed" Consent to Personal Jurisdiction Would Violate Separation of Powers.

The PSJVTA's "deemed consent" provisions are unconstitutional for a second reason as well: they violate separation of powers. Although Congress maintains inherent authority to pass new substantive law, it oversteps that authority when it attempts to "usurp a court's power to interpret and apply the law to the circumstances before it" by "direct[ing] the result without altering the legal standards governing the effect of [the specified activity]." *Bank Markazi v. Peterson*, 578 U.S. 212, 224-28 (2016); *see also City of Boerne v. Flores*, 521 U.S. 507, 536 (1997) (Congress cannot override the judiciary's responsibility to "say what the law is"); *Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1171 (10th Cir. 2004) (explaining Congress lacks the authority to interfere with private rights "by directing the judiciary to decide a particular way, or by setting aside [prior] judicial determinations").

The PSJVTA runs afoul of these basic principles by attempting to dictate to the courts the circumstances under which Defendants "shall be deemed to have consented to personal jurisdiction." 18 U.S.C. § 2334(e)(1). Determining whether a party has waived its constitutional rights is a quintessentially judicial question, requiring "application of constitutional principles to

the facts as found." *Brewer v. Williams*, 430 U.S. 387, 403 (1977). The PSJVTA improperly usurps the judicial function by directing courts to *always* find "voluntary" consent to jurisdiction if the statute's factual predicates are met—regardless of whether those activities would satisfy the governing "knowing and voluntary" standard under the Due Process Clause.

The PSJVTA also attempts to override the courts' consistent application of constitutional principles to the scope of Defendants' activities in the United States. In *Shatsky*, *Waldman*, *Livnat*, and *Klieman*, the courts uniformly held that the same conduct specified in the PSJVTA was *insufficient* to subject Defendants to personal jurisdiction. Permitting Congress to supersede those constitutional holdings by legislative fiat would make the Constitution, "like other acts ... alterable when the legislature shall please to alter it," in violation of fundamental principles of separation of powers. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

**B.   Defendants Lack Sufficient Contacts with the United States to Support the Exercise of Specific Jurisdiction.**

This Court should likewise reject the FAC's attempt to assert specific jurisdiction (FAC ¶¶ 13-16) over Defendants. "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King v. Rudzewicz*, 471 U.S. 462, 471-72 (1985); *Archangel Diamond Liquidating Trust v. OAO Lukoil*, 75 F. Supp. 3d 1343, 1364 (D. Colo. 2014) (courts look at nationwide, not state, contacts under the Fifth Amendment).   Exercising specific jurisdiction would violate due process because, as other courts have held, Defendants' "suit-related conduct"—their alleged involvement in attacks in Israel or Palestine (which they strongly dispute)—is "not sufficiently connected to the United States" to subject them to suit here. *Waldman I*, 835 F.3d at 335-44; *see also Klieman*, 923 F.3d at 1123-26 (explaining American citizenship of victims of the alleged attacks was too "random, fortuitous, or attenuated" a contact

- 15 -

with forum to support specific jurisdiction); *Walden v. Fiore*, 571 U.S. 277, 283-91 (2014) (describing due process limitations on specific jurisdiction).[8]

In a series of cases involving similar ATA claims, federal courts have repeatedly held the Due Process Clause prohibits jurisdiction over the PA and PLO in suits for alleged involvement in attacks in Israel or Palestine, because those attacks lack any "meaningful contacts" with the United States. *See, e.g.*, *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56-58 (D.C. Cir. 2017) (holding plaintiffs failed to establish that the exercise of jurisdiction "would meet the requirements of the Fifth Amendment's Due Process Clause"); *Shatsky*, 955 F.3d at 1036-38 (directing dismissal of ATA claims against Defendants for lack of personal jurisdiction); *Klieman*, 923 F.3d at 1118 (holding Due Process Clause "barred U.S. courts from exercising jurisdiction" over PA/PLO), *vac'd on other gnds*, 140 S. Ct. 2713 (2020), *reinstated in relevant part*, 820 F. App'x 11 (D.C. Cir. 2020); *Waldman I*, 835 F.3d at 344 (holding court "could not constitutionally exercise either general or specific personal jurisdiction" over either Defendant).

The FAC asserts that the activities of the PLO's Washington office from 1994 to 2014 creates specific jurisdiction in this case. FAC ¶¶ 13-16, 151. But the Second and D.C. Circuits have already reviewed the conduct of the PLO's former Washington office at length, discussing its employees, its "commercial presence" and "diplomatic activities," its "multi-million dollar

---

[8] As Defendants lack sufficient nationwide contacts to support jurisdiction, the Court need not reach the "convenience factors" under the Fifth Amendment. *See Livnat*, 851 F.3d at 55 n.6 (declining to consider convenience factors because "the [PA] lacks minimum contacts with the United States as a whole"). In any case, forcing Defendants to litigate in Colorado would violate fair play and substantial justice. *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1211-13 (10th Cir. 2000) (describing factors relevant to this inquiry). The FAC does not allege any contact between Defendants and Colorado, and discovery would "overwhelmingly" take place overseas. *Archangel*, 75 F. Supp. 3d at 1371. Defendants are foreign organizations without any presence in the state, such that the burden of litigating in Colorado is unconstitutionally "undue and unreasonable." *Id.* at 1371-74.

**0103**

contract" for "consulting and lobbying," and its promotion of "the Palestinian cause in speeches and media." *Waldman I*, 835 F.3d at 323; *Livnat*, 851 F.3d at 56-57. These types of activities are insufficient to establish specific jurisdiction because, as the Second Circuit explained, any connection between efforts "to influence United States policy" and specific attacks is too "attenuated" under the Due Process Clause. *Waldman I*, 835 F.3d at 341-42. The FAC fails for the same reason, as it cannot establish a substantial connection between the alleged activities of the PLO's former Washington office and the Attack. Its generic allegations of a strategy to "influence United States policy" are indistinguishable from the allegations rejected in *Waldman*, *Klieman*, *Livnat*, and *Shatsky*.

The courts have similarly rejected Plaintiffs' argument that Defendants cannot challenge the exercise of personal jurisdiction because the PA and PLO "have no Due Process rights." FAC ¶¶ 9-11. The Second and D.C. Circuits—the only two circuit courts to address the issue—have both held that Defendants *are* entitled to the protections afforded to "persons" under the Due Process Clause. *See Livnat*, 851 F.3d at 48-54 (holding Defendants are "persons" under the Due Process Clause); *Waldman I*, 835 F.3d at 329 (same). In so holding, the courts expressly rejected the assertion (repeated by Plaintiffs in this case) that Defendants should be treated as "foreign governments" rather than "persons" under the Due Process Clause, explaining that a "non-sovereign" entity like the PA or the PLO "lacks the 'panoply of mechanisms in the international arena' that a sovereign state … can use to resolve disputes with the United States." *Livnat*, 851 F.3d at 51; *see also Waldman I*, 835 F.3d at 329 (holding Defendants "have due process rights" because "neither the PLO nor the PA is recognized by the United States as a sovereign state"). Accordingly, like any other non-sovereign foreign association, Defendants are subject to personal jurisdiction in the United States "only if consistent with due-process limits." *Livnat*, 851 F.3d at

54; *see also Waldman I*, 835 F.3d at 329; *GCIU-Emplr. Ret. Fund v. Coleridge Fine Arts*, 700 F. App'x 865, 868 (10th Cir. 2017) (applying "Fifth Amendment due process standards" to exercise of personal jurisdiction over foreign corporation).

Rather than acknowledging this precedent, the FAC instead relies on Executive Branch materials filed *over thirty years ago* to assert that "[f]oreign entities such as the PLO … do not have due process rights." FAC ¶ 10. More recent pronouncements make clear that any such view is outdated. In 2018, for example, the U.S. Government argued that Defendants' due-process rights were so well-established that review of the Second Circuit's decision in *Waldman I* was unnecessary. *See* U.S. Amicus Br. at 9, *Sokolow v. PLO*, 138 S. Ct. 1438 (2018) (No. 16-1071). As the Solicitor General explained, the Supreme Court's "existing jurisprudence has set only States of the Union outside of the category of 'persons' [entitled to Due Process under the Fifth Amendment]," and thus "do[es] not establish that foreign entities like [the PA and PLO] are barred from invoking due process protections." *Id*. Every court of appeals to consider the issue has reached the same conclusion: the PA and PLO constitute "persons" within the meaning of the Due Process Clause, and are thus entitled to the Clause's protections. *Id.* at 9 & n.1 (collecting cases). "The Second Circuit's treatment of [the PA and PLO] as entities that receive due process protections" was thus uncontroversial, as it did not conflict with Supreme Court precedent or "with any decision of another court of appeals." *Id.* at 9. Put simply, there is no support for Plaintiffs' claim that foreign entities like the PA and PLO lack due-process rights.

Finally, the courts have also squarely rejected the FAC's assertion that Defendants' waiver of service under Fed. R. Civ. P. 4(k) creates jurisdiction. FAC ¶¶ 7-8. Prior plaintiffs made the same argument, but the Second Circuit correctly held that due process still "applies even when federal service-of-process statutes are satisfied." *Waldman I*, 835 F.3d at 343 (Rule 4(k) service

on Defendants insufficient to establish personal jurisdiction); Fed. R. Civ. P 4(d)(5) ("Waiving service of a summons does not waive any objection to personal jurisdiction or to venue."). The Tenth Circuit likewise recognizes that mere compliance with Rule 4(k) does not answer the constitutional question of whether the exercise of personal jurisdiction "satisfies Fifth Amendment due process standards." *GCIU-Emplr. Ret. Fund*, 700 F. App'x at 868; *see also Noble Sec. v. MIZ Eng*, 611 F. Supp. 2d 513, 552 (E.D. Va. 2009) ("[A]ssertion of jurisdiction under a federal statute pursuant to [Rule] 4(k)(1)(C) requires application of the due process clause of the Fifth Amendment."). Neither the PSJVTA nor Rule 4(k) excuses Plaintiffs from carrying their burden of demonstrating exercising jurisdiction over Defendants complies with the Fifth Amendment.

### C.   The Addition of Ambassador Mansour as a Rule 23.2 "Representative" Does Not Create Jurisdiction Over The PA and PLO.

This Court should reject Plaintiffs' attempt to evade jurisdictional due process by naming Ambassador Mansour as a "representative" in a Rule 23.2 class action. FAC ¶¶ 27-32. Rule 23.2 is a procedural rule permitting lawsuits "against the members of an unincorporated association as a class by naming certain members as representative parties." Fed. R. Civ. P. 23.2. But Rule 23.2 does not purport to create personal jurisdiction over the PA and PLO where otherwise lacking. Any assertion of personal jurisdiction must still comport with due process of law.

Plaintiffs, in any case, have *not* brought a class action against the "members" of the PA or the PLO. Rather, as permitted under both federal and Colorado law, they sued the PA and PLO as entities – the PA as "a foreign government" and the PLO as "a foreign political entity" – and requested a judgment *only* "against defendants PLO and PA, jointly and severally." FAC, Prayer for Relief, ¶¶ 10, 11. Plaintiffs do not request relief against the membership of the PA and PLO. Rule 23.2 is therefore superfluous here and does not apply. Rule 23.2 also does not apply because

the FAC does not define the members of the class, Ambassador Mansour is not a member of the class, and because, under Colorado law, he cannot be sued for any alleged torts of the PA and PLO.

### 1. Rule 23.2 Does Not Allow this Court to Ignore the Due Process Limits On Personal Jurisdiction.

The Rules Enabling Act, under which the Federal Rules of Civil Procedure were promulgated, states that "[s]uch rules shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). The Supreme Court has repeatedly held that Rule 23 class actions are not a license for courts to ignore the requirements of personal jurisdiction. In *Tyson Foods v. Bouaphakeo*, 136 S. Ct. 1036, 1048 (2016), the Court explained that it would have "violated the Rules Enabling Act" to give parties "different rights in a class proceeding than they could have asserted in an individual action." In other words, if this Court cannot exercise personal jurisdiction over the PA and PLO consistent with due process (which it cannot), Rule 23.2 does not change the result. *Price*, 294 F.3d at 95 ("it is well-settled that 'a statute cannot grant personal jurisdiction where the Constitution forbids it'") (citation omitted). Congress does not "have the power to authorize violations of the Due Process Clause" where due process requirements have not been met. *Quill Corp. v. North Dakota*, 504 U.S. 298, 305 (1992).

Procedural rules like Rule 23.2 do not change the constitutional rule that *the due process limits of personal jurisdiction must be satisfied. Railway. Labor Executives' Ass'n v. Ass'n of Am. R.R.*, No. 87-2145, 1988 U.S. Dist. LEXIS 18600, at *3-4 (D.D.C. July 14, 1988) ("A rule of procedure cannot create a cause of action which otherwise would not exist, nor may it excuse a court from ensuring compliance with constitutionally mandated bars to jurisdiction."). "The consistent constitutional rule has been that a court has no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant," and just as in *Railway,*

- 20 -

Plaintiffs "cannot escape application of this rule of law by interjecting a procedural rule." *Id.* (citing *Zenith Corp. v. Hazeltine,* 395 U.S. 100, 110 (1969)).

Just as Plaintiffs here argue that satisfying Rule 23.2 establishes personal jurisdiction over the PA and PLO, the plaintiffs in *Waldman I* argued that meeting the statutory requirement for service of process under Rule 4(k) sufficed to establish personal jurisdiction over the PA and PLO. *Waldman I,* 835 F.3d at 343. The Second Circuit disagreed, holding that due process still applies: "the exercise of personal jurisdiction must comport with constitutional due process principles.... due process is not satisfied in this case, and the courts have neither general nor specific jurisdiction over the defendants, regardless of the service-of-process statute." *Id.* (cleaned up). The Tenth Circuit agrees that Rule 4(k)(2) "provides for federal long-arm jurisdiction *if the plaintiff can show that the exercise of jurisdiction comports with due process*." *CGC Holding Co. v. Hutchens*, 974 F.3d 1201, 1208 (10th Cir. 2020) (emphasis added).

As explained above, the Second Circuit, the D.C. Circuit, and various district courts have already held that the conduct alleged in the FAC (Defendants' purported efforts to influence U.S. policy) is insufficient to support personal jurisdiction under the Due Process Clause. *See, e.g., Waldman I*, 835 F.3d at 333, 343. Plaintiffs' sudden choice to invoke a different procedural rule (Rule 23.2) does not change that fundamental due process analysis.

### 2. Rule 23.2 Does Not Apply in this Case Because Plaintiffs Have Sued the PA and PLO Directly as Entities.

Even if Rule 23.2 could sidestep due process, it does not apply where, as here, an unincorporated association has the capacity to be sued as an entity. *See, e.g., Northbrook Excess & Surplus Ins. v. Med. Malpractice Joint Underwriting Assn.*, 900 F.2d 476, 479 (1st Cir. 1990) ("If the [unincorporated association] can institute or defend a suit in its common name under Massachusetts law, [plaintiff] may not use Rule 23.2 to bring a class action against its members in

federal court."); *Nat'l Bank of Wash. v. Mallery*, 669 F. Supp. 22, 24-25 (D.C. Cir. 1987) ("[A]n unincorporated association may sue or be sued as a class only where state law does not allow suit by or against the group as an entity."); *Patrician Towers Owners, Inc. v. Fairchild*, 513 F.2d 216, 220 (4th Cir. 1975) ("when the law of the state in a particular case does not provide an unincorporated association with capacity as a jural person to sue or to be sued, then and *only* then does the mechanism of Rule 23.2 come into operation" (quotation omitted)).[9]

In this case, the PA and PLO may be sued as entities, *i.e.* in their common name, for both the federal and state law claims asserted in the FAC. Fed. R. Civ. P. 17(b)(3)(A) (unincorporated association may be sued in common name to enforce a substantive right existing under the Constitution or federal law); Colo. Rev. Stat. §7-30-107(1) ("A nonprofit association, in its name, may institute, defend, intervene or participate in a judicial … proceeding.").[10] Plaintiffs have in fact sued, and seek to recover damages from the PA and PLO as entities in the FAC. Specifically, the FAC names both the PA and PLO as Defendants in the case, claiming that each entity "aided and abetted and conspired with the PFLP to carry out the Terrorist Attack, and took other actions that facilitated, enabled, and caused the Terrorist Attack." FAC ¶ 3. The FAC likewise seeks damages from the PA and PLO as entities. *See, e.g.,* FAC, Prayer for Relief (requesting a "judgment be entered ... against defendants PLO and PA, jointly and severally, as to each of the causes of action enumerated" in the FAC).

---

[9] *See Benn v. Seventh-Day Adventist Church,* 304 F. Supp. 2d 716, 723 (D. Md. 2004) ("Because Maryland law does provide that unincorporated associations have the right to sue and be sued, on that ground alone Rule 23.2 may not be used by plaintiff as a device to sue the [unincorporated associations]." (citation omitted)); *Lang v. Windsor Mount Joy Mut. Ins.*, 493 F. Supp. 97, 99 (E.D. Pa. 1980) ("Because Pennsylvania law allows an unincorporated association to be sued as an entity, the purpose of Rule 23.2 has been served. Therefore, it is unavailable for plaintiff's use.").

[10] Under Fed. R. Civ. P. 17(b)(3), capacity to sue or be used is determined under Colorado law.

Rule 23.2, on the other hand, "applies to an action brought by or against the members of an unincorporated association as a class by naming certain members as representative parties." Fed. R. Civ. P. 23.2. The FAC does not assert any claims "against the members of [the PA or PLO] as a class." *Id.* "Although an action by or against representatives of the membership of an unincorporated association has often been viewed as a class action, the real or main purpose of this characterization has been to give 'entity treatment' to the association when for formal reasons it cannot sue or be sued as a jural person under Rule 17(b)." Rule 23.2, 1966 committee note.

Consistent with the "purpose" of Rule 23.2 and regardless of a court's view on its scope, Rule 23.2 is inapplicable where, as here, the unincorporated association is *already* present as a party in the case. *See, e.g., Coniglio v. Highwood Servs., Inc.*, 60 F.R.D. 359, 364 (W.D.N.Y. 1972) ("In the present action the NFL has been named and served as a party defendant pursuant to Rule 17(b). It is present as an entity and, accordingly, it would appear to this court that, for this and the other reasons set forth above, the maintenance of a defendant class pursuant to Rule 23.2 would be inappropriate in the present action."); *Patrician Towers*, 513 F.2d at 221 (finding Rule 23.2 action is "not maintainable" where such a case is "joined ... with an action brought by the party for whose benefit the representative action is sought to be asserted."); *Gay Lib v. Univ. of Mo.*, 416 F. Supp. 1350, 1360 (W.D. Mo. 1976), *rev'd on other grounds*, 558 F.2d 848 (8th Cir. 1977) ("There is, therefore, no need to allow a class suit under Rule 23.2 on behalf of Gay Lib and its members, because Gay Lib already stands before this Court as an unincorporated association fully competent to represent its own interests.... Accordingly, this Court will not certify a class under Rule 23.2 in this action."); *Wilkinson v. FBI*, 99 F.R.D. 148, 152 n.2 (C.D. Cal. 1983) ("Because [the unincorporated association] already is a party in this action, Rule 23.2 is not applicable."). As

Plaintiffs have already sued the PA and PLO as entities, their attempt to use Rule 23.2 as a device to evade the requirements of the Due Process Clause should be rejected.

Finally, Rule 23.2 is inapplicable where members of an unincorporated association do not have the capacity to be sued for the tortious actions of the association simply because they are members. Colo. Rev. Stat. §7-30-106(3) ("A person is not liable for a tortious act or omission for which a nonprofit association is liable merely because the person is a member of the nonprofit association [or] is authorized to participate in the management of the affairs of the nonprofit association…."). In *Lumbermen's Underwriting Alliance v. Mobil Oil*, 612 F. Supp. 1166, 1170-72 (D. Idaho 1985), the court concluded that Rule 23.2 was not available because the individual members of "a reciprocal insurance exchange" could not be liable under state law. *Id.* at 1171. Because the members could not be liable for the association's torts, "a procedural mechanism for such a suit is, of course, superfluous." *Id.* at 1172. *See also Taylor v. Bywater,* 1994 U.S. Dist. LEXIS 4176, at *8 (D. Kan. Mar. 29, 1994) (dismissing Rule 23.2 action against union members because "federal law prohibits actions for monetary damages against individual union members."). Because Plaintiffs have sued Ambassador Mansour ***solely*** for his alleged membership in the PA and PLO, and not his own actions, he cannot be liable for Defendants' alleged torts under Colorado law and Rule 23.2 is not applicable.

### 3.    The FAC Fails To Allege A Defendant Class Under Rule 23.2.

Numerous other pleading deficiencies confirm that Plaintiffs' invocation of Rule 23.2 is merely a fiction designed to avoid due process. While the FAC names Ambassador Mansour "as a representative member of both the PLO and the PA" based on his current position as Ambassador for Palestine's UN Mission (FAC ¶¶ 31-35), the FAC does not allege a defendant-class action as required under Rule 23.2, or assert any claims against the "members" of the PA and the PLO as

defendants. *Taylor*, 1994 U.S. Dist. LEXIS 4176, at *8 (under Rule 23.2, plaintiff "has had to sue, not the IUE itself, but the IUE's members"). Rather, the FAC attempts to use the Ambassador as a stalking horse for a lawsuit against the PA and PLO.

The only causes of action in the FAC are against the PA and PLO—there are no causes of action against Ambassador Mansour or any other putative class member. FAC ¶¶ 179-240. Similarly, the FAC only asks that "judgment be entered ... against defendants PLO and PA, jointly and severally, as to each of the causes of action enumerated." *Id*., p. 54. The lack of "specific claims for relief" against Ambassador Mansour requires his dismissal. *Souders v. Brill*, No. 09-00778, 2009 U.S. Dist. LEXIS 50407, at *1-2 (D. Colo. Apr. 29, 2009). A complaint "must explain what each defendant did to him or her; when the defendant did it; how the defendant's action harmed him or her; and, what specific legal right the plaintiff believes the defendant violated." *Id*. at *2-3 (citing *Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007)). The FAC does not explain what the Ambassador did, how the Ambassador harmed Plaintiffs, or what rights the Ambassador violated.

The lack of allegations regarding how the Ambassador's personal actions harmed Plaintiffs means that he cannot be held liable under Colorado law, which prevents members from being sued for the torts of an association. Colo. Rev. Stat. § 7-30-106(3). Just as an employee of a corporation cannot be sued for the unrelated torts committed by that corporation, Ambassador Mansour cannot be sued for terrorism in which he had no involvement—indeed, the FAC admits that he is a U.S. citizen that has peacefully worked at the United Nations for almost 40 years. FAC ¶ 34.

Nor can the Ambassador be an adequate class representative, as required by Rule 23.2, when the FAC neither defines the class membership nor defines an "ascertainable class." *Warnick v. Dish Network*, 301 F.R.D. 551, 555 (D. Colo. 2014) ("[a]lthough not specifically mentioned in

Rule 23, there must be an ascertainable class" determined "with 'reference to objective criteria'")

(citation omitted). An "ascertainable class … is an implied prerequisite" of Rule 23, and, by the

same logic, of Rule 23.2. *Low v. Chu*, 2009 U.S. Dist. LEXIS 111623, at *8 n.5 (N.D. Okla.. Dec.

1, 2009). And because the FAC only names the Ambassador in his "official capacity," he is not a

defendant at all because "[w]here a suit contains both entity and official capacity claims, the only

defendant is the entity." *Doe v. Douglas Cty. Sch. Dist.*, 775 F. Supp. 1414, 1416 (D. Colo. 1991).

These problems (no adequate representative, no claims against the class, and no definite class)

implicate this Court's "heightened responsibility to ensure due process for individuals absent from

the putative defendants' class." *Wynadotte Nation v. Kan. City*, 214 F.R.D. 656, 659 (D. Kan.

2003) (citing 2 Conte & Newberg, Newberg on Class Actions § 4:48 (4th ed. 2002) ("a defendant

class requires closer scrutiny of Rule 23 tests to assure fairness to absent members based on long-

standing due process protections for defendants in the absence of a defendant class")).

Additionally, Ambassador Mansour is not a "member" of the PA as a matter of law. The

Palestinian Authority was established by the Oslo Accords, which specifically defined the

"members" of the organization to be limited to its policy-makers: the President, Council of

Ministers, and Legislative Council.[11] The FAC does not allege the Ambassador is a member of

those bodies. The FAC instead nonsensically claims that members of certain Palestinian political

parties are also members of the PLO because the parties are "departments" of the PLO—yet still

---

[11] *See* Decl. of Principles on Interim Self-Government Arrangements, Sept. 13, 1993, 32 ILM 1525, at Preamble, Art. I & VII (the interim agreements would define the "members" of the "Council," later known as the PA); Agreement on the Gaza Strip and the Jericho Area, May 4, 1995, 33 ILM 622, Art. IV ("[t]he Palestinian Authority will consist of one body of 24 members [now known as the Council of Ministers] which shall carry out and be responsible for all the legislative and executive powers and responsibilities…"); Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip, Washington, D.C., Sept. 28, 1995, 36 ILM 551, Art. I, II, III (adding that the President and Legislative Council would also be "members" of the PA).

fails to allege the Ambassador is a member of those political parties. FAC ¶¶ 110-111. *See Monarch Asphalt Sales v. Wilshire Oil,* 511 F.2d 1073, 1077 (10th Cir. 1975) ("A class action may not be maintained by a putative representative who is not a member of the class.").

In any case, Ambassador Mansour, as an invitee to the United Nations, has functional immunity under the UN Headquarters Agreement for actions performed in an "official capacity" or that "relate[]" to official actions. *Brzak v. UN*, 597 F.3d 107, 113 (2d Cir. 2010); *van Aggelen v. UN*, 311 F. App'x 407, 409 (2d Cir. 2009); *see Nouinou v. Smith*, No. 20-8682, 2021 U.S. Dist. LEXIS 182293, at \*10 (S.D.N.Y. Sep. 22, 2021) (applying functional immunity "[b]ecause the allegations … arise from Plaintiff's employment at the UN and relate to acts performed by Smith within his official capacity as a UN employee"). For this reason alone, this Court should dismiss the FAC's attempt to name the Ambassador as a defendant in his "official capacity."

In the end, the FAC has neither the trappings nor the substance of a Rule 23.2 class action. As the presence of Ambassador Mansour is entirely superfluous to Plaintiffs' actual claims against the PA and PLO, this Court should dismiss him from this case.

## II.  THE AMERICAN PLAINTIFFS FAIL TO STATE A DIRECT-LIABILITY OR RESPONDEAT SUPERIOR CLAIM UNDER THE ATA.

Independent of personal jurisdiction, Plaintiffs' claims are legally insufficient under Fed. R. Civ. P. 12(b)(6). A complaint must be dismissed if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads *factual content* that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (emphasis added). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but—it has not

shown—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679; *see also Anapoell v. Am. Express Bus. Fin. Corp.*, 2009 U.S. App. LEXIS 6315, at *11-12 (10th Cir. Mar. 24, 2009) (same).

Here, Plaintiffs' FAC does not contain allegations with "sufficient factual matter" to raise a reasonable inference that Defendants had any involvement with, or connection to, the Attack. *Twombly*, 550 U.S. at 570; *Licerio v. Lamb*, No. 20-681-WJM, 2021 U.S. Dist. LEXIS 175346, at *55-56 (D. Colo. July 15, 2021) (dismissing claims where plaintiff's allegations were "conclusory and speculative."). The FAC does not allege Defendants directly communicated with or provided support to the Attackers. Instead, it makes three conclusory claims: (1) the Attackers were "operatives" of the PFLP (FAC ¶¶ 165, 172); (2) the PFLP was responsible for the Attack (*id.* ¶ 173); and (3) Defendants are liable for the PFLP because the PFLP is "without separate legal identit[y]" from Defendants, in that "the PLO's factions carry out terrorism under factional names," "work[ing] hand-in-glove" with Defendants (*id.* ¶ 152).[12] The FAC does not allege facts to plausibly support these assertions, requiring dismissal.

Plaintiffs allege Defendants are liable for the acts of the PFLP because the PLO, as a governmental entity, provides limited and generalized support to all of its constituent political factions, including the PFLP. But, Plaintiffs have not alleged any plausible way how Defendants, played any role whatsoever in the Attack (a) by providing the PFLP with: (i) limited and general

---

[12] The Court can take judicial notice of public reports contradicting Plaintiffs' speculative and conclusory allegations the Defendants operate "hand-in-glove" or in a "fictitious 'division of roles'" with the PFLP. FAC ¶¶ 149-150. For example, the PFLP is currently boycotting meetings at the highest level of the PLO due to its policy disagreements with other PLO factions and PA President Mahmoud Abbas. *See* Middle East Monitor, "PFLP reaffirms boycott of Palestinian National Council meetings," https://www.middleeastmonitor.com/20220131-pflp-reaffirms-boycott-of-palestinian-national-council-meetings/ (Jan. 31, 2022); *see also United Water & Sanitation Dist. v. Geo-Con, Inc.*, 488 F. Supp. 3d 1052, 1057 (D. Colo. 2020) ("Courts may also consider matters of which a court may take judicial notice ... includ[ing] adjudicative facts, which are those facts not subject to reasonable dispute because they are ... readily determined from sources whose accuracy cannot be reasonably questioned.") (internal quotations omitted).

monetary support; (ii) permission to maintain office space in Palestine; and (iii) payments to "PFLP operatives who had been incarcerated for terrorist activities," or (b) by refusing to shut down PFLP websites or radio programming. FAC ¶¶ 133, 135, 138, 137. Nor do Plaintiffs' allegations of *post*-Attack conduct—e.g., Defendants "publicly praising" the Attackers—establish any plausible connection between Defendants and the Attack *before* the Attack occurred. Plaintiffs' allegations of limited and general forms of government support for PLO political factions and *post*-Attack conduct are too speculative and attenuated to raise a plausible connection between the Attack and Defendants.

A causal chain cannot be presumptively drawn between the Attack and Defendants' alleged actions *as a government*. *See Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) (finding no proximate cause to support ATA claim and recognizing that governmental entities have "many legitimate agencies, operations, and programs to fund"); *see also Kemper v. Deutsche Bank AG*, 911 F.3d 383, 391-392 (7th Cir. 2018) ("When one of the links on a causal chain is a sovereign state, the need for facts specifically connecting a defendant's actions to the ultimate terrorist attack is especially acute."). That principle holds true for actions taken before or after the Attacks. *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 275 (D.C. Cir. 2018) (post-attack events "have no bearing on what actions 'caused' the bombings."); *see also Hamm v. United States*, 483 F.3d 135, 140 (2d Cir. 2007) (post-tort conduct cannot constitute ratification of an antecedent tort absent evidence that the tort "was done or professedly done on [the defendant's] account.") (quoting Restatement (Second) of Agency § 82 (1958)).

- 29 -

**0116**

### A. The American Plaintiffs Fail to State a Claim for Direct Liability for an Act of International Terrorism Pursuant to 18 U.S.C. § 2333(a).

The American Plaintiffs[13] claim first that Defendants are directly liable for an act of international terrorism under ATA Section 2333(a). These Plaintiffs fail to state a claim because the FAC does not allege plausible, non-conclusory factual allegations that Defendants: (1) proximately caused the American Plaintiffs' injuries; (2) *themselves*, committed an "act of international terrorism"; (3) provided material support to an FTO; or (4) provided any support to others with the knowledge or intent that such support would be used to prepare for, or to carry out, a criminal act of terrorism. These failures require dismissal of this claim.

### 1. The FAC Fails To Plausibly Allege Proximate Cause.

To state a claim for ATA direct liability, the American Plaintiffs must plausibly allege facts showing that their injuries occurred "by reason of" an act of international terrorism committed by Defendants themselves. Courts have interpreted the "by reason of" language to require a showing that a defendant's own acts proximately caused plaintiff's injuries. *See Rothstein*, 708 F.3d at 95; *see also Kemper*, 911 F.3d at 391-92; *Owens,* 897 F.3d at 275. Thus Plaintiffs must plausibly allege that each defendant's conduct was "*a substantial factor in the sequence of responsible causation*," and that Plaintiffs' injuries were "reasonably foreseeable or anticipated as a natural consequence." *Rothstein*, 708 F.3d at 91 (citation omitted; emphasis in original). In "an ATA action, proximate causation requires non-conclusory, plausible allegations of 'a proximate causal relationship between the cash transferred ... and the terrorist attacks ... that injured plaintiffs.'" *Ayda Husam Ahmad v. Christian Friends of Israeli Cmtys.*, 2014 U.S. Dist. LEXIS 62053, at *12 (S.D.N.Y. May 5, 2014) (quoting *Rothstein*, 708 F.3d at 97). Plaintiffs cannot meet this standard.

---

[13] The American Plaintiffs consist of all plaintiffs except for the family members and the personal representatives of the estates of Zidan Saif and Rabbi Abraham Goldberg.

First, the FAC does not plausibly allege that the Attack would not have been possible without the support of Defendants. The FAC acknowledges that the PLO, as a governmental entity, provides generalized funding and resources to its various political factions. FAC ¶¶ 86-88, 101 (alleging that the PLO has political factions; that Defendants provide "direct monetary allocations" to those factions to further their "organizational roles [and] positions"; and that the "PFLP is the second-largest faction in the PLO" yet is "a relatively small group in the Palestinian arena."). The American Plaintiffs have alleged that, in general, Defendants provided material support to the PFLP in the form of: (1) cash for political operations, (2) permission to maintain political offices and facilities in Palestine, (3) payments to "PFLP operatives who had been incarcerated for terrorist activities," as part of a Palestinian government program and (4) refusal to shut down PFLP websites or radio programming. FAC ¶¶ 133, 135, 137-144.

Plaintiffs have not plausibly pled any connection between these limited and generalized forms of governmental support and the Attack. Governments, such as Defendants, have "many legitimate agencies, operations, and programs to fund." *Rothstein*, 708 F.3d at 97. This is true even for state-sponsors of terrorism, which Defendants are *not*. *Kemper*, 911 F.3d at 393. Because Plaintiffs' theory is dependent on governmental actions, "the need for facts specifically connecting a defendant's actions to the ultimate terrorist attack is especially acute." *Id.*. Because governmental actions necessarily implicate non-terroristic objectives—even when state-sponsors of terrorism are defendants—causation cannot be established based on a generalized claim of a "pattern and practice" of terrorist support, which is all Plaintiffs have alleged here. *Rothstein*, 708 F.3d at 97 (no proximate cause where plaintiffs cannot show that "the moneys UBS transferred to Iran were in fact sent to Hizbollah or Hamas or that Iran would have been unable to fund the attacks by Hizbollah and Hamas without the cash provided by UBS"); *Owens*, 897 F.3d at 276 (to satisfy

proximate cause plaintiffs must allege that "BNPP *substantially* contributed to Plaintiffs' injuries because the funds to Sudan 'actually [were] transferred to al Qaeda ... and aided in' the embassy bombings") (emphasis and alteration in original) (citation omitted).

Here, Plaintiffs have not alleged a causal link between the limited government support Defendants allegedly provide to the PFLP and the Attack. To find otherwise, based on the facts alleged, would effectively render Defendants liable simply because the PFLP is a political faction within the PLO. *See Shatsky v. PLO*, No. 02-2280 (RJL), 2017 U.S. Dist. LEXIS 94946, at *29-30 (D.D.C. June 20, 2017) (holding that incidental support by Defendants to the PFLP, by paying rent for PFLP office, was not a substantial factor in the sequence of causation, because there was no connection between the incidental support and the attack), *vacated and remanded for dismissal on other grounds*, 955 F.3d 1016 (D.C. Cir. 2020).

Second, Plaintiffs cannot adduce the required specific facts linking Defendants' governmental acts to this Attack, because they already have blamed others for providing the support that caused this Attack. The overwhelming majority of these Plaintiffs earlier filed two separate complaints in the District of Columbia alleging that Syria and Iran provided material support to, and conspired with, the PFLP to carry out the Attack. *See Heching v. Syrian Arab Rep.*, No. 17-01192 (D.D.C.) ("*Heching I*"); *Heching v. Islamic Rep. of Iran*, No. 17-01659 (D.D.C.) ("*Heching II*"). In *Heching I*, the plaintiffs allege that "Syria and [] Syrian Officials conspired, and acted through and/or in concert, with the PFLP ... to carry out ... the November 18, 2014 Terrorist Attack." *Heching I*, Am. Compl. ¶ 95 (Dkt. 6). In *Heching II*, the plaintiffs allege that "Iran and its Officials and Agents conspired, and acted through and/or in concert, with the PFLP ... to carry out ... the November 18, 2014 Terrorist Attack." *Heching II*, Compl. ¶ 87 (Dkt. 1). In both *Heching* matters, plaintiffs informed the court that they have developed substantial evidence that Syria and

Iran provided material support for the Attack. *Heching I*, Pls.' Resp. to Order to Show Cause ¶ 7 (Dkt. 18); *Heching II*, Pls.' Resp. to Order to Show Cause ¶ 7 (Dkt. 19). On January 18, 2022, these plaintiffs moved the court for entry of default judgment against Syria and Iran. *Heching I*, Mot. for Default J. (Dkt. 21); *Heching II*, Mot. for Default J. (Dkt. 22). In their motions, these Plaintiffs assert that Syria and Iran's "state sponsorship" and "support" for the PFLP were "necessary for the survival and effectiveness of the PFLP." *Heching I*, Mem. in Supp. Mot. for Default J. (Dkt. 21-1) at 22; *Heching II*, Mem. in Supp. Mot. for Default J. (Dkt. 22-1) at 22.

In this FAC, Plaintiffs hedge their *Heching* bets four years after filing their *Heching* complaints. It is no wonder that Plaintiffs sought out a court two time-zones away from the *Heching* court. But that tactical maneuver cannot insulate their speculative allegations that seek to attribute responsibility for these Attacks to Defendants, rather than to Syria and Iran. Plaintiffs' assertions in *Heching* that Syria and Iran conspired to commit and provide material support for the Attack, and that the PFLP could not survive without that support, render entirely speculative their *post hoc* assertions that the limited and generalized support Defendants allegedly provided to the PFLP as a political faction was the proximate cause of the Attack. *Rothstein*, 708 F.3d at 91.

Third, the FAC relies on a manufactured connection between Defendants and the Attackers by the conclusory allegation that the Attackers were affiliated with the PFLP, which is a "constituent faction of" Defendants. FAC ¶¶ 3, 147. But the FAC does not state any fact-based allegations to connect Defendants themselves to the Attackers. Absent any factual allegations in this regard, the FAC cannot plausibly allege proximate cause. *See Shatsky*, 2017 U.S. Dist. LEXIS 94946, at *32 (finding "after-the-fact" conduct as "not sufficient" to support proximate causation) (citing *Sokolow v. PLO*, 60 F. Supp. 3d 509, 517 n.11 (S.D.N.Y. 2014)).

**0120**

      **2.**      **The American Plaintiffs Do Not Plausibly Allege that Defendants Committed an "Act of International Terrorism."**

To state a claim for ATA primary liability, a plaintiff must plausibly allege (i) that the defendant has violated a predicate criminal statute *and* (ii) that the additional elements for the ATA civil cause of action under 18 U.S.C. § 2333(a), apply, including, *inter alia*, that a U.S. national was injured or killed "by reason of an act of international terrorism." *See Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 553 (E.D.N.Y. 2012) ("Like a civil RICO claim, a suit for damages under the ATA is akin to a Russian matryoshka doll, with statutes nested inside of statutes.") (cleaned up). A plaintiff must plausibly allege that Defendants *themselves* committed an act of "international terrorism." *Linde v. Arab Bank PLC*, 882 F.3d 314, 326 (2d Cir. 2018). Section 2331 defines "international terrorism" to require that a defendant's *own acts* "involve violence or endanger human life" and "appear to be intended to intimidate or coerce a civilian population or to influence or affect a government." *See, e.g., id.* at 319-22; *Rothstein*, 708 F.3d at 97. The FAC does not plausibly allege that Defendants' own acts meet this standard.

The American Plaintiffs fail to plausibly plead that Defendants' own acts "appear[ed] to be intended to intimidate or coerce a civilian population or to influence or affect a government." *Linde*, 882 F.3d at 326. This is an objective test that "does not depend on the actor's beliefs, but imposes on the actor an objective standard to recognize the apparent intentions of actions." *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014) (citation omitted). Further, the FAC also fails to allege facts to support a reasonable inference that Defendants engaged in activities that "involve violent acts or acts dangerous to human life" sufficient to constitute an act of "international terrorism" under Section 2331(1).

As discussed above, the FAC does not allege any connection between Defendants and the Attackers. The FAC's only allegations which purportedly connect Defendants to the Attack itself

are allegations of *post*-Attack conduct. First, the American Plaintiffs allege that the "defendants endorsed and ratified" the Attack by "publicly prais[ing]" the Attackers after the Attack. FAC ¶ 176. Second, following the Attack, they allege the PLO continued to provide limited and generalized funding to the PFLP, and "endorsed the PFLP." FAC ¶ 178. Neither of these allegations plausibly pleads that Defendants' alleged actions were violent, dangerous to human life or conducted with terroristic intent. "A showing of support ... is not sufficient to demonstrate that Defendants were somehow responsible for the attacks." *Sokolow*, 60 F. Supp. 3d at 517 n.11. The *Sokolow* court held that "even *post*-attack financial support to the families of terrorists" was "not sufficient" for the plaintiffs to pin responsibility on Defendants. *Id*. (emphasis added). Here, the American Plaintiffs have alleged substantially less.

While Plaintiffs allege that the PLO provided limited and generalized political support to the PFLP (*e.g.,* FAC ¶ 153), *political* support for the PFLP does not objectively demonstrate that Defendants intended to foster a terrorist attack. Provision of support to an FTO that is non-terroristic in nature and purpose does not constitute an "act of international terrorism." *Kemper,* 911 F.3d at 390 (affirming dismissal of ATA claim and finding that alleged material support is not an act of international terrorism when motivated by economics and governmental policy and not a desire to "intimidate or coerce"); *Linde,* 882 F.3d at 326 (holding that "material support to a foreign terrorist organization does not invariably equate to an act of international terrorism").

Governmental authorities like Defendants have "many legitimate agencies, operations, and programs to fund." *Rothstein*, 708 F.3d at 97; *see also Owens,* 897 F.3d at 276. "When one of the links on a causal chain is a sovereign state, the need for facts specifically connecting a defendant's actions to the ultimate terrorist attack is especially acute." *Kemper,* 911 F.3d at 393. So too here, given Defendants' governmental responsibilities. Governmental authorities have many non-

- 35 -

terroristic obligations, policies, and priorities that negate a plausible inference that their implementation of government policies "appear[ed] to be intended to intimidate or coerce a civilian population or to influence or affect a government." *Linde*, 882 F.3d at 326. Plaintiffs have not alleged any facts to plausibly plead that Defendants' governmental action of limited political support to the PFLP objectively demonstrated an intent to foster the Attack. *Kemper,* 911 F.3d at 390 (support to Iranian entities, objectively, "d[id] not appear intended to intimidate or coerce" where actions were motivated by economics, rather than "a desire to intimidate or coerce.").

### 3. The American Plaintiffs Do Not Plausibly Allege Defendants Provided Material Support to an FTO, or Knew or Intended that Such Support Would Be Used for a Terrorist Act.

Section 2339A requires Plaintiffs to plausibly allege that Defendants "provide[d] material support or resources ... knowing or intending that they are to be used in preparation for, or in carrying out," the Attack. 18 U.S.C. § 2339A; *see United States v. Ghayth*, 709 F. App'x 718, 722-23 (2d Cir. 2017) (summary order); *Ahmad*, 2014 U.S. Dist. LEXIS 62053, at *7-8 (citing *Gill*, 893 F. Supp. 2d at 504). Section 2339C similarly requires Plaintiffs to plausibly allege that Defendants "provid[ed] or collect[ed] funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to carry out" the Attack. 18 U.S.C. § 2339C; *see Ahmad*, 2014 U.S. Dist. LEXIS 62053, at *8 (citation omitted).

The American Plaintiffs have not alleged that the Defendants had prior knowledge of the Attack or provided support or resources directly to the Attackers. Further, Plaintiffs' attempts to rely on Defendants' provision of generalized support to the PFLP are too attenuated to plausibly state a claim. There are no specific factual allegations to alleging that the generalized governmental funding that Defendants provide to the PFLP was intended to be used, in whole or in part, for the Attack. This is particularly true here, where most of the American Plaintiffs have made clear in

the *Heching* cases that Syria and Iran provided the material support for the Attack and that Syria and Iran's support was "necessary" for the PFLP's survival.

Section 2339B, on the other hand, explicitly requires a showing that the defendant provided material support or resources "to a foreign terrorist organization." 18 U.S.C. § 2339B(a)(1). But "material" support requires more than the type of *de minimis* political support for the PFLP at issue here, as recognized in *Shatsky,* 2017 U.S. Dist. LEXIS 94946, at *28-29 ("[P]laintiffs posit a connection between [a PFLP office] rent payment and the bombing solely on the fact that [the office location was] nearby to [the bombing location]. To say the least, that is a stretch!"); *see also Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 425-26 (E.D.N.Y. 2009) ("It has long been recognized that substantial assistance means more than just a little aid ....") (cleaned up).

**B.     The American Plaintiffs Fail to Establish Essential Elements of Respondeat Superior Liability.**

The FAC also fails to state a viable claim for "respondeat superior liability" for "international terrorism pursuant to 18 U.S.C. § 2333(a)." The American Plaintiffs base this cause of action on the conclusory allegation that "[t]he PFLP carried out the [] Attack as the agent of the defendants." FAC ¶ 202. The Court should dismiss this claim for two reasons.

First, the ATA does not authorize a cause of action for respondeat superior liability. The ATA is a statute that applies extraterritorially. As such, it must be construed narrowly. *See EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). The ATA does not expressly provide for vicarious liability, and if Congress wished to impose such liability, it would have done so expressly. *See* Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A (allowing suits against certain foreign states in terrorism cases for acts of "an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."). The ATA is akin to the Torture Victim Protection Act of 1991 ("TVPA") wherein the Supreme Court

held that in the absence of Congress' express authorization, the TVPA did not impose organizational liability for acts of individual employees. *Mohammad v. Palestinian Auth.*, 566 U.S. 449, 451, 455-56 (2012). To this end, the Seventh Circuit has recently reiterated that "[t]he Anti-Terrorism Act [] does not appear to provide a cause of action for imposing vicarious liability." *Boim v. Am. Muslims for Palestine*, 9 F.4th 545, 555 (7th Cir. 2021) (citation omitted); *see also Estate of Parsons v. Palestinian Auth.*, 715 F. Supp. 2d 27, 34 (D.D.C. 2010) (rejecting imposition of ATA liability under a respondeat superior theory), *aff'd in part, rev'd in part,* 651 F.3d 118, 139 (D.C. Cir. 2011) (declining to decide whether the ATA permits a respondeat superior claim).

Second, the American Plaintiffs have not properly pled essential elements of a respondeat superior claim, which would require Plaintiffs to plausibly plead that the Attackers were the Defendants' agents. *Am. Select Ins. v. Johnson*, 2018 U.S. Dist. LEXIS 101446, at *12-13 (D. Colo. June 18, 2018) (a claim for respondeat superior requires "a finding of an employer-employee relationship" between the tortfeasor and the alleged agent). The American Plaintiffs have not alleged facts sufficient to raise a reasonable inference that the Attackers were associated with the Defendants, let alone allegations that an employment relationship existed. The American Plaintiffs' claims that Defendants provided limited and generalized forms of support to the PFLP are too attenuated to establish that the Attackers "were acting" within the "scope of employment" with either Defendant when committing the Attack. *Frutos v. Am. Modern Prop. & Cas. Ins.,* No. 19-334, 2020 U.S. Dist. LEXIS 169276, at *3 (D. Colo. Mar. 20, 2020).

## III.  PLAINTIFFS' FAIL TO STATE A CLAIM FOR CONSPIRACY LIABILITY UNDER 18 U.S.C. 2333(D).

"The crux of any conspiracy is an agreement between the co-conspirators." *Kemper*, 911 F.3d at 395; *see also Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1262 (10th Cir. 2020) (dismissing conspiracy claim on "failure to show the requisite agreement—the first element

of a conspiracy claim"). A co-conspirator must join the "agreement knowing its purpose and with the intent to further" that purpose. *United States v. Fischman*, 645 F.3d 1175, 1187 (10th Cir. 2011). "Mere speculation ... will not do." *Cervantes Agribusiness*, 982 F.3d at 1262. Plaintiffs here have not alleged facts to plausibly plead that Defendants agreed with the Attackers or the PFLP to commit the Attack or any other act of international terrorism.

A conspiracy claim under Section 2333(d) requires plausible allegations that Defendants joined an agreement to commit an "act of international terrorism". *See O'Sullivan v. Deutsche Bank AG*, No. 17-8709, 2019 U.S. Dist. LEXIS 53134, at *35 (S.D.N.Y. Mar. 28, 2019) (The "plain language of JASTA ... suggests that JASTA liability lies where the secondary tortfeasor conspired with the principal tortfeasor in committing such an act of international terrorism.") (cleaned up). Plaintiffs must therefore allege that the co-conspirators' activities were "so coordinated or monolithic that [they] shared a common purpose or plan." *Id.* at *37. "[T]he further down the causal chain a defendant sits, the more diligent plaintiff must be to plead facts that plausibly suggest that the defendant entered into an agreement." *Kemper*, 911 F.3d at 395-96; *Kaplan*, 999 F.3d at 855 ("JASTA states that to be liable for conspiracy a defendant would have to be shown to have conspire[d] with the principal.") (internal quotations omitted); *Estate of Parsons*, 651 F.3d at 134 (J. Tatel, concurring) (ATA conspiracy claim requires more than "piling inference ... upon inference" which is "akin more to speculation than to reasonable fact-finding.").

Plaintiffs' claim fails under these standards. The FAC does not plausibly allege that Defendants agreed with the Attackers to commit an act of "international terrorism" as defined in the ATA. *O'Sullivan*, 2019 U.S. Dist. LEXIS 53134, at *35 (for a JASTA conspiracy claim, "a defendant must have conspired to commit an act of international terrorism."). Plaintiffs' allegation that the PLO provided the PFLP, like all Palestinian political factions, with generalized support

does not raise a reasonable inference that there was an *agreement* between the PFLP and Defendants to commit this specific Attack or any other act of terrorism. So too for Plaintiffs' allegations that Defendants made *post*-Attack statements "publicly praising" the Attackers. Statements of support after the attack cannot plausibly allege that Defendants agreed beforehand to perpetrate the attack. *See Sokolow*, 60 F. Supp. 3d at 517 n.11 ("A showing of support—even *post*-attack financial support to the families of terrorists—is not sufficient to demonstrate that [defendant is] somehow responsible for the attacks.") (emphasis added). Additionally, in the *Heching* matters, the vast majority of these Plaintiffs have alleged that Syria and Iran—not these Defendants—were the ones who conspired with the PFLP to commit this Attack.

## IV.   THE AMERICAN PLAINTIFFS FAILED TO PLAUSIBLY ALLEGE A CLAIM FOR AIDING AND ABETTING LIABILITY UNDER 18 U.S.C. § 2333(D).

The FAC also fails to allege the essential elements for a JASTA aiding-and-abetting claim, because the American Plaintiffs have failed to allege plausible facts showing that either Defendant (i) "knowingly and substantially assist[ed] the principal violation," here, the Attack, or (ii) was "generally aware" of its role "as part of an overall illegal or tortious activity at the time [it] provide[d] assistance." *Kaplan,* 999 F.3d at 856 (citation omitted).

### A.   The American Plaintiffs Have Not Alleged, and Could Not Plausibly Allege, that Defendants Knowingly and Substantially Assisted the Attack.

The American Plaintiffs' aiding-and-abetting claim fails because the FAC cannot plausibly allege that Defendants "knowingly and substantially assisted" those responsible for the Attack. The "knowingly" component requires "actual knowledge" that the defendant's alleged facilitative conduct substantially assisted "someone who performed wrongful conduct." *Kaplan*, 999 F.3d at 856. "That knowledge requirement is designed to avoid imposing liability on innocent, incidental participants." *Id*. at 864 (quotations omitted).

"[T]he 'proper legal framework for how [aiding-and-abetting] liability should function' under the ATA is that identified in" *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *Linde*, 882 F.3d at 329 (quoting 18 U.S.C. § 2333 Statutory Note) (alterations in original). *Halberstam* identified six factors relevant to determining "how much encouragement or assistance is substantial enough" to satisfy the requirement that the defendant "substantially assist the principal violation." *Linde*, 882 F.3d at 329 (citation omitted). Those factors are: (1) the nature of the act; (2) the amount of assistance ; (3) the defendant's presence at the time of the tort; (4) the defendant's relation to the principal; (5) the defendant's state of mind; and (6) the period of defendant's assistance. *Id.*; *see also Goldberg*, 660 F. Supp. 2d at 425-26 ("'substantial assistance' means more than just a little aid.") (citation omitted).

The American Plaintiffs' attempts to convert generalized political support into substantial assistance to the Attack falls flat. As discussed above, most of these Plaintiffs already brought two actions claiming it was Syria and Iran that provided substantial assistance to the Attack. Similarly, the FAC does not plausibly allege that the PLO's generalized funding provided to all political factions was a "major part" in promoting the Attack. *Halberstam*, 705 F.2d at 484. Nor have they plausibly alleged that the PFLP radio programs or websites played a role in the Attack. "[A]iding and abetting an act of international terrorism requires more than the provision of material support to a designated terrorist organization." *Kaplan,* 999 F.3d at 859 (citation omitted); *see also Shatsky,* 2017 U.S. Dist. LEXIS 94946 at *28-29 ("[P]laintiffs posit a connection between [a PFLP office] rent payment and the bombing solely on the fact that [the office location was] nearby to [the bombing location]. To say the least, that is a stretch!"). Here, the American Plaintiffs have alleged far less, warranting dismissal of their claim.

- 41 -

In addition, *post*-Attack payments and statements of support *after* the Attack could not logically have "substantially assisted" in the Attack. *See Sokolow*, 60 F. Supp. 3d at 517 n.11; *Shatsky*, 2017 U.S. Dist. LEXIS 94946 at *32 (citation omitted); *see also United States v. Hamilton*, 334 F.3d 170, 180 (2d Cir. 2003) ("[A] person cannot be found guilty of aiding and abetting a crime that already has been committed ... .").

> **B.   The American Plaintiffs Have Not Alleged, and Could Not Plausibly Allege, that Defendants were Generally "Aware" they were Assuming a Role in Violent Terrorist Activity.**

To state an aiding-and-abetting claim, the American Plaintiffs must also plausibly allege that Defendants were "generally aware of [their] role as part of an overall illegal or tortious activity." *Kaplan*, 999 F.3d at 863 (citation omitted); *see O'Sullivan*, 2019 U.S. Dist. LEXIS 53134, at *39 ("[T]he Complaint must allege plausibly that ... Defendants were 'generally aware' that they were ... playing a 'role' in an FTO's violent or life-endangering activities.") (citation omitted). Further, Defendants "must be generally aware of [their] role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Honickman v. Blom Bank Sal*, 6 F.4th 487, 496 (2d Cir. 2021) (emphasis in original).[14]

The American Plaintiffs have failed to allege that Defendants' provision of limited and generalized support to the PFLP as a political faction of the PLO would have made the Attack

---

[14] Plaintiffs' allegations are similar to those found insufficient in *Siegel*, as explained by the court in *Kaplan*. 999 F.3d at 861-862. "We affirmed the dismissal of the *Siegel* complaint for failure to state an aiding-and-abetting claim ... because the plaintiffs ha[d] not plausibly alleged that [defendant] assumed a role in the [attack] or provided substantial assistance ... . Their complaint failed to advance any plausible, factual, non-conclusory allegations that [defendant] knew or intended that the funds it forwarded ... would be sent to AQI or to any other terrorist organization, and it lacked any factual allegations that support a conclusion that [defendant] knowingly played a role in the terrorist activities." *Id*. (cleaned up). The same applies here, where, as explained, Plaintiffs have not alleged any connection between the limited and generalized support Defendants provide the PFLP as a political entity and the Attack itself.

foreseeable, or demonstrates awareness of involvement in the PFLP's terrorist activities. "[K]nowingly providing material support to an FTO, without more, does not as a matter of law satisfy the general awareness element." *Kaplan,* 999 F.3d at 860. Without alleging a connection between the alleged support and the Attack, the FAC fails to raise a "reasonable inference" that Defendants aided and abetted the Attack. *See Siegel,* 933 F.3d at 224-25 (allegation that banking defendant was aware that client was believed to have links to terrorist organizations insufficient to establish the "general awareness" element of JASTA aiding-and-abetting liability); *Honickman,* 6 F.4th at 498-99 (rejecting argument that, because "[m]oney is fungible," JASTA aiding-and-abetting liability can be premised solely on knowing and material support to an FTO). Accordingly, the Court should dismiss the American Plaintiffs' aiding-and-abetting claim.

## V.   PLAINTIFFS HAVE NOT PLAUSIBLY ALLEGED BUT-FOR CAUSATION AS REQUIRED FOR A NEGLIGENCE CLAIM UNDER ISRAELI LAW.

Under Israeli law, which Plaintiffs invoke for the negligence claim, Plaintiffs must plausibly allege that Defendants' actions were the "but-for" cause of Plaintiffs' injuries. "Israeli courts determine factual causation under the tort of negligence by applying a but-for causation test." *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 63 (D.D.C. 2010) (citing CA 148/80 *Vaknin v. Beit Shemesh Local Council 37*(1) PD 113, 133 [1982] (Isr.)). "'[T]he meaning of this test is that a breach of the duty is a factor *sine qua non*' resulting in injury, not merely a 'fundamental and substantial factor' contributing to injury." *Id*. (quoting *Vaknin*, 37(1) PD at 144).

The FAC does not meet this standard. The majority of these Plaintiffs alleged in *Heching* that Syria and Iran provided the material support to the PFLP for these Attacks. Accordingly, they cannot plausibly allege that Defendants' actions were the "but-for" cause of their injuries.

- 43 -

**0130**

## VI. PLAINTIFFS FAIL TO STATE A CLAIM FOR VICARIOUS LIABILITY UNDER ISRAELI LAW.

Similarly, Plaintiffs cannot meet Israeli law elements for vicarious liability under Israeli law. Pursuant to Israeli law, Plaintiffs' claim fails because they have not alleged beyond mere speculation that the Attackers were affiliated with Defendants. Israeli law provides that "[a]ny person who employs an agent ... to do any act or class of acts on his behalf shall be liable for anything done by such agent in the performance of, and for the manner in which such agent does such act or class of acts." *Estate of Botvin v. Islamic Rep. of Iran*, 772 F. Supp. 2d 218, 229-30 (D.D.C. 2011) (citing Israeli Civil Wrongs Ordinance (New Version), 5728-1968, 2 LSI 5, § 14 (1972) (Isr.)). An agency relationship is recognized when a party acts as the surrogate, or "long-arm," of the defendant. *Id.* (citing Israel Gilead, *Tort Law*, in The Law of Israel: General Surveys 275, 437 (Itzhak Zamir & Sylviane Clombo eds., 1995)).

The Plaintiffs do not plausibly allege that the PA or PLO ever authorized or ratified the actions of the Attackers. Plaintiffs' claim is based on the fact-free allegation that the Attackers were "PFLP operatives." FAC ¶¶ 165, 172. As noted above, Plaintiffs have not adequately alleged this beyond conclusory assertions. But even if the Attackers were PFLP-affiliates, the FAC does not plausibly plead any connection between the limited and generalized support that Defendants provide to political factions and the Attack , let alone that the PA or PLO expressly authorized the Attack. Plaintiffs' allegations of Defendants' *post*-Attack "public praise" of the Attackers and the PFLP also fail to sufficiently state a claim, because vicarious liability cannot be sufficiently stated based on post-incident conduct. *See Sokolow*, 60 F. Supp. 3d at 517 n. 11 ("A showing of support— even post-attack financial support to the families of terrorists—is not sufficient to demonstrate that Defendants were somehow responsible for the attack[].").

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' FAC should be dismissed either for lack of personal

jurisdiction, or with prejudice for legal insufficiency.

Respectfully Submitted,

June 27, 2022

**SQUIRE PATTON BOGGS (US) LLP**

/s/  *Gassan A. Baloul*
Gassan A. Baloul (DC Bar 1034245)
gassan.baloul@squirepb.com
Mitchell R. Berger (DC Bar 385467)
mitchell.berger@squirepb.com

2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile:  (202) 457-6315

1801 California Street
Suite 4900
Denver, CO 80202
Telephone: (303) 830-1776
Facsimile: (303) 894-9239

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

Gassan A. Baloul, an attorney duly admitted to practice before this Court, certifies that on June 27, 2022, I caused true and correct copies of the foregoing motion to dismiss to be served on Plaintiffs' counsel of record via electronic filing on the Court's CM/ECF system.

Dated:  June 27, 2022

/s/ *Gassan A. Baloul*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Case No. 1:21-cv-03043-RM-STV

SHELLEY LEVINE, *et al.*,

                 Plaintiffs,

v.

THE PALESTINE LIBERATION ORGANIZATION
and THE PALESTINIAN AUTHORITY (a/k/a "The
Palestinian Interim Self-Government Authority" and/or
"The Palestinian National Authority"),

                 Defendants.

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT
UNDER RULE 12(b)(2) AND RULE 12(b)(6)**

---

       Plaintiffs, Shelley Levine, et al. (collectively "Plaintiffs"), submit this Opposition to

Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and

Rule 12 (b)(6) as follows:

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................2

    I.  Personal Jurisdiction ...................................................................................2

        a.  The PLO and PA Are Not "Persons" Under the
            Due Process Clause .......................................................................2

        b.  The PLO and PA Submitted to Jurisdiction
            Under the PSJVTA .......................................................................9

            A.  The PLO and PA Submitted to Jurisdiction
                Under the PSJVTA ..........................................................10

            B.  The PSJVTA Statutory Predicates ...............................14

        c.  The Court Has Specific Jurisdiction
            Over the PLO and PA ...................................................................15

        d.  The Court Has Personal Jurisdiction
            Under Fed.R.Civ.P. 23.2 ..............................................................23

            A.  The Court May Properly Assert Personal Jurisdiction
                 Over The Defendants Because It Has Personal
                Jurisdiction Over Mansour ............................................23

            B.  Rule 23.2 Applies Regardless Of Whether State Law
                Provides Unincorporated Associations With
                Capacity To Sue And Be Sued .......................................26

            C.  The FAC Properly Identifies The Two Unincorporated
                Associations As Classes ................................................30

            D.  Mansour Will Fairly And Adequately Represent
                The Class ........................................................................30

    II.  Plaintiffs' FAC Validly States All The Claims Asserted ........................34

        a.  Direct Primary ATA Liability ..................................................34

b.   Primary ATA Liability On The Basis of
Respondeat Superior .......................................................................................42

c.   Secondary ATA Libility – Aiding and Abetting....................................................46

d.   Secondary ATA Liability – Conspiracy .............................................................50

e.   The Nonfederal Claims Are Valuable................................................................51

Appellate Case: 23-1335   Document: 010110991828   Date Filed: 01/29/2024   Page: 140

## **Introduction**

This is a civil action under the Antiterrorism Act ("ATA"), 18 U.S.C. § 2331, *et seq*., and supplemental causes of action, arising from a terrorist attack carried out on November 18, 2014, during morning prayers in a synagogue in Jerusalem, Israel ("Attack").

Congress enacted the ATA in response to the 1985 murder of Leon Klinghoffer by defendant, the Palestine Liberation Organization ("PLO"). Klinghoffer was an elderly, wheelchair-bound Jewish American who was shot in the head and tossed overboard in his wheelchair by PLO terrorists who had hijacked the Achille Lauro cruise ship. *Goldberg v. UBS*, 660 F. Supp. 2d 410, 421-22 (E.D.N.Y. 2009) (PLO's murder of Klinghoffer an "essential inspiration for the ATA."). Unfortunately, since Mr. Klinghoffer's murder, many more American citizens have been killed or injured by terrorist attacks carried out by or with the assistance of the PLO, and its governmental affiliate, defendant Palestinian Authority ("PA"). As a result, numerous ATA actions have been brought against the PLO and PA in our federal courts over the past two decades. *Cf. Sokolow v. PLO*, 2015 WL 10852003 (S.D.N.Y. Oct. 1, 2015), *vacated on other grounds*, 835 F.3d 317 (2d Cir. 2016) (entering judgment on jury trial verdict finding the PLO and PA liable under the ATA for six terrorist attacks in Jerusalem in which five Americans were murdered and many injured).

Defendants have moved to dismiss Plaintiffs' First Amended Complaint ("FAC") for lack of personal jurisdiction and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(2) and (b)(6). (DE 58).  For the reasons set forth below, the motion should be denied.

## ARGUMENT

### I.   PERSONAL JURISDICTION

Defendants' Rule 12(b)(2) motion should be denied because this Court has acquired personal jurisdiction over Defendants on multiple bases.

#### a.   The PLO and PA Are Not "Persons" Under the Due Process Clause

Defendants concede that, because ATA § 2334(a) permits nationwide service of process, and because they have waived service, this Court may exercise personal jurisdiction over them under Fed. R. Civ. P. (4)(k), provided only that the exercise of jurisdiction is not barred by the Fifth Amendment's Due Process Clause. The Due Process Clause cannot possibly bar exercise of personal jurisdiction over these Defendants because it applies only to a "person," and neither the PA nor the PLO is a "person" within the meaning of the Clause.

There is no dispute "the PA is a non-sovereign governmental entity." FAC ¶ 119. "The PA was established by the 1993 Oslo Accords as the interim and non-sovereign government of parts of the West Bank and the Gaza Strip." *Waldman v. PLO*, 835 F.3d 317, 322 (2d Cir. 2016).[1] It is axiomatic due process clause provisions "protect natural persons and private corporations, not government, from arbitrary actions by the sovereign. The notion [a] political body created by the state enjoys protection, by virtue of the due process clause, from enforcement of the laws of its

---

[1] The PA's legal status and the scope of authority were analyzed in detail in *Knox v. PLO*, 306 F. Supp. 2d 424, 430-38 (S.D.N.Y. 2004) and *Ungar v. PA*, 315 F. Supp. 2d 164, 177-82 (D.R.I. 2004).

4873-6555-8836, v. 1

**0139**

own or some other sovereign is not supported by either the case law or the language of the clause."

*Creek v. Village of Westhaven*, 1987 WL 5429, at *7 (N.D. Ill. Jan. 15, 1987) (emphasis added).[2]

Courts have therefore consistently held governmental entities—domestic or foreign, sovereign or not—are not a "persons" within the meaning of the Due Process Clause.  The Clause provides "[n]o *person* shall... be deprived of life, liberty, or property, without due process of law[.]" U.S. Const. Amend. V (emphasis added); *Taha v. Bucks Cnty. Pennsylvania*, 172 F. Supp. 3d 867, 873 (E.D. Pa. 2016) ("[d]efendants have failed to cite any precedent to support the suggestion that, as government entities, they are entitled to due process." (emphasis added); *Cf. South Carolina v. Katzenbach*, 383 U.S. 301, 323 (1966) ("word 'person' in the context of Due Process Clause […] cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union."); *Oklahoma v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113-14 (10th Cir. 2006) ("Oklahoma concedes that, as a State, it is not protected by the Due Process Clause[.]"); *City of E. St. Louis v. Cir. Ct. for the Twentieth Jud. Cir., St. Clair Cnty., Ill.*, 986 F.2d 1142, 1144 (7th Cir. 1993) ("Municipalities cannot challenge state action on federal constitutional grounds because they are not 'persons' within the meaning of [Due Process Clause]."); *In re Scott Cable Commc'ns, Inc.*, 259 B.R. 536, 543 (D. Conn. 2001) ("Government entities have no right to due process under Fifth Amendment's due process clause.").

Likewise, while the Supreme Court has never explicitly ruled whether foreign states are "persons" under the Due Process Clause, it has strongly hinted they are not. In *Republic of*

---

[2] *Cf. Associated Press v. Bd. of Pub. Educ.*, 246 Mont. 386, 390 (1991) ("The protections guaranteed by the constitutional right to due process were designed to protect people from governmental abuses. They were not designed to protect the government from the people.").

**0140**

*Argentina v. Weltover*, the Supreme Court "assum[ed], without deciding, that a foreign state is a 'person' for purposes of the Due Process Clause," 504 U.S. 607, 619 (1992), but then cited *South Carolina v. Katzenbach.* "[T]he Court's implication was plain: If the 'States of the Union' have no rights under the Due Process Clause, why should foreign states?" *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 398–99 (2d Cir. 2009). Therefore, "[f]ollowing *Weltover*, the vast majority of federal courts to address this issue have determined that foreign states are not persons within the meaning of the Due Process Clause[.] The Court finds the underlying reasoning of the majority position persuasive and holds that foreign states are not 'persons' entitled to protection under the Due Process Clause." *DRFP v. Republica Bolivariana de Venezuela*, 945 F. Supp. 2d 890, 906-07 (S.D. Ohio 2013) (collecting cases).

Similarly, neither the Virgin Islands nor Puerto Rico are "persons" under the Due Process Clause. *Virgin Islands v. Miller*, 2010 WL 1790213, at *5 (V.I. Super. May 4, 2010) (Virgin Islands "[g]overnment is not a person for purposes of due process."); *Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urb. Dev.*, 59 F. Supp. 2d 310, 325 (D.P.R. 1999) (Puerto Rican government instrumentalities are not "persons" under the Due Process Clause).

The Department of Justice ("DOJ"), too, has consistently taken the position governmental entities are not "persons" under the Due Process Clause. Thus, a Memorandum Opinion prepared by the DOJ Office of Legal Counsel opined "the rationale of *South Carolina v. Katzenbach*," where the Court held a state is not a person within the meaning of the Due Process Clause, is fully applicable to other "governmental bodies," even when they are not "states or instrumentalities of states." Office of Legal Counsel, *Mutual Consent Provisions in the Guam Commonwealth*

*Legislation: Memorandum Opinion for the Special Representative for Guam Commonwealth* (July 28, 1994) at 7 (emphasis added). Declaration of Asher Perlin ("Perlin"), **Ex. A**.

Similarly the DOJ has opined "the Supreme Court concluded that the Fifth Amendment's guarantee of due process applies only to persons and not to States. *See South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966). <u>While *Katzenbach* was concerned with a State, its rationale suggests that a governmental body […] could not assert rights under the Due Process Clause.</u>" *Report by the President's Task Force on Puerto Rico's Status*, App. E (Dec. 2007) (Letter from Robert Raben, Assistant Attorney General, at 9 n.13) (emphasis added). Perlin, **Ex. B**.

The DOJ has acted on this position. In *Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*, No. 96-1304 (D.P.R. 1996), it successfully argued that, as "political entities," instrumentalities of the government of Puerto Rico are not "persons" within the meaning of the Due Process Clause. "United States' Motion for Partial Dismissal," at 24-25. Perlin, **Ex. C**. *Cf. Puerto Rico Pub. Hous. Admin.*, 59 F. Supp. 2d at 325 (agreeing with DOJ position).

Thus, as a governmental entity, the PA is not a "person" under the Due Process Clause.

Nor is the PLO a "person" under the Due Process Clause. The PLO is a foreign political entity founded in 1964. Its structure and operations are governed by the PLO's Basic Law, and it is controlled by a "Palestine National Council," consisting of several hundred members, and a smaller Executive Committee, which runs its day-to-day operations. (FAC ¶ 108). As its name reflects—Palestine Liberation Organization—the goal and raison d'être of the PLO is to "liberate" territories it views as "Palestine," located in Israel, the West Bank, and Gaza. (*Id*. at ¶ 114).

The DOJ correctly explains: "Foreign entities such as the PLO <u>obviously do not have due process rights</u> since they are not part of our constitutional scheme." *Palestine Info. Office v.*

5

*Schultz*, No. 87-5396 (D.C. Cir. 1988), Brief for the U.S., at 44 (emphasis added). Perlin **Ex. D**.

Similarly, the DOJ has opined "[a]s <u>a foreign political entity, the PLO does not itself enjoy</u>

<u>constitutional protection</u> […] It is clear, for example, that the PLO would not be recognized by

American courts as a juridical entity capable of bringing a constitutional claim. Neither will the

argument that the PLO is not a sovereign nation bring it within the constitutional fold."

*Constitutionality of Closing the Palestine Information Office, an Affiliate of the Palestine*

*Liberation Organization*, 11 Op. O.L.C. 104 (1987) at 120 (citation omitted, emphasis added).

Perlin **Ex. E**.

Moreover, in the most recent decision to examine the constitutional status of the PLO and

PA, *Shatsky v. PLO*, 2022 WL 826409 (S.D.N.Y. Mar. 18, 2022), Judge Vyskocil found that, as

Plaintiffs assert, these Defendants are not protected by the Due Process Clause:

> It is inconsistent with our constitutional system … to extend due process
> protections to foreign governments. Our system leaves it to the political
> branches to decide how to deal with foreign governments, including whether to
> protect them from suit in U.S. courts. The Due Process Clause of the Fifth
> Amendment provides that "no *person* shall be ... deprived of life, liberty or
> property without due process of law." <u>The PLO and PA are not persons for</u>
> <u>purposes of constitutional due process</u>. The Supreme Court long ago explained
> that the word "person" in the context of the Due Process Clause of the Fifth
> Amendment cannot, by any reasonable mode of interpretation, be expanded to
> encompass the States of the Union. The Second Circuit then made the
> manifestly correct observation that it would make no sense to place foreign
> states in a more favored position than U.S. states. … This reasoning should
> apply to the PLO and PA. … The executive has, in the past, structured relations
> based on its explicit understanding that the PLO and PA are not entitled to
> constitutional protections of any kind. I think that understanding was correct.

*Shatsky*, 2022 WL 826409 at *5-6 (cleaned up) (emphasis added).

Despite this compelling analysis, Judge Vyskocil found she was bound by Second Circuit's decision in *Waldman*, 835 F.3d 317, holding the PLO and PA are entitled to due process protections. Defendants, predictably, ignore *Shatsky*, and urge the Court to follow *Waldman*, and the decision in *Livnat v. PA*, 851 F.3d 45 (D.C. Cir. 2017), which adopted *Waldman*.

*Waldman* and *Livnat* are unpersuasive. *Waldman*'s resolution of this issue is telegraphic: the court simply notes "sovereign states are not entitled to due process protection" and immediately concludes, with no analysis or discussion: "Because neither defendant is a state, the defendants have due process rights." *Waldman*, 835 F.3d at 329. But this is a logical fallacy. The fact sovereign states lack due process rights, does not mean that they are the <u>only</u> governmental entities that lack due process rights. To the contrary, as shown above, courts have found and the Executive Branch has opined, consistently, that governmental entities—including Puerto Rico and the Virgin Islands, which are neither sovereign nor creatures or subdivisions of the States of the Union—are not "persons" under the Due Process Clause.[3]

As for *Livnat*, that decision turns almost entirely on the *Livnat* plaintiffs' narrow argument that the D.C. Circuit could construe its prior ruling in *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002), which held foreign states have no Due Process rights, as including non-sovereign foreign entities as well. *Livnat*, 851 F.3d at 48 ("[A]ppellants … urge us to extend *Price* to the Palestinian Authority by holding that *Price* applies not just to sovereign

---

[3] *Waldman*'s shotgun disposition of this issue may come from the fact that, unlike Plaintiffs here, the *Waldman* plaintiffs "d[id] not cite any cases indicating [a] non-sovereign entity with governmental attributes lacks due process rights. All the cases cited by the plaintiffs stand for the proposition that sovereign governments lack due process rights." *Waldman*, at 329. Lacking a full briefing on this point, including the extensive authorities cited by Plaintiffs here, *Waldman* reached an incorrect conclusion.

foreign states, but to any foreign entity that 'functions as a government.'"). After analyzing *Price* and its progeny. *Livnat* concluded "*Price*'s holding applies to sovereigns alone." *Id*. at 52. While the D.C. Circuit is an authoritative arbiter of how to construe its <u>own</u> prior decisions, its finding that *Price* cannot be construed to encompass foreign non-sovereign governments sheds no light on the actual question of whether governmental entities have Due Process rights.

Indeed, the narrow focus in *Waldman* and *Livnat* on sovereignty is misplaced. The presence or absence of sovereignty is simply irrelevant to the question of whether a governmental entity is a "person" within the meaning of the Due Process Clause. The Virgin Islands are not sovereign, and neither is Puerto Rico. Nor do the States enjoy anything like the sovereignty of foreign state. Counties and cities are not sovereign. The false dichotomy of sovereignty-versus-personhood created by *Waldman* and *Livnat* lacks any conceptual or jurisprudential rationale, and appears (respectfully), to be result-oriented.[4] Sovereignty is not the flip-side of constitutional personhood; there is simply no inverse symmetry whatsoever between these two statuses.

Finally, as Judge Vyskocil explained, *Waldman* and *Livnat* are in error because they "paradoxically place[] the PLO and PA in a more favored position with respect to the safeguards of due process than both U.S. states and foreign sovereigns with whom the political branches have

---

[4] For example, in support of its finding that only <u>sovereign</u> states lack Due Process rights, *Livnat* cites to the unpublished ruling in *Toumazou v. Turkish Republic of Northern Cyprus*, No. 14-7170 (D.C. Cir. Jan. 15, 2016), regarding the Turkish Republic of Northern Cyprus ("TRNC"). *Livnat* notes that in *Toumazou* "we conducted the usual due-process inquiry," even though TRNC is a non-sovereign foreign government. (*Id*. at 52). That is not really accurate. The ruling <u>never addressed</u> whether the TRNC is covered by the Due Process Clause. Perlin, **Ex. F**. Moreover, in the district court and on appeal, the <u>plaintiffs</u> simply assumed that TRNC <u>does have</u> Due Process rights. Perlin **Ex. G-H**. Thus, the question of whether a non-sovereign government is a "person" for Due Process purposes was never raised, much less adjudicated, in *Toumazou*. *Livnat*'s reliance on a plainly inapposite case renders it even less persuasive.

8

**0145**

established friendly relations," because "stretching the Due Process Clause to protect foreign governments would create serious separation-of-powers problems in our constitutional system," and because "Congress has repeatedly enacted legislation that leaves no doubt about its intention to define our jurisdiction to include ATA suits against the PLO and PA. Yet the courts have interceded to protect the PLO and PA from suit." *Shatsky*, 2022 WL 826409, at *6.

**b. The PLO and PA Submitted to Jurisdiction Under the PSJVTA**

Alternatively, the Court has personal jurisdiction over Defendants under the Promoting Security and Justice for Victims of Terrorism Act of 2019 ("PSJVTA"), Pub. L. No. 116-94, div. J, tit. IX, § 903, 133 Stat. 3082 (codified at 18 U.S.C. § 2334(e)).

The PSJVTA provides the PLO and PA submit to personal jurisdiction in ATA cases if they: (1) made payments after April 18, 2020, to persons who were convicted or pled guilty and were imprisoned for terrorism that harmed a U.S. national (or made payments to the families of persons killed in such attacks); (2) maintained "any office … in the United States" after January 4, 2020, except for one used exclusively for official UN business; or (3) engaged in "any activity while physically present in the United States" after January 4, 2020, not exempted by the PSJVTA.

Defendants admit to having triggered the "payment" prong of the PSJVTA. DE 58 at n.4; DE 30 at n.5. Moreover, documents produced by Defendants to Plaintiffs in this case include records showing Defendants have made jurisdiction-triggering "Pay-for-Slay" payments to the families of the individual perpetrators of the Attack in <u>this</u> case. FAC ¶ 23.[5]

---

[5] As discussed below, however, Defendants deny having triggered the U.S.-activities prong of the PSJVTA.

4873-6555-8836, v. 1

**0146**

Defendants assert their statutory submission to jurisdiction under the PSJVTA is irrelevant, because the PSJVTA is unconstitutional. On January 6, 2022, a district judge in the Southern District of New York agreed the PSJVTA is unconstitutional. *Fuld v. PLO*, 578 F. Supp. 3d 577 (S.D.N.Y. 2022). Two other judges in the same court quickly followed suit. *Sokolow v. PLO*, --- F.Supp.3d ----, 2022 WL 719261 (S.D.N.Y. Mar. 10, 2022); *Shatsky*, 2022 WL 826409.

*Fuld*, *Sokolow,* and *Shatsky* are all currently on appeal in the Second Circuit. Therefore, the status of the PSJVTA is to some degree in flux. If the Second Circuit finds the PSJVTA constitutional, Defendants will be collaterally estopped from pursuing their constitutional challenge to the PSJVTA in this court; and since Defendants admit to having fulfilled a statutory predicate for submission to jurisdiction under the PSJVTA, jurisdiction will then be established in this action. On the other hand, if the Second Circuit affirms the decisions finding the PSJVTA unconstitutional, the issue will remain wide open in this Court and this Circuit.[6]

Given this posture, Plaintiffs will first address the constitutional issue, and then briefly discuss the PSJVTA's factual predicates.

A.   The PSJVTA Is Constitutional

The law of the land is that "[t]he actions of the defendant may amount to a legal submission to the jurisdiction of the court, underline whether voluntary or not." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704-05 (1982) (emphasis added). *Cf. V&A Collection, LLC v. Guzzini Properties Ltd.*, 46 F.4th ----, 2022 WL 3589143, at *3 (2d Cir. Aug. 23, 2022) ("[t]he

---

[6] Needless to say, if this Court finds that (as Plaintiffs assert) Defendants lack Due Process rights, or that it can exercise personal jurisdiction over Defendants under one or more of the other bases asserted in the FAC and discussed below, the constitutionality of the PSJVTA will become a moot issue.

actions of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not.") (quoting *Bauxites*).

*Fuld* and its progeny are founded on the premise—which is clearly erroneous in light of *Bauxites*' "voluntary or not" language—that a defendant's submission to personal jurisdiction must be "voluntary," in the sense that the defendant must agree, or must be deemed to have agreed, to the personal jurisdiction of the court. In other words, not only must the actions by which the defendant submits to jurisdiction be <u>volitional</u> (as opposed to coerced or oblivious), but the defendant must <u>willingly</u> submit to jurisdiction. In support of this mistaken premise, *Fuld* quotes language from *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880, (2011) to the purported effect that a finding of consent requires "'circumstances ... from which it is proper to infer an intention to benefit from and *thus an intention to submit to the laws of the forum*.'" *Fuld*, 578 F. Supp. 3d at 586 (quoting *McIntyre*) (emphasis added by *Fuld*).

Proceeding from its incorrect holding that submission to jurisdiction requires an inference (at least) that the defendant <u>willingly</u> agreed to jurisdiction, *Fuld* then goes on to hold that such an "inference is reasonable … only where the defendant's statements or conduct <u>actually signal approval or acceptance</u>." *Fuld* at 586 (emphasis added). Finally, applying its "actual approval" test, *Fuld* found that the PSJVTA does not permit an inference that the PLO and PA actually, i.e., willingly, approved or accepted the exercise of personal jurisdiction over them. *Id*. at 588. *Sokolow* and *Shatsky* simply echo *Fuld*'s reasoning and findings. *Sokolow* at *6; *Shatsky* at *5.

But the assumption of *Fuld* and its progeny is wrong. As *Bauxites* and subsequent cases (such as the fresh decision of the Second Circuit in *V&A Collection* cited above) teach, submission to jurisdiction may be "voluntary or not." The sentence fragment *Fuld* quoted from *McIntyre*,

which is the fulcrum on which *Fuld* and its progeny rest, was dicta and, moreover, that dicta is within Justice Kennedy's plurality opinion in *McIntyre* which is <u>not</u> the binding opinion of the Court. *Salt Lake City Corp. v. Sekisui SPR Americas, LLC*, 2018 WL 4688356, at *4 (D. Utah Sept. 28, 2018) (since *McIntyre* lacks a majority, pursuant to *Marks v. U.S.*, 430 U.S. 188 (1977), the opinion with the narrowest holding, which was Justice Breyer's concurrence, is the holding of *McIntyre*): *Ainsworth v. Cargotec USA*, 4443626, at *6 (S.D. Miss. Sept. 23, 2011) (binding holding in *McIntyre* is Justice Breyer's concurrence, not Justice Kennedy's plurality).

Thus, the rule stated in *Bauxites* that submission to jurisdiction may be "voluntary or not" was not disturbed or displaced by Justice Kennedy's non-binding plurality opinion in *McIntyre*, and therefore the legal premise underpinning *Fuld*, *Shatsky*, and *Sokolow* is erroneous.

For proof a defendant can unwillingly submit to personal jurisdiction, we need look no further than Rule 12(h)(1) of the Federal Rules of Civil Procedure—which provides a defendant waives a defense of lack of personal jurisdiction if she fails to assert it at the first opportunity.

Rule 12(h)(1) is an "automatic waiver provision." *Flory v. United States*, 79 F.3d 24, 25 (5th Cir. 1996). *Cf. White-Ruiz v. City of New York*, 1996 WL 744892, at *2 (S.D.N.Y. Dec. 31, 1996) ("Rule 12(h) provides for an automatic waiver."); *Mussat v. Enclarity*, 362 F. Supp. 3d 468, 476 (N.D. Ill. 2019) ("[T]he language of Rule 12(h) is unequivocal that waiver follows from the failure to join available motions as required by Rule 12(g)(2); it provides no discretion to excuse such waivers."); *Agbara v. Okoji*, 2021 WL 4940927, at *3 (D.D.C. Oct. 22, 2021) ("Rule 12(h) denies the court discretion to grant leave to amend in the case of the defenses such as lack of personal jurisdiction enumerated in Rule 12(b)(2) through Rule 12(b)(5).") (cleaned up).

Thus, Rule 12(h) operates automatically, and neither requires—nor allows—a court to examine the defendant's "willingness" to submit to jurisdiction. Indeed, courts enforce a Rule 12(h) waiver even when the defendant <u>affirmatively negates her willingness to submit to jurisdiction</u> by simultaneously purporting to reserve a personal jurisdiction defense. *Boston Telecomm. Grp., Inc. v. Deloitte Touche Tohmatsu*, 249 Fed.App'x 534, 536 (9th Cir. 2007) (defendant waived his right to assert the defense of personal jurisdiction where he did not raise it in his first motion to dismiss, even when he inserted a footnote in his brief stating that he "reserves his rights and objections to file a supplemental motion to dismiss" based on personal jurisdiction); *CGHH, LLC v. Cesta Punta Deportes, S.A. de C.V.*, 2006 WL 8430970, at *3 (N.D. Ga. Mar. 31, 2006) ("Defendants' motion to 'preserve' their Rule 12 defenses does nothing to dissuade this Court that the general principle of Rule 12(g) that those defenses not raised in a single, consolidated motion under Rule 12 are forever waived should not apply."); *Hunter v. Serv-Tech, Inc.*, 2009 WL 2858089, at *3 (E.D. La. Aug. 28, 2009) (cannot "reserve" 12(b)(2)-(5) defense).

If—as *Fuld* and its progeny would have it—courts were required to examine on a case-by-case basis whether a given defendant has willingly submitted to personal jurisdiction, the waiver provisions of Rule 12(h) would be unconstitutional. Those provisions are triggered automatically and peremptorily by the defendant's conduct, irrespective of whether the defendant intended to submit to personal jurisdiction. In fact, as shown above, those waiver provisions operate even when the defendant <u>explicitly disavows</u> any intention of submitting to jurisdiction. Yet, courts have rejected the argument that "Rule 12(h) only creates a 'rebuttable presumption' of waiver

because personal jurisdiction is a fundamental constitutional right that cannot be inadvertently waived." *WW, LLC v. Coffee Beanery, Ltd.*, 2012 WL 3728184, at \*3 (D. Md. Aug. 27, 2012).[7]

Defendants do not explain, because they cannot, why the PSJVTA—enacted by the federal Congress with the aim of deterring terrorist attacks against American citizens—is unconstitutional, while the automatic waiver provision contained in Rule 12(h) (which is a mere rule of procedure aimed at simply boosting judicial efficiency) is constitutional.

Put differently, the PSJVTA is constitutional for the same reason Rule 12(h) is, namely: a defendant may <u>unwillingly</u> submit to jurisdiction by conduct, as long as it has fair warning. Here, Defendants admit they elected to make Pay-for-Slay payments they knew would constitute statutory submission to jurisdiction under the PSJVTA. The fact Defendants did so while simultaneously objecting to jurisdiction on constitutional grounds is no more legally effective than protests made by defendants who purported to negate the effect of Rule 12(h) by objecting while engaging in conduct constituting submission to jurisdiction under the Rule.

B. <u>The PSJVTA Statutory Predicates</u>

As discussed above, Defendants have conceded they have made "at least one" payment triggering statutory submission to jurisdiction under the PSJVTA (DE 58 at n.4), and rested their challenge to personal jurisdiction under the PSJVTA solely on constitutional grounds. While Defendants claim they have not triggered submission to jurisdiction under the U.S.-activities prong

---

[7] A court needs to engage in a particularized waiver analysis only when the defendant has *complied* with Rule 12(g) by timely asserting a personal jurisdiction defense, but *subsequently* behaves in a manner that may be deemed a submission to jurisdiction. "Rule 12(h)(1) 'sets only the outer limits of waiver; it does not preclude waiver by implication.'" *Tinley v. Poly-Triplex Techs., Inc.*, 2009 WL 812150, at \*2 (D. Colo. Mar. 26, 2009) (quoting *Hunger U.S. Special Hydraulics Cylinders Corp. v. Hardie-Tynes Mfg. Co.*, 203 F.3d 835 (10th Cir. 2000)) (emphasis added, brackets omitted).

of the PSJVTA (because their activities fall within the PSJVTA's exception relating to UN activities) they make this argument only in a footnote. *Id*. at n.7

The *Shatsky* plaintiffs took jurisdictional discovery from Defendants regarding the factual predicates of the PSJVTA, i.e., regarding Defendants' Pay-for-Slay payments and their U.S.-based activities. Earlier in this proceeding, the parties stipulated Defendants would produce to Plaintiffs the fruits of the *Shatsky* discovery, to eliminate or minimize any need for jurisdictional discovery here. Those materials were produced and they are extremely voluminous.

Given: (a) Defendants have conceded they made a statutorily qualifying payment under the PSJVTA; (b) Defendants have not pressed or developed their argument about their U.S.-activities, except for the place-holder footnote; (c) Defendants have not challenged Plaintiffs' factual allegations (FAC ¶¶ 22-25), which were based on the *Shatsky* production, regarding satisfaction of the predicates of the PSJVTA; and (d) Defendants have based their challenge to the PSJVTA entirely on constitutional grounds—Plaintiffs see no reason to burden the Court with the massive volume of underlying records from the *Shatsky* production, which are not now and likely never will be relevant or necessary to determining jurisdiction under the PSJVTA.

If Defendants try to shift positions, or the posture of the case unexpectedly changes such that these documents become relevant, or the Court so orders, Plaintiffs will of course submit them.

**c.** **The Court Has Specific Personal Jurisdiction Over the PLO and PA**

Additionally or alternatively, the Court has specific personal jurisdiction over Defendants PLO and PA in this action. Specific jurisdiction is available if (1) the defendant "purposefully avails itself of the privilege of conducting activities within the forum," and (2) the plaintiff's claims "<u>relate to</u> the defendant's contacts with the forum. Or put just a bit differently, there must be an

affiliation between the forum and the underlying controversy." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024-25 (2021) (cleaned up, emphasis added).

Significantly here, the Supreme Court clarified in *Ford* that the "relate to" test "does not require proof of causation between a plaintiff's suit and a defendant's activities." *Ditter v. Subaru Corp.*, 2022 WL 889102, at *2 (D. Colo. Mar. 25, 2022) (cleaned up, citing *Ford*). Therefore, because a causal connection is no longer required, a "plaintiff can meet the 'relate to' component by another kind of relationship, affiliation, or connection," between the defendant's forum contacts and plaintiffs' claim, such as "by showing that any of the defendant's contacts with the forum are relevant to the merits of plaintiff's claim." *Titan Feeding, LLC v. Corey Cattle Company, LLC*, 2022 WL 4182458, at *7 (D. Colo. Sept. 13, 2022) (cleaned up, emphasis added).

Plaintiffs' allegations easily provide a solid basis for the exercise of specific jurisdiction over Defendants in this case. The FAC alleges in detail: (1) Defendants seek to obtain territorial concessions from Israel (¶¶ 114-115, 121-122); (2) Defendants have for many decades had a policy and practice of using terrorism, and the threat of further terrorism, to obtain Israeli concessions, and the Attack here was carried out pursuant to that long-standing policy and practice (¶¶ 114-115, 121-122, 150-153, 173-175); (3) Defendants admit they cannot extract concessions from Israel on their own, and therefore need the U.S. public and government to use their sway with Israel to convince it make concessions (¶¶ 116-117, 123-124, 153); (4) to cause the U.S. public and government to influence Israel to make concessions, Defendants used a double-pronged strategy: (a) Defendants employed terrorism to provoke the interest and concern of the U.S. public and government about Middle East peace and (b) in parallel, Defendants maintained an office and staff in Washington, D.C., which for years promoted and reiterated to U.S. public and government the

16

argument that in order to end the violence, Americans must use their leverage with Israel to make concessions to Defendants (¶¶ 14-15, 116-117, 123-124; 150-153).[8]

Both prongs of the specific jurisdiction test are satisfied here. First, it is clear that by maintaining an actual office and a staff within the United States, Defendants "purposefully avail[ed] [themselves] of the privilege of conducting activities within the forum." *Ford*, at 1024.[9]

Second, Defendants' activities in the United States "relate to" Plaintiffs' claims. It is critical to bear in mind Defendants are not a gang of vandals or skinheads, nor are they the Mafia. They do not engage in or support "senseless" violence, nor do they use violence to enrich themselves. Defendants strategically use violence, and the threat of more violence, for a very specific, non-pecuniary and rational (though appalling) reason: to achieve their political goals. But Defendants themselves have made explicitly clear violence alone cannot move Israel to make concessions. FAC ¶¶ 116, 123 ("Israel is the stronger party in the equation. Palestinians have no way of forcing Israel to accept anything […] Do you think we would be able to force Israel to do things that they don't want to do?"). Therefore, to achieve its purpose, the violence needed to be coupled with messaging—from Defendants' U.S.-based personnel and directed to the American public and government—that the violence will end only when Israel makes the concessions sought by Defendants. FAC ¶ 151 (Defendants' U.S. based officials wanted "Americans to understand" that "Palestinians are not looking to incite anything," but "incitement and violence are a

---

[8] "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits.*" Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) (cleaned up). Defendants do not controvert these allegations at all, much less with affidavits. At this stage of the case, Plaintiffs "need only make a prima facie showing that jurisdiction exists," and that "burden is light." *Id.*

[9] Because the ATA permits nationwide service of process, the relevant "forum" for personal jurisdiction analysis is the United States as a whole. *Cohen v. Facebook*, 252 F. Supp. 3d 140, 153 (E.D.N.Y. 2017).

4873-6555-8836, v. 1

consequence of occupation. Once the occupation ends, so will all the negative behavior," and widely repeated this message to the American public for years before the Attack).

Thus, there was a direct, purposeful, and strategic relationship between Defendants' U.S.-based propaganda activities and their use of and provision of material support for terrorist violence. This Court should consider Defendants' entire course of conduct—all the components of their overall "business plan" (so to speak)—and should not artificially separate their use of violence to achieve political goals, from the political messaging, *conducted in the U.S.*, that Defendants employed as a necessary complement to their violence.

Additionally, in examining the "related to" element in this case, the ATA's definition of "international terrorism" must be considered. That is because the "relatedness" test is satisfied if "any of the defendant's contacts with the forum are <u>relevant to the merits of plaintiff's claim</u>." *Titan Feeding* 2022 WL 4182458, at *7 (emphasis added). *Cf. Acorda Therapeutics Inc. v. Mylan Pharms. Inc.*, 817 F.3d 755, 759 (Fed. Cir. 2016) (determining "relatedness" for specific jurisdiction depends on "the nature of the claim asserted"); *In re Nexus 6P Prod. Liab. Litig.*, 2018 WL 827958, at *4 (N.D. Cal. Feb. 12, 2018) (Supreme Court emphasized specific jurisdiction requires a careful examination of the nature of the asserted claims); *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 175 (D.D.C. 2018) ("contours of plaintiffs' claims dictate what constitutes suit-related conduct."); *Havel v. Honda Motor Eur. Ltd.*, 2014 WL 4967229 at *10 (S.D. Tex. Sept. 30, 2014) ("connection between a defendant's suit-related conduct and the

4873-6555-8836, v. 1

**0155**

forum state will clearly be strongest when that conduct forms <u>one of the elements of the intentional tort alleged</u>.") (emphasis added).[10]

The ATA creates a cause of action for Americans harmed "by reason of an act of international terrorism." 18 U.S.C. § 2333(a). Under the ATA's definition, "international terrorism" is limited to "activities that … appear to be intended— (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." § 2331(1)(B). Thus, the ATA does <u>not allow</u> suits for pointless violence; rather, *by definition*, the "activities" from which an ATA action arises must appear to have been intended to impact "a government" (any government(s)) and/or a "civilian population" (any civilian population(s)).

Plaintiffs' FAC explicitly alleges the elements of ATA § 2331(1)(B) are satisfied in this case because Defendants' conduct was intended to influence the United States government and the American public. FAC ¶¶ 183, 201. Thus, Defendants' U.S. based conduct—the influence campaign conducted by their D.C. office and personnel—<u>fulfills a statutory element of Plaintiffs' ATA claims</u>, and that conduct therefore clearly "relates to" Plaintiffs' claims here. *Titan Feeding* 2022 WL 4182458, at *7 ("relatedness" exists if "any of the defendant's contacts with the forum are relevant to the merits of plaintiff's claim."); *Havel*, 2014 WL 4967229, at *10 (relatedness "will clearly be strongest" when the defendant's in-forum conduct constitutes "one of the elements of the intentional tort alleged.")

---

[10] However, the Supreme Court did "not limit 'suit-related conduct' to the *elements* of a tort." *Havel, id.* (emphasis in the original). Thus, while conduct that is an element of the cause of action is by definition "suit-related," the "relatedness" test is not <u>limited</u> to the actual elements of the cause of action.

Defendants do not contest the factual allegations underlying Plaintiffs' theory of specific jurisdiction. To the contrary, Defendants admit their Washington D.C. office had a multimillion dollar budget and engaged in extensive activities, including "promotion of 'the Palestinian cause in speeches and media.'" (DE 58 at 16-17, quoting factual findings in *Waldman*).[11] Rather, Defendants' sole challenge to Plaintiffs' specific jurisdiction argument is that the same argument was considered and rejected as a <u>matter of law</u> in *Waldman*, *Livnat*, *Klieman v. PA*, 923 F.3d 1115 (D.C. Cir. 2019) and *Shatsky v. PLO*, 955 F.3d 1016 (D.C. Cir. 2020) (DE 58 at 15-17).

But *Waldman*, *Livnat*, *Klieman,* and *Shatsky* cannot avail Defendants, because they rejected specific jurisdiction over Defendants on <u>legal</u> grounds later overruled by *Ford*. Under the traditional specific jurisdiction formula, a plaintiff's claims "must arise out of or relate to the defendant's contacts with the forum" (*Ford* at 1025), which courts interpreted as demanding some causal connection. *Ford* effected a sea-change in specific jurisdiction, by clarifying under the "relate to" prong of the formula, specific jurisdiction may be established without a causal showing. *Ditter*, 2022 WL 889102, at *2 (D. Colo. Mar. 25, 2022) (after *Ford*, "relate to" test "does not require proof of causation between a plaintiff's suit and a defendant's activities" in the forum).[12]

*Waldman* is bad law post-*Ford* because it never even discusses the "relate to" prong of the specific jurisdiction formula (which requires no causal link), focuses exclusively on the "arises from" prong (which requires causation), and then emphasizes <u>no less than three times</u> it is rejecting

---

[11] Defendants dispute only "their alleged involvement in attacks" (DE 58 at 15), which of course is an ultimate merits issue for the jury. By contrast, Defendants do not dispute any of the FAC's factual allegations regarding the existence of their U.S.-based propaganda activities and the purpose served by those activities as a necessary element for achieving the goals of their overall terrorist program. Those undisputed allegations are therefore treated as true for the purposes of this motion. *Wenz*, 55 F.3d at 1505.

[12] Tellingly, Defendants fail to even mention *Ford* in their motion.

4873-6555-8836, v. 1                                                                            **0157**

specific jurisdiction because "plaintiffs' claims did not arise from the defendants' purposeful contacts with the forum." *Waldman*, 835 F.3d at 343. *Cf. id.* (finding twice more that plaintiffs' claims did not "arise from" Defendants' U.S. activities).

*Waldman* also rejected the plaintiffs' specific jurisdiction argument because they did not show Defendants' U.S.-based conduct itself was tortious. *Id.* at 342 ("connections the defendants do have with the United States—the Washington, D.C. and New York missions—revolve around lobbying activities that are not proscribed by the ATA."). But *Ford* itself shows that in a purposeful-availment case, the defendant's in-forum conduct need not be wrongful or tortious. In *Ford*, the defendant's in-forum activities involved innocent sales and advertising activities. *Id.* at 1027-28. *Cf. Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) (upholding personal jurisdiction based on a course of non-tortious business dealings in the forum).

Moreover, irrespective of whether (standing alone) they were tortious or wrongful, Defendants' U.S. activities here constitute and satisfy a defined statutory element of Plaintiffs' ATA claim—i.e., § 2331(1)(B)—as discussed above.

*Livnat*, *Klieman*, and *Shatsky* are legally erroneous for similar reasons. In those cases, the D.C. Circuit found no jurisdiction because the plaintiffs did not show Defendants' U.S. contacts related to the particular terror attacks in which they were injured. *Livnat*, 851 F.3d at 57 (no specific jurisdiction because plaintiffs had not shown a link between Defendants' U.S.-related conduct and the particular attack); *Klieman*, 923 F.3d at 1124 (following *Livnat*, finding "Plaintiffs have not alleged tangible facts as to how *this* attack was intended (or even used ex post) to further defendants' political aims in the United States."); *Shatsky v. PLO*, 955 F.3d at 1037 (following

*Livnat* and *Klieman* and dismissing because there was no "evidence in the record connecting the Karnei Shomron bombing to the alleged public relations campaign.").[13]

After *Ford*, the holdings in *Livnat*, *Klieman*, and *Shatsky*—i.e., that an ATA plaintiff must show Defendants' U.S. activities are tied to the particular terrorist attack which injured her—are legally unsound. If we were to apply those holdings to the facts of *Ford*, the *Ford* plaintiffs would have had to show that Ford's in-forum activities (sales, advertising) related to the <u>particular vehicles</u> harming the plaintiffs. The Supreme Court has rejected any such requirement.

The constitutional rule established in *Ford*—that Due Process permits "relatedness" without causation—is not limited to a particular cause of action or set of circumstances. While *Ford* happened to involve a product liability suit, courts applying *Ford* have noted "the pitfalls of trying to compare the relatedness of contacts to a given forum in different tort claims for jurisdictional analysis," and cautioned against restricting the "relatedness" holding in *Ford* to the specific circumstances or causes of action in that case. *Bibbs v. Molson Coors Beverage Co. USA, LLC*, --- F.Supp.3d ----, 2022 WL 2900275, at *5, n.2 (N.D. Tex. July 22, 2022).[14]

---

[13] Notably, the decisions in *Waldman*, *Klieman* and *Shatsky* were given <u>after</u> discovery had been completed.

[14] The Court should disregard Defendants' footnote 8, claiming that exercise of jurisdiction "would violate fair play and substantial justice" under *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206 (10th Cir. 2000). "Arguments [of lack of "fair play and substantial justice"] raised in a perfunctory manner, such as in a footnote, are waived." *Titan Feeding*, at *8 (citation omitted). Defendants have not attempted to meet their burden "to show that the exercise of jurisdiction in the chosen forum will make litigation so gravely difficult and inconvenient that [they] unfairly [are] at a severe disadvantage in comparison to" Plaintiffs. *Peay*, at 1212 (cleaned up). Their claim that discovery will take place abroad <u>supports</u> jurisdiction, since *Peay*'s concern was that discovery will occur <u>away from</u> "defendant's residence or place of business." *Id.* Nor have Defendants tried to show, because they cannot, that any alleged burden on them outweighs the "federal interest in litigating the dispute in the chosen forum." *Id.* at 1213. The ATA "was not designed simply to afford *some* forum to victims of terrorism; it was designed to give them a forum in the courts of the United States…the ATA was designed to give American nationals broad remedies in a procedurally privileged U.S. forum." *Goldberg v. UBS* AG, 660 F. Supp. 2d 410, 421-22 (E.D.N.Y. 2009).

Accordingly, the Court has specific personal jurisdiction over the Defendants in this case.

### d. The Court Has Personal Jurisdiction Under Fed. R. Civ. P. 23.2

Alternatively, the Court has jurisdiction over Defendants under Fed. R. Civ. P. 23.2, which authorizes a "proceeding in the nature of a class action" against unincorporated associations.[15] FAC ¶ 11; C. Wright, A. Miller, M. Kane, 7C Fed. Prac. & Proc. Civ. § 1861 (3d ed.) (April 2022 update). Defendants assert "Rule 23.2 does not purport to create personal jurisdiction ... where otherwise lacking" (DE 58 at 19) and "if this Court cannot exercise personal jurisdiction over the PA and PLO consistent with due process ... Rule 23.2 does not change that result" (*id.* at 20). This assertion is at odds with decades of case law and leading commentators. Rule 23.2, like Rule 23 (class actions generally) allows a court to assert personal jurisdiction over a litigation class, including unincorporated associations, if the court has personal jurisdiction over the named class representative. This Court has general personal jurisdiction over Riyad Mansour, the named representative for the PLO and PA, as he is a domiciliary of the United States and service was effected at Mansour's home address in Florida. FAC ¶ 31; DE 55; 18 U.S.C. § 2334(a). Because the Court has jurisdiction over their representative, the Court may assert jurisdiction over the defendant unincorporated associations.

### A. The Court may properly assert personal jurisdiction over the Defendants because it has personal jurisdiction over Mansour.

Federal courts have long held a plaintiff may sue an unincorporated association using the form of a class action, even where personal or subject matter jurisdiction might be lacking if the

---

[15] Plaintiffs allege that "[t]he PLO and PA are both unincorporated associations." FAC ¶ 28. Defendants concede the point. DE 58 at 21.

plaintiff had sued the association as an entity or by naming each individual member. *Calagaz v. Calhoon*, 309 F.2d 248 (5th Cir. 1962); Wright & Miller § 1867. Wright & Miller explain unincorporated associations may be sued in different ways, and that a plaintiff's choice may determine the extent of a court's jurisdiction. *Id*. When the suit is brought as a class action, "service must be made only upon the named representatives and the court may proceed on the basis of its personal jurisdiction over the named representatives." *Id*. Thus, "treatment of unincorporated associations as classes provides substantial benefits from the perspective of personal jurisdiction, venue, and subject-matter jurisdiction." *Id*.; *Cf*. 5 Moore's Federal Practice - Civil § 23.2.02

Modern case law and the history of litigation involving unincorporated associations support this conclusion. Prior to the 1966 adoption of Rule 23.2, the Federal Rules of Civil Procedure allowed unincorporated associations to sue and be sued as litigation classes under the general language of Rule 23. *Cf*. *Calagaz* (finding plaintiff and defendant, both of which were unincorporated associations, to be properly designated as litigation classes under Rule 23(a); Wright & Miller § 1867; David Marcus, *The History of the Modern Class Action, Part I: Sturm Und Drang, 1953-1980*, 90 WASH. U. L. REV. 587, 600 (2013) (noting that the 1938 version of Rule 23 allowed "true" class actions, which included those involving unincorporated associations).

The *Calagaz* court held class treatment of unincorporated associations under Rule 23 did not address only the associations' legal capacity to sue or be sued. Rather, by regarding the suit as a class action, the court was able to assert diversity jurisdiction because the named class representatives did not share the same state citizenship as the plaintiff (even though other members of the association did). *Calagaz*, 309 F.2d at 252. Similarly, and critically here, *Calagaz* held

personal jurisdiction over the defendant <u>association</u> was established based upon the court's personal jurisdiction over the <u>named member/class representative</u>. *Id*. at 253.

In 1966, Rule 23.2 was enacted to continue the prior practice of allowing a class action mechanism to be used as to unincorporated associations while recognizing certain differences that made the stringencies of Rule 23 inapplicable to actions involving unincorporated associations. *Sembach v. McMahon Coll., Inc.*, 86 F.R.D. 188 (S.D. Tex. 1980); Benjamin Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I)*, 81 Harv. L. Rev. 356, 387 and notes 118-119 (1967). Thus, the Rule 23.2 class mechanism continues to provide litigants with many advantages of typical Rule 23 class actions. *Curley v. Brignoli, Curley & Roberts Assoc.*, 915 F.2d 81, 85 (2d Cir. 1990).

These advantages include (a) expanding the number of districts where venue is proper; (b) empowering a plaintiff to name only those association members whose citizenship will not disturb diversity jurisdiction; and, as relevant here, (c) permitting a court to exercise personal jurisdiction over a class representative and thereby obtain jurisdiction over the unincorporated association, which might otherwise be beyond the court's jurisdiction. *Id*.; *see also*, Moore's § 23.2.04 (identifying venue, subject matter jurisdiction, and personal jurisdiction among procedural advantages of suing unincorporated associations under Rule 23.2); *Resolution Trust Corp. v. Deloitte & Touche*, 822 F. Supp. 1512, 1515 (D. Colo. 1993) (personal jurisdiction over association based upon jurisdiction over representative member); *Battle Fowler v. Brignoli*, 765 F. Supp. 1202, (S.D.N.Y. 1991) (same). Wright & Miller explicitly note suing an unincorporated association as a class may facilitate the court's exercise of personal jurisdiction over the association. "[W]hen the association is a defendant, plaintiff's ability to select the class

25

representatives enables plaintiff to choose adversaries, which is helpful for purposes of securing personal jurisdiction." Wright & Miller § 1867.

Rule 23.2 is entirely consistent with recent decisions that continue to hold personal jurisdiction over a Rule 23 class is perfected where the court has personal jurisdiction over the named class representatives. *Cf. Mussat v. IQVIA, Inc.*, 953 F.3d 441, 445 (7th Cir. 2020) (class's affiliation with a forum depends only on the named class representatives); *Lyngaas v. Ag*, 992 F.3d 412, 433 (6th Cir. 2021) (in class actions, personal-jurisdiction analysis focuses on the named class representative); *Molock v. Whole Foods Mkt. Grp., Inc.*, 952 F.3d 293, 297 (D.C. Cir. 2020); *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1227–28 (10th Cir. 2021) (citing *Mussat* and *Lyngaas* approvingly). Defendants do not cite a single case holding due process is violated by the class action principle that personal jurisdiction may be exercised as to a class based upon jurisdiction over named representatives. Instead, they argue a rule of civil procedure cannot override due process. (DE 58 at 20-21). This argument is off point because, for jurisdictional purposes, class actions are treated differently than other cases; the class's affiliation with the forum depends only on the named class representatives. *Mussat*, 953 F.3d at 445; *Lyngaas*, 992 F.3d 435.

**B. Rule 23.2 applies regardless of whether state law provides unincorporated associations with capacity to sue and be sued.**

Defendants argue that Rule 23.2 merely affords unincorporated associations capacity to sue and be sued in diversity actions brought in federal courts in states that do not afford such associations with jural capacity. (DE 58 at 21-22, citing inter alia *Northbrook Excess & Surplus v. Med. Malpractice Joint Underwriting Ass'n of Massachusetts*, 900 F.2d 476 (1st Cir. 1990). Defendants assert that Rule 23.2 does not apply here because Colorado law provides unincorporated associations with capacity to be sued. Defendants cite in support of this

exceedingly narrow construction of the rule a handful of decisions that have been rejected based upon the plain language of Rule 23.2, the Advisory Committee Notes, the interplay between Federal Rules of Civil Procedure 23.2, 23, and 17, and the pre-Rule 23.2 history of using class actions to sue unincorporated associations. *Curley*, 915 F.2d at 86-87; *Kerney v. Fort Griffin Fandangle Ass'n, Inc.*, 624 F.2d 717 (5th Cir. 1980) ("Rule 23.2 clearly authorizes a class action against the members of an unincorporated association in Texas" though Texas law provided unincorporated associations with capacity); *Murray v. Sevier*, 156 F.R.D. 235, 240-41 (D. Kan. 1994); *Calagaz* (pre-Rule 23.2 decision holding Rule 17(b) is "no obstacle" to class actions based upon diversity). Both Wright & Miller and Moore's Federal Practice agree the expansive view of Rule 23.2 is the more reasonable interpretation. Wright & Miller § 1867; Moore's § 23.2.05[4].

By its terms, Rule 23.2 allows the class action form to be used in <u>any</u> actions involving unincorporated associations. The only limitation found in the Rule is that the class representative must fairly and adequately protect the interests of the association and its members. *Curley*, 915 F.2d at 86-87; *Northbrook*, 900 F.2d at 478. <u>Nowhere</u> does Rule 23.2 mention capacity or state law rules regarding unincorporated associations. In fact, questions of capacity generally, and that of unincorporated associations, specifically, are addressed in Fed. R. Civ. P. 17. If Defendants' narrow reading were correct, Rule 23.2 would have been included as a subparagraph within the capacity rule – Rule 17(b)(3)(A). *Curley*, at 87. As *Curley* noted, "[i]f the drafters of rule 23.2 intended to provide only a vehicle for capacity, it seems that they would have simply extended to the diversity realm rule 17(b)'s grant of association capacity in federal question cases," and "[i]f they intended the anomaly that the availability of class actions would turn on state capacity laws, the drafters could have so provided in the text of rule 23.2." *Id.*; *Cf.* Moore's, § 23.2.05[4].

Affording class treatment to unincorporated associations is consistent with class action jurisprudence generally. Wright & Miller § 1861.[16] Thus, in addition to preventing state capacity rules from providing unincorporated associations with an immunity shield, Rule 23.2 maintains other advantages afforded by class treatment. *Curley*, 915 F.2d at 87. As discussed above, these advantages include expanding venue options, personal jurisdiction, and diversity subject matter jurisdiction based upon the citizenship of the association's representative alone. *Id*. at 87; *Aetna Cas. & Sur. Co. v. Iso-Tex, Inc*., 75 F.3d 216, 218 (5th Cir. 1996). Recall Rule 23.2 was designed to continue the prior practice of allowing a class action to be used in actions involving unincorporated associations. *Sembach*, 86 F.R.D. 188. Thus, Professor Benjamin Kaplan, who served as the reporter to the Advisory Committee on Civil Rules, agrees that Rule 23.2 continues to provide the jurisdictional advantages that were available in unincorporated association class actions prior to the adoption of Rule 23.2. Kaplan, *Continuing Work of the Civil Committee, supra*, 81 Harv. L. Rev. at 387, n. 119. If the drafters had intended to break with the earlier practice by limiting the class action device to cases in states that do not afford capacity to unincorporated associations, they would have said so in the text of the Rule.

Defendants also argue it is inappropriate to sue an unincorporated association both as an entity and as a class. (DE 58 at 23, citing *Coniglio v. Highwood Servs., Inc.*, 60 F.R.D. 359

---

[16] The Defendants assert that Wright & Miller note a trend after the adoption of Rule 23.2, that the rule should be construed narrowly as a rule of capacity. Not so. Wright & Miller opine that state law should not interfere with the application of Rule 23.2. However, the commentary recognizes a trend to limit the applicability of Rule 23.2 in diversity cases where state law prohibits the use of class actions against unincorporated associations. Wright & Miller § 1861. The instant case is not premised upon diversity jurisdiction, and Colorado law does not bar class actions in suits involving unincorporated associations. *Cf. Murray*, 156 F.R.D. at 253 (Wright & Miller recognize trend restricting Rule 23.2 only in in cases where state law prohibits actions against the associative entity).

4873-6555-8836, v. 1

**0165**

(W.D.N.Y. 1972)). But *Coniglio* did not hold, as Defendants maintain, that plaintiffs may not plead in the alternative claims against the association as an "entity" and as a class. It merely rejected the plaintiffs' attempt to name the defendant association itself as the representative of the association's members. "Nowhere is the association itself authorized as the proper representative of its members. *Coniglio*, at 364. Moreover, in *Coniglio*, the defendant association, as an entity, was already subject to the court's jurisdiction. *Id*. Similarly in *Patrician Towers Owners, Inc. v. Fairchild*, 513 F.2d 216 (4th Cir. 1975), also relied upon by Defendants, the association, as an entity, was before the court, and the association and its members were suing to enforce a single obligation to the association. *Id*. at 221. The court held the representative action could not be maintained when "joined voluntarily by the plaintiffs themselves" with an action by the plaintiffs' association. *Id*.

Here, by contrast, the PLO and PA are challenging the exercise of jurisdiction over them as non-class defendants, and if that challenge succeeds, Rule 23.2 will be Plaintiffs' only basis for jurisdiction. Therefore, this is precisely the type of case for which Rule 23.2 was intended, as it "provides litigants with important procedural advantages." *Curley*, 915 F. 2d at 87; Wright & Miller § 1867; Moore's § 23.2.02. Nothing prohibits Plaintiffs from alternatively pleading their claims against Defendants through the class action device of Rule 23.2. Indeed, in *Curley*, the Second Circuit *sue sponte* held that the plaintiffs could have brought their claim as a class action under Rule 23.2, and affirmed the judgment by converting the case (on appeal) into a Rule 23.2 class action. *Id*.; *cf*., *Murray*, 156 F.R.D. at 240 (court ordered plaintiff to plead his claim as a Rule 23.2 class action, holding, "[t]he court is exceedingly troubled that this action is not being plead under Rule 23.2 when that Rule seems tailor-made for this case.").

### C.  The FAC properly identifies the two unincorporated associations as classes

Defendants baselessly argue Plaintiffs fail to allege a class under Rule 23.2. Plaintiffs allege both the PA and the PLO are unincorporated associations. FAC ¶¶ 28-29. And Plaintiffs named Riyad Mansour, a member of both the PA and the PLO, as class representative. That is sufficient under Rule 23.2. Moore's § 23.2.02 (Rule 23.2 enables a representative suit to be brought and enforced against the association itself). Plaintiffs need not allege any specific tortious conduct by Mansour because he is being sued as representative of the defendant classes—the associations, which are the tortfeasors. Thus, Defendants' claim "a complaint must explain what each defendant did to him or her[,]" (DE 58 at 25) fails.

Defendants also claim the FAC does not define class membership or an ascertainable class (DE 58 at 25-26), citing decisions addressing Rule 23 class actions. But Rule 23.2 does not incorporate Rule 23's requirements precisely because, by definition, the members of an unincorporated association constitute a class. A majority of authorities hold that the requirements of Rule 23 do <u>not</u> apply to Rule 23.2 actions. *Curley*, at 85-86; *Murray*, at 240-41; Wright § 1861.

### D.  Mansour Will Fairly and Adequately Represent the Class.

1.  <u>Defendants are estopped from disputing that Mansour is a member</u>

Defendants do not dispute Mansour is a member of the PLO, but assert he is not a member of the PA. DE 58 at 26. This claim is squarely refuted by Defendants' own representations and interrogatory answers in *Sokolow v. PLO*, 04-cv-397 (S.D.N.Y.). In *Sokolow*, Defendants moved to dismiss the plaintiffs' nonfederal claims on the grounds that, as unincorporated associations, they lacked the capacity to be sued under forum law. At a hearing on that motion, Judge Daniels stated Defendants' status as unincorporated associations had arisen in many ATA cases, and he

intended to resolve the question conclusively once and for all so that "every judge is not going to have to go through this depending on what's to the advantage or disadvantage of either party in terms of what they want to assert." Hearing Tr., Aug. 9, 2012 (Perlin, **Ex. I** at 3-4). In response, Defendants repeatedly stated for purposes of the Federal Rules of Civil Procedure generally, they should be considered unincorporated associations. *Id*. at 7, 12, 15, 64. Judge Daniels and the plaintiffs replied that to support their claim to be unincorporated associations, Defendants must identify their members. *Id*. at 10, 36.

Judge Daniels ordered Defendants to respond to discovery requests regarding their claim to be unincorporated associations. Among the materials produced were answers to interrogatories referencing exhibits that addressed the specific question of who comprised the membership of the PA and the PLO. (Perlin, **Ex. J**). Interrogatories 8 and 9 required Defendants to list the members of the PA and PLO. *Id*. at 8-9. Defendants responded their members included "certain elected, appointed, and employed officials" of the PA and PLO who were listed in documents referenced by Bates numbers. *Id*. at 8-10. The referenced documents were pages from the 2001 through 2011 editions of a privately-published governmental directory. *Id*. (Perlin, **Ex. K**). According to the documents cited in response to the interrogatories, the members of the PA and PLO are identical. Perlin, **Ex. J** (citing identical Bates stamped documents). Moreover, the membership of both unincorporated association defendants identified in the *Sokolow* interrogatory responses is much broader than the limited class of members Defendants describe in their Motion to Dismiss. DE 58 at 26 (purporting to limit membership of the PA to "the President, Council of Ministers, and Legislative Council."). Most importantly, the documents referred to in the *Sokolow* interrogatory

31

responses **identified Riyad Mansour, by name, as a member of both the PA and the PLO**.

Perlin, Ex. K at 84, 111, 138, 189 (Bates 02:008812, 02:008839, 02:008866 and 02:008917).

Under the Federal Rules of Civil Procedure and the Federal Rules of Evidence interrogatory answers given in one action may be used in another. *Sclafani v. Air & Liquid Sys. Corp.*, 2013 WL 12119556, at *6, n.9 (C.D. Cal. Mar. 20, 2013) (citing 8B Wright, Miller & Marcus, § 2180 (3d ed. 2010)). Here, Defendants should be bound by their prior answers to interrogatories, which provided detailed definitions of their respective memberships and specifically identified Mansour as a member of both the PA and PLO. "[A] party opponent's answers to interrogatories are admissible as admissions." *Buckley v. Airshield Corp.*, 116 F. Supp. 2d 658, 669 (D. Md. 2000) *citing*, *Gridiron Steel Co. v. Jones & Laughlin Steel Corp.,* 361 F.2d 791, 794 (6th Cir. 1966). "Such admissions qualify as substantive evidence of the fact stated therein." *Id. citing* Fed. R. Evid. 801(d)(2).

Additionally, Defendants are judicially estopped from denying that Mansour is a member of the PA and PLO. Identifying their membership was critical to *Sokolow*'s acceptance of their claim that they were both unincorporated associations. And by establishing their status as unincorporated associations, Defendants prevailed on their motion to dismiss New York state law claims. *Sokolow v. PLO*, 60 F. Supp. 3d 509, 524 (S.D.N.Y. 2014). Thus, Defendants are estopped from now denying that Mansour is a member of the PA and PLO. *New Hampshire v. Maine*, 121 S. Ct. 1808, 1814-15 (2001); *Eastman v. Union Pac. R. Co.*, 493 F.3d 1151 (10th Cir. 2007).

Rule 23.2 imposes only one requirement for the class action to proceed: the class representative fairly and adequately represent the association and its members. *Curley*, at 85; *Murray*, at 240-41 (same); Wright & Miller, § 1861 (same). "The requirement of 'fair and adequate

representation' is satisfied when: (1) the named representatives have common interests with the other class members; and (2) the class representatives will vigorously prosecute the interests of the class through qualified counsel." *Resolution Trust*, 822 F. Supp. at 1515 (D. Colo. 1993).

Here, the named class representative, Riyad Mansour, clearly has common interests with the class members and will protect the interests of the class through qualified counsel. Indeed, all the Defendants here are represented by the same law firm which has vigorously represented Defendants in numerous other terrorism lawsuits in the United States. *Cf. Resolution Trust*, at 1515 (adequate representation where litigation was handled by defendant association's national counsel and where class action briefing demonstrated that counsel would vigorously and competently protect the interests of the class members.).

Finally, Defendants offer only a *pro forma* argument that Mansour cannot be the class representative under Rule 23.2 because, they claim, "as an invitee to the United Nations" he enjoys immunity "under the UN Headquarters Agreement" for actions performed in the exercise of his functions as their representative to that body. DE 58 at 27.[17] This argument fails at the threshold for the PA, because the PA has no status at all at the UN (FAC ¶ 26), and thus Mansour can have no claim to any UN immunity as a member of the PA. More importantly, this argument is a colossal red herring: Mansour is not being sued for <u>any of his own actions</u>—much less actions at the UN. He is named in this action simply as a representative of the Defendants pursuant to Rule 23.2.

---

[17] Defendants have been claiming non-existent UN immunities in the federal courts for decades. Thus, in *Ungar v. PA*, Defendants argued that the Deputy Permanent Observer of the Permanent Observer Mission of Palestine to the United Nations "is immune from service pursuant to the Headquarters Agreement treaty between the U.N. and the United States." 153 F. Supp. 2d 76, 89 (D.R.I. 2001). The court rejected this claim because the Headquarters Agreement confers diplomatic immunity only on members of the United Nations. *Id.* citing *Klinghoffer*, 739 F.Supp. at 864; *aff'd*, 937 F.2d at 48.

**0170**

Mansour is a citizen and long-time domiciliary of the United States. He is not present in the United States because of his positions in the PA and PLO; he is present here because he lives here.

For all the reasons above, Defendants' Rule 12(b)(2) motion should be denied.

## II.  PLAINTIFFS' FAC VALIDLY STATES ALL THE CLAIMS ASSERTED

Defendants' Rule 12(b)(6) motion should be denied. No court has ever dismissed an ATA action against the PLO or PA under Rule 12(b)(6). Nor has any court ever dismissed under Rule 12(b)(6) an ATA complaint presenting allegations like, or even approaching, those at issue here— *i.e.*, where, as here, defendants with a frank ideological and political agenda provided material support and resources <u>directly</u> to the designated Foreign Terrorist Organization ("FTO") that carried out the attack. The Rule 12(b)(6) dismissals which Defendants cite involved banks with no ideological or political goals, which provided services or assistance to entities alleged to be affiliated—somehow—with the terrorist group that actually carried out terrorist attacks at issue.

### a.  <u>Direct Primary ATA Liability</u>

Plaintiffs assert a claim against Defendants for primary liability under ATA § 2333(a), on the basis that Defendants' own actions constituted "international terrorism." FAC ¶¶ 179-99. The term "international terrorism" is defined in the ATA as "activities" that "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." 18 U.S.C. § 2331(1). Those "activities" must also "occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished [or] the persons they appear intended to intimidate or coerce." *Id.* Finally, those "activities" must appear to be intend to influence a government or a population. *Id.*

Thus, to prevail on their direct primary liability claim, Plaintiffs need to show Defendants' conduct meets the definition of "international terrorism," and (2) that Plaintiffs were injured "by reason of" that conduct. Courts have construed the ATA's "by reason of" language as requiring proximate causation. *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 226 (D.C. Cir. 2022).

The allegations here easily plead these elements. As discussed above (regarding specific jurisdiction) the FAC alleges Defendants' actions appeared to be and were intended to influence a government and population. And Defendants' activities obviously "transcended national boundaries." Regarding the remaining elements (dangerousness, criminality and proximate causation) the FAC alleges in extensive detail: (1) the PFLP is a designated FTO that over a period of decades carried out a huge number of deadly terrorist attacks (¶¶ 115, 154-160) ; (2) for 15 years prior to the Attack, the PLO and PA provided the PFLP with massive funding, along with a range of other material support and resources, including a geographic base of operations adjacent to Israel, direct financial support for PFLP terrorist operatives, a dedicated radio frequency for the PFLP's radio station, and internet access for the PFLP's websites (¶¶ 126-146) ; and (3) the material support and resources provided by Defendants greatly enhanced the PFLP's organizational and operational capabilities, and enabled the PFLP to recruit, build, maintain and deploy the human, material, and operational resources and infrastructure in the West Bank and Gaza that were needed and used by the PFLP to plan, organize and execute acts of terrorism against Jewish and Israeli targets in Israel, the West Bank and Gaza, including the Attack. (¶¶ 126-146, 153-155, 174).

These allegations satisfy the ATA's "dangerousness" element. "Giving money to Hamas, like giving a loaded gun to a child … is an 'act dangerous to human life.'" *Boim v. Holy Land*

35

*Found. for Relief & Dev.*, 549 F. Supp. 685, 690 (7th Cir. 2008). *Cf. Miller v. Arab Bank*, 372 F. Supp. 3d 33, 45 (E.D.N.Y. 2019) (providing material support to an FTO like the PFLP is "dangerous to human life" since those resources "increase [the PFLP's] ability to carry out attacks.").

Defendants' actions were also criminal (or would be criminal if performed in the United States) because the knowing provision of "material support or resources" to an FTO is a violation (inter alia) of 18 U.S.C. § 2339B. A violation of § 2339B "requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities." *Linde v. Arab Bank*, 882 F.3d 314, 329-30 (2d Cir. 2018). *Cf. Weiss v. Nat'l Westminster Bank*, 768 F.3d 202, 206 (2d Cir. 2014) ("[I]n order to establish entitlement to a civil remedy under 18 U.S.C. § 2333(a) predicated on a violation of § 2339B(a)(1), Plaintiffs were obliged to show that [the defendant] had actual knowledge that, or exhibited deliberate indifference to whether" it was providing "material support to a terrorist organization, irrespective of whether the support aided terrorist activities."). Plaintiffs' allegations easily meet this requirement; indeed, Plaintiffs allege far more: namely, that Defendants provided support to the PFLP with the goal of enabling and facilitating terrorist attacks. [18]

The term "material support or resources" includes "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services […] safehouses […] communications equipment, facilities […] personnel […] and transportation." 18 U.S.C. § 2339A(b)(1). The funding, radio frequency, and internet service that Defendants provided

---

[18] Defendants' conduct violated many other federal and state criminal laws, ranging from counter-terrorism provisions to garden-variety crimes such as reckless endangerment; however, because the ATA is satisfied by violation of any criminal provision, Plaintiffs address here only § 2339B.

the PFLP obviously all meet this definition. Likewise, Defendants' support payments to PFLP operatives who had been convicted of terrorist crimes and then released, which "provided the PFLP with a large pool of experienced and hardened terrorist leaders and operatives" (FAC ¶¶ 133-134), constitutes provision of "personnel" to the PFLP under § 2339B. *Sattar v. United States*, 314 F. Supp. 2d 279 (S.D.N.Y. 2004) (by opening a channel of communication between an FTO's imprisoned leader and his confederates on the outside, defendants provided "personnel" to the FTO within the meaning of § 2339B); *United States v. Kandic*, 2022 WL 1266431, (E.D.N.Y. Apr. 28, 2022) (arranging travel of ISIS recruits to ISIS-held areas constitutes provision of "personnel" under § 2339B). Defendants' provision of a geographical base of operations to the PFLP (FAC ¶¶ 130-132) also constituted provision of material support to the PFLP under § 2339A(b)(1). *Rux v. Republic of Sudan*, 461 F.3d 461, 470 (4th Cir. 2006) (Sudan provided "material support and resources" to Al-Qaeda, within the meaning of § 2339A(b)(1), by granting Al-Qaeda a "safe haven and a base of operations" on Sudanese territory "from which to conduct its terrorist operations."). *Cf. Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 177 (D.D.C. 2016) (same).

Finally, Plaintiffs sufficiently allege causation. "To plead proximate causation, plaintiffs must plausibly allege (1) that defendants' acts were a substantial factor in the sequence of events that led to their injuries and (2) that those injuries were reasonably foreseeable or anticipated as a natural consequence of defendants' conduct. Those requirements are met by allegations of some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered. Proximate causation functions to eliminate the bizarre, by precluding liability based on an attenuated causal link more aptly described as mere fortuity." *Atchley*, at 226. Importantly, "Plaintiffs who bring an ATA action are not required to trace specific dollars to

specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter because money is fungible." *Schansman v. Sberbank of Russia*, 565 F. Supp. 3d 405, 418-19 (S.D.N.Y. 2021) (cleaned up). Likewise, for primary ATA liability, "Plaintiffs are not required to establish 'but-for' causation in addition to proximate causation." *Kaplan v. Lebanese Canadian Bank*, 405 F. Supp. 3d 525, 532 n.3 (S.D.N.Y. 2019).

Plaintiffs detail how the funds and other forms of material support that the Defendants provided to the PFLP in the 15 years prior to the attack boosted the PFLP's capabilities and enabled it to deploy the human and material resources necessary to carry out terrorist Attacks. (FAC ¶¶ 126-146, 153-155, 174). These allegations are analogous to those found adequate in *Atchley* for pleading proximate causation. "Defendants' alleged support here was similarly a substantial factor in plaintiffs' injuries. They gave both cash and cash equivalents to the terrorist organization that harmed plaintiffs, which allowed that organization to grow." *Id*. at 227 (emphasis added).

Plaintiffs also meet the second element of proximate causation, *i.e.*, the Attack was reasonably foreseeable or anticipated as a natural consequence of Defendants' conduct. As *Atchley* held: "Providing fungible resources to a terrorist organization allows it to grow, recruit and pay members, and obtain weapons and other equipment. It was reasonably foreseeable that financially fortifying Jaysh al-Mahdi would lead to the attacks that plaintiffs suffered." *Id*. Exactly so here, Defendants provision of a broad range of material resources to the PFLP "allow[ed] it to grow, recruit and pay members, and obtain weapons and other equipment," and it was thus "reasonably foreseeable that … fortifying [the PFLP] would lead to" terror attacks like that here. Moreover, as explained in the FAC, Defendants affirmatively desired such attacks.

4873-6555-8836, v. 1

**0175**

Defendants present several meritless arguments in response to Plaintiffs' direct primary liability claim.

First, Defendants claim Plaintiffs' allegation that the Attack was carried out by the PFLP is "conclusory." That is absurd: Plaintiffs identify by name four senior PFLP leaders (of whom two are quoted verbatim) who confirmed the PFLP executed the Attack, and explained why the PFLP did so. FAC ¶¶ 172-173.

Second, Defendants repetitiously and baldly claim that Plaintiffs' allegations are "conclusory" and/or implausible. Yet (with the sole exception of the PFLP executing the Attack, just discussed), Defendants never identify any <u>specific</u> allegations  they believe are conclusory or not plausible, much less explain <u>why</u> they purportedly are deficient. "Defendant fails to engage in a proper 12(b)(6) analysis. Specifically, Defendant fails to explain why Plaintiff's factual allegations in his complaint, accepted as true, fail to state a claim to relief that is plausible on its face. Defendant offers little in the way of a 12(b)(6) challenge beyond counsel's cursory factual assertions. Because it is Defendant's burden to show that dismissal is warranted, the Court will not sua sponte engage in this analysis with regard to Plaintiff's … claim." *Aicher v. Access Corr.*, 2017 WL 8944040, at *5–6 (D.N.M. Aug. 28, 2017), *report and recommendation adopted*, 2017 WL 4338552 (D.N.M. Sept. 28, 2017) (cleaned up, citing *Iqbal*). *Cf. Luna v. Bank of Am. NA*, 2015 WL 11120875, at *10 (N.D. Tex. Nov. 9, 2015), *report and recommendation adopted* 2016 WL 158128 (N.D. Tex. Jan. 12, 2016) ("Defendant fails to explain how Plaintiff's allegations in support of his claims […] fail to state a claim under 12(b)(6) […] Its conclusory statement, without any explanation or support, is simply not persuasive.").

Third, Defendants repetitively claim their provision of material support to the PFLP was "limited and generalized." This self-serving characterization has no support in the FAC, in any materials which may be considered on a Rule 12(b)(6) motion—or in any other source. To the contrary, the FAC makes clear Defendants' support for the PFLP was extensive (not limited), and diversified (not generalized). And some of the in-kind support (geographical base of operations, dedicated frequency for PFLP radio, etc.) was unique, invaluable, and irreplaceable. Defendants have simply conjured up this characterization out thin air. The Court should disregard it.[19]

Fourth, Defendants misrepresent Plaintiffs' allegations. The FAC alleges Defendants provide on-going financial support to PFLP operatives who were incarcerated for terrorist crimes and then released, thereby proving the PFLP with a pool of experienced terrorist personnel. Plaintiffs also allege Defendants provide the PFLP with a dedicated radio frequency on the bandwidth controlled by Defendants, and internet privileges on Defendants' top-level domain. Defendants misrepresent these allegations, and portray them as payments to incarcerated terrorists, and refusal to shut down (rather than affirmative provision of) the PFLP websites and radio.

Fifth, Defendants cite to a number of ATA decisions, but none of them is relevant to the facts, allegations, or posture of this case. Thus, *Shatsky v. PLO*, 2017 WL 2666111 (D.D.C. June 20, 2017) was a summary judgment decision, not a Rule 12(b)(6) decision, and was entered on a limited factual record after the court struck much of the plaintiffs' evidence. *Id*. at *3.[20] *Shatsky*

---

[19] The Court should also disregard Defendants' strange demand that the Court take judicial notice of an internet report about a current policy disagreement between them and the PFLP. (DE 58 n.28). The 2022 report is neither cognizable on a Rule 12(b)(6) motion nor relevant to events in 2014 and earlier.

[20] The D.C. Circuit later found that the *Shatsky* court lacked personal jurisdiction, and so vacated the decision and dismissed the case without prejudice. 955 F.3d 1016 (D.C. Cir. 2020).

found that Defendants' payment of rent for a single PFLP office was insufficient to establish proximate causation. Clearly, the facts of *Shatsky* are light-years from those here. Furthermore, *Shatsky* indicated the result would have been different if the plaintiffs had shown Defendants provided "millions of dollars" to the PFLP. *Id*. at *9. Plaintiffs have alleged in this case that Defendants provided the PFLP with millions of dollars annually, as well as many other types of material support. Thus, *Shatsky* supports Plaintiffs here, not Defendants.

Defendants also cite *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018) and *Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018) but those cases are even further off base—they dealt with ATA suits against banks that provided banking services to Iran and Sudan which, in turn, were alleged to have funded the terrorist groups that harmed the plaintiffs. Unsurprisingly courts held such twice-removed theories of liability, which bear no resemblance to the facts here, are not viable. Defendants repeatedly quote *Rothstein* to the effect that governmental entities have "many legitimate agencies, operations, and programs to fund" (DE 58 at 29, 31, 35), but the court there was not discussing Iran's provision of support to terrorist groups, but rather the bank's provision of services to Iran, and was making the point that not every dollar that goes to Iran goes to terrorism. By contrast, Iran's provision of material support to terrorist groups has rendered it liable in U.S. federal courts many times, and no court has ever found it to be "legitimate." Thus, Defendants' provision of material support to the PFLP is analogous to Iran's provision of such support to Hizbollah, and not to the *Rothstein* defendant's provision of banking services to Iran.

Finally, Defendants argue because Plaintiffs are suing Iran and Syria under the Foreign Sovereign Immunity Act ("FSIA") for their roles in supporting the PFLP, their allegations against

41

**0178**

Defendants are (somehow) defective. DE 58 at 32-33. This argument borders on the frivolous. ATA plaintiffs often bring parallel FSIA suits (usually in different courts, due to the venue rules for ATA and FSIA cases) and there is nothing contradictory or improper about doing so. Indeed, the identical argument has been rejected. *Kaplan*, 405 F. Supp. 3d at 533 n.4 (rejecting ATA defendant's claim that plaintiffs could not show that it was a proximate cause of their injuries because the court in plaintiffs' FSIA suit had found that "North Korea and Iran provided the weapons, training, logistical support, infrastructure, and financing, utilized by Hizbollah to commit the rocket attacks that caused Plaintiffs' injuries. Because it is common for injuries to have multiple proximate causes this argument is unavailing.") (cleaned up).

Therefore, Plaintiffs' direct primary liability claim should proceed.

### b. <u>Primary ATA Liability On the Basis of Respondeat Superior</u>

Plaintiffs assert Defendants are also primarily liable under the ATA under respondeat superior, because the Attack was an "act of international terrorism" under § 2333(a), and the PFLP—as an organization—executed the Attack as Defendants' agent. FAC ¶¶ 200-204.

The ATA allows imposition of liability on a defendant for the acts of its agents, pursuant to the doctrine of respondeat superior. "The ATA was 'intended to incorporate general principles of tort law,' of which respondeat superior is unquestionably one. *See Wultz*, 755 F.Supp.2d at 55; *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 148 (D.C.Cir. 2011) (Brown, J., concurring) ("Respondeat Superior liability is an elementary principle of tort law and must therefore inform our interpretation of the federal torts created in the [ATA]. Thus, the [PA] is liable for the acts of its employees committed within the scope of their employment.") (citation omitted); *see also Gill*, 893 F.Supp.2d at 558 (finding that plaintiff was correct in contending that the ATA provides for

liability on a theory of respondeat superior); *Abecassis v. Wyatt*, 785 F.Supp.2d 614, 649–50 (S.D.Tex. 2011)." *Sokolow v. PLO*, 60 F. Supp. 3d 509, 516 (S.D.N.Y. 2014).[21]

*Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242 (10th Cir. 2020) clarified the elements of respondeat superior liability in tort where, as here, the agent is <u>not</u> the employee of the principal.[22] The Court of Appeals held that "not every agent is an employee," that the "minimal level of control required to establish an agency relationship stands in contrast to the much more significant and intrusive right of control that makes an agent an employee," that the "right to control need not be exercised for an agency relationship to exist," that the "principal's control may concern only the overall mission, not operational details," and that the right of control "need not be control over the manner and means of the agent's performance of work." *Id*. at 1252-55.

Plaintiffs' allegations easily meet these elements. The FAC alleges in detail that Defendants and the PFLP (which is the second-largest faction within the PLO) share the identical ideological goal of gaining control of territories governed by Israel, that Defendants and the PFLP have worked together for many decades to achieve this goal by employing terrorism and the threat of terrorism, and that for many decades Defendants have provided the PFLP with material resources to carry out terrorism, while Defendants carefully remain at arm's-length from the

---

[21] *Sokolow* was vacated for lack of personal jurisdiction, but the Supreme Court has directed the Second Circuit to reexamine that dismissal in light of the PSJVTA. If the Second Circuit vacates the jurisdictional dismissal, *Sokolow*'s respondeat superior ruling will collaterally estop Defendants from contesting the availability of respondeat superior liability under the ATA, because (tellingly) Defendants did <u>not</u> challenge the respondeat superior ruling on appeal. *See* Brief and Special Appendix for Defendants-Appellants, *Sokolow v. Palestine Liberation Organization*, 15-3135 (2d. Cir.), DE 87 at 6 (listing issues on appeal). In any event, though not technically <u>preclusive</u> against Defendants at this time, the *Sokolow* respondeat superior decision remains <u>persuasive</u> authority, as do the authorities cited therein.

[22] Though *Alfaro-Huitron* was a New Mexico case, the Tenth Circuit conducted its analysis under federal common law principles as reflected in the Restatement (which New Mexico follows). *Id*. at 1259, n.6

4873-6555-8836, v. 1

**0180**

violence in order to effectively conduct public advocacy and thereby leverage the violence into political gains. *Id.* ¶¶ 108-153. Moreover, Defendants have both the practical ability and <u>the legal right</u> to control the conduct of the PFLP. *Id.* ¶¶ 112-113; 125. These allegations, which reflect an agency relationship between Defendants and the PFLP to carry out terrorist attacks, consistent with the principles outlined in *Alfaro-Huitron*, clearly support Plaintiffs' theory of respondeat superior liability. In fact, the PFLP confirmed that it executed the Attack to advance the goal of its agency relationship with Defendants, namely: wresting control of territories from Israel. FAC ¶ 173 (PFLP officials explain that "the two martyrs' blood that was shed yesterday has reinforced Jerusalem's Arab identity, and has thwarted the attempts to Judaize [sic] Jerusalem," and that the Attack "prove[s] that … we will continue to chase this enemy wherever it is until he leaves our land.").

Defendants challenge Plaintiffs' respondeat superior claim by building and thrashing a strawman; Defendants argue that "a respondeat superior claim … would require Plaintiffs to plausibly plead that <u>the Attackers</u> were the Defendants' agents," and that "Plaintiffs have not alleged facts sufficient to raise a reasonable inference … that <u>an employment relationship existed</u>." (DE 58 at 38, emphasis added). But it is crystal-clear from the FAC that the PFLP itself—as an organization—is alleged to be Defendants' agent. FAC ¶¶ 200-204.[23] Defendants' claim about the purported failure of the FAC to adequately allege an agency relationship between Defendants and the two individual murderers are non sequiturs, irrelevant to the actual allegations of the FAC. And

---

[23] An agent need not be a natural person; an organization or entity can be an agent for respondeat superior purposes. *Cf. Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 34 (D.D.C. 2001) (finding Iran liable under respondeat superior for the terrorist actions of Hizbollah); *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547 (S.D.N.Y. 2007) (member of global accounting firm, which was an umbrella organization for member firms, could be liable under respondeat superior for fraud committed by Italian member firm).

*Alfaro-Huitron* establishes that respondeat superior liability does not require any "employment relationship."[24] Thus, Defendants fail to address, much less demonstrate the insufficiency of, the <u>actual</u> allegations of Plaintiffs' respondeat superior theory, or the relevant law.

Defendants also claim respondeat superior liability is unavailable under the ATA. This assertion ignores *Sokolow* and the unanimous cases cited therein. In purported support of this claim Defendants cite a few cases but (here again) the cases do not say what Defendants claim they do. Defendants cite *Boim v. Am. Muslims for Palestine*, 9 F.4th 545 (7th Cir. 2021), but that case dealt only with veil-piercing and alter ego theories in post-judgment enforcement proceedings, and has literally nothing to do with respondeat superior.[25] Defendants also cite *Parsons v. PA*, 715 F. Supp. 2d 27, 34 (D.D.C. 2010), but that case explicitly dealt with "a conspiracy claim," not respondeat superior. And on appeal, the only judge to reach the issue held that the ATA <u>allows</u> respondeat superior liability. *Parsons v. PA*, 651 F.3d 118, 148 (D.C.Cir. 2011) (Brown, J., concurring).

Defendants' citation to *Mohamad v. PA*, 566 U.S. 449 (2012) is even further afield. The question in *Mohamad* was whether the Torture Victim Protection Act ("TVPA"), whose plain text is expressly limited to claims against an "individual," could be construed to include claims against these Defendants by the family of a U.S. citizen tortured to death by PA personnel. The Supreme Court held that it could not "read 'individual' so unnaturally. The ordinary meaning of the word,

---

[24] In putative support of their assertion that respondeat superior requires an employer-employee relationship, Defendants cite *Am. Select Ins. Co. v. Johnson*, U.S. Dist. LEXIS 101446, (D. Colo. June 18, 2018). But Defendants are aware of the contrary decision in *Alfaro-Huitron*, since they cite that case for other purposes in their motion. (*Id*. at 38). Thus, their reliance on *Am. Select Ins. Co*, which they know to be unfounded under the later decision in *Alfaro-Huitron*, is not made in good faith.

[25] Defendants the term "vicarious liability" as a synonym for respondeat superior liability, but the two concepts are not co-extensive, and respondeat superior liability is available even where secondary liability (such as aiding and abetting) is not allowed. *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d at 550-52.

fortified by its statutory context, persuades us that the Act authorizes suit against natural persons alone." *Id*. at 453-54. This holding is, obviously, irrelevant to the question of whether the ATA allows respondent superior liability.[26] Indeed, unlike the TVPA, the ATA nowhere limits or defines the types of defendants who may be held primarily liable under ATA. *Cf.* ATA § 2333(a) (limiting only the class of plaintiffs, not the class of defendants who may be held liable).

The fact Congress left the class of ATA defendants wide open and unlimited is further grounds in favor of allowing respondent superior liability under the ATA. Indeed, since the ATA allows suits against entity defendants, and since entities can act only through human agents,[27] barring respondeat superior liability in ATA cases would render the ATA a dead letter in actions against terror groups or other entities, and limit its application solely to defendants who are natural persons. Obviously, Congress intended no such thing; rather, by allowing suits against entity defendants under the ATA, Congress necessarily intended to allow respondeat superior liability.

Plaintiffs thus state a valid claim for primary liability on the basis of respondeat superior.

c.  **Secondary ATA Liability – Aiding and Abetting**

Section 2333(d) of the ATA provides in relevant part that where, as here, a terrorist attack was committed by an FTO, "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such

---

[26] In fact, the D.C. Circuit found that the *Mohamad* plaintiffs had waived any argument that the PA or PLO could be held liable under the TVPA pursuant to respondeat superior, but that such an argument would likely have failed, precisely because Congress had specifically *limited* the TVPA to defendants who (unlike the PA and PLO) are natural persons. *Mohamad v. Rajoub*, 634 F.3d 604, 608-09 (D.C. Cir. 2011), *aff'd* 566 U.S. 449 (2012). This decision, too, supports the conclusion that the ATA—which permits suits against any type of defendant—allows respondeat superior liability.

[27] "Corporations and other legal entities…are not living, breathing human beings and therefore can act only through their agents." *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 451 (S.D.N.Y. 2009).

an act of international terrorism." § 2333(d)(2). The FAC alleges that Defendants are liable under § 2333(d)(2) because they aided and abetted the PFLP. FAC ¶¶ 205-211. In enacting ATA § 2333(d), "Congress expressly embraced the aiding-and-abetting analysis in *Halberstam v. Welch* [705 F.2d 472, 474 (D.C. Cir. 1983)] as providing the proper legal framework for how aiding-and-abetting liability should function under the Act." *Atchley*, 22 F.4th at 219 (cleaned up). *Halberstam* "sets out three elements of aiding-and-abetting liability: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Id*. at 220.

Defendants assert the FAC fails to sufficiently allege Defendants were "generally aware of [their] role as part of an overall illegal or tortious activity," or that they "knowingly and substantially assist the principal violation." DE 58 at 40-43. This assertion is meritless. Under ATA 2333(d) "a defendant may be liable for aiding and abetting an act of terrorism if it was generally aware of its role in an overall illegal activity from which an act of international terrorism was a foreseeable risk. There is no specific intent requirement. … And *Halberstam*'s use of 'generally' as a modifier for 'aware' imparts a connotation of something less than full, or fully focused, recognition. Thus, a defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Atchley* at 220 (cleaned up).

Plaintiffs allegations easily meet this standard. As detailed in the FAC, Defendants provided material support and resources to the PFLP—including financial support to convicted PFLP terrorists who had been released—for 15 years prior to the Attack, for the specific purpose

of enabling the PFLP to carry out acts of terrorism; thus, PFLP terrorist acts were not only <u>foreseeable</u> by Defendants, they were affirmatively <u>desired</u> by them. Moreover, throughout this period, the PFLP was carrying out huge numbers of deadly terrorist attacks. FAC ¶¶ 154-160. Following one of the most horrific of these attacks—in which PFLP operatives entered the home of Jewish family and murdered the parents, two children and a three-month-old infant (whom they decapitated), Defendants called for the release of the PFLP murderers on the grounds that all Palestinians "have the right to resist the occupation, and they have a duty to resist the occupation," and have been making Pay-for-Slay payments to the murderers' families. FAC ¶¶ 158-160. Defendants were thus well aware of their role in "of an overall illegal or tortious activity," and welcomed that role.

Defendants' challenge to the "knowing and substantial assistance" element fares no better. The "knowledge" element "requires that the defendant know that it is providing assistance— whether directly to the FTO or indirectly through an intermediary. If the defendant knowingly— and not innocently or inadvertently—gave assistance, directly or indirectly" then the "knowledge" element is met. *Atchley* at 222 (cleaned up). Obviously, this element is satisfied here; Defendants provided material support directly to the PFLP with their eyes (and hands) wide open.

As for the final element, "substantial assistance," *Halberstam* "identifies six factors to weigh: (i) the nature of the act assisted, (ii) the amount and kind of assistance, (iii) the defendants' presence at the time of the tort, (iv) the defendants' relationship to the tortious actor, (v) the defendants' state of mind, and (vi) the duration of assistance. No factor alone is dispositive, and the weight of each varies with the circumstances of the particular claim. What is required is that,

48

on balance, the relevant considerations show that defendants substantially assisted the acts of terrorism." *Atchley* at 221 (cleaned up).

All six of these factors strongly support Plaintiffs' claims: (i) The "nature of the act assisted dictates what aid might matter, i.e., be substantial." *Id*. (cleaned up). Here, since the acts assisted were terror attacks, Defendants' provision of millions of dollars annually to the PFLP was critical, because: "Financial support is indisputably important to the operation of a terrorist organization, and any money provided to the organization may aid its unlawful goals." *Id*. (cleaned up). Moreover, as explained in the FAC, each of the other types of material support was important to the PFLP's ability to operate adjacent to, and to carry out attacks in, Israel; to deploy personnel (who were being financially supported by Defendants); to recruit new members and supporters, and generally to maintain and grow the organization; (ii) For the same reasons, the amount and kind of assistance provided to the PFLP by Defendants was substantial. Notably, the assistance does not have to be "indispensable to the injurious acts," nor does the defendant need to be the sole source of assistance. *Id*. (cleaned up) (rejecting claim that parallel Iranian funding of the FTO negated ATA liability); (iii) The Defendants were not present in the synagogue, but they were just a few miles away, since Jerusalem is bordered by the West Bank, and is a 20 minute drive from Defendants' headquarters in Ramallah; (iv) Defendants have a very close relationship with the PFLP, which is a faction within the PLO itself; (v) The Defendants' state of mind was extremely culpable—Defendants provided material support to the PFLP to facilitate terrorism; (vi) The duration of the assistance was extremely long—between 1999 and 2014.

Accordingly, Plaintiffs have adequately pled aiding and abetting.

4873-6555-8836, v. 1

### d. **Secondary ATA Liability – Conspiracy**

As noted above, § 2333(d) provides when a terrorist attack is committed by an FTO, "liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, <u>or who conspires</u> with the person who committed such an act of international terrorism." § 2333(d)(2) (emphasis added). The FAC alleges Defendants are liable under § 2333(d) because they conspired with the PFLP. *Id*. ¶¶ 212-218.

To date, few if any conspiracy claims under § 2333(d) have been found viable. There is a simple reason for that: the vast majority of ATA actions are brought against commercial actors (banks, internet companies), which <u>do not share any of the goals of the FTO</u>. Typically, these commercial defendants interact with FTOs out of greed (e.g., banks or other businesses) or out of inertia (e.g., internet companies which do not screen their users). This case is very different: here, Defendants are deeply driven by an ideology and political goals, which are shared by the PFLP. This case is a perfect fit for conspiracy liability.

To plead a civil conspiracy, the plaintiff must allege: "(1) an agreement between two or more persons; (2) to participate in an unlawful act"; "(3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam*, 705 F.2d at 477. Plaintiffs' allegations squarely meet these requirements. The whole warp and woof of the FAC details the agreement between Defendants and the PFLP to use terrorism to advance their shared political goals. Clearly, this constitutes an agreement between two or more persons to participate in unlawful acts. Likewise, Plaintiffs were injured by the Attack, which was one of the many terror attacks carried out by the

PFLP over the years, further to the common scheme with Defendants. If these Plaintiffs cannot sue for conspiracy under ATA § 2333(d), it is difficult to imagine which plaintiffs could.

**e.   <u>The Nonfederal Claims Are Viable</u>**

The FAC asserts claims for negligence and vicarious liability under Israel's Civil Wrongs Ordinance ("CWO"). There have been many terror attacks in Israel, where Americans widely visit, study and live. As a result, our federal courts have often had occasion to apply these selfsame CWO claims in ATA (and FSIA actions), and have even developed a body of case law in respect thereto. *Cf. Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 57-67, 80-81 (D.D.C. 2010) (ATA case); *Leibovitch v. Syrian Arab Republic*, 25 F. Supp. 3d 1071, 1084 (N.D. Ill. 2014) (FSIA case).

Defendants' anemic assertions (DE 58 at 43-44) that Plaintiffs' claims are not viable under Israeli law is rebutted in the attached Declaration of Dr. Boaz Shnoor, an Israeli tort law professor.

**WHEREFORE**, Defendants' motion should be denied in its entirety.

Respectfully Submitted,

s/ Daniel K. Calisher

Daniel K. Calisher
Foster Graham Milstein & Calisher, LLP
360 South Garfield Street, 6th Floor
Denver, Colorado 80209
Telephone: 303-333-9810
Email: calisher@fostergraham.com
*Attorneys for Plaintiff*

s/ Jordan Factor

Jordan Factor
Allen Vellon Wolf Helfrich & Factor, P.C.
1600 Stout Street, Suite 1900
Denver, Colorado 80202
Telephone: 303-534-4499
Email: jfactor@allen-vellone.com
*Attorneys for Plaintiff*

s/ Asher Perlin

Asher Perlin, Esq.
4600 Sheridan Street, Suite 303
Hollywood, Florida 33021
Telephone: 786-233-7164
Email: asher@asherperlin.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Case No. 1:21-cv-03043-RM-STV

SHELLEY LEVINE, *et al.*,

                    Plaintiffs,

v.

THE PALESTINE LIBERATION ORGANIZATION
and THE PALESTINIAN AUTHORITY (a/k/a "The
Palestinian Interim Self-Government Authority" and/or
"The Palestinian
National Authority"),

                    Defendants.

---

## DECLARATION OF ASHER PERLIN IN SUPPORT OF
## PLAINTIFFS'OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'
## FIRST AMENDED COMPLAINT UNDER RULE 12(b)(2) AND RULE 12(b)(6)

---

Pursuant to 28 U.S.C. § 1746 Asher Perlin declares as follows:

1.  I am co-lead counsel for Plaintiffs in this matter and submit this declaration in support of the Plaintiffs' Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint Under Rule 12(b)(2) and Rule 12(b)(6).

2.  I am over 18 years of age.

3.  Exhibit A hereto is a true and accurate copy of the Memorandum Opinion prepared by the DOJ Office of Legal Counsel, *Mutual Consent Provisions in the Guam Commonwealth Legislation: Memorandum Opinion for the Special Representative for Guam Commonwealth* (July 28, 1994), also available at:

https://www.justice.gov/sites/default/files/olc/opinions/attachments/2014/11/10/1994-07-28-guam-mutual-consent.pdf.

4.   Exhibit B hereto is a true and accurate copy of *Report by the President's Task Force on Puerto Rico's Status*, App. E (Dec. 2007) (Letter from Robert Raben, Assistant Attorney General), also available at: https://www.justice.gov/archive/opa/docs/2007-report-by-the-president-task-force-on-puerto-rico-status.pdf.

5.   Exhibit C hereto is a true and accurate copy of United States' Motion for Partial Dismissal filed in *Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*, No. 96-1304 (D.P.R. 1996).

6.   Exhibit D hereto is a true and accurate copy of the Brief for the U.S. filed in *Palestine Info. Office v. Schultz*, No. 87-5396 (D.C. Cir. 1988).

7.   Exhibit E hereto is a true and accurate copy of the Opinion prepared by the DOJ Office of Legal Counsel, *Constitutionality of Closing the Palestine Information Office, an Affiliate of the Palestine Liberation Organization*, 11 Op. O.L.C. 104 (1987), also available at: https://www.justice.gov/sites/default/files/olc/opinions/1987/08/31/op-olc-v011-p0104_0.pdf.

8.   Exhibit F hereto is a true and accurate copy of the D.C. Circuit's unpublished ruling in *Toumazou v. Turkish Republic of Northern Cyprus*, No. 14-7170 (D.C. Cir. Jan. 15, 2016).

9.   Exhibit G hereto is a true and accurate copy of Plaintiff's Opposition and Memorandum of Points and Authorities in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss, ECF No. 20, *Toumazou v. Turkish Republic of Northern Cyprus*, No. 1:09-cv-01967 (D.D.C.).

10. Exhibit H hereto is a true and accurate copy of the Brief of Appellants, *Toumazou v. Turkish Republic of Northern Cyprus*, No. 14-7170 (D.C. Cir.).

11. Exhibit I hereto is a true and accurate copy of the August 9, 2012 Hearing Transcript from *Sokolow v. PLO*, 04-cv-397 (S.D.N.Y.).

12. Exhibit J hereto is a true and accurate copy of the Declaration of Kent Yalowitz in Support of Plaintiffs' Motion for Summary Judgment on Defendants' Fourth Affirmative Defense, DE 490, including, as Exhibit B, thereto, which is an "excerpted copy of Defendants' Objections and Responses to the [Fifth] Set of Interrogatories From All Plaintiffs (To The Goldberg Plaintiffs), dated December 21, 2012, DE 490-3, *Sokolow v. PLO*, 04-cv-397 (S.D.N.Y.).

13. Exhibit K hereto is a true and accurate copy of the Bates numbered documents referred to in, and served with, Defendants' Objections and Responses to the [Fifth] Set of Interrogatories From All Plaintiffs (To The Goldberg Plaintiffs), dated December 21, 2012, DE 490-3, *Sokolow v. PLO*, 04-cv-397 (S.D.N.Y.).

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

September 19, 2022

        /s/ Asher Perlin           

**0192**

# EXHIBIT A

# Mutual Consent Provisions in the Proposed Guam Commonwealth Act

Sections of the proposed Guam Commonwealth Act requiring the mutual consent of the Government of the United States and the Government of Guam raise serious constitutional questions and are legally unenforceable.

July 28, 1994

MEMORANDUM OPINION FOR THE SPECIAL REPRESENTATIVE
FOR THE GUAM COMMONWEALTH

The Guam Commonwealth Act, H.R. 1521, 103d Cong. (1993), contains two sections requiring the mutual consent of the Government of the United States and the Government of Guam. Section 103 provides that the Commonwealth Act can be amended only with mutual consent of the two governments. Section 202 provides that no federal laws, rules, and regulations passed after the enactment of the Commonwealth Act will apply to Guam without the mutual consent of the two governments. The Representatives of Guam insist that these two sections are crucial for the autonomy and economy of Guam. The former views of this Office on the validity or efficacy of mutual consent requirements included in legislation governing the relationship between the federal government and non-state areas—i.e. areas under the sovereignty of the United States that are not States[1]—have not been consistent.[2] We therefore have carefully reex-

---

[1] Territories that have developed from the stage of a classical territory to that of a commonwealth with a constitution of their own adoption and an elective governor resent being called territories and claim that that legal term and its implications are not applicable to them. We therefore shall refer to all territories and commonwealths as non-state areas under the sovereignty of the United States or briefly as non-state areas.

[2] To our knowledge the first consideration of the validity of mutual consent clauses occurred in 1959 in connection with proposals to amend the Puerto Rico Federal Relations Act. At that time the Department took the position that the answer to this question was doubtful but that such clauses should not be opposed on the ground that they go beyond the constitutional power of Congress. In 1963 the Department of Justice opined that such clauses were legally effective because Congress could create vested rights in the status of a territory that could not be revoked unilaterally. The Department adhered to this position in 1973 in connection with then-pending Micronesians-status negotiations in a memorandum approved by then-Assistant Attorney General Rehnquist. On the basis of

amined this issue. Our conclusion is that these clauses raise serious constitutional issues and are legally unenforceable.[3]

In our view, it is important that the text of the Guam Commonwealth Act not create any illusory expectations that might mislead the electorate of Guam about the consequences of the legislation. We must therefore oppose the inclusion in the Act of any provisions, such as mutual consent clauses, that are legally unenforceable, unless their unenforceability (or precatory nature) is clearly stated in the document itself.

## I.

### *The Power of Congress to Govern the Non-State Areas Under the Sovereignty of the United States Is Plenary Within Constitutional Limitations*

All territory under the sovereignty of the United States falls into two groups: the states and the areas that are not states. The latter, whether called territories, possessions, or commonwealths, are governed by and under the authority of Congress. As to those areas, Congress exercises the

this advice, a mutual consent clause was inserted in section 105 of the Covenant with the Northern Mariana Islands. The Department continued to support the validity of mutual consent clauses in connection with the first 1989 task force report on the Guam Commonwealth bill. The Department revisited this issue in the early 1990s in connection with the Puerto Rico status referendum bill in light of *Bowen v. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 55 (1986), and concluded that there could not be an enforceable vested right in a political status; hence mutual consent clauses were ineffective because they would not bind a subsequent Congress. We took the same position in the second Guam task force report issued during the last days of the Bush Administration in January 1993.

[3] Mutual consent clauses are not a novel phenomenon; indeed they antedate the Constitution. Section 14 of the Northwest Ordinance contained six "articles of compact between the original States and the people and States in the said territory," which shall "forever remain unalterable, unless by common consent." These articles were incorporated either expressly or by reference into many early territorial organic acts. *Clinton v. Englebrecht*, 80 U.S. (13 Wall.) 434, 442 (1872). The copious litigation under these "unalterable articles" focused largely on the question whether the territories' obligations under them were superseded by the Constitution, or when the territory became a state, as the result of the equal footing doctrine. We have, however, not found any cases dealing with the question whether Congress had the power to modify any duty imposed on the United States by those articles.

combined powers of the federal and of a state government. These basic considerations were set out in the leading case of *National Bank v. County of Yankton*, 101 U.S. (11 Otto) 129 (1880). There the Court held:

> It is certainly now too late to doubt the power of Congress to govern the Territories. There have been some differences of opinion as to the particular clause of the Constitution from which the power is derived, but that it exists has always been conceded.[4]
>
> . . .
>
> All territory within the jurisdiction of the United States not included in any State must necessarily be governed by or under the authority of Congress. The Territories are but political subdivisions of the outlying dominion of the United States. Their relation to the general government is much the same as that which counties bear to the respective States, and Congress may legislate for them as a State does for its municipal organizations. The organic law of a Territory takes the place of a constitution as the fundamental law of the local government. It is obligatory on and binds the territorial authorities; but Congress is supreme, and for the purposes of this department of its governmental authority has all the powers of the people of the United States, except such as have been expressly or by implication reserved in the prohibitions of the Constitution.

*Id*. at 132–33 (footnote added).

---

[4] Some derived that power from the authority of the United States to acquire territory, others from the mere fact of sovereignty, others from the Territory Clause (U.S. Const. art. IV, § 3, cl. 2) pursuant to which Congress has "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." *See, e.g.*, *Am. Ins. Co. v. Canter*, 26 U.S. (1 Pet.) 511, 542 (1828); *Mormon Church v. United States*, 136 U.S. 1, 42–44 (1890); *Downes v. Bidwell*, 182 U.S. 244, 290 (1901).

At present, the Territory Clause is generally considered to be the source of the power of Congress to govern the non-state areas. *Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 673–74 (1945); *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 586 (1976); *Harris v. Rosario*, 446 U.S. 651 (1980); *see also Wabol v. Villacrusis*, 958 F.2d 1450, 1459 (9th Cir. 1992).

*County of Yankton* was anticipated in Chief Justice Marshall's seminal opinion in *American Insurance Co. v. Canter*, 26 U.S. (1 Pet.) 511, 542–43, 546 (1828). The Chief Justice explained:

> In the mean time [i.e., the interval between acquisition and statehood], Florida continues to be a territory of the United States; governed by virtue of that clause in the Constitution, which empowers Congress "to make all needful rules and regulations, respecting the territory, or other property belonging to the United States."
>
> Perhaps the power of governing a territory belonging to the United States, which has not, by becoming a state, acquired the means of self-government, may result necessarily from the facts, that it is not within the jurisdiction of any particular state, and is within the power and jurisdiction of the United States.
>
> . . .
>
> In legislating for them [the Territories], Congress exercises the combined powers of the general, and of a state government.

*Id*. at 542–43, 546.

The power of Congress to govern the non-state areas is plenary, like every other legislative power of Congress, but it is nevertheless subject to the applicable provisions of the Constitution. As Chief Justice Marshall stated in *Gibbons v. Ogden* with respect to the Commerce Power: "This power [the Commerce Power], like all others vested in Congress is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." 22 U.S. (9 Wheat.) 1, 196 (1824) (emphasis added).

This limitation on the plenary legislative power of Congress is self-evident. It necessarily follows from the supremacy of the Constitution. *See, e.g.*, *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276 (1981). That the power of Congress under the Territory Clause is subject to constitutional limitations has been recognized in *County of Yankton*, 101 U.S. at 133; *Downes v. Bidwell*, 182 U.S. 244, 290–91 (1901); and *District of Columbia v. Thompson Co.*, 346 U.S. 100, 109 (1953).

Finally, the power of Congress over the non-state areas persists "so long as they remain in a territorial condition." *Shively v. Bowlby*, 152 U.S. 1, 48 (1894); *see also Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 675 (1945) (recognizing that, during the intermediary period between the establishment of the Commonwealth of the Philippine Islands and the final withdrawal of United States sovereignty from those islands, "Congress retains plenary power over the territorial government").

The plenary congressional authority over a non-state area thus lasts as long as the area retains that status. It terminates when the area loses that status, either by virtue of its admission as a state, or by the termination of the sovereignty of the United States over the area by the grant of independence or by its surrender to the sovereignty of another country.

## II.

### *Congressional Legislation Relating to the Government of Non-State Areas Is Revocable*

While Congress has the power to govern the non-state areas, it need not exercise that power itself. Congress can delegate to the inhabitants of non-state areas full powers of self-government and an autonomy similar to that of states, and has done so since the beginning of the Republic. Such delegation, however, must be "consistent with the supremacy and supervision of National authority." *Clinton v. Englebrecht*, 80 U.S. (13 Wall.) 434, 441 (1872); *Puerto Rico v. Shell Co.*, 302 U.S. 253, 260, 261–62 (1937). The requirement that the delegation of governmental authority to the non-state areas be subject to federal supremacy and federal supervision means that such delegation is necessarily subject to the right of Congress to revise, alter, or revoke the authority granted. *Dist. of Columbia v. Thompson Co.*, 346 U.S. 100, 109 (1953)[5]; *see also United States v.*

___

[5] *Thompson* dealt with the District of Columbia's government which is provided for by Article I, Section 8, Clause 17 of the Constitution, rather than with the non-state areas as to whom the congressional power is derived from the Territory Clause. The Court, however, held that in this area the rules relating to the congressional power to govern the District of Columbia and the non-state areas are identical. Indeed, the Court relied on cases dealing with non-state areas—e.g., *Hornbuckle v. Toombs*, 85 U.S. (18 Wall.) 648, 655 (1874), and *Christianson v. King County*, 239 U.S. 365 (1915)—where it held that

*Sharpnack*, 355 U.S. 286, 296 (1958); *Harris v. Boreham*, 233 F.2d 110, 113 (3d Cir. 1956); *Firemen's Ins. Co. v. Washington*, 483 F.2d 1323, 1327 (D.C. Cir. 1973). The power of Congress to delegate governmental powers to non-state areas thus is contingent on the retention by Congress of its power to revise, alter, and revoke that legislation.[6] Congress therefore cannot subject the amendment or repeal of such legislation to the consent of the non-state area.

This consideration also disposes of the argument that the power of Congress under the Territory Clause to give up its sovereignty over a non-state area includes the power to make a partial disposition of that authority, hence Congress could give up its power to amend or repeal statutes relating to the governance of non-state areas. As shown above, the retention of the power to amend or repeal legislation delegating governmental powers to a non-state area is an integral element of the delegation power. Congress therefore has no authority to enact legislation under the Territory Clause that would limit the unfettered exercise of its power to amend or repeal.

The same result flows from the consideration that all non-state areas are subject to the authority of Congress, which, as shown above, is plenary. This basic rule does not permit the creation of non-state areas that are only partially subject to congressional authority. The plenary power of Congress over a non-state area persists as long as the area remains in that condition and terminates only when the area becomes a state or ceases to be under United States sovereignty. There is no intermediary status as far as the congressional power is concerned.

Congress can delegate its legislative authority under Article I, Section 8, Clause 17 to the District, subject to the power of Congress at any time to revise, alter, or revoke that authority.

[6] Congress has exercised this power with respect to the District of Columbia. The Act of February 21, 1871, ch. 62, 16 Stat. 419, gave the District of Columbia virtual territorial status, with a governor appointed by the President, a legislative assembly that included an elected house of delegates, and a delegate in Congress. The 1871 Act was repealed by the Act of June 20, 1874, ch. 337, 18 Stat. 116, which abrogated among others the provisions for the legislative assembly and a delegate in Congress, and established a government by a commission appointed by the President.

The two mutual consent clauses contained in the proposed Common-wealth Act therefore are subject to congressional modification and repeal.

### III.

### *The Rule that Legislation Delegating Governmental Powers to a Non-State Area Must be Subject to Amendment and Repeal Is but a Manifestation of the General Rule That One Congress Cannot Bind a Subsequent Congress, Except Where it Creates Vested Rights Enforceable Under the Due Process Clause of the Fifth Amendment*

The rule that Congress cannot surrender its power to amend or repeal legislation relating to the government of non-state areas is but a specific application of the maxim that one Congress cannot bind a subsequent Congress and the case law developed under it.

The rationale underlying that principle is the consideration that if one Congress could prevent the subsequent amendment or repeal of legislation enacted by it, such legislation would be frozen permanently and would acquire virtually constitutional status. Justice Brennan expressed this thought in his dissenting opinion in *United States Trust Co. v. New Jersey*, a case involving the Contracts Clause (U.S. Const. art. I, § 10, cl. 1):

One of the fundamental premises of our popular democracy is that each generation of representatives can and will remain responsive to the needs and desires of those whom they represent. Crucial to this end is the assurance that new legislators will not automatically be bound by the policies and undertakings of earlier days . . . . The Framers fully recognized that nothing would so jeopardize the legit-imacy of a system of government that relies upon the ebbs and flows of politics to "clean out the rascals" than the possibility that those same rascals might perpetuate their policies simply by locking them into binding contracts.

431 U.S. 1, 45 (1977).

Nonetheless, the maxim that one Congress cannot bind a future Con-gress, like every legal rule, has its limits. As early as 1810, Chief Justice Marshall explained in *Fletcher v. Peck*:

> The principle asserted is that one legislature is competent to repeal any act which a former legislature was competent to pass; and that one legislature cannot abridge the powers of a succeeding legislature.
>
> The correctness of this principle, so far as respects general legislation, can never be controverted. But, if an act be done under a law, a succeeding legislature cannot undo it. The past cannot be recalled by the most absolute power. Conveyances have been made, those conveyances have vested legal estates, and if those estates may be seized by the sovereign authority, still, that they originally vested is a fact, and cannot cease to be a fact.
>
> When, then, a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot devest [sic] those rights.

10 U.S. (6 Cranch) 87, 115 (1810).

The powers of one legislature to repeal or amend the acts of the preceding one are limited in the case of states by the Contracts Clause and the Due Process Clause of the Fourteenth Amendment, and in the case of congressional legislation by the Due Process Clause of the Fifth Amendment. This principle was recognized in the *Sinking-Fund Cases*:

> The United States cannot any more than a State interfere with private rights, except for legitimate governmental purposes. They are not included within the constitutional prohibition which prevents States from passing laws impairing the obligation of contracts, but equally with the States *they are prohibited from depriving persons or corporations of property without due process of law*. They cannot legislate back to themselves, without making compensation, the lands they have given this corporation to aid in the construction of its railroad. Neither can they by legislation compel the corporation to discharge its obligations in respect to the subsidy bonds otherwise than according to the terms of the contract already made in that connection. The United States are as much bound by their contracts as are individuals.

99 U.S. (9 Otto) 700, 718–19(1879) (emphasis added); *see also Bowen v. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 54–56 (1986).

## IV.

### *The Due Process Clause Does Not Preclude Congress from Amending or Repealing the Two Mutual Consent Clauses*

The question therefore is whether the Due Process Clause of the Fifth Amendment precludes a subsequent Congress from repealing legislation for the governance of non-state areas enacted by an earlier Congress under the Territory Clause. This question must be answered in the negative.

The Due Process Clause of the Fifth Amendment provides: "No *person* shall . . . be deprived of life, liberty, or property without due process of law." (Emphasis added.) This Clause is inapplicable to the repeal or amendment of the two mutual consent clauses here involved for two reasons. First, a non-state area is not a "person" within the meaning of the Fifth Amendment, and, second, such repeal or amendment would not deprive the non-state area of a property right within the meaning of the Fifth Amendment.

### A.

### *A Non-State Area Is Not a Person in the Meaning of the Due Process Clause of the Fifth Amendment*

In *South Carolina v. Katzenbach*, the Court held that a state is not a person within the meaning of the Due Process Clause of the Fifth Amendment. 383 U.S. 301, 323–24 (1966); *see also Alabama v. EPA*, 871 F.2d 1548, 1554 (11th Cir.) ("The State of Alabama is not included among the entities protected by the due process clause of the fifth amendment"); *State of Oklahoma v. FERC*, 494 F. Supp. 636, 661 (W.D. Okla. 1980), *aff'd*, 661 F.2d 832 (10th Cir. 1981).

Similarly it has been held that creatures or instrumentalities of a state, such as cities or water improvement districts, are not persons within the meaning of the Due Process Clause of the Fifth Amendment. *City of Sault Ste. Marie v. Andrus*, 532 F. Supp. 157, 167 (D.D.C. 1980); *El Paso County Water Improv. Dist. No. 1 v. Int'l Boundary & Water Comm'n*, 701 F. Supp. 121, 123–24 (W.D. Tex 1988).

The non-state areas, concededly, are not states or instrumentalities of states, and we have not found any case holding directly that they are not persons within the meaning of the Due Process Clause of the Fifth Amendment. They are, however, governmental bodies, and the rationale of *South Carolina v. Katzenbach*, 383 U.S. at 301, appears to be that such bodies are not protected by the Due Process Clause of the Fifth Amendment. Moreover, it is well established that the political subdivisions of a state are not considered persons protected as against the state by the provisions of the Fourteenth Amendment. *See, e.g.*, *Newark v. New Jersey*, 262 U.S. 192, 196 (1923); *Williams v. Mayor of Baltimore*, 289 U.S. 36, 40 (1933); *S. Macomb Disposal Auth. v. Twp. of Washington*, 790 F.2d 500, 505, 507 (6th Cir. 1986), and the authorities there cited. The relationship of the non-state areas to the federal government has been analogized to that of a city or county to a state. As stated, the Court held in *County of Yankton*: "The territories are but political subdivisions of the outlying dominion of the United States. Their relation to the general government is much the same as that which counties bear to the respective States[.]" 101 U.S. at 133.

More recently, the Court explained that a non-state area is entirely the creation of Congress and compared the relationship between the Nation and a non-state area to that between a state and a city. *United States v. Wheeler*, 435 U.S. 313, 321 (1978). It follows that, since states are not persons within the meaning of the Fifth Amendment and since the political subdivisions of states are not persons within the meaning of the Fourteenth Amendment, the non-state areas are not persons within the meaning of the Due Process Clause of the Fifth Amendment.

## B.

### *Legislation Relating to the Governance of Non-State Areas Does Not Create Any Rights or Status Protected by the Due Process Clause Regarding Repeal or Amendment by Subsequent Legislation*

As explained earlier, a subsequent Congress cannot amend or repeal earlier legislation if such repeal or amendment would violate the Due Process Clause of the Fifth Amendment—i.e., if such amending or repealing legislation would deprive a person of property without due process of

law. It has been shown in the preceding part of this memorandum that a non-state area is not a person within the meaning of the Due Process Clause. Here it will be shown that mutual consent provisions in legislation, such as the ones envisaged in the Guam Commonwealth Act, would not create property rights within the meaning of that Clause.

Legislation concerning the governance of a non-state area, whether called organic act, federal relations act, or commonwealth act, that does not contain a mutual consent clause is clearly subject to amendment or repeal by subsequent legislation. A non-state area does not acquire a vested interest in a particular stage of self-government that subsequent legislation could not diminish or abrogate. While such legislation has not been frequent, it has occurred in connection with the District of Columbia. *See Dist. of Columbia v. Thompson Co.*, 346 U.S. 100, 104–05 (1953); *supra* note 6. Hence, in the absence of a mutual consent clause, legislation concerning the government of a non-state area is subject to amendment or repeal by subsequent legislation.

This leads to the question whether the addition of a mutual consent clause—i.e., of a provision that the legislation shall not be modified or repealed without the consent of the Government of the United States and the government of the non-state area—has the effect of creating in the non-state areas a specific status amounting to a property right within the meaning of the Due Process Clause. It is our conclusion that this question must be answered in the negative because (1) sovereign governmental powers cannot be contracted away, and (2) a specific political relationship does not constitute "property" within the meaning of the Fifth Amendment.

As a body politic the Government of the United States has the general capacity to enter into contracts. *United States v. Tingey*, 30 U.S. (5 Pet.) 115, 128 (1831). This power, however, is generally limited to those types of contracts in which private persons or corporations can engage. By contrast, sovereign "governmental powers cannot be contracted away," *N. Am. Commercial Co. v. United States*, 171 U.S. 110, 137 (1898). More recently, the Supreme Court held in connection with legislation arising under the Contracts Clause that "the Contract[s] Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty." *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23

(1977).[7] In a similar context Mr. Justice Holmes stated: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357 (1908).[8]

Agreements or compacts to the effect that the Congress may not amend legislation relating to the government of a non-state area without the consent of the latter, or that federal legislation shall not apply to Guam unless consented to by the Government of Guam, would unquestionably purport to surrender essential powers of the federal government. They are therefore not binding on the United States and cannot confer a property interest protected by the Fifth Amendment.[9]

More generally, the Supreme Court held in *Bowen v. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41 (1986), that the contractual property rights protected by the Due Process Clause of the Fifth Amendment are the traditional private contractual rights, such as those arising from bonds or insurance contracts, but not arrangements that are part of a regulatory

---

[7] Cases arising under the Contracts Clause holding that a state cannot contract away a sovereign power are also applicable to the contracts made by the federal government, because the Contracts Clause imposes more rigorous restrictions on the states than the Fifth Amendment imposes on the federal government. *Pension Benefit Guar. Corp. v. R.A. Gray Co.*, 467 U.S. 717, 733 (1984); *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 472–73 n.25 (1985). Hence, when state legislation does not violate the Contracts Clause, analogous federal legislation is all the more permissible under the Due Process Clause of the Fifth Amendment.

[8] Cited with approval with respect to federal legislation in *Norman v. Balt. & Ohio R.R. Co.*, 294 U.S. 240, 308 (1935).

[9] Cases such as *Lynch v. United States*, 292 U.S. 571 (1934), and *Perry v. United States*, 294 U.S. 330 (1935), are not contrary to this conclusion. Both cases involved commercial agreements: *Lynch*, insurance; *Perry*, government bonds. In *Lynch*, the Court held that Congress could not amend the contract merely to save money "unless, indeed the action falls within the federal police power or some other paramount power." 292 U.S. at 579. *Perry* involved bonds issued by the United States under the authority of Article I, Section 8, Clause 2 of the Constitution to borrow money on the credit of the United States. The Court held that Congress did not have the power to destroy the credit of the United States or to render it illusory by unilaterally abrogating one of the pivotal terms of the bonds to save money. While the Court held that the United States had broken the agreement, it nevertheless held that plaintiff could not recover because, as the result of regulations validly issued by the United States, he had not suffered any monetary damages.

program such as a state's privilege to withdraw its participation in the Social Security system with respect to its employees. Specifically, the Court stated:

> But the "contractual right" at issue in this case bears little, if any, resemblance to rights held to constitute "property" within the meaning of the Fifth Amendment. The termination provision in the Agreement exactly tracked the language of the statute, conferring no right on the State beyond that contained in § 418 itself. The provision constituted neither a debt of the United States, *see Perry v. United States*, *supra*, nor an obligation of the United States to provide benefits under a contract for which the obligee paid a monetary premium, *see Lynch v. United States*, *supra*. The termination clause was not unique to this Agreement; nor was it a term over which the state had any bargaining power or for which the State provided independent consideration. Rather, the provision simply was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare.

*Id*. at 55. Agreements that the Guam Commonwealth Act may not be amended without the consent of the Government of Guam, or that future federal statutes and regulations shall not apply to Guam without the consent of the Government of Guam clearly do not constitute conventional private contracts; they are elements of a regulatory system.

The Department of Justice has at times concluded that a non-state area may have a vested interest in a specific status which would be immune from unilateral congressional amendment or repeal.[10] We cannot continue to adhere to that position in view of the rulings of the Supreme Court that legislation concerning the governance of a non-state area is necessarily subject to congressional amendment and repeal, that governmental bodies are not persons within the meaning of the Due Process Clause, and that governmental powers cannot be contracted away; and especially of the exposition in the recent *Bowen* case that the property rights protected by

---

[10] *Cf*. note 2.

the Due Process Clause are those arising from private law or commercial contracts and not those arising from governmental relations.[11]

Sections 103 and 202 therefore do not create vested property rights protected by the Due Process Clause of the Fifth Amendment.[12] Congress thus retains the power to amend the Guam Commonwealth Act unilaterally or to provide that its legislation shall apply to Guam without the consent of the government of the Commonwealth. The inclusion of such provisions, therefore, in the Commonwealth Act would be misleading. Honesty and fair dealing forbid the inclusion of such illusory and deceptive provisions in the Guam Commonwealth Act.[13]

Finally, the Department of Justice has indicated that it would honor past commitments with respect to the mutual consent issue, such as section 105 of the Covenant with the Northern Mariana Islands, in spite of its reevaluation of this problem. The question whether the 1989 Task Force proposal to amend section 103 of the Guam Commonwealth Act so as to limit the mutual consent requirement to sections 101, 103, 201, and 301

---

[11] It is significant that the circumstances in which Congress can effectively agree not to repeal or amend legislation were discussed in the context of commercial contracts. *Bowen*, 477 U.S. at 52.

[12] *Bowen*, it is true, dealt with legislation that expressly reserved the right of Congress to amend, while the proposed Guam Commonwealth Act would expressly preclude the right of Congress to amend without the consent of the Government of Guam. The underlying agreements, however, are not of a private contractual nature, and, hence, are not property within the meaning of the Due Process Clause. We cannot perceive how they can be converted into "property" by the addition of a provision that Congress foregoes the right of amendment.

[13] The conclusion that section 202 of the Guam Commonwealth Act (inapplicability of future federal legislation to Guam without the consent of Guam) would not bind a future Congress obviates the need to examine the constitutionality of section 202. In *Currin v. Wallace*, 306 U.S. 1, 15–16 (1939), and *United States v. Rock Royal Co-op., Inc.*, 307 U.S. 533, 577–78 (1939), the Court upheld legislation that made the effectiveness of regulations dependent on the approval of tobacco farmers or milk producers affected by them. The Court held that this approval was a legitimate condition for making the legislation applicable. Similarly, it could be argued that the approval of federal legislation by the Government of Guam is a legitimate condition for making that legislation applicable to Guam. Since, as stated above, a future Congress would not be bound by section 202, we need not decide the question whether the requirement of approval by the Government of Guam for every future federal statute and regulation is excessive and inconsistent with the federal sovereignty over Guam.

constitutes such prior commitment appears to have been rendered moot by
the rejection of that proposal by the Guam Commission.

TERESA WYNN ROSEBOROUGH
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

# EXHIBIT B

# Report By The President's Task Force On Puerto Rico's Status



D E C E M B E R   2 0 0 7

# Report By The President's Task Force On Puerto Rico's Status



D E C E M B E R   2 0 0 7

# REPORT BY THE PRESIDENT'S TASK FORCE ON PUERTO RICO'S STATUS

## *Table of Contents*

I. Members of the Task Force

II. Statement of Guiding Principles

III. Executive Orders

IV. Historical Overview

V. Legal Analysis of Options

VI. Recent Developments

VII. Task Force Recommendations

0214

*Members of*
*The President's Task Force on Puerto Rico's Status*

Maggie Grant, Co-Chair
Deputy Assistant to the President for Intergovernmental Affairs
The White House

Steven A. Engel, Co-Chair
Deputy Assistant Attorney General in the Office of Legal Counsel
U.S. Department of Justice

Annabelle Romero
Deputy Assistant Secretary for Civil Rights
U.S. Department of Agriculture

Mary Tinsley Raul
Director of Intergovernmental Affairs
U.S. Department of Commerce

Frank Jimenez
General Counsel of the Navy
U.S. Department of Defense

Margarita P. Pinkos
Director of the Office of English Language Acquisition
U.S. Department of Education

Theresa Speake
Director, of the Office of Economic Impact and Diversity
U.S. Department of Energy

Laura M. Caliguiri
Director of Intergovernmental Affairs
U.S. Department of Health and Human Services

---

Anne Petera
Assistant Secretary for Intergovernmental Programs
U.S. Department of Homeland Security


Robert M. Couch
General Counsel
U.S. Department of Housing and Urban Development


Douglas W. Domenech
Deputy Chief of Staff
U.S. Department of the Interior


Leon R. Sequeira
Assistant Secretary for Policy
U.S. Department of Labor


Portia Palmer
Director of Intergovernmental Affairs
U.S. Department of State


Kerry O'Hare
Deputy Assistant Secretary for Governmental Affairs
U.S. Department of Transportation


Anna Escobedo Cabral
U.S. Treasurer
U.S. Department of the Treasury


William McLemore
Deputy Assistant Secretary for Intergovernmental Affairs
U.S. Department of Veterans Affairs

---

# Statement of Guiding Principles

The mission of the President's Task Force on Puerto Rico's Status ("Task Force") is to provide options for Puerto Rico's future status and relationship with the Government of the United States. The Task Force has approached this mission without prejudice towards a status option and has developed options that are compatible with the Constitution and basic laws and policies of the United States.

The Task Force has developed these options after listening to and considering the views of individuals, elected officials, and other representatives of the people of Puerto Rico to ensure that views and positions have been objectively considered irrespective of affiliation or ideology.

The Task Force published its first report in December 2005. This report builds on the prior report and carries out the Task Force's continuing mandate to report, no less than every two years, on progress made in the determination of Puerto Rico's ultimate status.

# EXECUTIVE ORDERS CONCERNING PUERTO RICO'S STATUS

President George H.W. Bush issued a Memorandum on November 30, 1992, to heads of Executive Departments and Agencies establishing the current administrative relationship between the Federal Government and the Commonwealth of Puerto Rico. This memorandum directs all Federal departments, agencies, and officials to treat Puerto Rico administratively as if it were a State insofar as doing so would not disrupt Federal programs or operations. President Bush's memorandum remains in effect until Federal legislation is enacted to alter the status of Puerto Rico in accordance with the freely expressed wishes of the people of Puerto Rico. (See Appendix A.)

On December 23, 2000, President William J. Clinton signed Executive Order 13183, which established the President's Task Force on Puerto Rico's Status and the rules for its membership. This Executive Order outlines the policy and functions of the Task Force in identifying the options for Puerto Rico's future status and the process for realizing an option. (See Appendix B.)

On April 30, 2001, President George W. Bush amended Executive Order 13183, extending the deadline for the Task Force to forward a report to the President until August 2001. (See Appendix C.)

President Bush signed an additional amendment to Executive Order 13183 on December 3, 2003, which established the Task Force co-chairs and instructed the Task Force to issue reports as needed, but no less than once every two years. (See Appendix D.)

**0218**

# Historical Overview

The Commonwealth of Puerto Rico has a rich tradition and history. As United States citizens, the people of Puerto Rico have enhanced American society and culture. Among their many contributions, Puerto Ricans have been recognized for their service and sacrifice in the United States Armed Forces.

The 2005 Task Force Report described in detail the modern history of Puerto Rico and its relationship with the United States, and we summarize that history here. The relationship between the United States and Puerto Rico dates to 1898, when the island was ceded to the United States by Spain, pursuant to the Treaty of Paris, which formally ended the Spanish-American War. The United States governed the island through a U.S. military governor until 1900, when Congress passed the Foraker Act, which established a civilian government, including a non-voting Resident Commissioner in Congress. In 1917, Congress established the island as an "organized but unincorporated" territory and granted U.S. citizenship to the people of Puerto Rico.

In 1952, Congress passed Public Law 600, the Puerto Rican Federal Relations Act, which provided the people of Puerto Rico with self-government with respect to internal affairs and administration. Public Law 600 gave Puerto Rico the right to establish a government and a constitution for the internal administration of Puerto Rico "on matters of purely local concern." The people of Puerto Rico approved the Act and then approved a new constitution by referendum, which would establish the "Commonwealth of Puerto Rico." Congress then approved that constitution in 1952, subject to several conditions that Puerto Rico fulfilled through amendments in 1953.

Since the adoption of the commonwealth system, Puerto Rico has held four plebiscites to ascertain the views of its people as to the status question. In 1967, a majority chose to continue the existing commonwealth status, and, in 1991, a majority similarly rejected a call to review that status. In 1993, a plurality of 48.6% voted for the commonwealth status, while 46.3% favored statehood and 4.4% independence.

The people of Puerto Rico most recently voted on their status in 1998, through a plebiscite presenting them with four status options: territorial commonwealth, free association, statehood, or independence. The leadership for the Popular Democratic Party, while backing continued commonwealth status, campaigned in favor of "none of the above" because of disagree-

ment with the "territorial" definition of the commonwealth option. In the subsequent vote, a majority (50.3%) voted for "none of the above." In addition, 46.5% voted for statehood, 2.54% voted for independence, 0.29% voted for free association, and 0.06% voted for a territorial commonwealth.

# Legal Analysis of Options for Puerto Rico's Status

The 2005 Task Force Report explained that the U.S. Constitution allows for three options for the future status of Puerto Rico: continuing territorial status, statehood, and independence. In so doing, the Task Force did not break new ground. The Department of Justice affirmed the Commonwealth's territorial status in 1959, shortly after the enactment of Public Law 600, and the Supreme Court has held the same. *See, e.g., Harris v. Rosario*, 446 U.S. 651 (1980). Since 1991, the Executive Branch, through the Department of Justice, has further emphasized that the Constitution contemplates only three options for Puerto Rico's future status. (See Appendices E and F.)

This section reiterates and summarizes the conclusions of the 2005 Task Force Report.

## 1. Continuing Territorial Status

The existing form of government in Puerto Rico is often described as a "Commonwealth," and this term recognizes the significant powers of self-government Puerto Rico enjoys under current law. As discussed above, Congress established this arrangement through the passage of Public Law 600 and through the subsequent approval of the constitution drafted and amended by the people of Puerto Rico.

The constitution of Puerto Rico establishes a republican, popularly elected government with significant authority over local affairs, and since 1953, the people of Puerto Rico have exercised significant powers of self-government. As the Supreme Court has recognized, under the commonwealth system, Puerto Rico currently exercises "a measure of autonomy comparable to that possessed by the States." *Examining Bd. v. Flores de Otero*, 426 U.S. 572, 597 (1976).

When "Commonwealth" is used to describe the substantial political autonomy enjoyed by Puerto Rico, the term appropriately captures Puerto Rico's special relationship with the United States. The commonwealth system does not, however, describe a *legal* status different from Puerto Rico's constitutional status as a "territory" subject to Congress's plenary authority under the Territory Clause "to dispose of and make all needful Rules and Regulations respecting the Territory … belonging to the United States." Congress may continue the current commonwealth system indefinitely, but it necessarily retains the constitutional authority to revise or revoke the powers of self-government currently exercised by the government of Puerto Rico. Thus, while the commonwealth of Puerto Rico enjoys significant political autonomy, it is important to recognize that, as long as

Puerto Rico remains a territory, its system is subject to revision by Congress.

Both before and since the issuance of the 2005 Task Force Report, some have questioned whether Puerto Rico's status as a United States territory is consistent with statements that the United States made to the United Nations in 1953 following the adoption of Puerto Rico's constitution, in requesting that Puerto Rico be removed from the list of non-self-governing territories. In its official request to the United Nations, the United States stated that Congress had given Puerto Rico the freedom to conduct its own internal government subject only to compliance with federal law and the U.S. Constitution. The official request did not state that Congress could make no changes in Puerto Rico's status without its consent. It is true that, prior to the submission of this official request, the U.S. representative to the U.N. General Assembly indicated orally that common consent would be needed to make changes in the relationship between Puerto Rico and the United States. Notwithstanding this statement, however, the Department of Justice concluded in 1959 that Puerto Rico remained a territory, and as noted above, the Supreme Court, while recognizing that Puerto Rico exercises substantial political autonomy under the current commonwealth system, has held that Puerto Rico remains fully subject to congressional authority under the Territory Clause. *See Harris*, 446 U.S. at 651-52.

The 2005 Task Force Report also explained why existing constitutional principles foreclose the so-called "New Commonwealth" status, which would purport to adopt a covenant between Puerto Rico and the United States that could not be altered without the "mutual consent" of both entities. Although the Executive Branch had once taken a different view, the Task Force endorsed the constitutional understanding that the Executive Branch has maintained across Administrations since 1991.

The U.S. Constitution would not permit the "New Commonwealth" proposal because land under United States sovereignty must either be a State or a territory. As the Supreme Court stated over a hundred years ago, if land is "not included in any State," it "must necessarily be governed by or under the authority of Congress." *First Nat. Bank v. Yankton County*, 101 U.S. 129, 133 (1879). Thus, although Congress is free to allow a territory to exercise powers of self-government (as Congress has done with respect to Puerto Rico), it may not restrict the authority of a future Congress over that territory.

This limitation on the power of Congress reflects the general rule that one legislature cannot bind a subsequent one. Each Congress may repeal or amend laws that a previous Congress enacted, and Congress may pass laws inconsistent with treaties. By the same token, a future Congress must have the power to disavow commitments contained in a covenant between the Federal Government and one of its territories, regardless of the terms of that covenant.

Accordingly, the "New Commonwealth" proposal that some have proposed contemplates a political status for Puerto Rico that is not permitted by the United States

**0222**

Constitution. As long as Puerto Rico remains a territory of the United States, Congress may not impair the constitutional authority of later Congresses to alter the political powers of the government of Puerto Rico by entering into a covenant or compact with Puerto Rico or its residents.

### 2.   Statehood

A second option for the future status of Puerto Rico is statehood. If admitted as a State, Puerto Rico would stand on equal footing with the existing States in all respects.

At present, Puerto Rico is an "unincorporated" territory, subject only to the most fundamental provisions of the Constitution. One notable consequence of this status is that the Constitution's Tax Uniformity Clause is not applicable to Puerto Rico, allowing Congress to exempt the Puerto Rican people from most federal income tax laws and to provide them with other tax preferences not provided to residents of the States. These tax preferences would become impermissible under the Constitution if Puerto Rico were "incorporated" into the country as part of the process of being admitted as a State.

Statehood would, of course, confer upon Puerto Rico and its citizens certain political rights they do not currently possess. Puerto Rican citizens would be entitled to vote for President, and, as a State, Puerto Rico would elect two U.S. Senators and full voting Members in the U.S. House of Representatives. The number of Members in the House would be determined based on Puerto Rico's population at the next congressional reap-

portionment, following the 2010 census. In the interim, Congress could temporarily increase membership of the House to allow Puerto Rico to elect one or more Members.

### 3.   Independence

Another option for the future status of Puerto Rico is independence from the United States. Congress's power under the Constitution's Territory Clause includes the power to relinquish its sovereignty over a territory. *See* U.S. CONST., Art. IV, Cl. 2. Congress thus may determine whether and under what conditions a territory may receive independence and may regulate those conditions until the point of independence.

Independence would have significant legal consequences for Puerto Rico. As an independent nation, Puerto Rico would not be subject to the authority of the United States and would be free to direct its own relations with foreign nations. By the same token, Puerto Rico would not automatically be entitled to receive monetary support or military protection from the United States. Additionally, independence from the United States could affect the citizenship of Puerto Rico's residents. Individuals born in Puerto Rico are citizens of the United States by statute, 8 U.S.C. § 1402. The general rule is that citizenship follows sovereignty. So if Puerto Rico were to become an independent nation, Puerto Rico's residents could become citizens of the newly independent nation and cease to be citizens of the United States, unless a different rule were prescribed by legislation or treaty.

There are a variety of different paths that Puerto Rico could take to independence. For example, the Territory of the Philippines received its independence by the Philippine Independence Act of 1934. The Act authorized the Philippine government to draft a constitution for an interim Commonwealth, which upon approval by the people of the Philippines and the U.S. President initiated an interim Commonwealth. The Act provided that, after a transition period of ten years, the President, by proclamation, would withdraw and surrender United States jurisdiction and sovereignty and "recognize the independence of the Philippines as a separate and self-governing nation." In 1946, President Harry S Truman did proclaim independence, and the two nations entered into a Treaty of General Relations.

Another possible model of independence is that of the "freely associated states" of Micronesia, the Marshall Islands, and Palau. These states, which the United States had administered since World War II, became independent after Congress approved negotiated "compacts of free association" with the territories. The freely associated states retained close ties to the United States, however, and the United States continues to provide security, defense, and various other types of financial assistance and services. Citizens of the freely associated states may generally enter the United States as non-immigrants and may establish residence and work here.

Among the constitutionally available options, freely associated status may come closest to providing for the relationship that advocates for "New Commonwealth" appear to desire. But it would need to be made clear to the people of Puerto Rico that freely associated status is a form of independence from the United States and cannot be made immune from the possibility of unilateral termination by the United States.

# Recent Developments

Section 4 of Executive Order 13183 (as amended by Executive Order 13319) directs the Task Force to "report on its actions to the President … on progress made in the determination of Puerto Rico's ultimate status." Following the issuance of the 2005 Task Force Report, the former co-chair of the Task Force, Deputy Assistant Attorney General C. Kevin Marshall, testified before the House Committee on Natural Resources, its Subcommittee on Insular Affairs, and the Senate Committee on Energy and Natural Resources on the Task Force Report and proposed legislation. (See Appendix G.)

Since the issuance of the 2005 Report, Members of Congress have proposed several measures to address the future status of Puerto Rico. Each of these proposals seeks to allow the Puerto Rican people to express their will regarding the future status of the island, although they would do so in different ways. These proposals fall into three general categories:

- The first category of legislation would seek to ascertain the views of the Puerto Rican people through a plebiscite. Some of the proposed bills would sanction a plebiscite similar to the one recommended in the 2005 Task Force Report. Those bills include S. 2661 (sponsored by Senator Martinez) and H.R. 4687 (co-sponsored by Representatives Fortuño and Serrano), both of which were introduced in the 109th Congress. Other bills, such as S. 1936 (sponsored by Senator Salazar), would authorize a single plebiscite in which the Puerto Rican people would choose among four status options (continuing the current status, statehood, independence, and independence as a freely associated state).

- The second category, represented in H.R. 1230 (sponsored by Representative Velázquez), would support the convening of a constitutional convention in Puerto Rico, the purpose of which would be to develop a proposal for the future status of the island to be voted upon by the Puerto Rican people.

- A third category would combine elements of the first two categories. An example of such legislation is H.R. 900 (sponsored by Representative Serrano), which was passed by the House Natural Resources Committee on October 27, 2007. As amended, H.R. 900 would direct Puerto Rico to hold a plebiscite by December 31, 2009, in which voters would be asked to decide whether Puerto Rico should "consider a constitutionally viable permanent non-territorial status" or "continue to have its present form of territorial status and relationship with the United States." If voters favor the first option, the bill would recognize the right of the people of Puerto Rico either to conduct an additional plebiscite "to consider a self-determination option with the results presented to Congress" or to call a constitutional convention for the purpose of proposing a "self-determination option" to the Puerto Rican people.

# TASK FORCE RECOMMENDATIONS

As detailed earlier and in the 2005 Report, the Task Force concludes that there are only three options available under the U.S. Constitution for the future status of Puerto Rico:

- Continue as a territory. The current status of Puerto Rico as a commonwealth may continue indefinitely but remains subject to future modification by Congress.

- Statehood. Under this option, Puerto Rico would become the 51st State with standing equal to the other 50 States.

- Independence. Under this option, Puerto Rico would become a sovereign nation, independent from the United States.

The democratic will of the Puerto Rican people is paramount for determining the future status of the territory. To this end, the 2005 Task Force Report recommended a two-stage plebiscite to determine whether the Puerto Rican people wish to retain the status quo, and if not, which of the two available options they prefer. The Task Force concluded that such a process would be the best way to ascertain the popular will in a way that provides clear guidance for future action by Congress.

The Task Force acknowledges the pending legislative measures that would provide similar or alternative procedures through which the people of Puerto Rico might express their will regarding the future status of the island. The Task Force continues to believe that the two-stage plebiscite would provide clearer guidance for Congress than other procedures in which it is possible that none of the available options would win a majority of votes. At the same time, there are other ways to proceed, and the Task Force's recommendations do not preclude alternative action by Puerto Rico itself to express its views to Congress.

The following are the recommendations of the Task Force:

1. The Task Force reiterates its prior recommendation that Congress provide for a Federally sanctioned plebiscite as soon as practicable in which the people of Puerto Rico will be asked to state whether they wish to maintain the current territorial status or to pursue a constitutionally viable path toward a permanent non-territorial status. Congress should provide for this plebiscite to occur on a date certain.

2. The Task Force reiterates its prior recommendation that if the people of Puerto Rico elect to pursue a permanent non-territorial status, Congress should provide for an additional plebiscite to allow the people of Puerto Rico to choose between one of the permanent non-territorial options permitted by the Constitution: statehood or independence. Once the

people of Puerto Rico have selected one of the two options, we would encourage Congress to begin a process of transition consistent with that option.

3. If the people elect to maintain Puerto Rico's current status, the Task Force recommends, consistent with the 1992 memorandum of President George H.W. Bush, that a plebiscite occur periodically as long as that status continues, to keep Congress informed of the people's wishes.

Appellate Case: 23-1335   Document: 010110991828   Date Filed: 01/29/2024   Page: 231

# APPENDIX

# A

Federal Register

Vol. 57, No. 232

Wednesday, December 2, 1992

**Presidential Documents**

| | |
|---|---|
| Title 3— | Memorandum of November 30, 1992 |
| **The President** | **Memorandum for the Heads of Executive Departments and Agencies** |

Puerto Rico is a self-governing territory of the United States whose residents have been United States citizens since 1917 and have fought valorously in five wars in the defense of our Nation and the liberty of others.

On July 25, 1952, as a consequence of steps taken by both the United States Government and the people of Puerto Rico voting in a referendum, a new constitution was promulgated establishing the Commonwealth of Puerto Rico. The Commonwealth structure provides for self-government in respect of internal affairs and administration, subject to relevant portions of the Constitution and the laws of the United States. As long as Puerto Rico is a territory, however, the will of its people regarding their political status should be ascertained periodically by means of a general right of referendum or specific referenda sponsored either by the United States Government or the Legislature of Puerto Rico.

Because Puerto Rico's degree of constitutional self-government, population, and size set it apart from other areas also subject to Federal jurisdiction under Article IV, section 3, clause 2 of the Constitution, I hereby direct all Federal departments, agencies, and officials, to the extent consistent with the Constitution and the laws of the United States, henceforward to treat Puerto Rico administratively as if it were a State, except insofar as doing so with respect to an existing Federal program or activity would increase or decrease Federal receipts or expenditures, or would seriously disrupt the operation of such program or activity. With respect to a Federal program or activity for which no fiscal baseline has been established, this memorandum shall not be construed to require that such program or activity be conducted in a way that increases or decreases Federal receipts or expenditures relative to the level that would obtain if Puerto Rico were treated other than as a State.

If any matters arise involving the fundamentals of Puerto Rico's status, they shall be referred to the Office of the President.

This guidance shall remain in effect until Federal legislation is enacted altering the current status of Puerto Rico in accordance with the freely expressed wishes of the people of Puerto Rico.

The memorandum for the heads of executive departments and agencies on this subject, issued July 25, 1961, is hereby rescinded.

This memorandum shall be published in the **Federal Register**.

THE WHITE HOUSE,
*Washington, November 30, 1992.*

[FR Doc. 92-29441
Filed 12-1-92; 11:27 am]
Billing code 3195-01-M

# APPENDIX
# B

**Federal Register** / Vol. 65, No. 251 / Friday, December 29, 2000 / Presidential Documents   **82889**

# Presidential Documents

Executive Order 13183 of December 23, 2000

## Establishment of the President's Task Force on Puerto Rico's Status

By the authority vested in me as President by the Constitution and the laws of the United States of America, including Public Law 106-346, it is hereby ordered as follows:

**Section 1.** *Policy.* It is the policy of the executive branch of the Government of the United States of America to help answer the questions that the people of Puerto Rico have asked for years regarding the options for the islands' future status and the process for realizing an option. Further, it is our policy to consider and develop positions on proposals, without preference among the options, for the Commonwealth's future status; to discuss such proposals with representatives of the people of Puerto Rico and the Congress; to work with leaders of the Commonwealth and the Congress to clarify the options to enable Puerto Ricans to determine their preference among options for the islands' future status that are not incompatible with the Constitution and basic laws and policies of the United States; and to implement such an option if chosen by a majority, including helping Puerto Ricans obtain a governing arrangement under which they would vote for national government officials, if they choose such a status.

**Sec. 2.** *The President's Task Force on Puerto Rico's Status.* There is established a task force to be known as ''The President's Task Force on Puerto Rico's Status'' (Task Force). It shall be composed of designees of each member of the President's Cabinet and the Co-Chairs of the President's Interagency Group on Puerto Rico (Interagency Group). The Task Force shall be co-chaired by the Attorney General's designee and a Co-Chair of the Interagency Group.

**Sec. 3.** *Functions.* The Task Force shall seek to implement the policy set forth in section 1 of this order. It shall ensure official attention to and facilitate action on matters related to proposals for Puerto Rico's status and the process by which an option can be realized. It shall provide advice and recommendations on such matters to the President and the Congress. It shall also provide advice and recommendations to assist the Executive Office of the President in fulfilling its responsibilities under Public Law 106-346 to transfer funding to the Elections Commission of the Commonwealth of Puerto Rico for public education on and a public choice among options for Puerto Rico's future status that are not incompatible with the Constitution and the basic laws and policies of the United States.

**Sec. 4.** *Report.* The Task Force shall report on its actions to the President not later than May 1, 2001, and thereafter as needed but not less than

**82890**   **Federal Register** / Vol. 65, No. 251 / Friday, December 29, 2000 / Presidential Documents

annually on progress made in the determination of Puerto Rico's ultimate status.

THE WHITE HOUSE,
*December 23, 2000.*

[FR Doc. 00–33451
Filed 12–28–00; 8:45 am]
Billing code 3195–01–P

# APPENDIX C

**Federal Register** / Vol. 66, No. 85 / Wednesday, May 2, 2001 / Presidential Documents   **22105**

## Presidential Documents

**Executive Order 13209 of April 30, 2001**

### Amendment to Executive Order 13183, Establishment of the President's Task Force on Puerto Rico's Statis

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to extend by 3 months the time in which the President's Task Force on Puerto Rico's Status is to report to the President as directed in Executive Order 13183 of December 23, 2000, it is hereby ordered that section 4 of Executive Order 13183 is amended by deleting "May 1, 2001" and inserting in lieu thereof "August 1, 2001".

THE WHITE HOUSE,
*April 30, 2001.*

[FR Doc. 01–11210
Filed 5–1–01; 9:07 am]
Billing code 3195–01–P

# APPENDIX
# D

Federal Register

Vol. 68, No. 235

Monday, December 8, 2003

# Presidential Documents

Title 3—

The President

Executive Order 13319 of December 3, 2003

## Amendment to Executive Order 13183, Establishment of the President's Task Force on Puerto Rico's Status

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered that Executive Order 13183 of December 23, 2000, as amended, is further amended as follows:

(1) Section 2 is amended by deleting the second and third sentences, and inserting in lieu thereof the following: "It shall be composed of designees of each member of the President's Cabinet and the Deputy Assistant to the President and Director for Intergovernmental Affairs. The Task Force shall be co-chaired by the Attorney General's designee and the Deputy Assistant to the President and Director for Intergovernmental Affairs."

(2) By deleting section 4, and inserting in lieu thereof the following: "**Sec. 4.** *Report.* The Task Force shall report on its actions to the President as needed, but no less frequently than once every 2 years, on progress made in the determination of Puerto Rico's ultimate status."

THE WHITE HOUSE,
*December 3, 2003.*

[FR Doc. 03–30513

Filed 12–5–03; 8:45 am]

Billing code 3195–01–P

# APPENDIX E

**U.S. Department of Justice**

Office of Legislative Affairs

---

*Washington, D.C. 20530*

January 18, 2001

The Honorable Frank H. Murkowski
Chairman, Committee on Energy and Natural Resources
United States Senate
Washington, DC 20510

Dear Mr. Chairman:

This is in response to your letter to President Clinton requesting that the Administration provide an analysis of the status options for Puerto Rico favored by the three principle political parties in Puerto Rico.  This letter provides comments on two proposals that were voted on in the December 1998 political status plebiscite in Puerto Rico, as well as a third proposal outlined by the Popular Democratic Party in its 2000 platform.  The first proposal, for Statehood, is outlined in option number 3 in Puerto Rico's recent *Petition to the Government of the United States*.  The second proposal, for Independence, is outlined in option number 4 of that petition.  The third proposal, the "New Commonwealth" option, is described in the Popular Democratic Party platform documents.  Given the complexity and number of proposals on which our comments have been sought, we address only a limited number of issues raised by the proposals, most of them constitutional in nature.

1.    **Statehood**

The Statehood option[1] provides that Puerto Rico would become "a sovereign state, with rights, responsibilities and benefits completely equivalent to those enjoyed by the rest of the

---

[1]  The Statehood proposal contemplates a petition to Congress asking it to provide for the following:

> The admission of Puerto Rico into the Union of the United States of America as a sovereign state, with rights, responsibilities and benefits completely equal to those enjoyed by the rest of the states.  Retaining, furthermore, the sovereignty of Puerto Rico in those matters which are not delegated by the Constitution of the United States to the Federal Government.  The right to the presidential vote and equal representation in the Senate and proportional representation in the House of Representatives, without impairment to the representation of the rest of the states.  Also maintaining the present Constitution of Puerto Rico and the same Commonwealth laws; and with permanent United States citizenship guaranteed by the Constitution of the United States of America.  The provisions of the Federal law on the use of the English language in the agencies and courts of the Federal Government in the fifty states of the Union shall apply equally in the State of Puerto Rico, as at present.

1

**0239**

states." The principle that a new State stands on "equal footing with the original States in all respects whatsoever" has been recognized since the first days of the republic. *Coyle v. Smith*, 221 U.S. 559, 567 (1911) (quoting 1796 declaration upon the admission of Tennessee). Supreme Court caselaw makes clear that, as a State, Puerto Rico would be "equal in power, dignity, and authority" to the other States. *Id.* This shift in status to statehood would also have tax consequences not fully articulated in the statehood proposal itself. Currently, as an unincorporated territory, Puerto Rico is not subject to the Tax Uniformity Clause, which requires that "all Duties, Imposts, and Excises" imposed by Congress "shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1; *see Downes v. Bidwell*, 182 U.S. 244 (1901). As a result, it can be and is exempted from some federal tax laws (including most federal income tax laws), and it has other tax preferences not applicable to the States, although it also does not receive certain benefits such as the earned income tax credit. *See* 48 U.S.C. § 734 (1994) (providing that, with certain exceptions, "the internal revenue laws" shall not apply in Puerto Rico); 26 U.S.C. § 32 (earned income tax credit). Were Puerto Rico to become a State, however, it would be covered by the Tax Uniformity Clause and many, if not all, of these different tax treatments could not constitutionally be preserved on a permanent basis. *See Political Status of Puerto Rico: Hearings on S. 244 Before the Senate Comm. on Energy and Natural Resources*, 102d Cong. 189-90 (1991) (testimony of Attorney General Richard Thornburgh) ("Thornburgh Testimony") (reaching this conclusion, but also noting that the Tax Uniformity Clause permits the use of narrowly tailored transition provisions under which Puerto Rico's tax status need not be altered immediately once the decision were made to bring it into the Union as a State).

In addition, the statement in the Statehood option that admitting Puerto Rico as a State would not result in the "impairment of the representation of the rest of the states" may be inaccurate. If Puerto Rico gains representatives in Congress, it will affect the representation of the rest of the States in both the Senate and the House. In the Senate, because granting Puerto Rico two senators will increase the total membership of the Senate, the representation of the other States in the Senate will decline as a proportion of the whole, arguably "impair[ing]" their representation. Similarly, if the total number of representatives in the House of Representatives were to be increased beyond its current number of 435 with the addition of representatives from Puerto Rico, then the representation of current States as a proportion of the whole would decline, again arguably "impair[ing]" their representation. If, on the other hand, the total number of representatives were to remain fixed at 435, then the fact that Puerto Rico had achieved representation would necessarily mean that at least one State would have fewer representatives. The representation of that State (or States) would arguably be "impair[ed]" in two ways: its number of representatives in the House would decline, and (like all the other States) its representation would decline as a proportion of the whole.[2]

---

[2] In the past, Congress permanently increased the number of representatives in the House when new States were admitted. Most recently, however, when Hawaii and Alaska were admitted in 1959, the number of Members of Congress was temporarily increased (from 435 to a total of 437) by the addition of a representative from each of these States; following the 1960 census, however, the number of representatives returned to 435, and the House was reapportioned. *See* Comptroller General, *Puerto Rico's Political Future: A Divisive Issue with Many Dimensions* 103 (1981).

2

Moreover, the clause "maintaining the present Constitution of Puerto Rico and the same Commonwealth laws" contained in the Statehood option could be read as stating that the admission of Puerto Rico as a State would have no effect on the constitution and laws of Puerto Rico. Such a statement might not be entirely correct. Currently, not all provisions of the United States Constitution are fully applicable to Puerto Rico. *See Balzac v. Porto Rico*, 258 U.S. 298, 304-314 (1922) (Sixth Amendment right to jury trial not applicable in Puerto Rico); *Downes*, 182 U.S. at 291 (White, J., concurring in the judgment) (explaining that only constitutional provisions that are "of so fundamental a nature that they cannot be transgressed" apply to unincorporated territories such as Puerto Rico). If Puerto Rico were to become a State, however, it would then be subject to the entire Constitution. In that event, some aspects of Puerto Rico's constitution and laws might be preempted by the Constitution pursuant to the Supremacy Clause, U.S. Const. art. VI, cl. 2. Similarly, the admission of Puerto Rico as a State might extend to Puerto Rico some federal statutes that may be deemed not to apply to Puerto Rico at present because they are written to apply only in the several States. If so, then under the Supremacy Clause those statutes would also preempt aspects of Puerto Rican law with which they conflict (although it should be noted that Congress currently has power to preempt laws of Puerto Rico).

## 2.   Independence

The Independence proposal contains certain provisions regarding citizenship. Specifically, it states:

> The residents of Puerto Rico shall owe allegiance to, and shall have the citizenship and nationality of, the Republic of Puerto Rico. Having been born in Puerto Rico or having relatives with statutory United States citizenship by birth shall no longer be grounds for United States citizenship; except for those persons who already had the United States citizenship, who shall have the statutory right to keep that citizenship for the rest of their lives, by right or by choice, as provided by the laws of the Congress of the United States.

This proposal could be read as having two possible meanings: it could mean that persons already holding United States citizenship based on their birth in Puerto Rico or on the birth of their relatives have a right to that citizenship and that Congress must legislate in a way that makes provision for that right; or, it could mean that Congress has discretion to decide whether persons who have United States citizenship by virtue of their birth in Puerto Rico (or by virtue of having United States citizen relatives) will retain that citizenship once Puerto Rico becomes independent.[3] At least the second reading raises the question whether statutory United States citizens residing in Puerto Rico at the time of independence would have a constitutionally

---

[3] We do not read the proposal to affect existing statutory provisions regarding U.S. citizenship for persons born outside the United States to a U.S. citizen parent or parents. *See* 8 U.S.C. §§ 1401, 1409.

3

protected right to retain that citizenship should Congress seek to terminate it.[4]

Although the proposal speaks of a "statutory right" to retain citizenship,[5] there is at least an argument that individuals possessing United States citizenship would have a constitutional right to retain that citizenship, even if they continue to reside in Puerto Rico after independence. *See Afroyim v. Rusk*, 387 U.S. 253, 257 (1967) (rejecting the position that Congress has a "general power . . . to take away an American citizen's citizenship without his assent"). On the other hand, there is also case law dating from the early republic supporting the proposition that nationality follows sovereignty. *See American Insurance Co. v. Canter*, 26 U.S. (1 Pet.) 511, 542 (1828) (Marshall, C.J.) (upon the cession of a territory the relations of its inhabitants "with their former sovereign are dissolved, and new relations are created between them, and the government which has acquired their territory. The same Act which transfers their country, transfers the allegiance of those who remain in it."); *Boyd v. Nebraska ex rel. Thayer*, 143 U.S. 135, 162 (1892) ("Manifestly the nationality of the inhabitants of territory acquired by . . . cession becomes that of the government under whose dominion they pass, subject to the right of election on their part to retain their former nationality by removal, or otherwise, as may be provided."); *United States ex rel. Schwarzkopf v. Uhl*, 137 F.2d 898, 902 (2d Cir. 1943) (describing *Canter* as recognizing a "generally accepted principle of international law" that "[i]f the inhabitants [of a newly independent nation] remain within the territory [of the new nation] their allegiance is transferred to the new sovereign."). *See also Restatement (Third) of The Law of Foreign Relations* § 208 (1987) (observing that "[n]ormally, the transfer of territory from one state to another results in a corresponding change in nationality for the inhabitants of that territory" and that, in some cases of territory transfer, inhabitants can choose between retaining their former nationality and acquiring that of the new state). In view of the tension between *Afroyim* and cases such as *Canter*, it is unclear whether the Independence proposal's possible provision for congressional revocation of United States citizenship passes constitutional muster. *See* Treanor Testimony at 19 (reserving the constitutional issue of whether, upon independence, it would be permissible to terminate non-consensually the United States citizenship of residents of Puerto

---

[4] If such persons do have a constitutionally protected right to retain their United States citizenship even as they acquire Puerto Rican citizenship, then Puerto Rican independence could result in a significant number of people acquiring dual citizenship. While this letter does not address the policy implications of such dual citizenship, we do not think it would run afoul of any constitutional stricture.

[5] It is the Department's position that the source of the citizenship of those born in Puerto Rico is not the Fourteenth Amendment, but federal statute, specifically 8 U.S.C. § 1402 (1994). *See* Statement of William M. Treanor, Deputy Assistant Attorney General, Office of Legal Counsel, Before the House Comm. on Resources, 106th Cong. 18 (Oct. 4, 2000) ("Treanor Testimony"); *Puerto Rico: Hearings on H.R. 856 and S. 472 Before the Senate Comm. on Energy and Natural Resources,* 105th Cong. 148 (1998) (statement of Randolph D. Moss, Acting Assistant Attorney General, Office of Legal Counsel, U.S. Department of Justice). That point is separate, however, from the question whether the Constitution protects that citizenship once it is statutorily conferred, and, if so, to the same extent as it protects "Fourteenth Amendment citizenship."

4

Rico).[6]

The Independence proposal also provides that "Puerto Rico and the United States shall develop cooperation treaties, including economic and programmatic assistance for a reasonable period, free commerce and transit, and military force status." Viewing this language as part of a ballot option for the people of Puerto Rico, we understand it as a possible proposal to be made by Puerto Rico to Congress. We do not, therefore, read the use of the word "shall" to impose on the United States any obligation to enter into certain treaties with an independent Puerto Rico. Moreover, if the proposal did purport to impose such an obligation, we would construe its language as precatory, not binding, in order to preserve the sovereign prerogatives of the United States. We discuss this point in greater detail *infra* at 7-9.

## 3.   New Commonwealth[7]

The New Commonwealth proposal describes Puerto Rico as "an autonomous political body, that is neither colonial nor territorial, in permanent union with the United States under a covenant that cannot be invalidated or altered unilaterally." Our analysis of this proposal is based on two general premises, which we will outline before proceeding to address specific aspects of the proposal.

The first premise is that the Constitution recognizes only a limited number of options for governance of an area. Puerto Rico could constitutionally become a sovereign Nation, or it could remain subject to United States sovereignty. It can do the latter in only two ways: it can be admitted into the Union as a State, U.S. Const. art. IV, § 3, cl. 1, or it can remain subject to the authority of Congress under the Territory Clause, U.S. Const. art. IV, § 3, cl. 2. *See National Bank v. County of Yankton*, 101 U.S. 129, 133 (1879) ("All territory within the jurisdiction of the United States not included in any State must necessarily be governed by or under the authority of Congress."). The terms of the Constitution do not contemplate an option other than sovereign independence, statehood, or territorial status.

Although Puerto Rico currently possesses significant autonomy and powers of self-government in local matters pursuant to the Puerto Rican Federal Relations Act, Pub. L. No. 81-600, 64 Stat. 319 (1950) (codified at 48 U.S.C. §§ 731b-731e (1994)) ("Public Law 600"), that statute did not take Puerto Rico outside the ambit of the Territory Clause. In *Harris v. Rosario*,

---

[6] It should be noted that in 1991 the Department of Justice did not treat this question as unsettled. *See* Thornburgh Testimony at 206-07 (suggesting that should Puerto Rico become independent, its residents "should be required to elect between retaining United States citizenship (and ultimately taking up residence within the United States . . . )," and citizenship in the new republic of Puerto Rico.).

[7] Our comments on the New Commonwealth proposal are based in part on, and are intended to be consistent with, the October 4, 2000 testimony of Deputy Assistant Attorney General William M. Treanor before the House Committee on Resources. *See* Treanor Testimony, *supra* at n.5.

446 U.S. 651 (1980) (per curiam), for example, the Court sustained a level of assistance for Puerto Rico under the Aid to Families with Dependent Children program lower than that which States received, and explained that "Congress, which is empowered under the Territory Clause of the Constitution to 'make all needful Rules and Regulations respecting the Territory . . . belonging to the United States,' may treat Puerto Rico differently from States so long as there is a rational basis for its actions." *Id.* at 651-52 (internal citation omitted). *See also Califano v. Torres*, 435 U.S. 1, 3 n.4 (1978) (per curiam) ("Congress has the power to treat Puerto Rico differently, and . . . every federal program does not have to be extended to it."). The Department of Justice has long taken the same view,[8] and the weight of appellate case law provides further support for it. *See, e.g., Mercado v. Commonwealth of Puerto Rico*, 214 F.3d 34, 44 (1st Cir. 2000) ("[U]nder the Territorial Clause, Congress may legislate for Puerto Rico differently than for the states."); *Davila-Perez v. Lockheed Martin Corp.*, 202 F.3d 464, 468 (1st Cir. 2000) (affirming that Puerto Rico "is still subject to the plenary powers of Congress under the territorial clause."); *United States v. Sanchez*, 992 F.2d 1143, 1152-53 (11th Cir. 1993) ("'Congress continues to be the ultimate source of power [over Puerto Rico] pursuant to the Territory Clause of the Constitution.'") (quoting *United States v. Andino*, 831 F.2d 1164, 1176 (1st Cir. 1987) (Torruella, J., concurring), *cert. denied*, 486 U.S. 1034 (1988)), *cert. denied*, 510 U.S. 1110 (1994).[9]

---

[8]   This position has been expressed in briefs filed in federal court by past Solicitors General. *See, e.g.*, Jurisdictional Statement of the United States at 10-11, *Harris v. Rosario*, 446 U.S. 651 (1980) (No. 79-1294). It has also been taken in memoranda and opinions issued by the Office of Legal Counsel. *See, e.g.*, Memoranda for Linda Cinciotta, Director, Office of Attorney Personnel Management, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Interpretation of the Term "Territory" in the Department of Justice Appropriations Act* (July 31, 1997); Memorandum for Lawrence E. Walsh, Deputy Attorney General, from Paul A. Sweeney, Acting Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 5926, 86th Cong., 1st Sess., a bill "To provide for amendments to the compact between the people of Puerto Rico and the United States"* (June 5, 1959). In a 1963 opinion, the Office of Legal Counsel treated the legal consequences of Public Law 600 as an open question and did not resolve it. *See Memorandum Re: Power of the United States to Conclude with the Commonwealth of Puerto Rico a Compact Which Could Be Modified Only by Mutual Consent* (July 23, 1963).

[9]   We acknowledge, however, that the First Circuit has not always spoken with a single voice on this question. *See, e.g., United States v. Andino*, 831 F.2d 1164 (1st Cir. 1987) (prevailing opinion), *cert. denied*, 486 U.S. 1034 (1988)); *United States v. Quinones*, 758 F.2d 40, 42 (1st Cir. 1985) ("[I]n 1952, Puerto Rico ceased being a territory of the United States subject to the plenary powers of Congress as provided in the Federal Constitution."); *Cordova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank N.A.*, 649 F.2d 36, 41 (1st Cir. 1981) (Breyer, J.) (stating that following the passage of Public Law 600, "Puerto Rico's status changed from that of a mere territory to the unique status of Commonwealth."); *Figueroa v. People of Puerto Rico*, 232 F.2d 615, 620 (1st Cir. 1956) (Magruder, J.) (maintaining that to say that Public Law 600 was "just another Organic Act" for Puerto Rico would be to say that Congress had perpetrated a "monumental hoax" on the Puerto Rican people). Notwithstanding these inconsistencies, we believe the more recent First Circuit and other appellate decisions correctly state the law and properly recognize that the Supreme Court's decision in *Harris* is controlling.

We also acknowledge that the Federal Circuit's opinion in *Romero v. United States*, 38 F.3d 1204 (Fed. Cir. 1994), found that, for purposes of 5 U.S.C. § 5517, Puerto Rico is not a "State," "territory," or "possession." We read that opinion as addressing questions regarding the terms of that particular statute alone.

6

The second premise is that, as a matter of domestic constitutional law, the United States cannot irrevocably surrender an essential attribute of its sovereignty. *See United States v. Winstar Corp.*, 518 U.S. 839, 888 (1996) (The United States "may not contract away 'an essential attribute of its sovereignty.'") (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 23 (1977)); *Burnet v. Brooks*, 288 U.S. 378, 396 (1933) ("As a nation with all the attributes of sovereignty, the United States is vested with all the powers of government necessary to maintain an effective control of international relations."). This premise is reflected in the rule that, in general, one Congress cannot irrevocably bind subsequent Congresses. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) (Marshall, C.J.) (noting that legislative acts are "alterable when the legislature shall please to alter [them]."); *see also Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810) (Marshall, C.J.) (recognizing the general rule that "one legislature is competent to repeal any act which a former legislature was competent to pass; and that one legislature cannot abridge the powers of a succeeding legislature," while holding that vested rights are protected against subsequent congressional enactments). Moreover, as the Supreme Court has recognized, treaties and other covenants to which the United States is party stand, for constitutional purposes, on the same footing as federal legislation. *See Breard v. Greene*, 523 U.S. 371, 376 (1998) (per curiam) ("We have held 'that an Act of Congress . . . is on a full parity with a treaty, and that when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null.'") (quoting *Reid v. Covert*, 354 U.S. 1, 18 (1957) (plurality opinion)). Thus, to the extent a covenant to which the United States is party stands on no stronger footing than an Act of Congress, it is, for purposes of federal constitutional law, subject to unilateral alteration or revocation by subsequent Acts of Congress. As the Court explained in *Whitney v. Robertson*, 124 U.S. 190, 194 (1888):

> When the stipulations [of a treaty] are not self-executing they can only be enforced pursuant to legislation to carry them into effect, and such legislation is as much subject to modification and repeal by Congress as legislation upon any other subject. If the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, to that extent they have the force and effect of a legislative enactment. Congress may modify such provisions, so far as they bind the United States, or supersede them altogether.

This second premise applies to the exercise of presidential powers as well as to the exercise of congressional powers. Thus, a compact could not constitutionally limit the President's power to terminate treaties by requiring that he not exercise that power in the context of that compact without first obtaining the consent of the other signatories to the compact. *Cf. United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (President has "plenary and exclusive power . . . as the sole organ of the federal government in the field of international relations"); *Goldwater v. Carter*, 617 F.2d 697, 703-09 (D.C. Cir.) (en banc), *rev'd on other grounds*, 444 U.S. 996 (1979) (finding that the President has constitutional authority to terminate a treaty); *Goldwater*, 444 U.S. at 1007 (Brennan, J., dissenting) (President's power to recognize the People's Republic of China entailed power to abrogate existing defense treaty with Taiwan).

7

With these two premises established, we turn now to analyzing the New Commonwealth proposal.   The threshold point to consider is what type of status the proposal contemplates for Puerto Rico.  Parts of the New Commonwealth proposal appear to contemplate Puerto Rico's becoming an independent Nation,[10] while others contemplate Puerto Rico's remaining subject to United States sovereignty to some degree.[11]  To the extent that the proposal would thereby create for Puerto Rico a hybrid status, it runs afoul of the first premise discussed above.  The proposal must be assessed against the constitutionally permissible status categories that exist, and the precise nature of the constitutional issues raised by the proposal turns in part on whether it is understood to recognize Puerto Rico as a sovereign nation or to maintain United States sovereignty over Puerto Rico.

First, regardless of whether the New Commonwealth proposal contemplates full Puerto Rican independence or continued United States sovereignty over Puerto Rico, the proposal's mutual consent provisions are constitutionally unenforceable.  Article X of the proposal specifies that the New Commonwealth will be implemented pursuant to an "agreement between the people of Puerto Rico and the government of the United States," and provides that the agreement will have the force of a "bilateral covenant . . . based on mutual consent, that cannot be unilaterally renounced or altered."[12]  If the proposal is read to maintain United States sovereignty over Puerto Rico, then, since the "enhanced" Commonwealth it contemplates would not be a State, it would necessarily remain subject to congressional power under the Territory Clause.  It follows, then, that Congress could later unilaterally alter the terms of the covenant between the United States and Puerto Rico.  *See District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 106 (1953) (explaining that delegations of power from one Congress to the government of a territory are generally subject to revision, alteration, or revocation by a later Congress); *see also* Thornburgh Testimony at 194 (stating that proposed legislation conferring on Puerto Rico "sovereignty, like a State" and making that status irrevocable absent mutual consent was "totally inconsistent with the

---

[10] *See, e.g.*, Preamble (referring to Puerto Rico as a "nation," and describing the "natural right to self government" and "free will" of the people of Puerto Rico as "ultimate sources of their political power"); Article V(B) (referring to Puerto Rico's authority over international matters).

[11] *See, e.g.*, Preamble (describing Puerto Rico as being "in permanent union with the United States"); Article II (providing for continued United States citizenship for persons born in Puerto Rico); Article VIII (providing for federal court jurisdiction over matters arising from "provisions of the Constitution of the United States and of the Federal laws that apply to Puerto Rico consistent with this Covenant and not in violation [of] the laws of the Constitution of Puerto Rico"); Article XIII (providing that the Resident Commissioner of Puerto Rico shall be "considered a Member of the U.S. House of Representatives" for certain purposes).

[12] This mutual consent requirement appears in a number of places throughout the proposal.  The Preamble states that Puerto Rico shall remain "in permanent union with the United States under a covenant that cannot be invalidated or altered unilaterally."  Article II(A) provides that "[p]eople born in Puerto Rico will continue to be citizens of the United States by birth," and specifies that this rule "will not be unilaterally revokable").  *See also* Article XIII(e) (prohibiting unilateral alteration of the covenant by the United States by providing that "[a]ny change to the terms of this Covenant will have to be approved by the people of Puerto Rico in a special vote conducted consistent with its democratic processes and institutions.").

Constitution").[13]

If Puerto Rico is to become an independent nation under the New Commonwealth proposal, then the relationship between the United States and Puerto Rico would necessarily be subject to subsequent action by Congress or the President, even without Puerto Rico's consent. As a general matter, a treaty cannot, for purposes of domestic constitutional law, irrevocably bind the United States. *See supra* at 7-8. In particular, because the power to make and unmake treaties is "inherently inseparable from the conception" of national sovereignty, *Curtiss-Wright Export Corp.*, 299 U.S. at 318, it can not be contracted away. Thus, if Puerto Rico were to become independent, the New Commonwealth proposal's mutual consent requirements would be constitutionally unenforceable against the United States.[14]

The New Commonwealth proposal also contains certain provisions regarding the retention of United States citizenship. Specifically, it provides that "[p]eople born in Puerto Rico will continue to be citizens of the United States by birth and this citizenship will continue to be protected by the Constitution of the United States and by this Covenant and will not be unilaterally revokable."

---

[13] Under the approach set forth in *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87 (1810), a different result would be warranted if the covenant called for in the New Commonwealth proposal had the effect of vesting rights in Puerto Rico's status as a commonwealth or in an element of that status, such as the mutual consent requirement. It is true that in 1963, the Office of Legal Counsel concluded that a mutual consent provision would be constitutional because Congress could vest rights in political status. *See Memorandum Re: Power of the United States to Conclude with the Commonwealth of Puerto Rico a Compact which Could be Modified Only by Mutual Consent* (July 23, 1963). But the Justice Department altered its position on that question during the administration of President Bush, *see* Thornburgh Testimony at 194, and the Office of Legal Counsel now adheres to that position. *See* Treanor Testimony at 15-16; Memorandum for the Special Representative for Guam from Teresa Roseborough, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Mutual Consent Provisions in the Guam Commonwealth Legislation* (July 28, 1994).

Two independent grounds support our current position that rights may not be vested in political status. First, after the issuance of the Department's 1963 opinion, the Supreme Court concluded that the Fifth Amendment's guarantee of due process applies only to persons and not to States. *See South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966). While *Katzenbach* was concerned with a State, its rationale suggests that a governmental body, including a territory such as Puerto Rico, could not assert rights under the Due Process Clause. Second, the modern Supreme Court case law concerning vested rights is limited in scope. While the Court has recognized that economic rights are protected under the Due Process Clause, *see, e.g., Lynch v. United States*, 292 U.S. 571 (1934), the case law does not support the view that there would be Fifth Amendment vested rights in a political status for a governmental body that is not itself provided for in the Constitution. *Cf. Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 55 (1986) ("[T]he contractual right at issue in this case bears little, if any, resemblance to rights held to constitute 'property' within the meaning of the Fifth Amendment. . . . The provision simply cannot be viewed as conferring any sort of 'vested right' in the fact of precedent concerning the effect of Congress' reserved power on agreements entered into under a statute containing the language of reservation.").

[14] It is a separate question whether, or to what extent, the New Commonwealth proposal's mutual consent requirements would be binding under international law, and we do not address that question here.

0247

This provision could be read in two different ways. First, it could be read as concerned only with persons born in Puerto Rico after the New Commonwealth proposal goes into effect. Understood as limited to these individuals, the proposal would confer United States citizenship on them unless and until Puerto Rico and the United States mutually agree to revoke it. Second, the text could be read as addressing the United States citizenship of all persons born in Puerto Rico, whether before or after the New Commonwealth proposal goes into effect.[15] Under this second reading, the proposal would preserve these individuals' citizenship subject to revocation by the mutual consent of Puerto Rico and the United States.

With respect to either reading, the mutual consent stipulation (i.e. that the grant of citizenship cannot be altered except by mutual consent) is, for the reasons discussed above, *see supra* at 8-9, constitutionally unenforceable. If that stipulation is set aside, the provision then reads as a simple grant of citizenship to certain persons born in Puerto Rico – either those born in Puerto Rico after the New Commonwealth proposal goes into effect, or all those born in Puerto Rico before and after such time. We see no constitutional impediment with that provision, regardless of how broadly it is read. However, whether that provision is itself alterable by a subsequent Act of Congress becomes a question of whether the United States citizenship of the persons covered by the provision is constitutionally protected. The answer to that question depends on how the provision is read (that is, whether it is read as addressing those born in Puerto Rico in the future, or as covering those already born in Puerto Rico, or both),[16] and may also depend on whether the New Commonwealth proposal in general is understood as creating an independent nation or as maintaining United States sovereignty over Puerto Rico.

We first address whether there would be any constitutional constraints on Congress's authority to provide that persons born in Puerto Rico in the future would not acquire United States citizenship by virtue of their birth in Puerto Rico. If Puerto Rico is to become an independent nation, then, while Congress may well have the power to provide (as the New Commonwealth proposal appears to contemplate) that persons born in Puerto Rico in the future shall acquire United States citizenship, we think Congress could also change that rule and provide that, in the future, birth in Puerto Rico shall no longer be a basis for United States citizenship.[17] If, however, Puerto Rico is to remain subject to United States sovereignty, then the answer is less clear. We are unaware of any case addressing the power of Congress to withhold prospectively non-Fourteenth Amendment citizenship from those born in an area subject to United States

---

[15] One limitation to the scope of the clause should be noted: presumably it is not intended to apply to those residing outside of Puerto Rico at the time the proposal took effect.

[16] The proposal might also be read to refer to people born in Puerto Rico in the future, but before any future action by Congress to cease extending citizenship to persons born in Puerto Rico. Identifying the precise constitutional considerations relevant to that reading of the proposal would require further study.

[17] We do not, however, address whether Congress could also exclude residents of Puerto Rico from other statutory sources of United States citizenship, such as being born abroad to a United States citizen parent or parents.

10

sovereignty, when persons previously born in that area received statutory citizenship by birthright, and we think it is unclear how a court would resolve that issue.

Next, we consider whether the Constitution would permit Congress to revoke the United States citizenship of persons who already have such citizenship because they were born in Puerto Rico. If the New Commonwealth proposal is understood to maintain United States sovereignty over Puerto Rico, then we think Congress could not revoke the United States citizenship of persons who already possess that citizenship by virtue of their birth in Puerto Rico. As the Court explained in *Afroyim*, Congress lacks a "general power . . . to take away an American citizen's citizenship without his assent." 387 U.S. at 257. While not squarely faced with a case of statutory citizenship, the Court in *Afroyim* did not limit its decision to persons whose citizenship is based on the Fourteenth Amendment, and we think it should not be so confined.[18] Accordingly, while we find no constitutional impediment in the New Commonwealth proposal's provision that those born in Puerto Rico will retain their citizenship in the future, we do think that to the extent Puerto Rico is to remain subject to United States sovereignty, the provision is redundant (or at best declaratory) of an underlying constitutional requirement that such citizenship not be revoked once it is granted. If, on the other hand, Puerto Rico were to become an independent nation under the New Commonwealth proposal, then, as we noted in our discussion of the Independence proposal's treatment of citizenship, *see supra* at 4-5, it is unclear whether Congress could revoke the U.S. citizenship of persons already holding such citizenship at the time of independence. There is an argument that the Constitution would ensure that those who possessed United States citizenship at the time of Puerto Rican independence must be able to retain that citizenship after independence, *see Afroyim*, 387 U.S. at 257, but there is also case law supporting the proposition that nationality follows the flag. *See Canter*, 26 U.S. at 542. As noted, it is unclear how a court would resolve this issue.

The New Commonwealth proposal also provides for the election of a Resident Commissioner to "represent Puerto Rico before the Government of the United States and who will be considered a Member of the U.S. House of Representatives for purposes of all legislative matters that have to do with Puerto Rico." The applicable provision of the Constitution – Article

---

[18] A counter-argument might be made based on the Supreme Court's decision in *Rogers v. Bellei*, 401 U.S. 815 (1971), which upheld the loss of citizenship of an individual who was born in Italy and who acquired citizenship under a federal statute because one of his parents was an American citizen. The statute required that persons claiming citizenship on that basis meet certain requirements of residency in the United States prior to their twenty-eighth birthday. The *Rogers* Court upheld the statute's provision for loss of citizenship for those who failed to meet the residency requirement. While the *Rogers* Court criticized *Afroyim*'s language concerning non-Fourteenth Amendment citizenship and based its own holding in part on the fact that Bellei's citizenship was not conferred pursuant to the Fourteenth Amendment, *see* 401 U.S. at 835, *Rogers* is best understood as addressing the legitimacy of pre-established requirements for statutorily conferred citizenship (including conditions subsequent such as the residency by age 28 requirement) when Congress grants citizenship to those who would not otherwise receive it directly by operation of the Fourteenth Amendment. That issue – of the legitimacy of pre-established requirements – is not relevant to Congress's powers to divest citizenship once it has been unconditionally conferred. *Afroyim* thus appears to be the most relevant precedent, and it supports the view that, so long as Puerto Rico remains under United States sovereignty, citizenship that has been granted is constitutionally protected.

11

**0249**

I, Section 2, Clause 1 – provides that the House of Representatives "shall be composed of Members chosen every second Year by the People *of the several States*." (emphasis added). On its face, that provision would seem to mean that the Resident Commissioner from Puerto Rico could not be "considered a Member" of the House because, under the New Commonwealth proposal, Puerto Rico would not be a "State." While Congress has the ability to permit participation by representatives of the territories, *see Michel v. Anderson*, 14 F.3d 623, 630-32 (D.C. Cir. 1994) (holding that the House of Representatives had the authority to permit a territorial delegate (including the Resident Commissioner from Puerto Rico) to vote in the House's committees, including the Committee of the Whole), there are constitutional limits to the participation that would be permitted.

The New Commonwealth proposal contains a number of other provisions that may raise particular constitutional concerns if the proposal contemplates Puerto Rico remaining subject to United States sovereignty. The proposal authorizes Puerto Rico to "enter into commercial and tax agreements, among others, with other countries," and to "enter into international agreements and belong to regional and international organizations." The Constitution vests the foreign relations power of the United States, which includes the power to enter into treaties, in the federal government. *Curtiss-Wright Export Corp.*, 299 U.S. at 318. Specifically, Article I, Section 10, Clause 1 (the "Treaty Clause") prohibits States from entering into "any Treaty, Alliance, or Confederation." Under Article I, Section 10, Clause 3 (the "Compact Clause"), however, States are permitted, if authorized by Congress, to "enter into any Agreement or Compact . . . with a foreign Power." Read against the backdrop of these constitutional provisions, the New Commonwealth proposal raises several issues.

First, it is unclear whether either the Treaty Clause or the Compact Clause applies to Puerto Rico, since both clauses refer only to "State[s]." What little case law there is on this question is not in agreement. *Compare Venable v. Thornburgh*, 766 F. Supp. 1012, 1013 (D. Kan. 1991) (stating in dicta that "the compact clause addresses agreements between the states, territories and the District of Columbia."), *with Mora v. Torres*, 113 F. Supp. 309, 315 (D.P.R.) (concluding that "Puerto Rico is not a State, and the compact clause, as such, is not applicable to it."), *aff'd*, 206 F.2d 377 (1st Cir. 1953). If the two clauses do apply to Puerto Rico, then presumably the Compact Clause's provision for congressional authorization to enter into "Agreement[s] or Compact[s]" applies to Puerto Rico. Second, even if Congress may consent to Puerto Rico's entry into "Agreement[s] or Compact[s]," it is not clear that the "commercial and tax agreements" and "international agreements and . . . regional and international organizations" referred to in the New Commonwealth proposal would all constitute "Agreement[s] or Compact[s]" to which Congress may give its consent. As the Supreme Court has noted, the constitutional distinction between "Agreement[s] [and] Compact[s]," on the one hand, and "Treat[ies], Alliance[s], [and] Confederation[s]," on the other, is not easily discerned. *See U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 461-62 (1978) (noting that "the Framers used the words 'treaty,' 'compact,' and 'agreement' as terms of art, for which no explanation was

**0250**

required and with which we are unfamiliar.").[19] Some "commercial and tax agreements" would be likely to qualify as "Agreement[s] or Compact[s]" under Article I, Section 10, Clause 3 of the Constitution. If so, then Congress may be able to authorize Puerto Rico to enter into such agreements. The status of the "international agreements and . . . regional and international organizations" referred to in the New Commonwealth proposal, however, is less clear. At least some of the agreements embraced in this phrase might constitute "Treat[ies], Alliance[s], or Confederation[s]" under Article I, Section 10, Clause 1. If so, then Puerto Rico may not constitutionally enter into them, with or without congressional consent. Third, even assuming Congress may authorize Puerto Rico to enter into at least some of the types of international agreements referenced in the New Commonwealth proposal, it is unclear whether Congress could, as apparently contemplated by the proposal, give Puerto Rico prospective blanket authorization to conclude such agreements. Although it is our view that, under the Compact Clause, Congress may consent in advance to a State's entering into certain international agreements,[20] there would still be a question whether advance consent over such a broad and unspecified range of agreements as is contemplated here would be an impermissible use of Congress's power.[21]

---

[19] On one account (which traces back to Justice Story) of the distinction between the Treaty and Compact Clauses, the Treaty Clause's categorical prohibition refers to agreements of a political character such as one Nation would make with another, while the conditional prohibition of the Compact Clause on agreements with foreign countries refers to arrangements regarding the private rights of sovereigns, such as adjusting boundaries, making territorial acquisitions in another State, or harmonizing the internal regulations of bordering States. *See Louisiana v. Texas*, 176 U.S. 1, 16-18 (1900) (outlining Story's theory); *Virginia v. Tennessee*, 148 U.S. 503, 519-20 (1893) (same). Agreements between Puerto Rico and foreign countries regarding taxation and commerce seem unlikely to concern private sovereign rights; *a fortiori*, international agreements and membership in international or regional organizations would seem to be political in character. On this theory, therefore, the Treaty Clause, if applicable to Puerto Rico, could well bar *all* forms of international agreements mentioned in the bill.

[20] *See* Letter for the Hon. Caspar W. Weinberger, Director, Office of Management & Budget, from Ralph E. Erickson, Deputy Attorney General (Sept. 19, 1972); Memorandum for Nicholas deB. Katzenbach, Deputy Attorney General, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, Re: *Draft bill "To authorize the construction of certain international bridges," the proposed International Bridge Act of 1963* (July 18, 1963). The case law accords with that conclusion. *See Cuyler v. Adams*, 449 U.S. 433, 441 (1981) (advance congressional consent to certain interstate compacts relating to crime prevention and law enforcement); *Seattle Master Builders Ass'n v. Pacific Northwest Power and Conservation Council*, 786 F.2d 1359, 1363 (9th Cir. 1986) (even if advance congressional consent were "unusual," it would not be unconstitutional), *cert. denied*, 479 U.S. 1059 (1987); *see generally Virginia v. Tennessee*, 148 U.S. at 521 ("The Constitution does not state when the consent of congress shall be given, whether it shall precede or may follow the compact made . . . . In many cases the consent will usually precede the compact or agreement.").

[21] We have found little authority addressing the scope of permissible congressional delegation under the Compact Clause, and we note that potential "delegation" problems might arise whether or not the Compact Clause were thought to apply to Puerto Rico. *Compare Milk Industry Found. v. Glickman*, 132 F.3d 1467, 1473-78 (D.C. Cir. 1998) (analyzing issue arising under Compact Clause of delegation of authority to Executive Department), *with Philippine Islands–Postal Service*, 29 Op. Att'y Gen. 380 (1912) (analyzing without reference to Compact Clause whether Congress could delegate to government of Philippine Islands authority to negotiate and enter into international postal conventions). In either case, the breadth of the delegation contemplated here might raise constitutional concerns.

0251

Finally, if Puerto Rico remains subject to United States sovereignty, the provision that Puerto Rico would "retain[] all the powers that have not been delegated to the United States" rests on a constitutionally flawed premise. This provision appears to attempt to create for Puerto Rico an analogue to the Tenth Amendment. But the legislative powers of a non-State region under the sovereignty of the United States are entirely vested in Congress. Because territories are created by the Nation, as a matter of constitutional law they can not delegate power to the Nation. As Chief Justice Marshall explained in *Canter*, "[i]n legislating for [the territories], Congress exercises the combined powers of the general, and of a state government." 26 U.S. at 546. And while Congress may delegate some of its powers over a territory to the territory itself, such delegation is, as discussed *supra* at 7-8, always subject to Congress's own plenary power to revise, alter, or revoke that authority. *See Thompson*, 346 U.S. at 106, 109; *United States v. Sharpnack*, 355 U.S. 286, 296 (1958).[22]

We hope this information is helpful to you. Please do not hesitate to contact me if I can be of further assistance.

Sincerely,

Robert Raben

Assistant Attorney General

cc:   The Honorable Jeff Bingaman
      Ranking Minority Member

---

[22] Other provisions of the Commonwealth proposal may present constitutional concerns. Article VIII makes jurisdiction of federal courts subject to the provisions of the Constitution of Puerto Rico, and article XIII concerns the creation of a mechanism by which application of United States laws to Puerto Rico will be subject to the laws of Puerto Rico.

14

# APPENDIX F

# MUTUAL CONSENT PROVISIONS IN THE GUAM COMMONWEALTH LEGISLATION

*Sections of the Guam Commonwealth Bill requiring the mutual consent of the Government of the United States and the Government of Guam raise serious constitutional questions and are legally unenforceable.*

July 28, 1994

## MEMORANDUM OPINION FOR THE SPECIAL REPRESENTATIVE FOR GUAM COMMONWEALTH

The Guam Commonwealth Bill, H.R. 1521, 103d Cong., 1st Sess. (1993) contains two sections requiring the mutual consent of the Government of the United States and the Government of Guam. Section 103 provides that the Commonwealth Act could be amended only with mutual consent of the two governments. Section 202 provides that no Federal laws, rules, and regulations passed after the enactment of the Commonwealth Act would apply to Guam without the mutual consent of the two governments. The Representatives of Guam insist that these two sections are crucial for the autonomy and economy of Guam. The former views of this Office on the validity or efficacy of mutual consent requirements included in legislation governing the relationship between the federal government and non-state areas, *i.e.* areas under the sovereignty of the United States that are not States,[1] have not been consistent.[2] We therefore have carefully reexamined this issue. Our conclusion is that these clauses raise serious constitutional issues and are legally unenforceable.[3]

---

[1] Territories that have developed from the stage of a classical territory to that of a Commonwealth with a constitution of their own adoption and an elective governor, resent being called Territories and claim that that legal term and its implications are not applicable to them. We therefore shall refer to all Territories and Commonwealths as non-state areas under the sovereignty of the United States or briefly as non-state areas.

[2] To our knowledge the first consideration of the validity of mutual consent clauses occurred in 1959 in connection with proposals to amend the Puerto Rico Federal Relations Act. At that time the Department took the position that the answer to this question was doubtful but that such clauses should not be opposed on the ground that they go beyond the constitutional power of Congress. In 1963 the Department of Justice opined that such clauses were legally effective because Congress could create vested rights in the status of a territory that could not be revoked unilaterally. The Department adhered to this position in 1973 in connection with then pending Micronesians status negotiations in a memorandum approved by then Assistant Attorney General Rehnquist. On the basis of this advice, a mutual consent clause was inserted in Section 105 of the Covenant with the Northern Mariana Islands. The Department continued to support the validity of mutual consent clauses in connection with the First 1989 Task Force Report on the Guam Commonwealth Bill. The Department revisited this issue in the early 1990's in connection with the Puerto Rico Status Referendum Bill in light of *Bowen v. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 55 (1986), and concluded that there could not be an enforceable vested right in a political status; hence that mutual consent clauses were ineffective because they would not bind a subsequent Congress. We took the same position in the Second Guam Task Force Report issued during the last days of the Bush Administration in January 1993.

[3] Mutual consent clauses are not a novel phenomenon; indeed they antedate the Constitution. Section 14 of the Northwest Ordinance contained six "articles of compact, between the original States and the people and States in the said territory, and [shall] forever remain unalterable, unless by common consent." These articles were incorporated either expressly or by reference into many early territorial organic acts. *Clinton v. Englebrecht*, 80 U.S. (13 Wall.) 434, 442 (1872). The copious litigation under these "unalterable articles" focussed largely on the question whether the territories' obligations under them were superseded by the Constitution, or when the territory

*Opinions of the Office of Legal Counsel*

In our view, it is important that the text of the Guam Commonwealth Act not create any illusory expectations that might mislead the electorate of Guam about the consequences of the legislation. We must therefore oppose the inclusion in the Commonwealth Act of any provisions, such as mutual consent clauses, that are legally unenforceable, unless their unenforceability (or precatory nature) is clearly stated in the document itself.

I.

*The Power of Congress to Govern the Non-State
Areas under the Sovereignty of the United States
is Plenary within Constitutional Limitations*

All territory under the sovereignty of the United States falls into two groups: the States and the areas that are not States. The latter, whether called territories, possessions, or commonwealths, are governed by and under the authority of Congress. As to those areas, Congress exercises the combined powers of the federal and of a state government. These basic considerations were set out in the leading case of *National Bank v. County of Yankton*, 101 U.S. 129, 132-33 (1880). There the Court held:

> It is certainly now too late to doubt the power of Congress to govern the Territories. There have been some differences of opinion as to the particular clause of the Constitution from which the power is derived, but that it exists has always been conceded.[4]

> \* \* \*

> All territory within the jurisdiction of the United States not included in any State must necessarily be governed by or under the authority of Congress. The Territories are but political subdivisions of the outlying dominion of the United States. Their relation to the general government is much the same as that which counties bear to the respective states, and Congress may legislate for them as a State does for its municipal organizations. The organic law of a Territory takes the place of a constitution as the fundamental law of the local government. It is obligatory on and binds the territorial authorities; but Congress is supreme, and for the purposes of this department of its governmental authority has all the

---

became a State, as the result of the equal footing doctrine. We have, however, not found any cases dealing with the question whether the Congress had the power to modify any duty imposed on the United States by those articles.

[4] Some derived that power from the authority of the United States to acquire territory, others from the mere fact of sovereignty, others from the Territory Clause of the Constitution of the United States (Art. IV, Sec. 3, Cl. 2) pursuant to which Congress has "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States". *See e.g. American Insurance Co. v. Canter*, 26 U.S. (1 Pet.) 511, 542 (1828); *Mormon Church v. United States*, 136 U.S. 1, 42-44 (1890); *Downes v. Bidwell*, 182 U.S. 244, 290 (1901).

At present, the Territory Clause of the Constitution is generally considered to be the source of the power of Congress to govern the non-state areas. *Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 673-674 (1945); *Examining Board v. Flores de Otero*, 426 U.S. 572, 586 (1976); *Harris v. Rosario*, 446 U.S. 651 (1980); *see also Wabol v. Villacrusis*, 958 F.2d 1450, 1459 (9th Cir. 1992), *cert. denied* 506 U.S. 1027 (1992). (Footnote supplied.)

*Mutual Consent Provisions in the Guam Commonwealth Legislation*

powers of the people of the United States, except such as have been expressly or by implication reserved in the prohibitions of the Constitution.

*Yankton* was anticipated in Chief Justice Marshall's seminal opinion in *American Insurance Co. v. Canter*, 26 U.S. (1 Pet.) 511, 542-43, 546 (1828). The Chief Justice explained:

> In the mean time [*i.e.* the interval between acquisition and statehood], Florida continues to be a territory of the United States; governed by virtue of that clause in the Constitution, which empowers Congress "to make all needful rules and regulations, respecting the territory, or other property belonging to the United States."

> Perhaps the power of governing a territory belonging to the United States, which has not, by becoming a state, acquired the means of self-government, may result necessarily from the facts, that it is not within the jurisdiction of any particular state, and is within the power and jurisdiction of the United States.

> \* \* \*

> In legislating for them [the Territories], Congress exercises the combined powers of the general, and of a state government.

*Id.* at 542-43, 546.

The power of Congress to govern the non-state areas is plenary like every other legislative power of Congress but it is nevertheless subject to the applicable provisions of the Constitution. As Chief Justice Marshall stated in *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 196 (1824), with respect to the Commerce Power:

> This power [the Commerce Power], like all others vested in Congress is complete in itself, may be exercised to its utmost extent, and *acknowledges no limitations, other than are prescribed in the constitution*. (Emphasis added.)

This limitation on the plenary legislative power of Congress is self-evident. It necessarily follows from the supremacy of the Constitution. *See e.g*., *Hodel v. Virginia Surface Mining and Reclamation Assoc.*, 452 U.S. 264, 276 (1981). That the power of Congress under the Territory Clause is subject to constitutional limitations has been recognized in *County of Yankton*, 101 U.S. at 133; *Downes v. Bidwell*, 182 U.S. 244, 290-91 (1901); *District of Columbia v. Thompson Co.*, 346 U.S. 100, 109 (1953).

Finally, the power of Congress over the non-state areas persists "so long as they remain in a territorial condition." *Shively v. Bowlby*, 152 U.S. 1, 48 (1894). *See also Hooven & Allison Co. v. Evatt*, 324 U.S. 652, 675 (1945) (recognizing that during the intermediary period between the establishment of the Commonwealth of the Philippine Islands and the final withdrawal of United States sovereignty from those islands "Congress retains plenary power over the territorial government").

The plenary Congressional authority over a non-state area thus lasts as long as the area retains that status. It terminates when the area loses that status either by virtue of its admission

– 3 –

*Opinions of the Office of Legal Counsel*

as a State, or by the termination of the sovereignty of the United States over the area by the grant of independence, or by its surrender to the sovereignty of another country.

II.

*The Revocable Nature of Congressional Legislation
Relating to the Government of Non-State Areas*

While Congress has the power to govern the non-state areas it need not exercise that power itself. Congress can delegate to the inhabitants of non-state areas full powers of self-government and an autonomy similar to that of States and has done so since the beginning of the Republic. Such delegation, however, must be "consistent with the supremacy and supervision of National authority". *Clinton v. Englebrecht*, 80 U.S. (13 Wall.) 434, 441 (1872); *Puerto Rico v. Shell Co.*, 302 U.S. 253, 260, 261-62 (1937). The requirement that the delegation of governmental authority to the non-state areas be subject to federal supremacy and federal supervision means that such delegation is necessarily subject to the right of Congress to revise, alter, or revoke the authority granted. *District of Columbia v. Thompson Co.*, 346 U.S. 100, 106, 109 (1953).[5] *See also United States v. Sharpnack*, 355 U.S. 286, 296 (1958), *Harris v. Boreham*, 233 F.2d 110, 113 (3rd Cir. 1956), *Firemen's Insurance Co. v. Washington*, 483 F.2d 1323, 1327 (D.C. Cir. 1973). The power of Congress to delegate governmental powers to non-state areas thus is contingent on the retention by Congress of its power to revise, alter, and revoke that legislation.[6] Congress therefore cannot subject the amendment or repeal of such legislation to the consent of the non-state area.

This consideration also disposes of the argument that the power of Congress under the Territory Clause to give up its sovereignty over a non-state area includes the power to make a partial disposition of that authority, hence that Congress could give up its power to amend or repeal statutes relating to the governance of non-state areas. But, as shown above, the retention of the power to amend or repeal legislation delegating governmental powers to a non-state area is an integral element of the delegation power. Congress therefore has no authority to enact legislation under the Territory Clause that would limit the unfettered exercise of its power to amend or repeal.

The same result flows from the consideration that all non-state areas are subject to the authority of Congress, which, as shown above, is plenary. This basic rule does not permit the

---

[5] *Thompson* dealt with the District of Columbia's government which is provided for by Art. I, Sec. 8, Cl. 17 of the Constitution, rather than with the non-state areas as to whom the Congressional power is derived from the Territory Clause. The Court, however, held that in this area the rules relating to the Congressional power to govern the District of Columbia and the non-state areas are identical. Indeed, the Court relied on cases dealing with non-state areas, *e.g.*, *Hornbuckle v. Toombs*, 85 U.S. (18 Wall.) 648, 655 (1874), and *Christianson v. King County*, 239 U.S. 365 (1915), where it held that Congress can delegate its legislative authority under Art. I, Sec. 8, Cl. 17 of the Constitution to the District, subject to the power of Congress at any time to revise, alter, or revoke that authority.

[6] Congress has exercised this power with respect to the District of Columbia. The Act of February 21, 1871, 16 Stat. 419, gave the District of Columbia virtual territorial status, with a governor appointed by the President, a legislative assembly that included an elected house of delegates, and a delegate in Congress. The 1871 Act was repealed by the Act of June 20, 1874, 18 Stat. 116, which abrogated among others the provisions for the legislative assembly and a delegate in Congress, and established a government by a Commission appointed by the President.

*Mutual Consent Provisions in the Guam Commonwealth Legislation*

creation of non-state areas that are only partially subject to Congressional authority.  The plenary power of Congress over a non-state area persists as long as the area remains in that condition and terminates only when the area becomes a State or ceases to be under United States sovereignty. There is no intermediary status as far as the Congressional power is concerned.

The two mutual consent clauses contained in the proposed Commonwealth Act therefore are subject to Congressional modification and repeal.

III.

*The Rule that Legislation Delegating Governmental Powers to a*
*Non-State Area Must be Subject to Amendment and Repeal is but a*
*Manifestation of the General Rule that one Congress Cannot Bind*
*a Subsequent Congress, Except where it Creates Vested Rights*
*Enforceable under the Due Process Clause of the Fifth Amendment*

The rule that Congress cannot surrender its power to amend or repeal legislation relating to the government of non-state areas is but a specific application of the maxim that one Congress cannot bind a subsequent Congress and the case law developed under it.

The rationale underlying that principle is the consideration that if one Congress could prevent the subsequent amendment or repeal of legislation enacted by it, such legislation would be frozen permanently and would acquire virtually constitutional status.  Justice Brennan expressed this thought in his dissenting opinion in *United States Trust Co. v. New Jersey*, 431 U.S. 1, 45 (1977), a case involving the Impairment of the Obligation of Contracts Clause of the Constitution (Art. I, Sec 10, Cl. 1):

> One of the fundamental premises of our popular democracy is that each generation of representatives can and will remain responsive to the needs and desires of those whom they represent.  Crucial to this end is the assurance that new legislators will not automatically be bound by the policies and undertakings of earlier days . . . .  The Framers fully recognized that nothing would so jeopardize the legitimacy of a system of government that relies upon the ebbs and flows of politics to "clean out the rascals" than the possibility that those same rascals might perpetuate their policies simply by locking them into binding contracts.

Nonetheless, the maxim that one Congress cannot bind a future Congress, like every legal rule, has its limits.  As early as 1810, Chief Justice Marshall explained in *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810):

> The principle asserted is that one legislature is competent to repeal any act which a former legislature was competent to pass; and that one legislature cannot abridge the powers of a succeeding legislature.

> The correctness of this principle, so far as respects general legislation, can never be controverted.  But, if an act be done under a law, a succeeding legislature cannot undo it.  The past cannot be recalled by the most absolute power.  Conveyances have been made, those conveyances have vested legal

– 5 –

0258

*Opinions of the Office of Legal Counsel*

estates, and if those estates may be seized by the sovereign authority, still, that they originally vested is a fact, and cannot cease to be a fact.

When, then, a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot devest [sic] those rights.

The powers of one legislature to repeal or amend the acts of the preceding one are limited in the case of States by the Obligation of Contracts Clause (Art. I, Sec. 10, Cl. 1) of the Constitution and the Due Process Clause of the Fourteenth Amendment, and in the case of Congressional legislation by the Due Process Clause of the Fifth Amendment.  This principle was recognized in the *Sinking-Fund Cases*, 98 U.S. 700, 718-19 (1879):

The United States cannot any more than a State interfere with private rights, except for legitimate governmental purposes.  They are not included within the constitutional prohibition which prevents States from passing laws impairing the obligation of contracts, but equally with the States *they are prohibited from depriving persons or corporations of property without due process of law*.  They cannot legislate back to themselves, without making compensation, the lands they have given this corporation to aid in the construction of its railroad.  Neither can they by legislation compel the corporation to discharge its obligations in respect to the subsidy bonds otherwise than according to the terms of the contract already made in that connection.  The United States are as much bound by their contracts as are individuals.  (emphasis supplied.)

*See also Bowen v. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 54-56 (1986).

IV.

*The Due Process Clause Does Not Preclude Congress from*
*Amending or Repealing the Two Mutual Consent Clauses*

The question therefore is whether the Due Process Clause of the Fifth Amendment precludes a subsequent Congress from repealing legislation for the governance of non-state areas enacted by an earlier Congress under the Territory Clause.  This question must be answered in the negative.

The Due Process Clause of the Fifth Amendment provides:

No *person* shall . . . be deprived of life, liberty, or *property* without due process of law.  (emphasis supplied.)

This Clause is inapplicable to the repeal or amendment of the two mutual consent clauses here involved for two reasons.  First, a non-state area is not a "person" within the meaning of the Fifth Amendment, and, second, such repeal or amendment would not deprive the non-state area of a property right within the meaning of the Fifth Amendment.

A.

*A non-state area is not a person in the meaning of the Due Process Clause of the Fifth*
*Amendment.*

*Mutual Consent Provisions in the Guam Commonwealth Legislation*

In *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966), the Court held that a State is not a person within the meaning of the Due Process Clause of the Fifth Amendment. *See also Alabama v. EPA*, 871 F.2d 1548, 1554 (11th Cir.), *cert. denied*, 493 U.S. 991 (1989) ("The State of Alabama is not included among the entities protected by the due process clause of the fifth amendment"); *State of Oklahoma v. Federal Energy Regulatory Comm.*, 494 F.Supp. 636, 661 (W.D. Okl. 1980), *aff'd*, 661 F.2d 832 (10th Cir. 1981), *cert. denied*, *sub. nom. Texas v. Federal Energy Regulatory Comm.*, 457 U.S. 1105 (1982).

Similarly it has been held that creatures or instrumentalities of a State, such as cities or water improvement districts, are not persons within the meaning of the Due Process Clause of the Fifth Amendment. *City of Sault Ste. Marie, Mich. v. Andrus*, 532 F. Supp. 157, 167 (D.D.C. 1980); *El Paso, County Water Improvement District v. IBWC/US*, 701 F. Supp. 121, 123-24 (W.D. Tex 1988).

The non-state areas, concededly, are not States or instrumentalities of States, and we have not found any case holding directly that they are not persons within the meaning of the Due Process Clause of the Fifth Amendment. They are, however, governmental bodies, and the rationale of *South Carolina v. Katzenbach*, 383 U.S. at 301, appears to be that such bodies are not protected by the Due Process Clause of the Fifth Amendment. Moreover, it is well established that the political subdivisions of a State are not considered persons protected as against the State by the provisions of the Fourteenth Amendment. *See, e.g.*, *Newark v. New Jersey*, 262 U.S. 192, 196 (1923); *Williams v. Mayor of Baltimore*, 289 U.S. 36, 40 (1933); *South Macomb Disposal Authority v. Township of Washington*, 790 F.2d 500, 505, 507 (6th Cir. 1986), and the authorities there cited. The relationship of the non-state areas to the Federal Government has been analogized to that of a city or county to a State. As stated, *supra*, the Court held in *National Bank v. County of Yankton*, 101 U.S. 129, 133 (1880):

The territories are but political subdivisions of the outlying dominion of the United States. Their relation to the general government is much the same as that which counties bear to the respective States . . . .

More recently, the Court explained that a non-state area is entirely the creation of Congress and compared the relationship between the Nation and a non-state area to that between a State and a city. *United States v. Wheeler*, 435 U.S. 313, 321 (1978). It follows that, since States are not persons within the meaning of the Fifth Amendment and since the political subdivisions of States are not persons within the meaning of the Fourteenth Amendment, the non-state areas are not persons within the meaning of the Due Process Clause of the Fifth Amendment.

B.

*Legislation relating to the governance of non-state areas does not create any rights or status protected by the Due Process Clause against repeal or amendment by subsequent legislation.*

As explained earlier, a subsequent Congress cannot amend or repeal earlier legislation if such repeal or amendment would violate the Due Process Clause of the Fifth Amendment, *i.e.*, if such amending or repealing legislation would deprive a person of property without due process of law. It has been shown in the preceding part of this memorandum, that a non-state area is not a person within the meaning of the Due Process Clause. Here it will be shown that mutual

– 7 –

*Opinions of the Office of Legal Counsel*

consent provisions in legislation, such as the ones envisaged in the Guam Commonwealth Act, would not create property rights within the meaning of that Clause.

Legislation concerning the governance of a non-state area, whether called organic act, federal relations act, or commonwealth act, that does not contain a mutual consent clause is clearly subject to amendment or repeal by subsequent legislation.  A non-state area does not acquire a vested interest in a particular stage of self government that subsequent legislation could not diminish or abrogate.  While such legislation has not been frequent, it has occurred in connection with the District of Columbia.  *See District of Columbia v. Thompson Co.*, 346 U.S. 100, 104-05 (1953); *supra* n.6.  Hence, in the absence of a mutual consent clause, legislation concerning the government of a non-state area is subject to amendment or repeal by subsequent legislation.

This leads to the question whether the addition of a mutual consent clause, *i.e.* of a provision that the legislation shall not be modified or repealed without the consent of the Government of the United States and the Government of the non-state area, has the effect of creating in the non-state areas a specific status amounting to a property right within the meaning of the Due Process Clause.  It is our conclusion that this question must be answered in the negative because (1) sovereign governmental powers cannot be contracted away, and (2) because a specific political relationship does not constitute "property" within the meaning of the Fifth Amendment.

1.  As a body politic the Government of the United States has the general capacity to enter into contracts.  *United States v. Tingey*, 30 U.S. (5 Pet.) 115, 128 (1831).  This power, however, is generally limited to those types of contracts in which private persons or corporations can engage.  By contrast sovereign "governmental powers cannot be contracted away," *North American Coml. Co. v. United States*, 171 U.S. 110, 137 (1898).  More recently the Supreme Court held in connection with legislation arising under the Contract Clause (Art. I, Sec. 10, Cl. 1) of the Constitution that "the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty."  *United States Trust Co. v. New Jersey*, 431 U.S. 1, 23 (1977).[7]  In a similar context Mr. Justice Holmes stated:

> One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them.  *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357 (1908).[8]

Agreements or compacts to the effect that the Congress may not amend legislation relating to the government of a non-state area without the consent of the latter, or that federal legislation shall not apply to Guam unless consented to by the Government of Guam would unquestionably purport to surrender essential powers of the federal government.  They are

---

[7] Cases arising under the Contract Clause holding that a State cannot contract away a sovereign power are also applicable to the contracts made by the federal government because the Contract Clause imposes more rigorous restrictions on the States than the Fifth Amendment imposes on the federal government.  *Pension Benefit Guaranty Corp. v. R.A. Gray Co.*, 467 U.S. 717, 733 (1984); *National Railroad Passenger Corp. v. A.T. & S.F. Ry..*, 470 U.S. 451, 472-73 n.25 (1985).  Hence, when state legislation does not violate the Contract Clause, analogous federal legislation is all the more permissible under the Due Process Clause of the Fifth Amendment.

[8] Cited with approval with respect to federal legislation in *Norman v. B. & O.R.*, 294 U.S. 240, 308 (1935).

– 8 –

**0261**

*Mutual Consent Provisions in the Guam Commonwealth Legislation*

therefore not binding on the United States and cannot confer a property interest protected by the Fifth Amendment.[9]

More generally, the Supreme Court held in *Bowen v. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41 (1986), that the contractual property rights protected by the Due Process Clause of the Fifth Amendment are the traditional private contractual rights, such as those arising from bonds or insurance contracts, but not arrangements that are part of a regulatory program such as a State's privilege to withdraw its participation in the Social Security system with respect to its employees. Specifically, the Court stated:

> But the "contractual right" at issue in this case bears little, if any, resemblance to rights held to constitute "property" within the meaning of the Fifth Amendment. The termination provision in the Agreement exactly tracked the language of the statute, conferring no right on the State beyond that contained in § 418 itself. The provision constituted neither a debt of the United States, *see Perry v. United States*, *supra*, nor an obligation of the United States to provide benefits under a contract for which the obligee paid a monetary premium, *see Lynch v. United States*, *supra*. The termination clause was not unique to this Agreement; nor was it a term over which the State had any bargaining power or for which the State provided independent consideration. Rather, the provision simply was part of a regulatory program over which Congress retained authority to amend in the exercise of its power to provide for the general welfare.

*Id.* At 55. Agreements that the Guam Commonwealth Act may not be amended without the consent of the Government of Guam, or that future federal statutes and regulations shall not apply to Guam without the consent of the Government of Guam clearly do not constitute conventional private contracts; they are elements of a regulatory system.

In the past the Department of Justice at times has concluded that a non-State area may have a vested interest in a specific status which would be immune from unilateral Congressional amendment or repeal.[10]  We cannot continue to adhere to that position in view of the rulings of the Supreme Court that legislation concerning the governance of a non-state area is necessarily subject to Congressional amendment and repeal; that governmental bodies are not persons within the meaning of the Due Process Clause; that governmental powers cannot be contracted away, and especially the exposition in the recent *Bowen* case that the property rights protected by the

---

[9] Cases such as *Lynch v. United States*, 292 U.S. 571 (1934), and *Perry v. United States*, 294 U.S. 330 (1935), are not contrary to this conclusion. Both cases involved commercial agreements (*Lynch*: insurance; *Perry*: Government bonds)  In *Lynch* the Court held that Congress could not amend the contract merely to save money "unless, indeed the action falls within the federal police police power or some other paramount power."  292 U.S. at 579.  *Perry* involved bonds issued by the United States under the authority of Art. I, Sec. 8, Cl. 2 of the Constitution, to borrow money on the credit of the United States.  The Court held that Congress did not have the power to destroy the credit of the United States or to render it illusory by unilaterally abrogating one of the pivotal terms of the bonds to save money.  While the Court held that the United States had broken the agreement, it nevertheless held that plaintiff could not recover because, as the result of regulations validly issued by the United States, he had not suffered any monetary damages.

[10] *Cf.* n.2.

– 9 –

**0262**

*Opinions of the Office of Legal Counsel*

Due Process Clause are those arising from private law or commercial contracts and not those arising from governmental relations.[11]

Sections 103 and 202 therefore do not create vested property rights protected by the Due Process Clause of the Fifth Amendment.[12]  Congress thus retains the power to amend the Guam Commonwealth Act unilaterally or to provide that its legislation shall apply to Guam without the consent of the government of the Commonwealth.  The inclusion of such provisions, therefore, in the Commonwealth Act would be misleading.  Honesty and fair dealing forbid the inclusion of such illusory and deceptive provisions in the Guam Commonwealth Act.[13]

Finally, the Department of Justice has indicated that it would honor past commitments with respect to the mutual consent issue, such as Section 105 of the Covenant with the Northern Mariana Islands, in spite of its reevaluation of this problem.  The question whether the 1989 Task Force proposal to amend Section 103 of the Guam Commonwealth Act so as to limit the mutual consent requirement to Sections 101, 103, 201, and 301 constitutes such prior commitment appears to have been rendered moot by the rejection of that proposal by the Guam Commission.


TERESA WYNN ROSEBOROUGH
Deputy Assistant Attorney General
Office of Legal Counsel

---

[11] It is significant that the circumstances in which Congress can effectively agree not to repeal or amend legislation were discussed in the context of *commercial* contracts.  *Bowen*, 477 U.S. at 52.

[12] *Bowen*, it is true, dealt with legislation that expressly reserved the right of Congress to amend, while the proposed Guam Commonwealth Act would expressly preclude the right of Congress to amend without the consent of the Government of Guam.  The underlying agreements, however, are not of a private contractual nature, and, hence, are not property within the meaning of the Due Process Clause.  We cannot perceive how they can be converted into "property" by the addition of a provision that Congress foregoes the right of amendment.

[13] The conclusion that Section 202 of the Guam Commonwealth Act (inapplicability of future federal legislation to Guam without the consent of Guam) would not bind a future Congress obviates the need to examine the constitutionality of Section 202.  In *Currin v. Wallace*, 306 U.S. 1, 15-16 (1939), and *United States v. Rock Royal Co-op.* 307 U.S. 533, 577-78 (1939), the Court upheld legislation that made the effectiveness of regulations dependent on the approval of tobacco farmers or milk producers affected by them.  The Court held that this approval was a legitimate condition for making the legislation applicable.  Similarly, it could be argued that the approval of federal legislation by the Government of Guam is a legitimate condition for making that legislation applicable to Guam.  Since, as stated above, a future Congress would not be bound by Section 202, we need not decide the question whether the requirement of approval by the Government of Guam for *every* future federal statute and regulation is excessive and inconsistent with the federal sovereignty over Guam.

# APPENDIX G

STATEMENT OF C. KEVIN MARSHALL
DEPUTY ASSISTANT ATTORNEY GENERAL
OFFICE OF LEGAL COUNSEL
U.S. DEPARTMENT OF JUSTICE

BEFORE THE COMMITTEE ON RESOURCES,
UNITED STATES HOUSE OF REPRESENTATIVES

HEARING ON THE REPORT BY THE PRESIDENT'S TASK FORCE
ON PUERTO RICO'S STATUS
APRIL 27, 2006

Thank you, Mr. Chairman and Ranking Member Rahall, for inviting me to discuss the work and report of the President's Task Force on Puerto Rico's Status.  President Clinton established the Task Force in December 2000, and President Bush has continued it through amendments of President Clinton's Executive Order.  The Task Force consists of designees of each member of the President's Cabinet, and the Deputy Assistant to the President and Director for Intergovernmental Affairs, Ruben Barrales.  I am a Deputy Assistant Attorney General in the Justice Department's Office of Legal Counsel.  As the Attorney General's designee on the Task Force, I serve as its Co-Chair, along with Mr. Barrales.

The status of Puerto Rico, and the options regarding that status, have been issues for many years.  In 1992, for example, President George H.W. Bush issued a Memorandum that recognized Puerto Rico's popularly approved Commonwealth structure as "provid[ing] for self-government in respect of internal affairs and administration," described Puerto Rico as "a territory," and directed the Executive Branch to treat Puerto Rico as much as legally possible "as if it were a State."  He also called for periodically ascertaining "the will of its people regarding their political status" through referenda.

President Clinton, in his order establishing the Task Force, made it the policy of the Executive Branch "to help answer the questions that the people of Puerto Rico have asked for years regarding the options for the islands' future status and the process of realizing an option."  He charged the Task Force with seeking to implement that policy.  We are required to "consider and develop positions on proposals, without preference among the options, for the Commonwealth's future status."  Our recommendations are limited, however, to options "that are not incompatible with the Constitution and basic laws and policies of the United States."

On the same day that he issued his Executive Order, President Clinton also issued a Memorandum for the Heads of Executive Departments and Agencies regarding the Resolution of Puerto Rico's status.  That memorandum added that "Puerto Rico's ultimate status has not been determined" and noted that the three major political parties in Puerto Rico were each "based on different visions" for that status.  Although Puerto Rico held a plebiscite in 1998, none of the proposed status options received a majority.  Indeed, "None of the Above" prevailed, because of objection to the ballot definition of the commonwealth option.

Some in Puerto Rico have proposed a "New Commonwealth" status, under which Puerto

Rico would become an autonomous, non-territorial, non-State entity in permanent union with the United States under a covenant that could not be altered without the "mutual consent" of Puerto Rico and the federal Government. In October 2000, a few months before President Clinton established the Task Force, this Committee held a hearing on a bill (H.R. 4751) incorporating a version of the "New Commonwealth" proposal. William Treanor, who held the same position in the Office of Legal Counsel that I now hold, testified that this proposal was not constitutional.

Thus, the Task Force's duties were to determine the constitutionally permissible options for Puerto Rico's status and to provide recommendations for a process for realizing an option. We had no duty or authority to take sides among the permissible options.

The Task Force considered all status options objectively, without prejudice. We also attempted to develop a process for realizing one of the options. We sought input from all interested parties. The members met with anyone who requested a meeting. I myself had several meetings with representatives of various positions, and also received and benefited from extensive written materials.

The Task Force issued its report last December and concluded that there were three general options under the Constitution for Puerto Rico's status: (1) continue its current status as a largely self-governing territory of the United States; (2) admit Puerto Rico as a State, on an equal footing with the existing 50 States; or (3) make Puerto Rico independent of the United States.

As indicated in my discussion of the 1998 plebiscite and the origins of the Task Force, the primary question regarding options was whether the Constitution currently allows a "Commonwealth" status that could be altered only by "mutual consent," such that Puerto Rico could block Congress from altering its status. Since 1991, the Justice Department has, under administrations of both parties, consistently taken the position that the Constitution does not allow such an arrangement. The Task Force report reiterates that position, noting that the Justice Department conducted a thorough review of the question in connection with the work of the Task Force. The report is of course not a legal brief. But it does outline the reasoning, and it includes as appendices two extended analyses by the Clinton Justice Department. The second of these, a January 2001 letter to the Senate Committee on Energy and Natural Resources, also was sent to this Committee on the same date. The report also cites additional materials such as Mr. Treanor's testimony and the 1991 testimony of the Attorney General.

The effect of this legal conclusion is that the "New Commonwealth" option, as we understand it, is not consistent with the Constitution. Any promises that the United States might make regarding Puerto Rico's status as a commonwealth would not be binding. Puerto Rico would remain subject to Congress's authority under the Constitution "to dispose of and make all needful Rules and Regulations respecting the Territory . . . belonging to the United States." Puerto Rico receives a number of benefits from this status, such as favorable tax treatment. And Puerto Rico may remain in its current Commonwealth, or territorial, status indefinitely, but always subject to Congress's ultimate authority to alter the terms of that status, as the

2

Constitution provides that Congress may do with any U.S. territory.

The other two options, which are explained in the report, merit only brief mention here. If Puerto Rico were admitted as a State, it would be fully subject to the U.S. Constitution, including the Tax Uniformity Clause.  Puerto Rico's favorable tax treatment would generally no longer be allowed.  Puerto Rico also would be entitled to vote for presidential electors, Senators, and full voting Members of Congress.  Puerto Rico's population would determine the size of its congressional delegation.

As for the third option of independence, there are several possible ways of structuring it, so long as it is made clear that Puerto Rico is no longer under United States sovereignty.  When the United States made the Philippines independent in 1946, the two nations entered into a Treaty of General Relations.  Congress might also provide for a closer relationship along the lines of the "freely associated states" of Micronesia, the Marshall Islands, and Palau.

With regard to process, the Task Force focused on ascertaining the will of the people of Puerto Rico.  In particular, we sought to ascertain that will in a way that, as the report puts it, "provides clear guidance for future action by Congress."  The keys to providing *clear* guidance are, first, to speak unambiguously about the options the Constitution allows and, second, to structure the process so that popular majorities are likely.  The inconclusive results of the 1998 plebiscite, as well as an earlier one in 1993, did not strike us as providing much guidance to Congress.

We therefore have recommended a two-step process.  The first step is simply to determine whether the people of Puerto Rico wish to remain as they are.  We recommend that Congress provide for a federally sanctioned plebiscite in which the choice will be whether to continue territorial status.  If the vote is to remain as a territory, then the second step, one suggested by the first President Bush's 1992 memorandum, would be to have periodic plebiscites to inform Congress of any change in the will of the people.  If the first vote is to change Puerto Rico's status, then the second step would be for Congress to provide for another plebiscite in which the people would choose between statehood and independence, and then to begin a transition toward the selected option.  Ultimate authority of course remains with Congress.

Two points about this recommended process merit brief explanation.  First, consistent with our presidential mandate, it does not seek to prejudice the outcome, even though it is structured to produce a clear outcome.  At least once before, Puerto Ricans have voted by a majority to retain their current Commonwealth status.  They may do so again.  But it is critical to be clear about that status.  Second, our recommended process does not preclude action by Puerto Rico itself to express its views to Congress.  At the first step, we recommend that Congress provide for the plebiscite "to occur on a date certain."  We did not, of course, specify that date.  But if Congress wished to ensure that some action occurred but not preclude the people of Puerto Rico from taking the initiative, it could allow a sufficient period for local action before that "date certain."  If such action occurred and produced a clear result, there might be no need to proceed with the federal plebiscite.

**0267**

The Task Force knows well the importance of the status question to the loyal citizens of Puerto Rico and to the nation as a whole.  We appreciate the Committee's commitment to this matter and the opportunity to share our views.

4

STATEMENT OF C. KEVIN MARSHALL
DEPUTY ASSISTANT ATTORNEY GENERAL
OFFICE OF LEGAL COUNSEL
U.S. DEPARTMENT OF JUSTICE

BEFORE THE COMMITTEE ON ENERGY AND NATURAL RESOURCES
UNITED STATES SENATE

HEARING ON THE REPORT BY THE PRESIDENT'S TASK FORCE
ON PUERTO RICO'S STATUS
NOVEMBER 15, 2006

Thank you, Mr. Chairman and Ranking Member Bingaman, for inviting me to discuss the work and report of the President's Task Force on Puerto Rico's Status. President Clinton established the Task Force in December 2000, and President Bush has continued it through amendments of President Clinton's Executive Order. The Task Force consists of designees of each member of the President's Cabinet, and the Deputy Assistant to the President and Director for Intergovernmental Affairs, Ruben Barrales. I am a Deputy Assistant Attorney General in the Justice Department's Office of Legal Counsel. As the Attorney General's designee on the Task Force, I serve as its Co-Chair, along with Mr. Barrales.

The status of Puerto Rico, and the options regarding that status, have been issues for many years. In 1992, for example, President George H.W. Bush issued a Memorandum that recognized Puerto Rico's popularly approved Commonwealth structure as "provid[ing] for self-government in respect of internal affairs and administration," described Puerto Rico as "a territory," and directed the Executive Branch to treat Puerto Rico as much as legally possible "as if it were a State." He also called for periodically ascertaining "the will of its people regarding their political status" through referenda.

President Clinton, in his order establishing the Task Force, made it the policy of the Executive Branch "to help answer the questions that the people of Puerto Rico have asked for years regarding the options for the islands' future status and the process of realizing an option." He charged the Task Force with seeking to implement that policy. We are required to "consider and develop positions on proposals, without preference among the options, for the Commonwealth's future status." Our recommendations are limited, however, to options "that are not incompatible with the Constitution and basic laws and policies of the United States."

On the same day that he issued his Executive Order, President Clinton also issued a Memorandum for the Heads of Executive Departments and Agencies regarding the Resolution of Puerto Rico's status. That memorandum added that "Puerto Rico's ultimate status has not been determined" and noted that the three major political parties in Puerto Rico were each "based on different visions" for that status. Although Puerto Rico held a plebiscite in 1998, none of the proposed status options received a majority. Indeed, "None of the Above" prevailed, because of objection to the ballot definition of the commonwealth option.

Some in Puerto Rico have proposed a "New Commonwealth" status, under which Puerto

**0269**

Rico would become an autonomous, non-territorial, non-State entity in permanent union with the United States under a covenant that could not be altered without the "mutual consent" of Puerto Rico and the federal Government.  In October 2000, a few months before President Clinton established the Task Force, the House Committee on Resources held a hearing on a bill (H.R. 4751) incorporating a version of the "New Commonwealth" proposal.  William Treanor, who held the same position in the Office of Legal Counsel that I now hold, testified that this proposal was not constitutional.

Thus, the Task Force's duties were to determine the constitutionally permissible options for Puerto Rico's status and to provide recommendations for a process for realizing an option. We had no duty or authority to take sides among the permissible options.

The Task Force considered all status options, including the current status and the New Commonwealth option, objectively and without prejudice.  We also attempted to develop a process for Congress to ascertain which of the constitutional options the people of Puerto Rico prefer.  We sought input from all interested parties, including Governor Acevedo-Vilá.  The members met with anyone who requested a meeting.  I myself had several meetings with representatives of various positions, and also received and benefited from extensive written materials.

The Task Force issued its report last December and concluded that there were three general options under the Constitution for Puerto Rico's status:  (1) continue Puerto Rico's current status as a largely self-governing territory of the United States; (2) admit Puerto Rico as a State, on an equal footing with the existing 50 States; or (3) make Puerto Rico independent of the United States.

As indicated in my discussion of the 1998 plebiscite and the origins of the Task Force, the primary question regarding options was whether the Constitution currently allows a "Commonwealth" status that could be altered only by "mutual consent," such that Puerto Rico could block Congress from altering its status.  Since 1991, the Justice Department has, under administrations of both parties, consistently taken the position that the Constitution does not allow such an arrangement.  The Task Force report reiterates that position, noting that the Justice Department conducted a thorough review of the question in connection with the work of the Task Force.  The report is of course not a legal brief.  But it does outline the reasoning, and it includes as appendices two extended analyses by the Clinton Justice Department.  The second of these is a January 2001 letter to this Committee, a copy of which was sent to the House Committee on Resources on the same date.  The report also cites additional materials such as Mr. Treanor's testimony and the 1991 testimony of the Attorney General.

The effect of this legal conclusion is that the "New Commonwealth" option, as we understand it, is not consistent with the Constitution.  Any promises that the United States might make regarding Puerto Rico's status as a commonwealth would not be binding.  Puerto Rico would remain subject to Congress's authority under the Territory Clause of the Constitution "to dispose of and make all needful Rules and Regulations respecting the Territory . . . belonging to

2

the United States." Puerto Rico receives a number of benefits from this status, such as favorable tax treatment. And Puerto Rico may remain in its current Commonwealth, or territorial, status indefinitely, but always subject to Congress's ultimate authority to alter the terms of that status, as the Constitution provides that Congress may do with any U.S. territory.

The other two options, which are explained in the report, merit only brief mention here. If Puerto Rico were admitted as a State, it would be fully subject to the U.S. Constitution, including the Tax Uniformity Clause. Puerto Rico's favorable tax treatment would generally no longer be allowed. Puerto Rico also would be entitled to vote for presidential electors, Senators, and full voting Members of Congress. Puerto Rico's population would determine the size of its congressional delegation.

As for the third option of independence, there are several possible ways of structuring it, so long as it is made clear that Puerto Rico is no longer under United States sovereignty. When the United States made the Philippines independent in 1946, the two nations entered into a Treaty of General Relations. Congress might also provide for a closer relationship along the lines of the "freely associated states" of Micronesia, the Marshall Islands, and Palau. The report explains, with a few qualifications, that, "[a]mong the constitutionally available options, freely associated status may come closest to providing for the relationship between Puerto Rico and the United States that advocates for 'New Commonwealth' status appear to desire."

With regard to process, the Task Force focused on ascertaining the will of the people of Puerto Rico. In particular, we sought to ascertain that will in a way that, as the report puts it, "provides clear guidance for future action by Congress." The keys to providing *clear* guidance are, first, to speak unambiguously about the options the Constitution allows and, second, to structure the process so that popular majorities are likely. The inconclusive results of the 1998 plebiscite, as well as an earlier one in 1993, did not strike us as providing clear guidance to Congress.

We therefore have recommended a two-step process. The first step is simply to determine whether the people of Puerto Rico wish to remain as they are. We recommend that Congress provide for a federally sanctioned plebiscite in which the choice will be whether to continue territorial status. If the vote is to remain as a territory, then the second step, one suggested by the first President Bush's 1992 memorandum, would be to have periodic plebiscites to inform Congress of any change in the will of the people. If the first vote is to change Puerto Rico's status, then the second step would be for Congress to provide for another plebiscite in which the people would choose between statehood and independence, and then to begin a transition toward the selected option. Ultimate authority of course remains with Congress.

Two points about this recommended process merit brief explanation. First, consistent with our presidential mandate, it does not seek to prejudice the outcome; it is structured to produce a clear outcome. At least once before, Puerto Ricans have voted by a majority to retain their current Commonwealth status. They may do so again. But it is critical to be clear about that status. Second, our recommended process does not preclude action by Puerto Rico itself to

3

express its views to Congress. At the first step, we recommend that Congress provide for the plebiscite "to occur on a date certain." We did not, of course, specify that date. But if Congress wished to ensure that some action occurred but not preclude the people of Puerto Rico from taking the initiative, it could allow a sufficient period for local action before that "date certain." If such action occurred and produced a clear result, there might be no need to proceed with the federal plebiscite.

The Task Force knows well the importance of the status question to the loyal citizens of Puerto Rico and to the nation as a whole. We appreciate the Committee's commitment to this matter and the opportunity to share our views.

4

**STATEMENT OF C. KEVIN MARSHALL**
**DEPUTY ASSISTANT ATTORNEY GENERAL**
**OFFICE OF LEGAL COUNSEL**
**U.S. DEPARTMENT OF JUSTICE**

**BEFORE THE SUBCOMMITTEE ON INSULAR AFFAIRS**
**OF THE COMMITTEE ON NATURAL RESOURCES**
**UNITED STATES HOUSE OF REPRESENTATIVES**

**HEARING ON H.R. 900, THE "PUERTO RICO DEMOCRACY ACT OF 2007," AND**
**H.R. 1230, THE "PUERTO RICO SELF DETERMINATION ACT OF 2007 "**
**APRIL 25, 2007**

Thank you, Madame Chairman and Ranking Member Fortuno, for inviting the Administration to discuss pending legislation concerning the future political status of Puerto Rico.  The work and report of the President's Task Force on Puerto Rico's Status have contributed to renewed attention to this question in the last few years, including a hearing in April 2006 before the full Committee, in which I participated.  President Clinton established the Task Force in December 2000, and President Bush has continued it through amendments of President Clinton's Executive Order.  The Executive Order as amended provides for the Task Force to consist of designees of each member of the President's Cabinet, and the Deputy Assistant to the President and Director for Intergovernmental Affairs.  I am a Deputy Assistant Attorney General in the Justice Department's Office of Legal Counsel.  As the Attorney General's designee on the Task Force, I have served as its Co-Chair.  Today I appear because of that work but also as a representative of the Administration.

The status of Puerto Rico, and the options regarding that status, have been issues for many years.  In 1992, for example, President George H.W. Bush issued a Memorandum that recognized Puerto Rico's popularly approved Commonwealth structure as "provid[ing] for self-government in respect of internal affairs and administration," described Puerto Rico as "a territory," and directed the Executive Branch to treat Puerto Rico as much as legally possible "as if it were a State."  He also called for periodically ascertaining "the will of its people regarding their political status" through referenda.

President Clinton, in his order establishing the Task Force, made it the policy of the Executive Branch "to help answer the questions that the people of Puerto Rico have asked for years regarding the options for the islands' future status and the process of realizing an option." He charged the Task Force with seeking to implement that policy.  The Task Force was required to "consider and develop positions on proposals, without preference among the options, for the Commonwealth's future status."  Its recommendations are limited, however, to options "that are not incompatible with the Constitution and basic laws and policies of the United States."

On the same day that he issued his Executive Order, President Clinton also issued a Memorandum for the Heads of Executive Departments and Agencies regarding the Resolution of

**0273**

Puerto Rico's status.  That memorandum added that "Puerto Rico's ultimate status has not been determined" and noted that the three major political parties in Puerto Rico were each "based on different visions" for that status.  Although Puerto Rico held a plebiscite in 1998, none of the proposed status options received a majority.  Indeed, "None of the Above" prevailed, because of objection to the ballot definition of the commonwealth option.

Some in Puerto Rico have proposed a "New Commonwealth" status, under which Puerto Rico would become an autonomous, non-territorial, non-State entity in permanent union with the United States under a covenant that could not be altered without the "mutual consent" of Puerto Rico and the federal Government.  In October 2000, a few months before President Clinton established the Task Force, the House Committee on Resources held a hearing on a bill (H.R. 4751) incorporating a version of the "New Commonwealth" proposal.  William Treanor, who held the same position in the Office of Legal Counsel that I now hold, testified that this proposal was not constitutional.

Thus, the Task Force's duties were to determine the constitutionally permissible options for Puerto Rico's status and to provide recommendations for a process for realizing an option.  We had no duty or authority to take sides among the permissible options.

The Task Force considered all status options, including the current status and the New Commonwealth option, objectively and without prejudice.  It also attempted to develop a process for Congress to ascertain which of the constitutional options the people of Puerto Rico prefer.  It sought input from all interested parties, including Governor Acevedo-Vilá.  The members met with anyone who requested a meeting.  I myself had several meetings with representatives of various positions, and also received and benefited from extensive written materials.

The Task Force issued its report in December 2005 and concluded that there were three general options under the Constitution for Puerto Rico's status:  (1) continue Puerto Rico's current status as a largely self-governing territory of the United States; (2) admit Puerto Rico as a State, on an equal footing with the existing 50 States; or (3) make Puerto Rico independent of the United States.

As indicated in my discussion of the 1998 plebiscite and the origins of the Task Force, the primary question regarding options was whether the Constitution currently allows a "Commonwealth" status that could be altered only by "mutual consent," such that Puerto Rico could block Congress from altering its status.  Since 1991, the Justice Department has, under administrations of both parties, consistently taken the position that the Constitution does not allow such an arrangement.  The Task Force report reiterates that position, noting that the Justice Department conducted a thorough review of the question in connection with the work of the Task Force.  The report is of course not a legal brief.  But it does outline the reasoning, and it includes as appendices two extended analyses by the Clinton Justice Department.  The second of these is a

2

**0274**

January 2001 letter to the Senate Committee on Energy and Natural Resources, a copy of which was sent to the House Committee on Resources on the same date.  The report also cites additional materials such as Mr. Treanor's testimony and the 1991 testimony of the Attorney General.

The effect of this legal conclusion is that the "New Commonwealth" option, as the Task Force understood it, is not consistent with the Constitution.  Any promises that the United States might make regarding Puerto Rico's status as a commonwealth would not be binding.  Puerto Rico would remain subject to Congress's authority under the Territory Clause of the Constitution "to dispose of and make all needful Rules and Regulations respecting the Territory . . . belonging to the United States."  Puerto Rico receives a number of benefits from this status, such as favorable tax treatment.  And Puerto Rico may remain in its current Commonwealth, or territorial, status indefinitely, but always subject to Congress's ultimate authority to alter the terms of that status, as the Constitution provides that Congress may do with any U.S. territory.

The other two options, which are explained in the report, merit only brief mention here. If Puerto Rico were admitted as a State, it would be fully subject to the U.S. Constitution, including the Tax Uniformity Clause.  Puerto Rico's favorable tax treatment would generally no longer be allowed.  Puerto Rico also would be entitled to vote for presidential electors, Senators, and full voting Members of Congress.  Puerto Rico's population would determine the size of its congressional delegation.

As for the third option of independence, there are several possible ways of structuring it, so long as it is made clear that Puerto Rico is no longer under United States sovereignty.  When the United States made the Philippines independent in 1946, the two nations entered into a Treaty of General Relations.  Congress might also provide for a closer relationship along the lines of the "freely associated states" of Micronesia, the Marshall Islands, and Palau.  The report explains, with a few qualifications, that, "[a]mong the constitutionally available options, freely associated status may come closest to providing for the relationship between Puerto Rico and the United States that advocates for 'New Commonwealth' status appear to desire."

With regard to process, the Task Force focused on ascertaining the will of the people of Puerto Rico.  In particular, it sought to ascertain that will in a way that, as the report puts it, "provides clear guidance for future action by Congress."  The keys to providing *clear* guidance are, first, to speak unambiguously about the options the Constitution allows and, second, to structure the process so that popular majorities are likely.  The inconclusive results of the 1998 plebiscite, as well as an earlier one in 1993, did not strike the Task Force as providing much guidance to Congress.

The Task Force therefore recommended a two-step process.  The first step is simply to determine whether the people of Puerto Rico wish to remain as they are.  The Task Force recommended that Congress provide for a federally sanctioned plebiscite in which the choice

3

**0275**

will be whether to continue territorial status. If the vote is to remain as a territory, then the second step, one suggested by the first President Bush's 1992 memorandum, would be to have periodic plebiscites to inform Congress of any change in the will of the people. If the first vote is to change Puerto Rico's status, then the second step would be for Congress to provide for another plebiscite in which the people would choose between statehood and independence, and then to begin a transition toward the selected option. Ultimate authority of course remains with Congress.

Three points about this recommended process merit specific explanation in connection with the two bills the Subcommittee is considering. First, consistent with the presidential mandate to the Task Force, its recommended process does not seek to prejudice the outcome, even though it is structured to produce a clear outcome. At least once before, Puerto Ricans have voted by a majority to retain their current Commonwealth status. They may do so again. But it is critical to be clear about that status. H.R. 1230, in referring to "a new or modified Commonwealth status" as among the status options that are "not subject to the plenary powers of the territorial clause of the Constitution of the United States," does not further the necessary clarity.

Second, the Task Force's recommended process does not preclude action by Puerto Rico itself to express its views to Congress. At the first step, the report recommended that Congress provide for the plebiscite "to occur on a date certain." The Task Force did not, of course, specify that date. But if Congress wished to ensure that some action occurred but not preclude the people of Puerto Rico from taking the initiative, it could allow a sufficient period for local action before that "date certain." If such action occurred and produced a clear result, there might be no need to proceed with the federal plebiscite. H.R. 900 adopts a similar approach in leaving the Puerto Rico Elections Commission discretion to set the date of the first plebiscite but requiring that it occur by December 31, 2009.

Finally, I am authorized to state that the Administration supports the Task Force report. The report correctly identifies the limited options available under the U.S. Constitution for permanent status and sets out a process so Puerto Ricans are heard on the critical question of Puerto Rico's status. The Administration therefore also supports legislation consistent with the report and recognizes that H.R. 900 sets out a process closely resembling that which the report recommends. We will work with Congress to be sure that any process to solicit the views of the people of Puerto Rico is transparent, understandable, and fair.

The Administration knows well the importance of the status question to the loyal citizens of Puerto Rico and to the nation as a whole. We appreciate the Subcommittee's commitment to this matter and the opportunity to share our views.

4